Stacy Scheff
LAW OFFICE OF STACY SCHEFF
P.O. Box 40611, Tucson, AZ 85717-0611
(520) 471-8333  •  FAX (520) 300-8033
stacy.scheff@gmail.com
State Bar No. 028364
*Counsel for Plaintiff*

## DISTRICT COURT FOR THE UNITED STATES

## DISTRICT OF ARIZONA

Keith Raniere,

       Plaintiff,

v.

Merrick Garland, US Attorney General;
Colette Peters, Director Federal Bureau of
Prisons; Unknown Current Warden USP
Tucson, Anthony Gallion (all in their
official capacities),

       Defendants

Case No.:

**COMPLAINT**
**(Prospective relief only)**
**(Hearing requested)**

1. This is an action for narrow injunctive and declaratory relief for Plaintiff Keith

   Raniere, a prisoner in the U.S. Penitentiary in Tucson Arizona ("USP Tucson").

   Plaintiff seeks an order enjoining prison officials from retaliating for

   constitutionally protected activities, and from actively frustrating and impeding his

   First and Sixth Amendment rights to access to the courts and counsel.

   **JURISDICTION AND VENUE**

2. This Court has subject-matter jurisdiction under the First and Sixth Amendments

   to the United States Constitution, and 28 U.S.C. § 1331 (federal question

1

jurisdiction), as Plaintiff seeks to enjoin practices and malpractices that amount to violations of the First and Sixth Amendments to the U.S. Constitution.

3. This Court has jurisdiction under 28 U.S.C. § 2201 to declare the rights of the respective parties.

4. This Court has jurisdiction under 5 U.S.C. §702, 28 U.S.C. § 2202, and Rule 65 of the Federal Rules of Civil Procedure to grant preliminary injunctive relief for the constitutional violations alleged herein.

5. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to this action occurred in the District of Arizona.

## **PARTIES**

6. The Plaintiff Keith Raniere is and was at all relevant times, a federal inmate at USP Tucson.

7. Defendant Merrick Garland is the Attorney General of the United States and the head of the United States Department of Justice. BOP is an agency of the United States Department of Justice. As such, Defendant Garland has ultimate authority over BOP decisions, including policy decisions regarding USP Tucson, and the promulgation of BOP regulations. See 18 U.S.C. § 4042. Garland has affirmatively maintained the policy of allowing Wardens to retaliate against individual prisoners based on personal animus and not supported by any legitimate penological purpose. Defendant Garland's place of work is located in Washington, DC. Defendant Garland is sued in his official capacity.

2

**8.** Defendant Peters is Director of the BOP. Defendant Peters exercises authority over all BOP determinations. Defendant Peters has affirmatively carried out the policy of allowing Wardens to retaliate against individual prisoners based on personal animus and not supported by any legitimate penological purpose. See 18 U.S.C. §§ 4041, 4042. Defendant Peters' place of work is located in Washington, DC. Defendant Peters is sued in her official capacity.

**9.** Defendant Unknown Warden ("USP Tucson Warden") is and was the Warden of USP Tucson at all relevant times.[1]  Defendant USP Tucson Warden made the affirmative decision to interfere with Plaintiff's First and Sixth Amendment rights by endorsing the actions of previous wardens who violated Plaintiff's First and Sixth Amendments to the U.S. Constitution.   Defendant USP Tucson Warden also endorsed and/or caused a pattern of retaliating against Plaintiff for exercising his First and Sixth Amendment rights Defendant USP Tucson Warden is sued in their official capacity.

**10.** Defendant Anthony Gallion was a Lieutenant at USP Tucson.  Defendant Gallion made the affirmative decision to "scrub" Plaintiff's approved callers and visitors list, to include attorneys and their agents.  Gallion is sued in his official capacity.

---

[1]Information about the name of the person currently holding the position of Warden at USP Tucson is not currently available.  As soon as the information is available, the name will be used.  F.R.Civ.P. 25(d) provides for substitution when an official capacity party leaves office.

11. Plaintiff has exhausted or has been prevented by BOP staff from exhausting his administrative remedies related to the allegations of First Amendment retaliation and Sixth Amendment interference with counsel.

### FACTS

12. Plaintiff is incarcerated at USP Tucson, serving a sentence of 120 years for, among other things, purportedly taking twenty-two photographs in 2005 that the prosecution claimed were child pornography.  *U.S. v. Raniere*, US District Court, Eastern District of New York, 1:18-CR-00204-NGG-VMS.

13. Mr. Raniere is adamant that he is innocent of all charges, and that they were based on falsified evidence. Six forensics experts have concluded that the photographic evidence was extensively staged, including manipulation of folder names and photo dates and the planting of photos on a hard drive. The experts are Former FBI Special Agent Dr. James Richard Kiper, Former FBI Senior Forensic Examiner Stacy Eldridge, Former FBI Forensic Examiner William Odom, Steve Abrams, Stephen Bunting, Wayne Norris, and Professor Alan Dershowitz. In an October press conference regarding these allegations, Professor Alan Dershowitz stated,

> If this alleged FBI malfeasance turns out to be true, as our experts say it is, then this is really historic. This is really an attempt to frame somebody based on manipulation of data. That's just unacceptable in an American court and in the American legal system.

14. The criminal case has been the subject of significant mainstream and social media attention, in part due to the many high-profile individuals who were involved in his self-help organization NXIVM, including Edgar Bronfman, Sr. (former CEO

4

of the Seagram's Company) and his two daughters Clare and Sara, several well-known Hollywood actresses including Nicole Clyne and Allison Mack, and prominent families and individuals in Mexican politics.

15. Among the "Special Conditions of Supervision" upon his supervised release, Mr. Raniere is prevented from associating "with any individual with an affiliation to Executive Success Programs, NXIVM, DOS, or any other NXIVM affiliated organizations…".

16. The Conditions of Supervision do not take effect until Mr. Raniere is released from custody upon the termination of his sentence.

17. NXIVM was a corporation founded by Plaintiff that offered personal development courses, also known as "coaching" to nearly 17,000 people in the time it existed.

18. The level of involvement with NXIVM among these individuals varied from brief interactions with members, to taking a class, all the way to being business partners with Plaintiff.

19. The Conditions of Supervision do not distinguish between these distinctly different levels of "affiliation" to NXIVM.

### Suneel Chakravorty – Plaintiff's Power-of-Attorney Banned

20. Mr. Chakravorty first met Mr. Raniere in approximately June of 2017, when he enrolled in a coaching program to be coached by NXIVM teachers.

21. Mr. Chakravorty attended the entirety of Mr. Raniere's criminal trial in the Eastern District of New York.

22. Mr. Chakravorty is not a witness, co-conspirator, or co-defendant in the case.

23. Mr. Chakravorty got to know Mr. Raniere more personally after the criminal trial, which ended in his conviction in June of 2019.

24. After the trial concluded, Mr. Raniere was housed at the Metropolitan Detention Center in Brooklyn NY ("MDC").

25. In September of 2019, Mr. Raniere wrote to his partner, and mother of his child, Marianna via the monitored email system for federal prisoners, "TRULINCS". (Doc. 14-4, pp. 3-4).

26. In the email, Mr. Raniere asserted his innocence, and expressed his sincere belief that the wealthy and powerful people who had been members of NXIVM, but later disliked him, had used their influence to have him prosecuted, convicted, and imprisoned.  (Doc. 14-4, pp. 3-4).

27. In the email, Mr. Raniere expressed a need for an advocate to help him expose the injustices of his conviction. (Doc. 14-4, pp. 3-4).

28. Mr. Chakravorty turned out to be such an advocate.

29. From September of 2019 to February 2020, Mr. Chakravorty visited Mr. Raniere every week that visitation was available at the MDC.

30. Mr. Raniere and Mr. Chakravorty shared their observations about Plaintiff's criminal case.

31. Mr. Raniere and Mr. Chakravorty discussed potential theories regarding those convictions.

**32.** From September of 2019 until January of 2020, Mr. Chakravorty was approved, and visited Plaintiff when Plaintiff was housed at Metropolitan Detention Center ("MDC") in New York.

**33.** Between the jury's verdict and the court's sentence, Mr. Raniere continued to regularly contact people affiliated with NXIVM, including Suneel Chakravorty, and the government informed the judge of that fact in its sentencing memorandum. *United States v. Raniere*, Case No. 1:18-CR-00204-NGG-VMS, Dkt. 914 (E.D. N.Y. August 27, 2020). (Doc. 14, p.2)

**34.** On these calls, which were recorded, transcribed, and included in the criminal Sentencing Memorandum, Mr. Raniere expressed his sincerely held belief that his conviction and sentence were not supported by the evidence, and that corruption was involved.  [Dkt. 914-3 at 44.] (Doc. 14, p.2).

**35.** On March 12, 2020, Mr. Chakravorty was on a call with Mr. Raniere. Chakravorty recorded Mr. Raniere speaking for a podcast.

**36.** On April 6, 2020, Mr. Chakravorty had a call with Mr. Raniere where they discussed a competition which encouraged the public to review Mr. Raniere's conviction and see if they could find evidence of corruption in order to win money prizes. (Doc. 14-4, p. 3).

**37.** On April 8, 2020, Mr. Chakravorty had a call with Mr. Raniere where they discussed having an important pundit like Alan Dershowitz speak out against the conviction. (Doc. 14-4, p.54)

**38.** Neither Mr. Raniere nor Mr. Chakravorty was ever charged with any crime for the contents of these calls.

**39.** When visitation was suspended due to COVID-19, Mr. Chakravorty continued to be allowed to have phone calls with Plaintiff at MDC.

**40.** On July 16, 2020, an Intelligence Analysis in the Bureau's Counter Terrorism Unit (CTU) drafted a memorandum seeking to block all contact between Raniere and Suneel Chakravorty due to behavior that allegedly compromised the security of the facility in which Plaintiff was then held, the Metropolitan Detention Center in Brooklyn, New York (MDC Brooklyn).

**41.** On information and belief, this was done in retaliation for Mr. Raniere's expression of his disdain for how his case was handled within the justice system, and his allegation of government corruption in his case, which is protected by the First Amendment.

**42.** The reasons cited for claiming that Mr. Chakravorty was a threat to security were all protected, First Amendment activities: "Specifically, Raniere and Suneel Chakravorty were recording prison-initiated telephone calls to use for podcasts and "interviews [Raniere] is pursuing to use in HBO, Netflix and Showtime." Additionally, they were endangering the security of the facility and the public by organizing "a group of women to show up regularly and dance provocatively by inmates to view through their cell windows." Raniere "directed Suneel [Chakravorty] to contact more women" to "danc[e] erotically" which led to a request for Plaintiff to be moved to another housing unit. Plaintiff also informed

8

Suneel Chakravorty about "the staff work schedules and indicated his protesters should wait outside for the staff and offer donuts and coffee as they exit the facility" because "we are all in this together."" Doc. 14-5, p.3. (internal citations omitted).

43. On August 27, 2020, Mr. Raniere was sentenced to 120 years in federal prison. [Dkt. 914] (Doc. 14-3, p.2)

44. In January of 2021, Mr. Raniere was transferred to USP Tucson.

45. Prior to his sentencing in October 2020, Mr. Raniere asked Mr. Chakravorty if he would agree to be Power of Attorney for all public relations, legal, personal, and financial matters in the event that Mr. Raniere went to prison for a long period of time.

46. In January of 2021, Mr. Chakravorty signed a contract to act as Power of Attorney for Mr. Raniere.

47. As Power of Attorney, Mr. Chakravorty stands in Plaintiff's shoes in public relations, personal, financial, and legal matters, and can make decisions as though he were Mr. Raniere. *See generally,* Uniform Power-of-Attorney Act.[2]

48. Mr. Chakravorty takes this responsibility very seriously, and always makes sure that the decisions he makes are the decisions that Mr. Raniere wants to be made.

49. It is impossible for Mr. Chakravorty to carry out his duties as Power of Attorney effectively without regularly communicating with Mr. Raniere.

---

[2] https://www.uniformlaws.org/committees/community-home?CommunityKey=b1975254-8370-4a7c-947f-e5af0d6cb07c Accessed 12/16/2022

9

**50.** On Mr. Raniere's behalf, Mr. Chakravorty hired experts (first wave) to investigate digital evidence used to secure the conviction.

**51.** The first-wave experts provided Mr. Chakravorty with information called "metadata" about the files in a spreadsheet format, such as the file names, dates, and times.  This metadata did not contain visual content of any photographs.

**52.** Using his background as a graduate from Harvard College trained in math and data analysis, Mr. Chakravorty performed a preliminary analysis of the metadata used to convict Plaintiff of the child pornography-related charges.

**53.** In Mr. Chakravorty's capacity as his Power of Attorney, Mr. Raniere and Mr. Chakravorty spoke about this information and analysis for months.

**54.** As Power of Attorney, Mr. Chakravorty found three additional qualified experts (second-wave), on Mr. Raniere's behalf, to analyze the information and to rigorously and skeptically examine the preliminary information and findings.

**55.** The second-wave experts concluded that the anomalies that had been uncovered could only be explained by deliberate manipulation and forgery.

**56.** The preliminary reports generated by the experts' conclusions during these processes were presented to Mr. Raniere's legal team, including attorney Joseph Tully.

**57.** The second-wave expert reports convinced attorney Tully to draft and file a Rule 33 motion to reopen his criminal case.

**58.** Mr. Chakravorty's role in orchestrating the analysis of this information has given him personal, intimate knowledge of the technical and esoteric facts vital to Mr. Raniere's challenge to his convictions.

**59.** Mr. Chakravorty's subject matter expertise of data analysis allowed him to translate between these two worlds: one is the highly technical world of forensic data analysts and the other is the world of Plaintiff's legal team.

**60.** Mr. Chakravorty's personal knowledge of the facts of this case allows him to translate concepts, and facilitate streamlined communications between Mr. Raniere, the experts, and the legal team.

**61.** Since the advent of the expert opinions, Mr. Chakravorty's role has evolved into both paralegal for, and manager of the legal team, working to overturn the conviction of his criminal case, based on what Mr. Chakravorty, Mr. Raniere, members of his legal team, and renowned experts believe to have been extensive government corruption in his case.  Attorney Joseph Tully has confirmed this position in writing to the BOP.

**62.** As paralegal and legal manager, Mr. Chakravorty will be helping the attorneys and experts during the post-conviction proceedings.

**63.** Additionally, Mr. Chakravorty is involved in other matters pertaining to Plaintiff's financial and legal matters.

**64.** The estate of Mr. Raniere's deceased partner, Pamela Caftriz, is currently in probate.

**65.** Mr. Chakravorty acts on Plaintiff's behalf, as Power of Attorney, to represent his interests in that matter.

**66.** Mr. Chakravorty also communicates with the mother of Mr. Raniere's son in matters regarding their son and Plaintiff's interest in Mexico.

**67.** Defendant USP Tucson Warden does not recognize Plaintiff's Mexican attorney Jorge de la Garza as an attorney for the purposes of legal calls and/or visits, therefore Mr. Chakravorty is currently the only person who can represent Plaintiff's interests in Mexico.

**68.** Despite being blocked from speaking with Mr. Chakravorty at MDC, Plaintiff was allowed to call and visit with Mr. Chakravorty at USP Tucson initially.

**69.** On May 2, 2021, during visitation with Plaintiff, Mr. Chakravorty had his visit abruptly terminated and his visitation privileges permanently revoked by the Warden of USP Tucson.

**70.** Nicole Clyne was also present at the visit, but was not removed from the visit when Chakravorty was.

**71.** Officer Stengl explained to Chakravorty that the reason for the visitation privileges being revoked was the lack of an established relationship with Plaintiff.

**72.** Stengl accused Chakravorty of lying about the length of his relationship with Mr. Raniere on his application for visitation.

**73.** Chakravorty appealed this decision to the Warden.   Chakravorty explained that, in his application he stated that he had known Mr. Raniere for over three years.  In terminating the visitation, the unit manager referred to a blog post where

12

Chakravorty stated that he met Mr. Raniere after the trial.  The unit manager assumed that Chakravorty was lying about the length of his relationship with Mr. Raniere.   Mr. Chakravorty explained that the misunderstanding was due to the different phases of the friendship between the two men, and the different meanings of the word "met":  Chakravorty had participated in coaching classes presented by NXIVM, where he met Plaintiff in Plaintiff's capacity as founder of NXIVM; Chakravorty then attended the trial; after the trial, they developed a closer relationship.

**74.** An unidentified individual responded to Mr. Chakravorty's appeal:

> According to records, an article you authored was published on December 28, 2020, titled "A Different View of USA v. Keith Raniere".  In this article you specifically state, "The first time I met Keith was after his trial, in his prison setting." On your Visitor Information form under question 9, "Did you know the person prior to his current incarceration?", you checked "yes".  Additionally, under the question 10, "Indicate the length of time you have known this person and where the relationship developed", you wrote, "3 years, Albany and Brooklyn, NY"  This information on your Visitation Form, dated February 15, 2021, contradicts the information you posted/published regarding your relationship with inmate Raniere.

> According to Bureau of Prison Program Statement 5267.09, Visiting Regulations, dated September 8, 2020, "Visiting privileges shall be extended to friends and associates having an established relationship **prior to confinement**." Additionally, "Any violation of the institution's visiting procedures may result in termination of the visit and/or disciplinary action.  As soon as staff became aware of this information, your visiting privileges with inmate Raniere were terminated.

**75.** On information and belief, Mr. Chakravorty was removed from the visit and banned from further visits as retaliation for coordinating experts to support Mr. Raniere's challenge to his conviction, and to frustrate his ability to develop and file post-conviction relief petitions.

**76.** Curiously, after being banned from visitation, Mr. Chakravorty was still permitted to speak receive phone calls from Mr. Raniere for a year.

**77.** 28 CFR § 540.45 states: An inmate who was engaged in a business or profession prior to commitment is expected to assign authority for the operation of such business or profession to a person in the community. Pretrial inmates may be allowed special visitors for the purpose of protecting the pretrial inmate's business interests. In those instances where an inmate has turned over the operation of a business or profession to another person, there still may be an occasion where a decision must be made which will substantially affect the assets or prospects of the business. The Warden accordingly may permit a special business visit in such cases. The Warden may waive the requirement for the existence of an established relationship prior to confinement for visitors approved under this paragraph.

**78.** 28 CRF § 543.16 states: Other paralegals, clerks, and legal assistants. (a) The Bureau of Prisons recognizes the use of assistants by attorneys to perform legal tasks and, with proper controls and exceptions enumerated in this section and in part 540 of this chapter, accords such assistants the same status as attorneys with respect to visiting and correspondence.

**"Send Her My Love", & 97 Days in the SHU - Nicole Clyne is Banned**

14

**79.** Nicole Clyne has been a close personal friend of Mr. Raniere's for over 15 years.

**80.** In November of 2019, Mr. Raniere corresponded with Nicole Clyne via TRULINCS email.  Mr. Raniere expressed his sincere belief that the underlying purpose of the secret sorority "DOS" that was created by several women in NXIVM with the guidance of Mr. Raniere, was morally sound. (Doc. 14-4, pp. 5-9).

**81.** Nicole Clyne was a founding member of DOS, along with seven other women, and shares Mr. Raniere's belief in the moral underpinnings of the group. Ms. Clyne welcomed the opportunity to discuss the philosophical and practical purpose of DOS with Mr. Raniere, as both feel that it has been grossly misrepresented by the media.

**82.** Nicole Clyne was never indicted for any crimes.

**83.** In the summer of 2020 when prisons were on 24/7 lockdown due to COVID, Ms. Clyne started an outreach program for inmates and their families. Since then, she has spoken to many inmates at different facilities across the BOP to provide support and a connection to the outside.

**84.** For over two years, Ms. Clyne has spoken to several inmates across the BOP who lack support from family and friends, without incident.

**85.** Nicole Clyne was approved for visitation at both the Metropolitan Detention Center in New York and initially at the USP in Tucson.

86. On information and belief, the USP Tucson Warden was aware of Ms. Clyne's widely-publicized prior involvement with NXIVM and DOS, and approved the visitation anyway.

87. In January of 2021, Mr. Raniere was transferred to USP Tucson.

88. In May of 2021, Nicole Clyne was visiting Mr. Raniere regularly in Tucson.

89. On July 20, 2021, Mr. Raniere attended a restitution hearing where the bench and bar had a heated exchange that received publicity.[3]

90. Only two days later, on July 22, 2021, Mr. Raniere was given a disciplinary ticket for Disruptive Conduct, Mail Abuse, and Phone Abuse for asking Mr. Brooks to send his love to Nicole.

91. On information and belief, this disciplinary ticket was a pretense for retaliation against Mr. Raniere for the media attention that the restitution hearing produced.

92. Ms. Clyne had been helping inmate Tim Brooks with various issues for approximately two weeks before the communications were cut off.

93. On July 24, 2021, two days after the ticket was issued, astonishingly, Mr. Raniere was allowed an in-person visit with Ms. Clyne.

---

[3]https://www.nydailynews.com/new-york/ny-keith-raniere-lawyer-mark-fernich-threaten-arrest-nicholas-garaufis-20210720-vhfxgpo5arfyhb5abllrotzw5i-story.html;

 https://abovethelaw.com/2021/07/give-him-this-to-go-cry-federal-judge-says-during-yelling-match-with-sex-cult-lawyer/;

https://nypost.com/2021/07/20/nxivm-leader-keith-raniere-ordered-to-pay-almost-3-5m-to-victims/

94. After the visit on July 24, 2021, Ms. Clyne was banned from visiting or communicating with Mr. Raniere.

95. Ms. Clyne was never given an explanation for this.

96. Mr. Raniere was told that the offending communication was asking Mr. Brooks to "send her my love" when speaking with Ms. Clyne.

97. On information and belief, this does not violate any policy, or threaten the safe and secure operation of the institution.

98. Mr. Raniere was placed in the Special Housing Unit ("SHU") during the investigation.

99. The SHU is extremely restrictive and unpleasant regardless of whether the placement is administrative or punitive.

100. SHU inmates only receive one hour, at most, of recreation on weekdays, alone (or with 1-3 others) in a cage, instead of having access to a general population recreation yard.

101. SHU inmates eat their meals in their cells instead of in the dining hall. Visits with friends, family, or attorneys are done in shackles and belly chains.

102. SHU inmates are shackled any time they leave their cell, with hands-on officer escorts.

103. The shackles are frequently painful and cut into the skin on the wrists and ankles.

104. SHU inmates are given one extra set of clothing, and must wash their own clothes in the cell sink or toilet, and hang it up to dry.

**105.**     If SHU inmates are caught hanging clothes up to dry, they are given a disciplinary ticket and recreation time is cancelled for the day.

**106.**     The disciplinary hearing report states that Mr. Raniere was trying to communicate with "un-indicted co-conspirator" Clyne via Mr. Brooks.

**107.**     On information and belief, the Defendants are aware that Ms. Clyne is innocent of any criminal wrongdoing, but intentionally use the label of "un-indicted co-conspirator" in order to unfairly and improperly vilify Ms. Clyne without the due process of having to prove any criminal conduct.

**108.**     Prior to the July 22, 2021 incident, however, Mr. Raniere was able to communicate directly with Ms. Clyne for months, and she was permitted to visit two days later, on July 24, 2021.  Therefore there would be no need to communicate through Mr. Brooks.

**109.**     On information and belief, the USP Tucson Warden was aware that Mr. Raniere, Ms. Clyne, and Mr. Brooks were speaking to each other and had no objection to it until July 22, 2021.

**110.**     Plaintiff was told by officers Rynart and Shirley that the suspension of Ms. Clyne and the subsequent disciplinary action were ordered by an individual "above the Warden".

**111.**     The Incident Report was not written until September 16, 2021, 56 days later.

**112.**      The disciplinary hearing was not held until October 26, 2021, 96 days since the alleged incident.

18

**113.** Mr. Raniere spent a total of 97 days in the SHU for saying "Send her my love".

**114.** Mr. Brooks – the main actor in the alleged misconduct – only spent 56 days in the SHU.

**115.** On information and belief, the USP Tucson Warden intentionally delayed the disciplinary process for the purpose of keeping Mr. Raniere in the SHU as retaliation for exercising his First Amendment rights to challenge his conviction.

### Dr. Danielle Roberts is Banned

**116.** Danielle Roberts was licensed as a physician in New York.

**117.** Dr. Roberts knows Plaintiff from her involvement in NXIVM.

**118.** Dr. Roberts and Plaintiff have been friends and business partners since November of 2013.

**119.** Dr. Roberts supervised the ceremony for some of the women in DOS where they had their skin cauterized or branded with a symbol indicating their commitment to the group.

**120.** Dr. Roberts was never charged with any crime for this participation.

**121.** In February of 2021, Dr. Roberts spoke to the press and defended her actions as well as Plaintiff.[4]

**122.** On September 29, 2021, New York State revoked Dr. Roberts' medical license citing her involvement with DOS.

---

[4]https://nypost.com/2021/02/24/nxivm-doctor-defends-branding-sex-cult-members/

**123.**     On November 8, 2021, Dr. Roberts publicly posted a response to the revocation of her license.

**124.**     Dr. Roberts visited Plaintiff regularly from approximately April of 2021 until January of 2022.

**125.**     On January 6, 2022, Dr. Roberts was informed by Defendant USP Tucson Warden that her visitation privileges were revoked.

**126.**     USP Tucson Warden cited the publicity surrounding the revocation of Dr. Roberts' license, and the Sentencing Memorandum that restricts Plaintiff's contact with members of NXIVM after his release from prison.

**127.**     On information and belief, the USP Tucson Warden was aware of Dr. Roberts' involvement with NXIVM, but did not take any action to stop her from visiting Plaintiff until after the publicity surrounding the license revocation and Dr. Roberts' defense of her actions.

**128.**     On information and belief, Dr. Roberts was banned from communicating with Mr. Raniere because her defense of her actions brought attention to the inconsistencies in the case against Mr. Raniere.

**129.**     On information and belief, the USP Tucson Warden cancelled the visitation as retaliation against Plaintiff for the actions of Dr. Roberts, in violation of Plaintiff's First Amendment rights of Free Speech to challenge his conviction.

### Jorge De La Garza – Plaintiff's Mexican Attorney Banned

**130.**     Mr. Jorge de la Garza is a licensed Mexican attorney that represents Plaintiff's interests in Mexico, where Plaintiff has a child with partner, Marianna

Fernandez. He has over 30-years of experience practicing law, and for fifteen years, he has managed US-based law firms in Monterrey, Mexico.

**131.**     On April 28, 2022, Mr. de la Garza requested a legal call with Plaintiff.

**132.**     On May 31, 2022, Counselor Daniel Flores directed Mr. de la Garza to mail in a visitation form, which Mr. de la Garza did.

**133.**     On June 24, 2022, Mr. de la Garza had not heard back and inquired as to the status of his application. Counselor Flores directed Mr. de la Garza to mail another visitation form, now with a copy of Mr. de la Garza's credentials.

**134.**     On June 28, 2022, Counselor Flores denied having received Mr. de la Garza's mailed documents.

**135.**     On July 25, 2022, after several email follow-ups, Counselor Daniel Flores confirmed receipt of Mr. de la Garza's documents, including his identification document and license to practice law in Mexico, in application of legal visitation with Mr. Raniere and noted he was "still waiting on guidance and clearance from our legal department."

**136.**     On July 26, 2022, Counselor Flores notified Mr. de la Garza that he was approved to have a legal call through the Mexican Consulate Office.

**137.**     On August 1, 2022, Mr. de la Garza applied for visitation, as an attorney working under Tully & Weiss.

**138.**     On August 7, 2022, Counselor Flores denied visitation between Mr. de la Garza and Plaintiff, stating that the Warden had denied the visit based on the safety and security of the institution.

**139.**     On August 12, 2022, Mr. de la Garza appealed the Warden's denial of legal

visitation pursuant to 28 C.F.R. § 543.14(d)

### The Rule 33 is Filed - BOP Scrubs Plaintiff's Call List

**140.**     Aided by the work of Mr. Chakravorty, Plaintiff's criminal defense

attorneys hired several waves of experts, culminating in the expert report of Dr. J.

Richard Kiper, former FBI Unit Chief and instructor at the FBI Academy, whose

conclusion was that, to a scientific certainty, evidence in Mr. Raniere's criminal

case had been tampered with, and the evidence planted on a hard drive alleged to

belong to Plaintiff.

**141.**     The deadline for filing petitions based on newly-discovered evidence under

Rule 33 was June 21, 2022.

**142.**     For about five months prior to April 28, 2022, Plaintiff's attorneys had

weekly calls with Plaintiff.

**143.**     Some of these calls had connectivity issues, but most were completed

successfully.

**144.**     On April 28, 2022, Plaintiff's criminal defense attorney Joseph M. Tully

filed a motion to stay the appeal that was pending with the 2nd Circuit.  The motion

stated that Plaintiff intended to file for a new trial in the District court based on

newly discovered evidence of evidence tampering and perjury.

**145.**     On the same day,  Nicole Clyne tweeted about the newly discovered

evidence, and it has received approximately two million impressions.

**146.** On May 3, 2022, Plaintiff's criminal defense attorney Joseph M. Tully filed the motion pursuant to F.R.Crim.P. 33, requesting relief from the criminal conviction on the grounds of the newly discovered evidence. *U.S. v. Raniere*, Doc. 1169.

**147.** On May 4, 2022, Plaintiff was on a privileged legal call with attorney Tully, when the call was apparently terminated prematurely, and without warning.

**148.** Only moments after the May 4 legal call was interrupted, Plaintiff's counselor pulled Plaintiff out and instructed Plaintiff to go to an administrator's office.

**149.** Within the federal prison system, a counselor is the prison official who has routine, daily contact with federal prisoners. As such, a counselor follows orders from supervisory and management personnel at the prison.

**150.** Plaintiff complied with the counselor's instruction to visit the administrative office.

**151.** When he arrived at the administrative office, Acting Special Investigative Agent for the Federal Bureau of Prisons Anthony Gallion was present, and proceeded to ask Plaintiff about certain people on his list of approved people that he could call and receive as visitors. Many of them were attorneys or attorney's agents like Mr. Chakravorty.

**152.** On information and belief, Gallion is with the Special Investigative Agency ("SIA") of the Federal Bureau of Prisons.

**153.**     Defendant Gallion then told Plaintiff that his list of approved callers was being "scrubbed", that Plaintiff would have to apply to the Unit Manager to have anyone re-approved, and that Mr. Chakravorty was not likely to be re-approved.

**154.**     At that point, the only way that Mr. Chakravorty could communicate with Plaintiff is if Mr. Chakravorty was on Plaintiff's approved list of callers.  These calls are recorded and monitored by prison personnel, and are not treated as confidential even though Mr. Chakravorty is an agent of Plaintiff's criminal defense attorney Joseph Tully.

**155.**     Plaintiff asked Gallion why this was being done.

**156.**     Gallion refused to answer beyond an assertion that there was an investigation.

**157.**     On May 6, 2022, at 9AM, attorney Joseph Daugherty had a confidential legal call with Plaintiff. Upon information and belief, Defendants interfered and frustrated that legal call by, among other things, causing the phone call to be cut off before Plaintiff and Mr. Daugherty had concluded their conversation.

**158.**     On June 9, 2022, Defendants USP Tucson Warden, Peters, and Garland justified the restrictions on Mr. Chakravorty as being supported by Mr. Raniere's conditions of supervised release, and took quotes from recorded conversations between Mr. Chakravorty and Mr. Raniere.  Doc. 14, p.2.

**159.**     The quotes from the recorded conversations were used out of context.  On information and belief, this was done intentionally in order to misrepresent the content of the conversations.

24

**160.**     Defendant USP Tucson Warden removed Mr. Chakravorty from Mr.

Raniere's approved contacts under advice from the Counter Terrorism Unit.  Doc.

14, p.3.

**161.**     On June 17, 2022, Mr. Chakravorty requested to be recognized by the BOP

as a paralegal to attorney Tully on an urgent basis.

**162.**     Attorney Clay Cook at USP Tucson denied Mr. Chakravorty's request for a

legal visit, stating,

> 28 CFR 543.16(b)(3) and Program Statement 1315.07 at p.
> 19.  "The Warden may required each assistant to fill out and
> sign a personal history statement..."  Also, "If necessary to
> maintain security or good order in the institution, the Warden
> may prohibit a legal assistant from visiting or corresponding
> with an inmate."   Given Mr. Chakravorty's history of being
> denied social visitation and social telephone privileges with
> Mr. Raniere at two separate BOP institutions, the NCIC form
> is also being required so that a formal background check can
> be completed.

**163.**     On June 17, 2022, the USP Tucson Warden reversed the decision of

Attorney Cook and permitted a legal call on the same day, but not a visit.

**164.**     On June 19, 2022, a second legal call was permitted between Mr.

Chakravorty and Mr. Raniere.

**165.**     On June 23, 2022, Mr. Chakravorty requested a legal visit with Mr.

Raniere.

**166.**     On June 24, 2022, the USP Tucson Warden denied the legal visit.  The

Warden refused to give the reason for the re-reversal.

**167.**     Mr. Chakravorty continued to request calls or visits with Plaintiff.

25

**168.**     The USP Tucson Warden has denied each subsequent request for legal calls or visits made by Mr. Chakravorty.

**169.**     On information and belief, the USP Tucson Warden is acting arbitrarily and without penological justification for the purpose of interfering with Mr. Raniere's ability to challenge his conviction.

**Mr. Raniere is Assaulted in the Chow Hall  -  143 Days in the SHU and Counting**

**170.**     In the months leading up to the assault, Mr. Raniere's criminal case received increased publicity.

**171.**     On May 22, 2022, TNT television released an episode of "The Rich and Shameless" that focused on Mr. Raniere's co-defendant Clare Bronfman and her involvement with NXIVM.  On information and belief, this episode was aired at USP Tucson at some point prior to July 26, 2022.

**172.**     On July 12, 2022, at the 69th Annual Attorney General's Awards, Defendant Garland honored the FBI agents that Plaintiff is accusing of falsifying and tampering with evidence, for their actions in Plaintiff's case.

**173.**     On July 26, 2022, at approximately 6:50 A.M., Mr. Raniere was in the dining hall at USP Tucson, walking to a table with his breakfast tray when he was assaulted by Inmate Maurice Withers (BOP #10300-090) with a closed fist on Mr. Raniere's head and face.

**174.**     Mr. Raniere did not fight back.

**175.**     On information and belief, the incident was captured on video and witnessed by several inmates and staff.

**176.**     Plaintiff has not been permitted to view the video.

**177.**     Mr. Raniere suffered a black eye, swelling, nausea, and dizziness for over a week.

**178.**     Mr. Raniere asked for ice packs to help with the pain and swelling but the request was denied.

**179.**     Mr. Raniere was given a disciplinary ticket for "201 – Fighting with another person." and sent back to the SHU.

**180.**     Mr. Raniere is housed with Toni Fly, an intersex prisoner who has a history of being raped repeatedly while incarcerated, and suffers from both homicidal and suicidal ideation.

**181.**     On information and belief, Mr. Raniere was placed with Ms. Fly intentionally by Defendants as a way to harm him indirectly, because Mr. Raniere is convicted of child sex offenses, and Ms. Fly has been recorded threatening to kill any child sex offender that she can.

**182.**     On information and belief, the BOP has a history, pattern, and practice of intentionally or negligently allowing high profile inmates to be killed by other inmates using this indirect process.  One example is notorious crime boss Whitey Bulger, whose murder was the subject of an official investigation which found, "The fact that these serious deficiencies occurred in connection with a high-profile

inmate like Bulger was especially concerning, given that the BOP would presumably take particular care in handling such an inmate's case."[5]

**183.**     On July 29, 2022, Mr. Raniere had a legal visit with undersigned counsel.

**184.**     Mr. Raniere was told that he would have to use the non-contact attorney visit room and speak through a phone.

**185.**     The phone in the non-contact attorney visit room did not function.

**186.**     The staff were able to get clearance for Mr. Raniere to use the regular attorney visit room with handcuffs, a belly chain, and leg irons on during the visit.

**187.**     On August 5, 2022, Mr. Raniere had another legal visit with undersigned counsel.

**188.**     The visit was initially scheduled for 8:30 A.M., but was rescheduled at the last minute to 9:30 A.M.

**189.**     When undersigned arrived, the staff insisted on using the non-contact room again.

**190.**     When the same problem occurred with the phone system, it took an hour for the staff to obtain approval.  As a result, the legal visit lasted only one hour instead of two.

**191.**     The justification given for the restrictions was the fact that Mr. Raniere was housed in the SHU pending investigation of his disciplinary ticket for fighting.

---

[5]https://www.cbsnews.com/news/whitey-bulger-death-justice-department-inspector-general-report/ Accessed 12/15/2022

28

**192.** On information and belief, the USP Tucson Warden is aware that Mr. Raniere was the victim of an assault and not a combatant.

**193.** On information and belief, the USP Tucson Warden is following a pattern of retaliation for Plaintiff exercising his constitutional rights to challenge his criminal conviction and express his sincerely held beliefs, supported by credible evidence, that his conviction was the result of government corruption.

**194.** On August 9, 2022, Officer Estrada told Plaintiff that the ticket would be expunged.

**195.** On August 23, 2022, the disciplinary ticket was dismissed.

**196.** On August 26, 2022, Plaintiff was approved by the SIS Lt., the DHO, and SHU Lt. to return to general population with no security concerns.

**197.** On September 5, 2022, Plaintiff had a legal visit with undersigned counsel. Plaintiff was still forced to wear painful handcuffs and belly chains for the visit.

**198.** On September 8, 2022, the Warden, SIA and other officers took Plaintiff and his cellmate into a holding cell. Within the holding cell were 3 x 3 cages with small wooden benches. Plaintiff and cellmate were locked in a cage and left handcuffed for 45-60 minutes. The room was contaminated with feces, with two piles on the floor and 19 streaks on the wall. Plaintiff and cellmate remained in this room for approximately 5 hours. During that time, they were forced to eat lunch in the room. They were visited by members of the Psychology staff, including Doctors Hermosillo and Poleski. Upon information and belief, security staff including officers Lee-Trajo, Francis, and Cosme observed the conditions.

**199.**     Upon information and belief, this was further retaliation against Plaintiff and possibly an attempt to incite his cellmate, Toni Fly, to harm Mr. Raniere.

**200.**     On September 20, 2022, Mr. Raniere was interviewed regarding returning him to general population, where he was before the chow-hall assault.  He was not allowed to return to general population and a new investigation was allegedly initiated regarding his safety.

**201.**     On October 13, 2022, a group of respected professionals including attorney Alan Dershowitz held a press conference in support of Mr. Raniere's Rule 33 petition.[6]

**202.**     On Monday, October 24, 2022, Plaintiff had a legal visit with undersigned and attorney Greg Stoltz.

**203.**     Mr. Raniere was escorted to the visit by his counselor.

**204.**     The counselor told Mr. Raniere that he had too many legal calls and visits.

**205.**     On Tuesday, November 1, 2022, Plaintiff had a legal visit with undersigned.

**206.**     The counselor told Mr. Raniere that USP Tucson did not have enough staff to accommodate Plaintiff's legal needs.

**207.**     On November 6, 2022, Plaintiff's counselor, Daniel Flores, responded to undersigned regarding a legal visit, "Due to other appointments and calls, I will not be able to accommodate a visit this week."

---

[6] https://twitter.com/alandersh/status/1580670651039244288.  Accessed 11/3/2022.

**208.** On November 8, 2022, Mr. Flores emailed undersigned that he could accommodate a visit on November 14, 2022.

**209.** On November 14, 2022, as undersigned was driving to the prison for a visit with Plaintiff, Mr. Flores emailed,

> Due to unforeseen events at FCC Tucson your visitation with inmate Raniere has to be rescheduled for a different date. I will notify your office once the institution is back to normal operations. Thank you in advance.

**210.** On November 14, 2022, a prisoner at the prison camp across the road from Mr. Raniere was able to obtain a firearm, prompting the entire complex to be shut down.

**211.** Local news commented, "The Bureau of Prisons has been plagued by chronic mismanagement, misconduct and a severe staffing crisis. A new director was brought on earlier this year as Justice Department officials attempt to reform the agency."[7]

**212.** Since November 14, 2022, Mr. Raniere has not been permitted any legal visits.

**213.** On information and belief, Mr. Raniere is being singled-out, and other prisoners in the same institution are receiving attorney visits.

---

[7]https://tucson.com/news/local/crime-and-courts/federal-inmate-tried-to-shoot-visitor-at-tucson-prison-camp/article_7deb898a-6475-11ed-8af5-6bcf452be75b.html Accessed 12/16/2022

**214.** On December 13, 2022, Toni Fly was not given her medication and acted out violently, kicking the cell door and yelling about wanting to kill someone and then kill herself.

**215.** On December 14, 2022, undersigned had a legal call with Mr. Raniere. This was the first contact with Mr. Raniere since November 1, 2022.

**216.** Mr. Raniere is still in the SHU, despite being exonerated of any wrongdoing and is subject to the same punitive conditions as those prisoners who are in the SHU as punishment.

**217.** According to BOP Program Statement 5270.11 regarding SHU conditions, Mr. Raniere's placement was supposed to be reviewed every 5 days, and a hearing held every 30 days. 28 C.F.R. § 541.  These reviews have not occurred.

**218.** On information and belief, Defendant Peters, or whoever the Director of the BOP was at the relevant time, is aware that federal prison wardens retaliate against individual prisoners based on personal animus and not supported by any legitimate penological purpose but fails to take action to prevent it, and perpetuated the policy and practice.

## <u>COUNT I</u>

### <u>Unlawful Frustration and Interference with First Amendment Access to the Courts</u>

**219.** Plaintiff is neither a lawyer nor trained in the law. The First Amendment right of access to the courts includes with it a reasonable opportunity to communicate in a contemporaneous manner with his lawyers.

**220.**     As described above, Defendants, in a non-frivolous manner, have a pattern and practice of frustrating and interfering with Plaintiff's First Amendment right to communicate with his attorneys. By doing so, Defendants frustrated and interfered with Plaintiff's First Amendment right of access to the courts.

**221.**     Similarly, Defendants continue to frustrate and interfere with Plaintiff's First Amendment right of access to the courts by keeping him in the SHU without justification.

**222.**     Under this Count, Plaintiff seeks reasonable access to communicate with his attorneys and their agents, both in person and using contemporaneous telephonic methods, subject only to modest limitations that have a reasonable relationship to legitimate penological interests.

### COUNT II

**Retaliation Based on Rights Protected Under the First Amendment**

**223.**     The First Amendment protects the right of all persons - including prisoners - to have meaningful access to the Court. Nowhere is this right more critical than when a prisoner seeks access to the courts for the express purpose of attacking his underlying criminal conviction and sentence.

**224.**     The First Amendment protects the right of all persons to express themselves and advocate for themselves without fear of retaliation.

**225.**     Prior to May 2, 2021, Plaintiff exercised his First Amendment rights by communicating with Mr. Chakravorty in visits for the purpose of expressing his wishes regarding his finances, legal affairs, and the conditions of confinement.

33

**226.** On information and belief, Plaintiff's right to communicate with Mr. Chakravorty was denied as retaliation for exercising his First Amendment rights.

**227.** Prior to July 24, 2021, Plaintiff exercised his First Amendment rights by communicating with Ms. Clyne in visits and over the phone for the purpose of expressing his thoughts about his criminal case and conditions of confinement.

**228.** On information and belief, Plaintiff's right to communicate with Ms. Clyne was denied as retaliation for exercising his First Amendment rights.

**229.** Plaintiff exercised his First Amendment rights by communicating with Dr. Roberts in visits and over the phone for the purpose of expressing his thoughts about his criminal case and conditions of confinement.

**230.** On information and belief, Plaintiff's right to communicate with Dr. Roberts was denied as retaliation for exercising his First Amendment rights.

**231.** Prior to May 3, 2022, Plaintiff exercised his First Amendment right by communicating with his criminal defense attorneys and their agents for the express purposes of assisting them in preparing a timely Rule 33 petition in the federal court, asserting that newly discovered evidence justified the granting of a new trial in his underlying criminal prosecution.

**232.** Less than 24 hours after Plaintiff's criminal defense attorney filed the Rule 33 petition, Defendants substantially, and in a non-frivolous manner, frustrated and impeded Plaintiff's ongoing ability to assist his criminal defense attorney by scrubbing his contact list of his contacts, including power-of-attorney Suneel Chakravorty.

233.     The short time between when Plaintiff exercised his First Amendment right to access the courts by filing an important petition in the federal courts on May 3, 2022 and the adverse action of Defendants in threatening him with this violative action raises a substantial likelihood that Defendants actions were retaliatory.

234.     Plaintiff is entitled to declaratory relief and injunctive relief under this Count. The injunctive relief that Plaintiff seeks is merely to maintain the status quo ante.

## COUNT III

## Sixth Amendment Interference With Representation By Counsel

235.     Plaintiff is a criminal defendant.

236.     Defendants have deliberately interfered with the confidential relationship between Plaintiff and his criminal defense counsel by denying calls and visits.

237.     On information and belief, Defendants do not intend to give Plaintiff enough contact with his attorneys to meet his legal needs.

238.     The interference substantially prejudices the Plaintiff by denying Plaintiff the ability to timely communicate with his counsel during the time that his Rule 33 petition is pending.

239.     On information and belief, this interference is not isolated, but rather part of a pattern and practice of interference intended to deprive Plaintiff of effective assistance of counsel.

35

## **REQUEST FOR RELIEF**

WHEREFORE, the Plaintiff respectfully requests that this Court:

A. Issue a preliminary injunction to preserve the status quo, to include restraining Defendants, their employees, successors, and agents, from:

1. Prohibiting, preventing, restricting, impeding, and/or obstructing Plaintiff from communicating with his attorneys using contemporaneous telephonic communications technologies, subject only to modest limitations that are reasonably related to legitimate penological interests of Defendants;

2. Prohibiting, preventing, restricting, impeding, and/or obstructing Plaintiff from visiting in-person with his attorneys at the federal prison facility where he is currently housed, subject only to modest limitations that are reasonably related to legitimate penological interests of Defendants;

3. Prohibiting, preventing, restricting, impeding, and/or obstructing Plaintiff from communicating with the employees and agents of his attorneys using contemporaneous telephonic communications technologies, subject only to modest limitations that are reasonably related to legitimate penological interests of Defendants;

4. Engaging in other behavior that amounts to a non-frivolous frustration or interference with his First Amendment right to access the courts for the purpose of collaterally attacking his conviction and sentence;

B. Enter a judgment declaring that:

36

1. This court retains equitable powers to issue injunctions intended to maintain the status quo pending administrative exhaustion, regardless of the requirements imposed by 42 U.S.C. 1997e;

2. Defendants have violated Plaintiff's rights under the First Amendment;

3. Plaintiff is entitled under the First Amendment to communicate with his attorneys and his attorneys' employees, both in-person and using contemporaneous telephonic communications, for the purpose of discussing legal matters aimed at attacking his criminal sentence, and subject only to limited restrictions that are reasonably related to penological interests.

C. Attorneys' fees and costs accrued in bringing this action;

D. Such other relief as this court deems just and proper.

DATED this 16th day of December, 2022 by

/s/Stacy Scheff
STACY SCHEFF
Attorney for Plaintiff

37