GARY M. RESTAINO
United States Attorney
District of Arizona
DENISE ANN FAULK
Assistant U.S. Attorney
State Bar No. 12700
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: (520) 620-7300
Email: denise.faulk@usdoj.gov
Attorneys for Defendants

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Keith Raniere,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>Merrick Garland, et al.,<br><br>　　　　　Defendants. | CV-22-00561-TUC-RCC<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

Defendants Garland, Peters, Gutierrez and Ulrich,[1] acting in their official capacities by and through undersigned counsel, hereby respond to Plaintiff's Motion for Preliminary Injunction (Doc. 3). For the reasons discussed below, Defendants request that the Court deny the Motion.

## I.　　Factual Background

### A.　　Plaintiff Keith Raniere

A jury convicted Plaintiff Keith Raniere of Racketeering, Racketeering Conspiracy, Forced Labor Conspiracy, Wire Fraud Conspiracy, Sex Trafficking, Attempted Sex Trafficking and Sex Trafficking Conspiracy, and he was sentenced to 120 years in prison. (Ex. A, Flores Decl., ¶ 4, Att. 1, SENTRY Public Information, pp. 2-4; Att. 2, Judgment, pp. 1-4.) Plaintiff's sentencing judge specifically ordered that Plaintiff "shall not associate in person, through mail, electronic mail or telephone with any individual *with an affiliation to*

---

[1] Acting Special Investigative Agent Ulrich, in his official capacity, is substituted for LT. Gallion pursuant to Rule 25, Fed. R. Civ. P.

1   Executive Success Programs, Nxivm, DOS or any other Nxivm-affiliated organizations."

2   (Ex. A, ¶ 5, Att. 2, p. 9.)  (Emphasis added.)  Currently, Plaintiff is a federal inmate at the

3   United States Penitentiary (USP Tucson) in Tucson, Arizona.  (Ex. B, *Raniere v. Garland*,[2]

4   No. 22-CV-00212-RCC, Dkt. 14-2, Flores Declaration, p. 3.)  He is projected to be released

5   from custody on June 27, 2120.  (*Id.*)

6   **B.   Plaintiff's Banned Visitors**

7   Nicki Clyne is a former associate of NXIVM who has been banned from

8   communicating with Plaintiff.  (Ex. C, *Raniere v. Garland*, No. 22-CV-00212-RCC, Dkt.

9   31-2, Mitchell Declaration, pp. 3, 10.)  Ms. Clyne is an unindicted co-conspirator.  (*Id.* pp.

10  3, 16.)  Plaintiff circumvented mail monitoring by communicating with Ms. Clyne through

11  another inmate and by using her to communicate with Clare Bronfman, another associate of

12  NXIVM and co-defendant of Plaintiff who currently is serving time in federal prison.  (*Id.*

13  pp. 3, 12-17.)

14  Danielle Roberts is a former associate of NXIVM who has been removed from

15  Plaintiff's visiting list due to her extensive involvement with NXIVM.  (*Id.* pp. 3, 9.)  She

16  was removed "for safety and security of institution."  (*Id.*)  In January 2022, Ms. Robert's

17  attorney contacted the Bureau of Prisons (Bureau) and was informed that Plaintiff could file

18  a request through the Administrative Remedy Program regarding her removal.  (*Id.* pp. 3,

19  19.)  Plaintiff has provided no evidence that he has done so.  (Docs. 1, 3.)

20  Suneel Chakravorty is a former associate of NXIVM who has been banned from

21  communicating with Plaintiff at two institutions for misconduct during Plaintiff's

22  incarceration.  Plaintiff and Mr. Chakravorty's improper actions are detailed as follows:

23  **1.   Sentencing Memorandum as to Mr. Chakravorty**

24  ———————
    [2] Plaintiff previously brought an action against the same Defendants raising many of

25  the same issues in *Raniere v. Garland*, No. 22-CV-00212-RCC (D. Ariz.)  In that action,
    he unsuccessfully brought four motions for preliminary injunction and/or temporary

26  restraining order seeking the relief he seeks in his current motion.  Defendants provided
    evidence refuting each of Plaintiff's allegations in that case.  For the Court's convenience,

27  Defendants are providing as exhibits the relevant evidence produced and Orders entered in
    that case.  Mr. Flores's latest Declaration only addresses Plaintiff's new allegations and

28  brings the Court current as to the legal calls and legal visits that have occurred since the
    last declaration produced in that case.

Between the jury's verdict and the court's sentence, Plaintiff continued regularly contacting people affiliated with NXIVM, including Mr. Chakravorty, and the government so informed the judge. *United States v. Raniere*, Case No. 1:18-cr-00204-NGG-VMS, Dkt. 914 (E.D. N.Y. August 27, 2020). The government noted that "in a March 12, 2020 call with Suneel Chakravorty, one of Raniere's supporters, [Plaintiff] addressed his conduct with respect to [a victim], stating that she 'would have to go back to Mexico or she had to explain to people how she was going to stop from all the stealing and the other things that she was doing. She also had to finish a book report. She had a number of different book reports she was supposed to do and she was seen as being very prideful about it and no matter what, she would do anything, you know, say anything, but never just sit down and simply finish the book report.' [Dkt. 914-3 at 22.] [Ex. D, *Raniere v. Garland*, No. 22-CV-00212-RCC, Dkt. 14-4, Ex. D to Sentencing Memorandum, p. 22.] [Plaintiff] described [the victim] as engaging him a 'battle of wills' and who 'threw, like, uh, what would be a massive sort of tantrum.' [Dkt. 914-3 at 23.] [Ex. D, p. 23.]" Dkt. 914 at 52-53. (Ex. E, *Raniere v. Garland*, No. 22-CV-00212-RCC, Dkt. 14-3, Sentencing Memorandum, pp. 53-54.)

The government also informed the court that "[i]n addition, [Plaintiff] has demonstrated a disregard for the law and for the system of justice. In many phone calls with Mr. Chakravorty, [Plaintiff] expresses contempt for the prosecution and the Court. For instance, during an April 8, 2020 phone call with Mr. Chakravorty, [Plaintiff] stated that 'the major witnesses all lied' and expressed his view that 'this judge' – referring to the Court – was corrupt. [Dkt. 914-3 at 44.] [Ex. D, p. 44.] [Plaintiff] further stated that they had to 'get scrutiny on this judge, get some pundit who is willing to speak out about what this judge is saying, which is crazy, and the judge needs to know he's being watched . . . .' [Dkt. 914-3 at 53.] [Ex. D, p. 53.]" Dkt. 914 at 53-54. (Ex. E, pp. 54-55.)

The Bureau suspended calls between Plaintiff and Mr. Chakravorty in July 2020, and, thereafter, Plaintiff "entered an individual [to his contact list] under the name 'Issac Edwards.' The address provided by [Plaintiff] for 'Issac Edwards' is fabricated and the phone number provided by [Plaintiff] for 'Issac Edwards' belongs to a burner phone.

Subsequent calls between [Plaintiff] and 'Issac Edwards' reflect that 'Issac Edwards' is Mr. Chakravorty."  Dkt. 914 at 56 n. 14. (Ex. E, p. 57.)

Plaintiff "also directed his supporters to develop a podcast and to set up a 'contest' in which members of the public would be invited to find purported errors in [his] prosecution and trial in exchange for a cash prize.  In many phone calls, Mr. Chakravorty describes his efforts to find 'judges' – i.e., members of the public – to evaluate submissions for the contest and 'check[] the prosecutor's homework.'" [Dkt. 914-3 at 50.] [Ex. D, p. 50.]; see, e.g., [Dkt. 914-3 at 25, 43.] [Ex. D, p. 25, 43.]" Dkt. 914 at 54.  (Ex. E, p. 55.)  Also, "[i]n subsequent calls, [Plaintiff] offers lengthy diatribes on the criminal justice system for Mr. Chakravorty to record, similar to the 'verbal downloads' that were described at [his] trial." Dkt. 914 at 54. (Ex. E, p. 55.)

Plaintiff recognized that Mr. Chakravorty's communications with Plaintiff's attorney were not protected by the attorney client privilege.  On April 24, 2020, Plaintiff stated to Mr. Chakravorty: "Right. We have 10 seconds. You may want to somehow become his client, so you'll have attorney client privilege.  But I mentioned that in an email to him just a few minutes ago." Dkt. 914-3 at 64.  (Ex. D, p. 65.)

### 2.     Bureau Records on Mr. Chakravorty from New York

As early as July 16, 2020, the Bureau recognized that Plaintiff and Mr. Chakravorty were engaging in behavior that compromised the security of the facility in which Plaintiff was held.  (Ex. F, *Raniere v. Garland*, No. 22-CV-00212-RCC, Dkt. 14-5, Gallion Declaration, pp. 2, 10-13.)  Specifically, Plaintiff and Mr. Chakravorty were recording prison-initiated telephone calls to use in podcasts and "interviews [Plaintiff] is pursuing to use in HBO, Netflix and Showtime."  (*Id.*)  Additionally, they were endangering the security of the facility and the public by organizing "a group of women to show up regularly and dance provocatively for inmates to view through their cell windows."  (*Id.*)  Plaintiff "directed Suneel [Chakravorty] to contact more women" to "danc[e] erotically" which led to a request for Plaintiff to be moved to another housing unit.  (*Id.*)  Plaintiff also informed Mr. Chakravorty about "the staff work schedules and indicated his protesters should wait outside

for the staff and offer donuts and coffee as they exit the facility." (*Id.*) (internal quotation marks omitted).

The Counter Terrorism Unit (CTU) concluded, "[Plaintiff's] manipulative behavior continues to manifest from behind the prison through the help of Suneel Chakravorty. [Plaintiff's] actions would place the safety and security of staff and the public at risk." (*Id.*, p. 12.) The CTU recommended that Mr. Chakravorty be removed as one of Plaintiff's approved contacts. (*Id.*) The Warden concurred, and Mr. Chakravoty was removed from Plaintiff's approved contact list. (Ex. F, pp. 2-3, 15.)

### 3. Mr. Chakavorty's Representations to the New York District Court

On October 30, 2021, Mr. Chakravorty wrote to the district court judge presiding over *Edmonson v. Raniere*, Case 1:20-cv-00485-EK-CLP (E.D. N.Y.), a civil action brought by some of Plaintiff's victims. (Ex. G, *Raniere v. Garland*, No. 22-CV-00212-RCC, Dkt. 14-7, Letter dated October 30, 2021, from S. Chakravorty to the Court.) He identified himself as "not a party to this case, nor am I an attorney. I am defendant Keith Raniere's power of attorney." He further indicated that "as Mr. Raniere's power of attorney, [he had] referred cyber forensics experts to his criminal counsel." (*Id.*) The letter is not on an attorney's letterhead. (*Id.*)

On November 28, 2021, Mr. Chakravorty again wrote to the court in that case. Again, Mr. Chakravorty clearly identified himself as holding Plaintiff's power of attorney, not as a paralegal *working for* Plaintiff's attorneys. (Ex. H, *Raniere v. Garland*, No. 22-CV-00212-RCC, Dkt. 14-7, Letter dated November 28, 2021, from S. Chakravorty to the Court.) He indicated that he would "request a transcript of the hearing and have Mr. Raniere's criminal attorney send it to him." (*Id.*) Again, the letter is not on an attorney's letterhead. (*Id.*)

### 4. Restrictions on Mr. Chakravorty at USP Tucson

On May 2, 2021, Mr. Chakravorty's visiting privileges at USP Tucson were denied as the "prospective visitor/applicant did not have an established relationship with [Plaintiff] prior to [his] incarceration." (Ex. F, pp. 3, 18.) In October 2020, Mr. Chakravorty had

admitted to the New York District Court that his "first conversation with Keith Raniere was in prison, after his trial.  At this time, he and I were complete strangers."  (Ex. F, pp. 3, 20.)  Mr. Chakravorty also detailed his involvement with NXIVM, as a coach for Executive Success Programs (ESP) and NXIVM, and his decision to "stay involved even during an international media storm.  To me, ESP did not seem like a sinister organization[,]" and "that is why I chose to continue as a coach up u[n]til the companies closed in May 2018."  (*Id.*)

In early May 2022, the SIS Department at USP Tucson was monitoring telephone calls between Plaintiff and Mr. Chakravorty.  (Ex. F, p. 4.)  They spoke to each other about being "at war" with the federal government that would be "no holds barred."  (*Id.*)  Even more concerning than this language of being "at war," Plaintiff asked about the quality of the recordings and stated that he has many recordings.  (*Id.*)  As indicated above, Mr. Chakravorty previously recorded telephone conversations with Plaintiff while he was incarcerated in New York.  (*Id.*)  The CTU recommended that the USP Tucson SIS Department remove all of Plaintiff's current contacts and review all future contact requests.  (*Id.*)  The SIS Department may determine whether any requested individuals are affiliated with NXIVM, ESP, DOS or any other NXIVM-affiliated organizations, as prohibited by the special conditions of supervised release in the Judgment.  (Ex. F, pp. 5, 33.)  If it is dangerous for Plaintiff to have access to particular individuals once released, it is also a security risk to allow Plaintiff to have access to these same individuals while incarcerated.  (Ex. F, p. 5.)

On May 3, 2022, as a result of the findings of the SIS Department and in consultation with the CTU, the USP Tucson Warden imposed limitations on Plaintiff's contact list.  (Ex. F, pp. 4-5, 41.)  Plaintiff was limited to a maximum of ten active contacts, not including counsel.  (*Id*)  His then current contacts were removed, except Marianna Fernandez and nine verified attorneys.  (*Id.*, pp. 5, 43-45.)  In the future, if Plaintiff wants to add more contacts to his approved TRULINCS list, the SIS Department will review the individuals as part of the approval process.  (*Id.*, p. 5.)

The limitations on Plaintiff's contact list do not impede Plaintiff's access to his

1  attorneys via legal mail, legal calls and legal visits.  (*Id.*)  Plaintiff still may access his

2  attorneys through these confidential lines of communication.  (*Id.*)  In addition to the

3  numerous legal calls, Plaintiff has had frequent legal visits.  (Ex. A, ¶¶ 24-25; Ex. B, p. 7;

4  Ex. C, pp. 5-6; Ex. K, *Raniere v. Garland*, No. 22-CV-00212-RCC, Dkt. 17-1, Second

5  Declaration of Daniel Flores, pp. 2-3.)

6        When the restrictions were imposed, Acting SIA Gallion was not aware of

7  Plaintiff's litigation regarding his New York conviction and sentence.  All recommendations

8  and determinations made, as reflected above, were made for the safety, security and good

9  order of the institution and not in any way to hinder Plaintiff's legal efforts.  (Ex. F, p, 5.)

10       **C.    Prior District Court Action**

11       In May 2022, Plaintiff filed an action against Defendants in Arizona District Court,

12  *Raniere v. Garland*, No. 22-CV-00212-RCC (D. Ariz.), alleging First and Sixth Amendment

13  violations.  He filed a Motion for Preliminary Injunction, seeking reinstatement of

14  communications with Mr. Chakravorty.  (Dkt. 7.)  The Court denied the motion because

15  "Plaintiff has not provided any evidence that Mr. Chakravorty is a paralegal or agent of any

16  kind *employed by* Plaintiff's attorney(s)."[3]  (Ex. I, *Raniere v. Garland*, No. 22-CV-00212-

17  RCC, Dkt. 18, Order entered June 18, 2022, p. 14.) (Emphasis added.)  Plaintiff also had

18  failed to introduce "evidence before the Court that Plaintiff has been unable to communicate

19  with his attorneys or their agents who have been cleared by the institution to have

20  confidential communications with Plaintiff."  (*Id.*, p. 15.)

21       The Court rejected Plaintiff's "circular argument" that "he 'is likely to suffer

22  irreparable harm because, absent injunctive relief, he will be deprived of the most basic

23  constitutional protections under the First and Sixth Amendments.'"[4]  (*Id*., quoting Dkt. 7 at

24

25       [3] The Court flatly rejected Plaintiff's argument: "Plaintiff argues that Mr.
    Chakravorty 'serves 'precisely this role on behalf of the attorneys of Tully & Weiss,'
26  'played an essential role in interpreting computer data for the attorneys,' and before Tully &
    Weiss were retained, Mr. Chakravorty and Plaintiff 'spent months discussing, analyzing and
27  theorizing about how this metadata contained in computer files affects Plaintiff's legal
    case.'" (Ex. I, p. 14.)  Plaintiff makes the identical argument here.  (Compare Dkt. 7 at 8-9
28  with Doc. 3 at 7-8.)
         [4] Again, Plaintiff uses identical language here.  (Doc. 3 at 11.)

11.)  First, the court noted Plaintiff's "argument fails to support that Plaintiff is at risk of losing a 'nonfrivolous' or 'arguable' underlying claim as needed to support a First Amendment claim or that his 'right to privately confer with counsel has been chilled' as needed to support a Sixth Amendment claim." (Ex. I, p. 16.)  The Court concluded that "[a]t best, Plaintiff's risk of injury is speculative, and speculative injury is not irreparable injury sufficient for a preliminary injunction. *Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988)." (*Id.*)

Plaintiff filed a Motion for Temporary Restraining Order seeking the same relief. (Dkt. 13.)  The Court denied the motion as moot.  (Ex. I, pp. 15-16.)

Plaintiff then filed a second Motion for Temporary Restraining Order or, Alternatively, for Preliminary Injunctive Relief, seeking immediate release from the SHU. (Dkt. 34.)  The Court denied the motion because Plaintiff failed to allege irreparable harm. (Ex. J, *Raniere v. Garland*, No. 22-CV-00212-RCC, Dkt. 45.)  Specifically, the Court recognized "[i]n the section of his Motion discussing irreparable injury, Plaintiff merely cites the legal standards and states in a conclusory fashion that he 'is likely to suffer irreparable harm because, absent injunctive relief, he will be deprived of the most basic constitutional protections under the First Amendment.'"[5]  (Ex. J, pp. 5-6, quoting Dkt. 34 at 10.)  Further, the Court noted that "Plaintiff speculates that he is still in the SHU in some effort to silence him, but Plaintiff has not presented any evidence showing that he has been silenced." (*Id.*, p. 6.)  Also, the Court noted that "Plaintiff also speculates his cellmate in SHU may falsely charge Plaintiff with sexual misconduct based on the cellmate's past behavior, but such speculative injury is not irreparable injury sufficient for a preliminary injunction." (*Id.*) Finally, the Court held that "Plaintiff's Motion, as it relates to his access to the courts, fails because Plaintiff has not presented any evidence supporting that his ability to litigate has been hindered by prison officials, and Plaintiff has not alleged an actual injury such as inability to meet a filing deadline or to present a claim." (Ex. J, p. 7.)

Plaintiff filed a third Motion for Temporary Restraining Order, seeking "an ***urgent***

---

[5] Plaintiff makes the identical argument here.  (Doc. 3 at 11.)

injunction preventing his impending transfer away from USP Tucson." *Raniere v. Garland*, No. 22-CV-00212-RCC, Dkt. 44 at 1.  That motion was denied as moot when the Court dismissed the case for insufficient service of process.[6]  *Raniere v. Garland*, No. 22-CV-00212-RCC, Dkt. 52 at 8.

### D.  Plaintiff's Legal Calls

One of a Correctional Counselor's regular duties is to set up legal calls.  (Ex. B, p. 3.)  When an attorney requests a legal call, the inmate's counselor ensures the attorney is licensed and in good standing.  (*Id.*, p. 4)  Inmate legal calls are prioritized by institutional safety and security, staffing, facility availability, demand among the inmate population and current conditions within the institution (e.g., COVID-19 measures, security threats, lockdown, etc.).  (*Id.*)  When legal calls occur in the housing unit, the inmate reports to the counselor's office at the appointed time, and the counselor facilitates the call.  (*Id.*)  Inmate legal calls are not audio-recorded or monitored.  (*Id.*)  Instead, when a legal call takes place in a staff office,[7] the staff member places the call and remains in the office until the connection is made with the inmate's attorney or appropriate staff.  (*Id.*)  Once the attorney or staff member is on the line, the counselor leaves the room and visually monitors the inmate from outside the room.  (*Id.*)  Once outside the room, the counselor cannot hear the content of the legal telephone call.  (*Id.*)  Plaintiff's legal calls have been and will continue to be coordinated within the institution's normal procedures.  (*Id.*)  He has not been targeted for any restrictions on his ability to have legal telephone calls.  (*Id.*)

Additionally, Plaintiff's counselor keeps a log of his legal calls.  (Ex. A, ¶ 23; Ex. B, p. 4-7; Ex. C, pp. 4-5; Ex. K, p. 2.)  Plaintiff has had many legal calls while housed at USP Tucson.  (*Id.*)  Most calls lasted one hour, some an hour and many two hours.  (*Id.*)  The log includes a call on May 4, 2022, between Joseph Tully and Plaintiff, which lasted an hour.  (Ex. B, p. 5.)  The call was not disconnected.  (*Id.*, p. 7.)  When a call is disconnected,

---

[6] Inexplicably, having already had a case against the same Defendants dismissed for insufficient service of process, Plaintiff has, once again, failed to complete service of process in the instant proceeding.  (Docs. 9, 10.)  *See* Rule 4(i), Fed. R. Civ. P.

[7] Legal calls in the SHU follow the same procedure, but they occur in an assigned room instead of a staff office.  (Ex. A, ¶ 23.)

1    Plaintiff's counselor attempts to reestablish the call.  (*Id.*)

2    Others have facilitated legal calls for Plaintiff as well.  On May 6, 2022, Case

3    Manager Watson facilitated a call between Plaintiff and Mr. Daugherty.  (Ex. L, *Raniere v.*

4    *Garland*, No. 22-CV-00212-RCC, Dkt. 14-9, p. 2.)  During the legal call, the connection was

5    lost.  (*Id.*)  Case Manager Watson called Mr. Daugherty back, and the legal call resumed

6    without further incident.  (*Id.*)  Plaintiff has never produced any evidence of anything

7    nefarious regarding his legal calls.

8    **E.    Plaintiff's Placement in the SHU**

9    On July 26, 2022, Plaintiff was involved in a physical altercation in Food Service.

10   (Ex. M, *Raniere v. Garland*, No. 22-CV-00212-RCC, Dkt. 39-1, Ulrich Declaration, pp. 5,

11   10.)  When two inmates are involved in a physical altercation, each inmate is written an

12   incident report that will be investigated and is subject to a final decision by a disciplinary

13   hearing officer.  (*Id.*, p. 5.)  As a result of receiving the incident report, Plaintiff was placed

14   on administrative detention status in the SHU pending an investigation.  (*Id.*, pp. 5, 14.)  The

15   incident report was expunged following the investigation and disciplinary hearing.  (*Id.*, pp.

16   5, 12.)

17   Currently, Plaintiff remains in the SHU while the Special Investigative Services

18   (SIS) Department is investigating safety and security issues pertaining to Plaintiff at USP

19   Tucson.[8]  (*Id.*, p. 5.)  While Plaintiff has been housed in the SHU, he has been reviewed

20   periodically by the Segregation Review Official (SRO) as required by policy.  (*Id.,* pp. 3, 5,

21   16-21.)  Plaintiff may express concerns about cell assignments, cellmates and other issues

22   while housed in the SHU.  (*Id.*, pp. 3-5.)  Plaintiff has introduced no evidence that he

23   expressed concerns about his current housing status or cellmate during any of the SRO

24   reviews, through cop-outs or through the Administrative Remedy Program.  (Doc. 1, 3.)

25   There are no safety or security concerns with Plaintiff's current housing assignment,

26

27   ───────────────

28   [8] If the Court requires more detailed information regarding the investigation and the
     safety and security issues pertaining to Plaintiff at USP Tucson, Defendants will provide it
     in camera to the Court.

1  including his current cellmate.[9]  (Ex. M, p. 5.)

2      **F.  Current Complaint**

3        In December 2022, Plaintiff brought his second action against the same Defendants.

4  (Doc. 1.)  Plaintiff again asserts First and Sixth Amendment claims based on two allegedly

5  dropped legal calls with attorneys in May 2022, allegations of retaliatory conduct and the

6  banning of three of Plaintiff's NXIVM affiliated people – two of whom have violated

7  Bureau rules, including by being added to Plaintiff's contact list under a false name after

8  having been banned and for transmitting messages to Plaintiff's co-defendant who is serving

9  time in federal prison.  (*Id.*)  Notably, each of the claimed retaliatory events in the

10  Complaint is alleged "on information and belief" except the purely speculative claim that

11  "[t]he short time between" Plaintiff's attorneys filing a Rule 33 and the Bureau scrubbing

12  his contact list of non-lawyers "raises a substantial likelihood that Defendants actions were

13  retaliatory."[10]  (*Id*. at 35.)

14        The Complaint sought an injunction restraining Defendants and their agents from

15  interfering with Plaintiff's telephonic communication with his attorneys and their employees

16  and agents or Plaintiff's visiting with his attorneys, "subject only to modest limitations that

17  are reasonably related to legitimate penological interests of Defendants."[11]  (Doc. 1 at 36.)

18      **G.  Current Motion for Preliminary Injunction**

19

20       [9] Plaintiff has made allegations regarding his cellmate and speculates that the Bureau

21  placed them together "intentionally" "as a way to harm him indirectly."  (Doc. 1 at 27.) Again, the speculations are "on information and belief" and lack evidence.  (*Id.*)  Due to Plaintiff's cellmate's privacy rights, Defendants will not discuss the allegations except to note

22  that there are no safety or security concerns regarding housing Plaintiff with his cellmate. (Ex. M, p. 5.)  The Court already determined "such speculative injury is not irreparable injury

23  sufficient for a preliminary injunction."  (Ex. J, p. 6.)

24       [10] The docket in Plaintiff's criminal case belies his claim that he is being denied access to the court.  Plaintiff's criminal attorneys filed a Rule 33 motion, and Plaintiff filed one as

25  well.  *United States v. Raniere*, Case No. 1:18-cr-00204-NGG-VMS, Dkt. 1169, 1178.

26       [11] Plaintiff also requests an injunction restraining Defendants from "[e]ngaging in other behavior that amounts to a non-frivolous frustration or interference with his First Amendment right to access the courts for the purpose of collaterally attacking his conviction

27  and sentence."  (Doc. 1 at 36.)  The request is too vague to determine what, if any, behavior Plaintiff is requesting to have restrained, possibly because Defendants have not engaged in

28  any behavior which interferes with Plaintiff's access to courts or his collateral attack on his conviction, which is ongoing in New York District Court.

Citing only the Complaint for "background" and providing no evidence, Plaintiff filed the instant motion, seeking four injunctions, that:

1.    Plaintiff receive all legal calls and visits with attorneys that are requested by the Attorney;

2.    Plaintiff's power-of-attorney, Suneel Chakravorty be recognized as a legal professional for the purposes of communicating confidentially with Plaintiff;

3.    Plaintiff be released from SHU and returned to his original unit, or, if Plaintiff has to stay in the SHU, that he get a single cell for safety; and

4.    Plaintiff not be transferred to another prison.

(Doc. 3 at 12-13.)

## II.    Bureau Policies and Standards

### A.    Policies on Visitation and Telephone Privileges

As to inmate friends and associates, "[t]he visiting privilege ordinarily will be extended to friends and associates having an established relationship with the inmate prior to confinement, *unless such visits could reasonably create a threat to the security and good order of the institution.*  Exceptions to the prior relationship rule may be made, particularly for inmates without other visitors, *when it is shown that the proposed visitor is reliable and poses no threat to the security or good order of the institution.*"  28 C.F.R. § 540.44(c).  (Emphasis added.)  "Regardless of the institution's security level, the inmate must have known the proposed visitor(s) prior to incarceration.[12]  The Warden must approve any exception to this requirement."  P.S. 5267.09, *Visiting Regulations,* p. 6.[13]  (Ex. F, p. 3.)

"Use of TRULINCS is a privilege; therefore, the Warden may limit or deny the privilege of a particular inmate."  P.S. 4500.12, Trust Fund/Deposit Fund Manual, p. 126.[14]

---

[12] The Supreme Court approved a similar regulation in *Pell v. Procunier*, 417 U.S. 817, 827 (1974), because "[i]n the judgment of the state corrections officials, this visitation policy will permit inmates to have personal contact with those persons who will aid in their rehabilitation, while keeping visitations at a manageable level that will not compromise institutional security.  Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters."

[13] Available at https://www.bop.gov/policy/progstat/5267_09.pdf (last visited on January 6, 2023).

[14] Available at https://www.bop.gov/policy/progstat/4500.12.pdf (last visited on January 6, 2023).

(Ex. F, p. 4.)  "Inmates may be subject to telephone restrictions imposed by the Warden to protect the safety, security, and good order of the institution, as well as to protect the public." P.S. 5264.08, Inmate Telephone Regulations, p. 14.[15]  (*Id*.)

"The Bureau of Prisons recognizes the use of assistants by attorneys to perform legal tasks and, with proper controls and exceptions enumerated . . . accords such assistants the same status as attorneys with respect to visiting and correspondence."  28 C.F.R. § 543.16(a).  "The special visiting/correspondence status accorded to paralegals, clerks, and legal assistants depends on an ongoing, supervisory relationship with an attorney on an approved visiting/correspondence list.  Absent any current supervisory relationship, such persons may only receive social visiting or general correspondence privileges."  P.S. 1315.07, *Inmate Legal Activities*, p. 19.[16]  (Ex. B, p. 2.)

"The attorney who employs an assistant and who wishes the assistant to visit or correspond with an inmate on legal matters shall provide the Warden with a signed statement including: (1) Certification of the assistant's ability to perform in this role and awareness of the responsibility of this position; (2) A pledge to supervise the assistant's activities; and (3) Acceptance of personal and professional responsibility for all acts of the assistant which may affect the institution, its inmates, and staff.  The Warden may require each assistant to fill out and sign a personal history statement and a pledge to abide by Bureau regulations and institution guidelines.  *If necessary to maintain security and good order in the institution, the Warden may prohibit a legal assistant from visiting or corresponding with an inmate.*"  28 C.F.R. § 543.16(b)(1)-(3) (Emphasis added).  "The Warden may require each paralegal, clerk, or legal assistant to complete a BP-S243.013" Application to Enter Institution as Representative form[17] as well as the BP-S242.013 Paralegal or Legal Assistant Agreement

---

[15] Available at https://www.bop.gov/policy/progstat/5264_008.pdf (last visited on January 6, 2023).

[16] Available at https://www.bop.gov/policy/progstat/1315_007.pdf (last visited on January 6, 2023).

[17] Available at https://www.bop.gov/policy/forms/BP_A0243.pdf (last visited on January 6, 2023)

1  form.[18]  P.S. 1315.07, *Inmate Legal Activities,* pp. 18-19.[19]  (Ex. B, p. 3.)

2      **B.**    **SHU Policies and Procedures**

3         There are two types of status in the SHU: (1) administrative detention status and (2)

4  disciplinary segregation.  (Ex. M, p. 2.)  Administrative detention is a non-punitive status

5  which removes the inmate from the general population when necessary to ensure the safety,

6  security, and orderly operation of correctional facilities, or to protect the public.  *See* 28

7  C.F.R. § 541.22(a).  An inmate may be placed in administrative detention status for

8  investigation into or while awaiting a hearing "for possibly violating a Bureau regulation or

9  criminal law."  *See* 28 C.F.R. § 541.23(c)(1).  Bureau officials, not the inmate, determine

10  whether an inmate is placed in the SHU on administrative detention status.  (Ex. M, p. 2.)

11         Conversely, an inmate is placed on disciplinary segregation status "as a disciplinary

12  sanction."  *See* 28 C.F.R. § 541.24.  In disciplinary segregation status, an inmate's "personal

13  property will be impounded, with the exception of limited reading/writing materials, and

14  religious articles.  Also, [an inmate's] commissary privileges may be limited."  *See* 28

15  C.F.R. § 541.31(h)(1).  An inmate may be released from disciplinary segregation status

16  "after satisfying the sanction imposed by the DHO.  The SRO may release [the inmate]

17  earlier if it is determined [that he] no longer require[s] disciplinary segregation status."  *See*

18  28 C.F.R. 541.33(b).  (Ex. M, pp. 2-3.)

19         Regardless of the status of the inmate in the SHU, standardized conditions of

20  confinement are afforded each inmate in the SHU.  *See* 28 C.F.R. § 541.31(a)-(o) ("Your

21  living conditions in the SHU will meet or exceed standards for healthy and humane

22  treatment.").  Likewise, "You will receive personal items necessary to maintain an

23  acceptable level of personal hygiene, for example, toilet tissue, soap, toothbrush and

24  cleanser, shaving utensils, etc.  You will ordinarily have an opportunity to shower and shave

25  at least three times per week."  28 C.F.R. § 541.31(f).  Federal regulations outline the

---

27      [18] Available at https://www.bop.gov/policy/forms/BP_A0242.pdf (last visited on
January 6, 2023).

28      [19] Available at https://www.bop.gov/policy/progstat/1315_007.pdf (last visited on
January 6, 2023).

specific conditions of confinement in the following categories: (a) Environment; (b) Cell
Occupancy; (c) Clothing; (d) Bedding; (e) Food; (f) Personal Hygiene; (g) Exercise; (h)
Personal Property; (i) Correspondence; (j) Telephone; (k) Visiting; (l) Legal Activities; (m)
Staff Monitoring; (n) Programming Activities; and (o) Administrative Remedy Program.  *Id.*
Medical and mental health care are mandated as well.  *See* 28 C.F.R. § 541.32(a)-(b) ("After
every 30 calendar days of continuous placement in . . . administrative detention . . . status,
mental health staff will examine you, including a personal interview.  Emergency mental
health care is always available.").  (Ex. M, p. 3.)

        The SRO reviews an inmate's placement in the SHU periodically.  *See* 28 C.F.R.
§ 541.26.  "Within three work days of your placement in administrative detention status, not
counting the day you were admitted, weekends, and holidays, the SRO will review the
supporting records." 28 C.F.R. § 541.26(a).  There is also a formal review within "seven
continuous calendar days of your placement in . . . administrative detention . . . status . . . at
a hearing you can attend." 28 C.F.R. § 541.26(b).  "After every 30 calendar days of
continuous placement in . . . administrative detention . . . status, the SRO will formally
review your status at a hearing you can attend." 28 C.F.R. § 541.26(c).  "You can submit a
formal grievance challenging your placement in the SHU through the Administrative
Remedy Program[.]" 28 C.F.R. § 541.26(d).  (Ex. M, p. 3.)

        While in the SHU, inmates have access to informal grievance forms (BP-8) and
formal grievance forms (BP-9, BP-10, BP-11), as well as Cop-Outs, to make requests to
staff.  Cop-Outs can include any type of request, including if an inmate believes his Unit
Team is not providing him with forms, and may be made to any staff member, including
Associate Wardens and the Warden.  (Ex. M, pp. 3-4.)  SHU inmates are monitored by
program and unit team staff.  Qualified health personnel and one or more responsible
officers the Warden designates visit each inmate daily, and a Lieutenant visits the SHU
during each shift.  (*Id.*, p. 4.)  Either the Unit Manager or a Case Manager/Correctional
Counselor makes daily visits to inmates housed in the SHU.  The Unit Manager visits at
least weekly.  (*Id.*)  If an inmate has an issue he wants to bring to the attention of staff, he

can do so via a Cop-Out at any time or during the in person rounds with multiple Unit Team and other staff.  (*Id*., pp. 4-5.)

### C.      Constitutionality of SHU Placement

The Fifth Amendment prohibits deprivation of a protected life, liberty or property interest without due process.  U.S. Const. amend. V.  However, inmates who have been convicted of crimes do not have a liberty interest in being housed in the general population because placement in segregated housing for nonpunitive reasons is "within the terms of confinement ordinarily contemplated by a prison sentence." *Toussaint v. McCarthy*, 801 F.2d 1080, 1091 (9th Cir. 1986) (citing *Hewitt v. Helms*, 459 U.S. 460, 468 (1983)).  While a State may create liberty interests protected by the Due Process Clause, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995).  The *Sandin* Court recognized that placement in segregated housing does not "present the type of atypical, significant deprivation" in which a liberty interest might exist within the prison context.  *Id*. at 486; *see also Hewitt*, 459 U.S. at 468 ("It is plain that the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence... [A]dministrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration.")  Further,

> Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel…[T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.  Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.

*Bell v. Wolfish*, 441 U.S. 520, 547 (1979) (internal citations omitted).

**D.    Designation of Inmates**

Congress delegated to the Bureau the duty to manage and regulate all federal penal and correctional institutions.  18 U.S.C. § 4042(a)(1).  Title 18 U.S.C. § 3621 governs imprisonment of persons convicted of federal crimes and delegates to the Bureau the authority to designate the institution where a prisoner will serve his sentence.  *See* 18 U.S.C. § 3621(b); *Rodriguez v. Smith*, 541 F.3d 1180, 1184–86 (9th Cir. 2008) (recognizing discretionary authority of Bureau under 18 U.S.C. § 3621(b) to make placement or transfer decisions); *United States v. Ceballos*, 671 F.3d 852, 855 (9th Cir. 2011) ("Authority to determine place of confinement resides in the executive branch of government and is delegated to the Bureau of Prisons.") (internal citation omitted); *United States v. Dragna*, 746 F.2d 457, 458 (9th Cir. 1984) (same).  The place of incarceration can be "maintained by the Federal Government or otherwise," and the Bureau "may at any time … direct the transfer of a prisoner from one penal or correctional facility to another."  18 U.S.C. § 3621(b).  The statute unambiguously states that "a designation of a place of imprisonment … is not reviewable by any court."  18 U.S.C. § 3621(b); accord *Ceballos*, 671 F.3d at 855 (holding courts have "no jurisdiction to select the place where the sentence will be served").

**III.    Legal Standards**

**A.    Standards for a Preliminary Injunction**

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion.'" *Lopez v. Brewer,* 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (per curiam)) (emphasis added); *see also Winter v. NRDC, Inc.,* 555 U.S. 7, 24 (2008) (citation omitted) ("[A] preliminary injunction is an extraordinary remedy never awarded as of right.").  Whether for a temporary restraining order or a preliminary injunction, the test is the same.  *White v. Lindermen,* No. CV 11-8152-PCT-RCB (ECV), 2012 WL 5040850, at *1 (D. Ariz. Oct. 18, 2012) (citations omitted).

A plaintiff seeking preliminary injunctive relief must show (1) he is likely to succeed

on the merits, (2) he is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his favor, and (4) the requested injunction is in the public interest. *Fuller v. Granville,* No. CV 14-0020-PHX-DGC, 2014WL4541122, at *6 (D. Ariz. Sept. 12, 2014) (citing *Winter,* 555 U.S. at 20). Alternatively, the plaintiff may establish "serious questions going to the merits" – something less than a likelihood of success on the merits – but only if the plaintiff also establishes that the "balance of hardships tips sharply in the plaintiff's favor" and the other two elements of the *Winter* test are met. *All. For The Wild Rockies v. Cottrell,* 632 F.3d 1127, 1135 (9th Cir. 2011). Under the "serious questions" test, the plaintiff must make a stronger showing of one element to offset a weaker showing of another. *Id.* Whichever formulation of the standard is applied, the movant has the burden of proof on each element of the test. *Env'l Council of Sacramento v. Slater,* 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).

Further, a preliminary injunction is "merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981). Thus, "there is a heightened burden where a plaintiff seeks a mandatory preliminary injunction (one that would alter the status quo), which should not be granted 'unless the facts and law clearly favor the plaintiff.'" *White,* 2012 WL 5040850, at *1 (quoting *Comm. of Cent. Am. Refugees v. Immigration and Naturalization Serv.,* 795 F.2d 1434, 1441 (9th Cir. 1986)).

The Prison Litigation Reform Act (PLRA) imposes further requirements on a prisoner who seeks injunctive relief. The PLRA requires that any injunctive relief be *narrowly drawn* and the *least intrusive means* necessary to correct the harm. 18 U.S.C. § 3626(a)(2); *Gilmore v. Cal.,* 220 F.3d 987, 999 (9th Cir. 2000). Under the PLRA, "[t]he court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." 18 U.S.C. § 3626(a)(2). Courts recognize that "because the problems of prisons in America are complex and intractable, and because courts are particularly ill equipped to deal with these problems, [courts] generally have deferred to the judgments of prison officials." *Shaw v. Murphy,* 532 U.S. 223, 229 (2001)

1  (internal quote marks and citation omitted).

2  **B.    Standards Regarding Bureau Policies and Correctional Judgment**

3         The Supreme Court has made it clear that "a prison regulation [that] impinges on

4  inmates' constitutional rights … is valid if it is reasonably related to legitimate penological

5  interests.  In our view, such a standard is necessary if 'prison administrators ..., and not the

6  courts, [are] to make the difficult judgments concerning institutional operations.'" *Turner v.*

7  *Safley*, 482 U.S. 78, 89 (1987).  First, the regulation cannot be "arbitrary or irrational," and

8  the "governmental objective must be a legitimate and neutral one." *Id.* at 90.  Second, if

9  "there are alternative means of exercising the right that remain open to prison inmates," then

10  "courts should be particularly conscious of the 'measure of judicial deference owed to

11  corrections officials ... in gauging the validity of the regulation.'" *Id.* (quoting *Procunier*,

12  417 U.S. at 827).  Third, the court considers the impact accommodation would have on the

13  allocation of prison resources, guards and other inmates.  *Id.*  "When accommodation of an

14  asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff,

15  courts should be *particularly deferential to the informed discretion of corrections officials*."

16  *Id.* (Emphasis added.)  Finally, the court considers whether there is a ready alternative or the

17  regulation is an "'exaggerated response" to prison concerns." *Id.*  Thus, "if an inmate

18  claimant can point to an alternative that fully accommodates the prisoner's rights at *de*

19  *minimis* cost to valid penological interests, a court may consider that as evidence that the

20  regulation does not satisfy the reasonable relationship standard." *Id.*

21         As to the First Amendment, "a prison inmate retains those First Amendment rights

22  that are not inconsistent with his status as a prisoner or with the legitimate penological

23  objectives of the corrections system.  Thus, challenges to prison restrictions that are asserted

24  to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and

25  goals of the corrections system, to whose custody and care the prisoner has been committed

26  in accordance with due process of law." *Procunier*, 417 U.S. at 822.  Also, "central to all

27  other corrections goals is the institutional consideration of internal security within the

28  corrections facilities themselves." *Id.*

- 19 -

1    In the Ninth Circuit, if the Sixth Amendment right to counsel is implicated, the

2    courts also consider whether "the government deliberately interferes with the confidential

3    relationship between a criminal defendant and defense counsel," and, if so, whether the

4    interference "substantially prejudices the criminal defendant." *Nordstrom v. Ryan*, 762 F.3d

5    903, 910 (9th Cir. 2014).  In an action seeking to enjoin "the continuation of an

6    unconstitutional practice," substantial prejudice would be "that his right to privately confer

7    with counsel has been chilled." *Id.* at 911.

8    **IV.    Legal Discussion**

9        **A.    The motion is outside the scope of the instant proceeding.**

10    "A court's equitable power lies only over the merits of the case or controversy

11    before it." *Pac. Radiation Oncology, L.L.C. v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th

12    Cir. 2015).  If, instead, "a plaintiff seeks injunctive relief based on claims not pled in the

13    complaint, the court does not have the authority to issue an injunction." *Id.* "[T]here must

14    be a relationship between the injury claimed in the motion for injunctive relief and the

15    conduct asserted in the underlying complaint." *Id.* at 636.  A "sufficiently strong" nexus

16    between the injunction and the complaint can be found "where the preliminary injunction

17    would grant 'relief of the same character as that which may be granted finally.'" *Id.*

18    (quoting *De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 220 (1945)); *see also*

19    *Saddiq v. Ryan*, 703 F. App'x 570, 572 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 1335 (2018)

20    (denying request for preliminary injunctive relief regarding alleged retaliation because

21    Saddiq failed to establish nexus between the retaliation claim and the claims in the

22    complaint); *Pearson v. GEO Grp. Inc.,* No. CV-16-03094-PHX-DGC (BSB), 2018 WL

23    1382526, at *2 (D. Ariz. Mar. 19, 2018) (denying motion for injunctive relief regarding

24    nipple rings in proceeding involving mail); *Brisken v.* Griego, No. CV 16-02434-PHX-JJT

25    (ESW), 2017 WL 8792538, at *4 (D. Ariz. Dec. 8, 2017) (denying injunction to be taken to

26    eye doctor when only medical allegations in complaint related to broken hand); *Valenzuela*

27    *v. Ryan,* No. CV-15-00158-PHX-NVW (MHB), 2016 WL 8193623, at *1 (D. Ariz. Nov. 14,

28    2016) (denying request for preliminary injunction regarding rapes alleged to be retaliation

for current lawsuit because plaintiff was required to file new lawsuit to allege new claims).

Here, Plaintiff seeks four injunctions requiring that

➢ Plaintiff receive all legal calls and visits with attorneys that are requested by the attorney;

➢ Defendants recognize Plaintiff's *power-of-attorney*, Suneel Chakravorty, a non-attorney, as a legal professional for the purposes of communicating confidentially with Plaintiff;

➢ Defendants release Plaintiff from SHU and return him to his original unit or provide him a single cell in the SHU; and

➢ Defendants designate Plaintiff to USP Tucson for the remainder of his 120-year prison sentence.

(Doc. 3 at 12-13.)  The requested injunctions are not related to or greatly exceed the relief requested in the suit.  (Compare Doc. 3 at 12-13 with Doc. 1 at 36-37.)  The Complaint itself sought an injunction restraining Defendants and their agents from interfering with Plaintiff's telephonic communication with his attorneys and their employees and agents or Plaintiff's visiting with his attorneys, "subject only to modest limitations that are reasonably related to legitimate penological interests of Defendants."  (Doc. 1 at 36.)  Thus, an injunction requiring that the Bureau provide Plaintiff *all* legal calls and visits requested by *any* of his many attorneys, not subject "to modest limitations that are reasonably related to legitimate penological interests" greatly exceeds the relief requested in the Complaint.  The request that Plaintiff's "power-of-attorney," an admitted non-lawyer, be considered a legal professional for purposes of confidential communications is not included in or related to the relief requested in the Complaint.  (*See* Doc. 1.)  Nor is the request for an injunction requiring that Plaintiff be released from the SHU or housed singly while in the SHU or an injunction requiring Defendants to designate Plaintiff to USP Tucson indefinitely.  (*Id.*)

Plaintiff's motion for a preliminary injunction must be denied because the requested injunctions are outside the scope of and exceed the relief requested in the instant proceeding.

## B.    Plaintiff Has Not Established the *Winter* Factors.

Plaintiff seeks extraordinary affirmative injunctive relief.  Far from the required "clear showing" and heightened standard for such affirmative relief altering the status quo,

Plaintiff fails to establish the *Winter* factors as to any of his requested injunctions.

**1.     Plaintiff has not established a likelihood of success on the merits as to access to counsel or Mr. Chakravorty.**

Just as with Plaintiff's first Motion for Preliminary Injunction in his first action against Defendants, Plaintiff has not established a likelihood of success or that serious questions go to the merits as to access to counsel or to Mr. Chakravorty.  Once again, Plaintiff has failed to introduce "evidence . . . that Plaintiff has been unable to communicate with his attorneys or their agents who have been cleared by the institution to have confidential communications with Plaintiff," and "Plaintiff has not provided any evidence that Mr. Chakravorty is a paralegal or agent of any kind *employed by* Plaintiff's attorney(s)." (Ex. I, pp. 14-15.) (Emphasis added.)

The record is clear that Plaintiff has had robust access to his counsel, including legal calls, legal visits and legal mail.  (Ex. A, ¶¶ 23-26; Ex. B, pp. 4-8, 36-37, 39-40; Ex. C, pp. 4-6; Ex. K, pp. 1-3, 6-7, 11-12.).  Plaintiff's criminal attorney has recognized as much: "Thank you for assisting me and my firm with the many calls over the last year or so.  I know it isn't easy to arrange this many calls and visits.  I understand that you have limited resources and other calls and visits to manage in addition to Mr. Raniere's numerous requests.  Overall, you have been able to arrange most calls and most visits with Mr. Raniere.  These calls are extremely helpful and important in our representation of Mr. Raniere."  (Ex. A, ¶ 22, Att. 3, Email from criminal attorney.)  Plaintiff attempts to manufacture a claim for lack of access to counsel by noting the legal visit that was cancelled when an inmate at FCC Tucson attempted to shoot a visitor and the Warden's refusal to allow Mr. de la Garza[20] a legal visit when he has not established that he is a licensed attorney in good standing.  (Doc. 1 at 20-22, 31.) The Bureau has facilitated Plaintiff's meeting with his attorneys, both via numerous confidential legal calls and frequent legal visits.  No evidence supports the bald allegations

---

[20] Plaintiff alleges that Mr. de la Garza has been "banned."  (Doc. 3 at 3.)  The evidence shows that he has not yet been granted legal visitation because he has not taken the necessary steps. (Ex. A, ¶¶ 9-21.)  Plaintiff also alleges that attorneys Stoltz and Scheff "have been banned from in-person legal visits with Plaintiff for the foreseeable future." (Doc. 3 at 3.)  Again, the evidence flatly contradicts the allegation:  Both Stoltz and Scheff had legal visits with Plaintiff on January 9, 2023, and January 31, 2023, clearly dates within the "foreseeable future" from December 19, 2022.  (Ex. A, ¶ 25.)

that the Bureau has interfered with any legal calls.  The one legal call that was dropped was promptly reconnected, which Plaintiff neglected to mention in the Complaint.  (Doc. 1.) Plaintiff produced no evidence that any Bureau employee hindered a single legal call or legal visit between Plaintiff and his attorneys.

As to Mr. Chakravorty, the great weight of the evidence shows that he is Plaintiff's agent who was affiliated with ESP and NXIVM, not a "paralegal" *employed by* his attorney, has engaged in conduct that threatened the safety and security of the institutions and the public in both New York and Arizona, and is one of the people with whom Plaintiff was banned by his sentencing judge from associating.

Plaintiff has not cited a single case that shows that a defendant has a Sixth Amendment right to meet with someone who has a "power of attorney," rather than a paralegal employed and supervised by an attorney.  Instead, Plaintiff's cited cases assert that the "attorney-client privilege" applies to communications with a paralegal *employed by* an attorney.[21]  *See United States v. Sanmina Corp. & Subsidiaries,* 968 F.3d 1107, 1116 (9th Cir. 2020) ("The attorney-client privilege may extend to communications with third parties *who have been engaged* to assist the attorney in providing legal advice." (Emphasis added.)); *United States v. Mikhel*, 552 F.3d 961, 963-65 (9th Cir. 2009) (holding "[t]he inmate's attorney's *pre-cleared* paralegal(s) and *pre-cleared* investigators *in the regular full-time employment of the attorney* may meet with the inmate without the necessity of the inmate's attorney being present" and recognizing that the government's security interests were

---

[21] Plaintiff's reliance on *United States v. Rowe*, 96 F.3d 1294 (9th Cir. 1996), is problematic at best.  While the Ninth Circuit did recognize that "fact-finding which pertains to legal advice counts as 'professional legal services,'" no paralegals were involved.  *Id.* at 1297.  Instead, the senior attorney "asked lawyers – not secretaries, paralegals, librarians or other of the firm's employees – to conduct the investigation.  And, having chosen to hand the job over to lawyers, he is justified in expecting that communications with these lawyers will be privileged." *Id.*  Similarly, in *Jenkins*, 487 F.3d at 491, the court does not indicate "outside experts engaged 'to assist the attorney in providing legal services to the client'" "often prove indispensable to the attorney because they 'transmit[] or interpret[] client communications to the attorney" as stated at Doc. 3 at 7.  To the contrary, the court included in the list of people covered by the attorney client privilege "*members of the office staff responsible for transmitting messages between the attorney and client.*" (Emphasis added.) *Benjamin v. Fraser*, 264 F.3d 175, 186 (2d Cir. 2001), cited at Doc. 3 at 10, did not involve paralegals and does not include the purported quotation.

1   satisfied by a translator submitting to a background check and being "cleared by the FBI and

2   USA/CDCA.")

3          Nor is Plaintiff's belief that his Sixth Amendment rights trump all other

4   considerations supported by his cited cases.  In *Luis v. United States*,[22] 578 U.S. 5, 11-12

5   (2016), the Supreme Court explained that "[a] defendant has no right, for example, *to an*

6   *attorney who is not a member of the bar*."  (Emphasis added.)  In *Geders v. United States*,

7   425 U.S. 80, 87 (1976), the court noted that "[t]o the extent that conflict remains between the

8   defendant's right to consult with his attorney during a long overnight recess in the trial, and

9   the prosecutor's desire to cross-examine the defendant without the intervention of counsel,

10  with the risk of improper 'coaching,' the conflict must, under the Sixth Amendment, be

11  resolved in favor of the right to the assistance and guidance of counsel."  However, here, the

12  conflict is not with a prosecutor's desire to avoid counsel's coaching the witness, it is with

13  the Bureau's "legitimate penological interests" and "the institutional consideration of internal

14  security within the corrections facilities themselves."  *See Turner*, 482 U.S. at 89, *Procunier*,

15  417 U.S. at 822.  Plaintiff has not shown that the Bureau has deliberately interfered with the

16  confidential relationship between him and his counsel or chilled his right to privately confer

17  with counsel.  *See Nordstrom*, 762 F.3d at 910.  He cannot do so because the evidence shows

18  that the Bureau has facilitated his numerous confidential legal calls and frequent legal visits

19  with his counsel.

20         Plaintiff has introduced no credible evidence[23] that he has been denied access to his

21  counsel or that his ardent supporter, with whom he had been engaging in monitored social

22  calls, is a "paralegal."  The evidence is clear that Mr. Chakravorty is *Plaintiff's* agent.  Once

23  again, Plaintiff has failed to show a lack of access to counsel and the courts.  (*See* Ex. I, pp.

24

25         [22] Plaintiff erroneously states that *Luis* is about "the government's interest in
    'freezing' potentially ill-gotten proceeds."  (Doc 3 at 10.)  The Supreme Court said the

26  opposite in holding "the pretrial restraint of *legitimate, untainted assets* needed to retain
    counsel of choice violates the Sixth Amendment.  The nature and importance of the

27  constitutional right *taken together with the nature of the assets* lead us to this conclusion."
    *Luis*, 578 U.S. at 10.  (Emphasis added.)

28         [23] Plaintiff has introduced no evidence at all, instead relying upon the allegations in
    his Complaint, many of which are based "on information and belief."  (Doc. 1.)

14-15.)  Plaintiff has not established a likelihood of success on the merits as to access to counsel or Mr. Chakravorty.

**2.      Plaintiff has not established a likelihood of success on the merits as to his allegations regarding retaliation.**

Plaintiff has not established a likelihood of success or that serious questions go to the merits as to his allegations of retaliation.  The evidence contradicts Plaintiff's bald assertions.  As demonstrated above, Plaintiff has had and continues to have robust access to his attorneys, and Plaintiff's "friends and supporters" have been banned for legitimate reasons because they broke Bureau rules and endangered the safety and security of Bureau institutions.  That leaves Plaintiff's claimed "adverse action" as "keeping Plaintiff in the SHU with a mentally unstable cellmate." (Doc. 3 at 8.)  This Court already rejected Plaintiff's speculative allegations regarding his cellmate. (*See* Ex. J, p. 6.)  The only *evidence* in the record is that Plaintiff is being held in the SHU while the SIS Department is investigating safety and security issues pertaining to Plaintiff at USP Tucson.  (Ex. M, p. 5.)

The Bureau has "legitimate penological interests" and a central correctional goal "of internal security within the corrections facilities themselves." *See Turner*, 482 U.S. at 89; *Procunier*, 417 U.S. at 823.  Plaintiff has not provided any evidence that the Bureau deliberately interfered with the confidential relationship between him and his counsel or chilled his right to confer privately with counsel. *See Nordstrom*, 762 F.3d at 910.  He cannot do so because the evidence shows that the Bureau has facilitated his numerous confidential legal calls and frequent legal visits with his multiple counsel – which legal calls and legal visits continue even while he currently is housed in the SHU. (Ex. A, ¶¶ 23-26; Ex. B, pp. 4-8, 36-37, 39-40; Ex. C, pp. 4-6; Ex. K, pp. 1-3, 6-7, 11-12.)  Similarly, Plaintiff has not shown that his SHU placement interferes with his access to courts.  Access to courts and counsel form the basis of the Complaint and Motion.  (Docs. 1, 3.)

**3.      Plaintiff has not established a likelihood of success on the merits as to a purported transfer.**

Not having provided a scintilla of support for his request to avoid a transfer, Plaintiff fails to establish a likelihood of success on the merits as to a transfer.  First, the Complaint does not seek to avoid a transfer or even mention a transfer. (Doc. 1.)  Second, the motion

1   does not mention a transfer – except to request that this Court enter an injunction preventing

2   a transfer.  (Doc. 3 at 1, 13.)  Plaintiff has not established a likelihood of success on the

3   merits as to a purported transfer.

4            **4.**        **Plaintiff has not established irreparable harm as to any of his requested injunctions.**

5          Plaintiff has not shown irreparable harm.  A plaintiff "must demonstrate that there

6   exists a significant threat of irreparable injury."  *Oakland Tribune, Inc. v. Chron. Publ'g Co.,*

7   762 F.2d 1374, 1376 (9th Cir. 1985).  The irreparable injury must be both likely and

8   immediate.  *Winter,* 555 U.S. at 24.  Mere "[s]peculative injury does not constitute

9   irreparable injury to warrant granting a preliminary injunction."  *Caribbean Marine,* 844

10  F.2d at 674.

11         Plaintiff erroneously[24] stated that an Arizona District Court found that "a prisoner

12  who suffered a First Amendment violation enjoys a presumption of irreparable harm."  (Doc.

13  3 at 11.)  Again, the case says the opposite:  "Therefore, based on the filings, the oral

14  argument, the evidence presented, and the case law, the Court finds that the Plaintiff has

15  demonstrated the possibility of irreparable harm, if not the probability of harm."  *Luckette v.*

16  *Lewis*, 883 F. Supp. 471, 483 (D. Ariz. 1995).  Here, Plaintiff has had and continues to have

17  confidential communication with his counsel by frequent legal visits, legal mail and legal

18  calls.[25]  (Ex. A, ¶¶ 23-26; Ex. B, pp. 4-8, 36-37, 39-40; Ex. C, pp. 4-6; Ex. K, pp. 1-3, 6-7,

19  11-12.)  This Court already has rejected Plaintiff's allegations regarding his cellmate as too

20  speculative to constitute irreparable harm.  (Ex. J, p. 6.)

21         In Plaintiff's prior action, the Court recognized "[i]n the section of his Motion

22  discussing irreparable injury, Plaintiff merely cites the legal standards and states in a

23        [24] Many of Plaintiff's cited cases simply do not support his claims.  In *United States v.*
24  *Gonzalez-Lopez*, 548 U.S. 140, 147-48 (2006), after the lower court refused to allow the
    defendant's chosen counsel to appear pro hac vice, the Supreme Court noted that "[t]he right
25  to select counsel of one's choice, by contrast, has never been derived from the Sixth
    Amendment's purpose of ensuring a fair trial.  It has been regarded as the root meaning of
26  the constitutional guarantee," not as Plaintiff claims "Courts have held that access-to-counsel
    claims based on the government's wrongful interference strike at the 'root . . . of the
27  constitutional guarantee.'"  (*See* Doc. 3 at 10-11.)
          [25] Not having mentioned a purportedly imminent transfer in the motion (Doc. 3),
28  Plaintiff has not shown irreparable injury by denying his injunctive requests regarding his
    housing.

conclusory fashion that he 'is likely to suffer irreparable harm because, absent injunctive relief, he will be deprived of the most basic constitutional protections under the First Amendment."[26]  (Ex. J, pp. 5-6.)  In that case, the Court held that "Plaintiff's Motion, as it relates to his access to the courts, fails because Plaintiff has not presented any evidence supporting that his ability to litigate has been hindered by prison officials, and Plaintiff has not alleged an actual injury such as inability to meet a filing deadline or to present a claim." (Ex. J, p. 7.)  The same applies equally here.

**5.      The equities and public policy favor upholding Bureau policies and correctional decisions.**

The equities and public policy favor upholding the Bureau's correctional decisions. The evidence establishes no grounds for the extraordinary measure of overriding the professional judgment of the Bureau:  first, in preventing the security risk inherent in allowing contact between an inmate and a person the sentencing court banned, particularly when the person already has violated Bureau policies and put the safety and security of the institutions and the public at risk in two states; second, in holding an inmate in non-punitive administrative detention status while the SIS Department is investigating safety and security issues pertaining to him at his current institution; and third, in fulfilling its statutorily mandated duty to designate Plaintiff.

The Court should reject Plaintiff's effort to override those decisions and choose his place and manner of incarceration.

## IV.      Request for Hearing

It is Plaintiff's burden to establish entitlement to injunctive relief, which he has failed to do.  However, in the event further evidence or information are needed for the denial of Plaintiff's motion, Defendants request an evidentiary hearing.

## V.      Conclusion

For the foregoing reasons, Defendants Garland, Peters, Gutierrez and Ulrich request that the Court deny the Motion for Preliminary Injunction (Doc. 3).

---

[26] Plaintiff makes the identical argument here.  (Doc. 3 at 11.)

1      RESPECTFULLY SUBMITTED:  February 7, 2023.

2                                          GARY M. RESTAINO
                                           United States Attorney
3                                          District of Arizona

4                                          *s/ Denise Ann Faulk*
                                           DENISE ANN FAULK
5                                          Assistant U.S. Attorney

6      Copy of the foregoing served via EM/ECF to

7      Stacy Scheff
       LAW OFFICE OF STACY SCHEFF
8      P.O. Box 40611
       Tucson, AZ 85717
9

10     s/ *Pamela Vavra*
       */ Resp to MPI - First*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28