Exhibit G

October 30, 2021

Dear Honorable Judge Komitee,

My name is Suneel Chakravorty. I am not a party to this case, nor am I an attorney. I am defendant Keith Raniere's power of attorney.

The plaintiffs' attorney, Neil Glazer referred to me in a status conference on October 15 (Dkt. 92) and his letter to the Court dated October 29 (Dkt. 100), requesting a non-party subpoena be served upon me.

I respectfully submit this letter to your Honor in response to some of Mr. Glazer's comments.

First and foremost, I am not in possession, nor have I ever been, of any hard drive, or copy thereof, from the criminal case. By now, Honorable Judge Garaufis's inquiry has likely confirmed this. I do not possess any DOS collateral, nor do I possess or have I ever seen any nude photographs of Camila, one of the plaintiffs in the case before you.

To my knowledge, I possess no evidence that has any relevance to this civil litigation.

I do possess redacted nude photos [where the breasts and genitals are blurred] of a 27-year-old Camila, taken in 2017, which contain no visible appendectomy scar. The original, unredacted version of the photos, which I do not possess, were not collateral.

I was informed that these photos were voluntarily and happily taken by the founding sisters of DOS as a ritual before meetings and were not meant for anyone to use as collateral.

The purpose of the redacted photos is to possibly be used as evidence in the criminal proceeding of the USA v Raniere, to show that the prosecution's determining the age of the subject in the photos based on the lack of an appendectomy scar is not dispositive, and the redacted photos are not to be otherwise disseminated. I would be glad to submit these redacted photos to the Court, *ex parte* and under seal.

As Mr. Raniere's power of attorney, I have referred cyber forensics experts to his criminal counsel to investigate his allegation that the FBI falsified and tampered with evidence. These experts signed a Protective Order and had access to protected discovery materials. The experts include the following:

Dr. James Richard Kiper, Ph.D., who served in the FBI for twenty years and retired in 2019, in good standing. He is a celebrated whistleblower and the "raison d'etre" of the FBI Whistleblower Protection Enhancement Act of 2016.

Mr. Steve Abrams, M.S., J.D., who has advised and trained federal, state and local law enforcement in cyber forensics for three decades, on over 1,200 cases.

Mr. Wayne Norris, who has been an expert witness in roughly 100 cases, holds several patents in nuclear instrumentation, and has a diverse technical background, from working on the Apollo project, to project managing for the US Navy, to digital forensics.

These experts have stated that prior to this case, they had never before seen or claimed to have seen credible evidence of tampering on the part of any law enforcement. After examining the forensic evidence, they issued reports which may be used in a motion in the criminal case, and here are some of their findings:

- FBI Senior Forensic Examiner Brian Booth provided false testimony.
- An unknown person improperly accessed and altered data on the camera card on 9/19/18.
- Photos were added to the camera card while the device was in FBI custody, between 4/11/19 and 6/11/19.
- Date and times of photos on the hard drive were manually altered.
- Folder names were manually set to exact dates and times in 2005, to corroborate the fabricated photo dates.
- The backup folder on the hard drive containing the photos was backdated and manually placed on the hard drive and efforts were made to conceal the forgery and make it look like a legitimate automatic computer backup.

Dr. Kiper writes in his technical report, "In my 20 years as an FBI agent, I have never observed or claimed that an FBI employee tampered with evidence, digital or otherwise. But in this case, I strongly believe the multiple, intentional alterations to the digital information I have discovered constitute evidence manipulation. And when so many human-generated alterations happen to align with the government's narrative, I believe any reasonable person would conclude that evidence tampering had taken place. My analysis demonstrates that some of these alterations definitely took place while the devices were in the custody of the FBI. Therefore, in the absence of any other plausible explanation it is my expert opinion that the FBI must have been involved in this evidence tampering."

Mr. Abrams writes, "[I]t saddens me to conclude that the most plausible explanation for these artifacts is manual alteration of the digital photographic and file system evidence and an unsuccessful attempt to cover that manual alteration, at least some of which had to have occurred while the evidence was in the custody of the FBI."

Mr. Norris writes, "I believe based on what I have reviewed that Dr. Kiper is correct in his assessments that no plausible explanation exists for the anomalies in the Government's exhibits other than intentional tampering on the part of the Government."

I hope that the above information assuages Mr. Glazer's concerns and provides this Court with useful context.

Sincerely,

Suneel Chakravorty

Suneel Kumar Chakravorty

# ALL-PURPOSE ACKNOWLEDGMENT

State/Commonwealth of __TEXAS__ )
)
☐ City ☑ County of __Comal__ )

On __11/01/2021__ before me, __Lauren Peterson__ ,
<div style="padding-left:1em">Date        Notary Name</div>

personally appeared __Suneel Kumar Chakravorty__
<div style="text-align:center">Name(s) of Signer(s)</div>

☐ personally known to me **– OR –**

☐ proved to me on the basis of the oath of _____ **– OR –**
<div style="text-align:center">Name of Credible Witness</div>

☑ proved to me on the basis of satisfactory evidence: ____**passport**____
<div style="text-align:center">Type of ID Presented</div>

to be the individual(s) whose name(s) is (are) subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and by proper authority, and that by his/her/their signature(s) on the instrument, the individual(s), or the person(s) or entity upon behalf of which the individual(s) acted, executed the instrument for the purposes and consideration therein stated.

WITNESS my hand and official seal.

Notary Public Signature: _Lauren Peterson_

Notary Name: __Lauren Peterson__

Notary Commission Number: _12499352-4_

Notary Commission Expires: _06/03/2025_

*Notarized online using audio-video communication*

**Notary Seal:**
Lauren Peterson
NOTARY PUBLIC
STATE OF TEXAS
ID NUMBER
12499352-4
COMMISSION EXPIRES
June 3, 2025

## DESCRIPTION OF ATTACHED DOCUMENT

Title or Type of Document: __Letter__

Document Date: __11/01/2021__ Number of Pages (w/ certificate): __3__

Signer(s) Other Than Named Above: __N/A__

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _Suneel Kumar Chakravorty_

☐ Corporate Officer Title: _____
☐ Partner – ☐ Limited ☐ General
☑ Individual ☐ Attorney in Fact
☐ Trustee ☐ Guardian of Conservator
☐ Other: _____
Signer Is Representing: _Self_

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____

☐ Corporate Officer Title: _____
☐ Partner – ☐ Limited ☐ General
☐ Individual ☐ Attorney in Fact
☐ Trustee ☐ Guardian of Conservator
☐ Other: _____
Signer Is Representing: _____

( 3 )

Ex. G, p. 3

Exhibit H

ORIGINAL

November 28, 2021



Dear Honorable Judge Komitee,

I am writing on behalf of defendant Keith Raniere, as his power of attorney, to respectfully inform you that he intends to retain counsel to defend him in this case, but unfortunately has not yet been able to do so. He has been in the SHU, or "solitary," for the better part of the last four months and so has had little ability to communicate, even with his attorneys.

Although there will be no attorney appearing for him in this week's status hearing, I will request a transcript of the hearing and have Mr. Raniere's criminal attorney send it to him, so he can remain as up to date as possible.

Should this Court require proof of my Power of Attorney, I would be happy to submit it under seal and *ex parte*.

Sincerely,

Suneel Kumar Chakravorty

Suneel Chakravorty

*see attached acknowledgement certificate *

**Ex. H, p. 1**

# ALL-PURPOSE ACKNOWLEDGMENT

State/Commonwealth of __FLORIDA__ )
)
☐ City ☑ County of __Palm Beach County__ )

On __11/28/2021__ before me, __Tikel R. Wedges-Phoenix__,
*Date*                                          *Notary Name*

personally appeared __Suneel Kumar Chakravorty__
*Name(s) of Signer(s)*

☐   personally known to me **-- OR --**

☐   proved to me on the basis of the oath of _____ **-- OR --**
*Name of Credible Witness*

☑   proved to me on the basis of satisfactory evidence: __driver_license__
*Type of ID Presented*

to be the individual(s) whose name(s) is (are) subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and by proper authority, and that by his/her/their signature(s) on the instrument, the individual(s), or the person(s) or entity upon behalf of which the individual(s) acted, executed the instrument for the purposes and consideration therein stated.

WITNESS my hand and official seal.

TIKEL R. WEDGES-PHOENIX
Notary Public - State of Florida
Commission # HH86020
Expires on January 27, 2025

Notary Public Signature: *Tikel R. Wedges-Phoenix* Online Notary

Notary Name: __Tikel R. Wedges-Phoenix__

Notary Commission Number: __HH86020__

Notary Commission Expires: __01/27/2025__

*Notarized online using audio-video communication*

Notarized online using audio-video communication

## DESCRIPTION OF ATTACHED DOCUMENT

Title or Type of Document: __Letter to Judge__

Document Date: __11/28/2021__        Number of Pages (w/ certificate): __2__

Signer(s) Other Than Named Above: _____N/A_____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: __Suneel Kumar Chakravorty__

☐   Corporate Officer  Title: _____N/A_____
☐   Partner – ☐   Limited ☐   General
☐   Individual ☐   Attorney in Fact
☐   Trustee   ☐   Guardian of Conservator
☑   Other: __POA__
Signer Is Representing: __self__

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: __N/A__

☐   Corporate Officer  Title: ___N/A___
☐   Partner – ☐   Limited ☐   General
☐   Individual ☐   Attorney in Fact
☐   Trustee   ☐   Guardian of Conservator
☐   Other: ___N/A___
Signer Is Representing: ___N/A___

( 2 )

Ex. H, p. 2

Suneel Chakravorty
# 1112
1280 Lexington Ave, Ste 2
New York, NY 10028

Honorable Eric Komitee

Re: 20-cv-00485



Exhibit I

MGD

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Keith Raniere,

                Plaintiff,

v.

Merrick Garland, et al.,

                Defendants.

No.  CV 22-00212-TUC-RCC

**ORDER**

On May 5, 2022, Plaintiff Keith Raniere, who is currently confined in the United States Penitentiary (USP)-Tucson and is represented by counsel, filed a civil rights Complaint pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) against United States Attorney General Merrick Garland, Bureau of Prisons (BOP) Director Michael Carvajal, USP-Tucson Warden Barbara Von Blanckensee, and Lieutenant Anthony Gallion.  Plaintiff also paid the filing fee.  On May 6, 2022, Plaintiff filed a First Amended Complaint seeking declaratory and injunctive relief to enjoin "prison officials from retaliating, and from actively frustrating and impeding his First and Sixth Amendment rights to access to the courts and counsel." (Doc. 3 at 1.)

On May 26, 2022, Plaintiff filed a Motion for Preliminary Injunction and requested expedited consideration and a hearing.  (Doc. 7.)  Plaintiff states in his Motion that his three-year deadline for post-conviction relief based on newly discovered evidence is June 19, 2022 and that Defendants are "unlawfully hindering and obstructing Plaintiff's First and Sixth Amendment rights to communicate via telephone with his criminal defense

attorneys and his attorneys' agents in the lead-up to the 3-year deadline . . . ." (*Id.* at 1.) On May 31, 2022, the Court determined that Plaintiff did not meet the standard for an ex parte temporary restraining order and ordered Plaintiff to immediately serve Defendants with the First Amended Complaint and Motion for Preliminary Injunction given the imminent deadline for Plaintiff's post-conviction relief filing. (Doc. 9.) Defendants filed an expedited Response to the Motion on June 9, 2022, and Plaintiff filed a Reply on June 10. (Docs. 14, 15.) Meanwhile, on June 7, 2022, Plaintiff filed a Motion for Temporary Restraining Order (TRO) and requested expedited consideration of that motion and a hearing. (Doc. 13.) The Motion for TRO seeks "an urgent injunction reinstating communication with Mr. Suneel Chakravorty, who is Plaintiff's Power-of-Attorney and a paralegal to Plaintiff's post-conviction attorneys." (*Id.* at 1.) Plaintiff states that Defendants "have actual notice of the Complaint and Motion" and "additional notice should not be required because it is apparent that Defendants intend to delay their response until the harm has been done and the F.R.Crim.P. Rule 33 deadline has passed."[1] (*Id.* at 3.) Defendants filed an expedited response on June 14, 2022. (Doc. 17.) To date, Plaintiff has not filed a Reply.[2]

The Court finds Plaintiff's Motions suitable for disposition without a hearing pursuant to Local Rule of Civil Procedure 7.2(f) and will deny the Motions.

## I. Background

Plaintiff alleges the following in his First Amended Complaint. Plaintiff is serving a 120-year prison sentence for, among other things, child sexual exploitation and possession of child pornography. (Doc. 3 ¶ 11.) On April 28, 2022, Plaintiff's criminal defense attorney Joseph Tully filed a motion to stay an appeal in the Second Circuit Court

---

[1] Federal Rule of Criminal Procedure 33, *New Trial*, requires that "[a]ny motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case." Fed. R. Crim. P. 33(b)

[2] Because Plaintiff's Motion for TRO addresses the exact same issue as his Motion for Preliminary Injunction, and because Plaintiff apparently wants a ruling on both Motions before June 19, 2022, the Court need not await Plaintiff's Reply to rule on the Motion for TRO.

of Appeals because he intended to file a motion for new trial in the district court based on newly discovered evidence in the form of three experts' reports concluding the FBI had falsified and tampered with evidence and federal agents had committed perjury relevant to Plaintiff's child pornography and sexual exploitation convictions. (*Id.* ¶ 15.)

On May 2, 2021, Suneel Chakravorty, who is Plaintiff's power-of-attorney and "an agent of Plaintiff's criminal defense attorney Joseph Tully," was visiting Plaintiff, and the visit was terminated, and Mr. Chakravorty's visitation privileges were permanently revoked by Defendant Von Blanckensee. (*Id.* ¶¶ 13, 26.)

On May 3, 2022, criminal defense attorney Tully filed the aforementioned motion for new trial pursuant to Federal Rule of Criminal Procedure 33 in the district court. (*Id.* ¶ 17.) On May 4, 2022, Plaintiff was on a privileged legal call with Tully, and the call was terminated prematurely and without warning. (*Id.* ¶ 18.) Mr. Tully aniticiaptes that the district court in New York will hold a hearing on the Rule 33 petition, and he needs to consult with Plaintiff to prepare for the hearing. (*Id.* ¶ 19.) Shortly after the May 4 call was terminated, Plaintiff was instructed to go to an administrative office, where Defendant Gallion, whom Plaintiff believes is with BOP's Special Investigative Services (SIS), asked Plaintiff about certain individuals who were on Plaintiff's approved telephone and visitation list. (*Id.* ¶¶ 20, 23.) Many of the individuals on the list were attorneys or "attorney's agents," such as Mr. Chakravorty.[3] (*Id.* ¶ 23.) Defendant Gallion "made the affirmative decision to 'scrub' Plaintiff's approved callers and visitors list" and told Plaintiff he would have to apply to a unit manager to have anyone re-approved, and it was unlikely Mr. Chakravorty would be approved. (*Id.* ¶ 25.) When Plaintiff asked Defendant Gallion why this was being done, Gallion only told him, "there was an investigation." (*Id.* ¶¶ 27, 28.) On May 6, Defendants "interfered and frustrated" a confidential legal call

---

[3] Plaintiff claims he can only communicate with Mr. Chakravorty if he is on Plaintiff's approved list of callers. (Doc. 3 ¶ 26.) Plaintiff's conversations with Mr. Chakravorty are recorded and monitored by prison officials and are not treated as confidential, even though Mr. Chakravorty is an agent of Plaintiff's criminal defense attorney. (*Id.*)

between Plaintiff and attorney Joseph Daugherty by "causing the phone call to be cut off" before Plaintiff and the attorney had concluded the conversation. (*Id.* ¶ 29.)

Count One alleges a violation of Plaintiff's First Amendment right of access to the courts based on Defendants' interference with Plaintiff's right to communicate with his attorneys and their agents. Count Two alleges a First Amendment retaliation claim based on Defendants "imminently threatening to cut off Plaintiff's telephonic and in-person communication with his attorneys" the day after his criminal defense attorney filed the Rule 33 motion for new trial. Count Three alleges a violation of Plaintiff's Sixth Amendment rights based on Defendants' deliberate interference to the confidential relationship between Plaintiff and his criminal defense attorney, which "substantially prejudices" Plaintiff by preventing him from helping prepare his attorney for the hearing on the motion and preventing his attorney from providing effective assistance of counsel. Plaintiff seeks declaratory and injunctive relief prohibiting Defendants from impeding him from communicating with his attorneys and their agents either by telephone or in person.

On screening Plaintiff's First Amended Complaint under 28 U.S.C. § 1915A(a), the Court required Plaintiff to serve Defendants and required Defendants to answer. (Doc. 5.)

## II. Motion for Preliminary Injunction

### A. Plaintiff's Motion and Evidence

In his Motion filed on May 26, 2022, Plaintiff seeks an urgent injunction reinstating communications with Suneel Chakravorty, "who is Plaintiff's Power-of-Attorney and a paralegal to Plaintiff's post-conviction attorneys" in advance of the "3-year deadline for post-conviction relief petitions based on newly discovered evidence on June 19, 2022." (Doc. 7 at 1.) Plaintiff asserts that his legal team has communicated regularly with Plaintiff since January 2021, but Mr. Chakravorty's in-person visitation privileges were revoked without explanation on May 2, 2021, meaning Plaintiff could only speak with Mr. Chakravorty on a recorded, non-privileged telephone line. (*Id.* at 2.) Despite this hindrance, Plaintiff states that Mr. Chakravorty hired the criminal defense firm of Tully & Weiss, and Mr. Chakravorty serves "a central role in the communications between and

within the legal team." (*Id.*)  Because Mr. Chakravorty may only use a non-confidential phone line when speaking with Plaintiff, "any conversation they wished to remain private had to be arranged directly with the attorneys," which has hindered Plaintiff's lawyers "in their representation just as the deadline for post-conviction relief based on newly discovered evidence is expiring." (*Id.* at 2-3.)

In support of his Motion, Plaintiff presents an Affidavit by Mr. Chakravorty, who asserts that he has a background in computer technology, he attended every day of Plaintiff's trial in 2019, and he was not a witness, co-conspirator, or co-defendant in Plaintiff's criminal case in New York.  (Doc. 7-1 at 2.)  Mr. Chakravorty asserts that Plaintiff founded an organization called NXIVM in 1998, but NXIVM had no members, and "consisted of companies that offered self-development courses to over 17,000 students." (*Id.* at 6.)  Mr. Chakravorty took courses from NXIVM-affiliated companies, but he was not a member and was never identified during Plaintiff's criminal trial as a member of NXIVM's "inner circle." (*Id.* at 6-7.)  Mr. Chakravorty met with Plaintiff after the trial and told Plaintiff he thought the government's expert witness "misrepresented the reliability of the digital evidence" presented at trial.  (*Id.* at 2-3.)  Mr. Chakravorty asserts that, in January 2021, he signed a contract to act as Power of Attorney for Plaintiff, and in that role, Mr. Chakravorty retained experts to analyze the government experts' information and findings.  (*Id.* at 4.)  Mr. Chakravorty asserts that, as Power of Attorney, he "stand[s] in Plaintiff's shoes in various matters and can legally make decisions as though [he] were [Plaintiff]" and that he "cannot conduct these duties ethically without regularly communicating with [Plaintiff]." (*Id.*)  Mr. Chakravorty asserts that the findings of the experts convinced attorney Tully to file a Rule 33 motion to reopen Plaintiff's criminal case, and that he "act[s] as a paralegal to attorney Tully for the purposes of the Rule 33 petition." (*Id.*)  According to Mr. Chakravorty, his role "evolved into paralegal and manager of the legal team" working to overturn Plaintiff's conviction, and Mr. Chakravorty has retained and discharged members of Plaintiff's legal team as circumstances warranted. (*Id.*)  Mr. Chakravorty maintains that his knowledge of the facts of the case and expertise

in data analysis allow him to translate concepts and streamline communication between Plaintiff, the computer forensics experts, and the legal team, and that he must have regular communication with Plaintiff before the June 19, 2022, deadline for Rule 33 motions. (*Id.*)

### B. Defendants' Response and Evidence

#### 1. Plaintiff's Ongoing Criminal Proceedings

On April 29, 2022, the Second Circuit Court of Appeals denied Plaintiff's April 28, 2022 motion to stay his criminal appeal pending a Rule 33 motion. (Doc. 14 at 8-9; Ex. G (Doc. 193 in *Raniere v. United States*, Case 20-3789 (2nd Cir. April 29, 2022).) On May 9, 2022, the New York District Court deferred consideration of Plaintiff's Rule 33 Motion due to the ongoing appeal. (*Id.*, citing May 9, 2022 order in *United States v. Raniere*, Case No. 1:18-cr-00204-NGG-VMS (E.D.N.Y. May 9, 2022).) According to Defendants, there is no hearing imminent, and Plaintiff neglected to mention this in his Motion for Preliminary Injunction, filed 17 days after the New York District Court issued its Order deferring the Rule 33 Motion. (Doc. 14 at 9.)

Defendants' evidence shows that Plaintiff was convicted by a jury on June 19, 2019, of Racketeering, Racketeering Conspiracy, Forced Labor Conspiracy, Wire Fraud Conspiracy, Sex Trafficking, Attempted Sex Trafficking, and Sex Trafficking Conspiracy. (Doc. 14 at 1; Ex. A ¶ 4, Attach. 1 at 2-4 and Attach. 2 at 1-4, 12.) Prior to Plaintiff's sentencing, the government informed the judge that Plaintiff continued to regularly contact people affiliated with NXIVM, including Mr. Suneel Chakravorty. (Doc. 14 at 2, citing Doc. 914 in *United States v. Raniere*, Case No. 1:18-cr-00204-NGG-VMS (E.D.N.Y. Aug. 27, 2020) and Ex. B.) The government represented that, in July 2020, the BOP suspended calls between Plaintiff and Mr. Chakravorty, and Plaintiff thereafter entered an individual by the name of "Issac Edwards" to his contact list; the address Plaintiff provided for Issac Edwards was fabricated, the phone number belonged to a burner phone, and Issac Edwards turned out to be Mr. Chakravorty. (*Id.* at 3, citing Doc. 914 at 56 n.14 in *United States v. Raniere*, Case No. 1:18-cr-00204-NGG-VMS.) At Plaintiff's sentencing on October 27, 2020, the sentencing judge ordered that Plaintiff "shall not associate in person, through

mail, electronic mail or telephone with any individual with an affiliation to Executive Success Programs, Nxivm, DOS or any other Nxivm-affiliated organizations." (Doc. 14 at 1-2; Ex. A, Attach. 2 at 9.)

### 2. BOP Regulations and Policies

Defendants cite the following regulations and BOP Policies addressing visitors and telephone privileges at BOP facilities. (Doc. 14 at 5.) Visiting privileges are extended to friends and associates "having an established relationship with the inmate prior to confinement, unless such visits could reasonably create a threat to the security and good order of the institution." 28 C.F.R. § 540.44(c). An exception is made for prisoners without other visitors if it "is shown that the proposed visitor is reliable and poses no threat to the security or good order of the institution." (*Id.*) The Warden may limit or deny the use of TRULINCS to a prisoner, and prisoners may be subject to telephone restrictions imposed by the Warden "to protect the safety security and good order of the institution, as well as to protect the public." Program Statement (P.S.) 4500.12 and P.S. 5264.08.

The BOP recognizes the use of assistants by attorneys to perform legal tasks and, with proper controls and exceptions enumerated . . . accords such assistants the same status as attorneys with respect to visiting and correspondence." 28 C.F.R. § 543.16(a). "The special visiting/correspondence status accorded to paralegals, clerks, and legal assistants depends on an ongoing, supervisory relationship with an attorney on an approved visiting/correspondence list. Absent any current supervisor relationship, such persons may only receive social visiting or general correspondence privileges." P.S. 1315.07. An attorney who employs an assistant whom the attorney wants to visit or correspond with a prisoner must provide the Warden with a signed statement certifying the assistant's ability, that the attorney pledges to supervise the assistant's activities, and the attorney accepts personal and professional responsibility for the assistant's activities that may affect the institution, prisoners, and staff. 28 C.F.R. § 543.16(b)(1)-(3). The Warden may require the assistant to fill out and sign a personal history statement and pledge to abide by BOP regulations and institution guidelines, and the Warden may prohibit a legal assistant from

1    visiting or corresponding with a prisoner if necessary to maintain security and good order
2    in the institution.  *Id*.  The Warden may also require each paralegal, clerk, or legal assistant
3    to complete a BP-S243.013 application and the BP-S242.013 Paralegal or Legal Assistant
4    Agreement form.  P.S. 1315.07.

         **3.    Relationship Between Mr. Chakravorty and Plaintiff**

6        In October 2020, Mr. Chakravorty admitted to the New York District Court that his
7    first conversation with Plaintiff was after Plaintiff's trial, when Plaintiff was already in
8    prison, and prior to that time, "he and I were complete strangers."  (Doc. 14 at 6; Ex. D ¶
9    5, Attach. 5 at 1.)  Mr. Chakravorty detailed his involvement with NXIVM, as a coach for
10   the Executive Success Programs (ESP) and NXIVM, and his decision to "stay involved
11   even during an international media storm," and he stated that ESP "did not seem like a
12   sinister organization" and that is why he chose to continue as a coach until the companies
13   closed in May 2018.  (*Id*., Ex. D, Attach. 5 at 2-4.)

14       As early as July 2020, the BOP determined that Plaintiff and Mr. Chakravorty were
15   engaging in behavior that compromised the security of the facility where Plaintiff was
16   being held.  (*Id*. at 3; Ex. D ¶ 5 and Attach. 2.)  Plaintiff and Mr. Chakravorty were
17   recording prison-initiated telephone calls to use in podcasts and interviews Plaintiff was
18   pursuing with HBO, Netflix, and Showtime.  (*Id*.)  They were also organizing a group of
19   women to show up at the prison and dance provocatively in view of prisoners, which led
20   to Plaintiff being moved to another housing unit, and Plaintiff gave Mr. Chakravorty staff
21   work schedules and indicated that protesters on Plaintiff's behalf should wait outside for
22   staff and offer them donuts and coffee as they exited the facility.  (*Id*.)  The Counter
23   Terrorism Unit (CTU) concluded that Plaintiff's manipulative behavior, through the help
24   of Mr. Chakravorty, "would place the safety and security of staff and the public at risk,"
25   and recommended that Mr. Chakravorty be removed as one of Plaintiff's approved
26   contacts.  (*Id*.)  The Warden agreed, and Mr. Chakravorty was removed from Plaintiff's
27   approved contact list.  (Id.; Ex. D ¶ 8, Attach 3 at 1.)

28

In an October 30, 2021 letter, which was not on an attorney's letterhead, Mr. Chakravorty wrote to the court presiding over a civil action against Plaintiff that he was "not a party to this case, nor am I an attorney. I am defendant Keith Raniere's power of attorney," and, as Plaintiff's power of attorney he had "referred cyber forensics experts to his criminal counsel." (*Id*. at 4; Ex. F (Doc. 121 in *Edmonson v. Raniere*, Case 1:20-cv-00485-EK-CLP (E.D.N.Y.).) In a November 28, 2021 letter to that same court, which is also not on an attorney's letterhead, Chakravorty again identified himself as holding Plaintiff's power of attorney, not as a paralegal working for Plaintiff's attorney. (*Id*.; Ex. E.)

In early May 2022, the USP-Tucson Special Investigative Services (SIS) Department was monitoring telephone calls between Plaintiff and Mr. Chakravorty in which they spoke about being "at war" with the federal government with "no holds barred." (*Id*. at 7; Ex. D.) Even more concerning to the SIS was Plaintiff asking Mr. Chakravorty about the quality of the recordings and stating that he had many recordings. (*Id*.) On May 3, 2022, as a result of the SIS Department's findings and in consultation with the BOP's Counter-Terrorism Unit, the USP-Tucson Warden imposed limitations on Plaintiff's contact list, limiting Plaintiff to 10 active contacts, not including counsel, and all contacts were removed from Plaintiff's list except Marianna Fernandez and 9 verified attorneys. (*Id*.; Ex. D, Attach 8.) If Plaintiff wants to add more contacts in the future, the SIS Department will review the individuals as part of the approval process. (*Id*.; Ex. D ¶ 18.) As of May 31, 2022, Plaintiff had not requested that additional individuals be added to his approved contact list. (*Id*.; Ex. D ¶ 18.) According to Acting SIA Gallion, all recommendations and determinations "were made for the safety, security and good order of the institution and not in any way to hinder Plaintiff's legal efforts." (*Id*. at 8; Ex. D ¶ 19.)

Plaintiff may still access his attorneys through confidential legal mail, legal calls, and legal visits, and Plaintiff has had frequent legal visits. (*Id*.; Ex. D ¶ 17; Ex. A ¶ 15.) . . . .

### 4. Plaintiff's Legal Calls

When an attorney requests a legal call with a prisoner, the prisoner's correctional counselor ensures the attorney is licensed and in good standing. (Doc. 14 at 9; Ex. A ¶ 9.) Legal calls in a housing unit take place in the counselor's office and the counselor facilitates the call. (*Id.*) The legal calls are not recorded or monitored, and the staff member only remains in the office until the connection is made with the prisoner's attorney or appropriate staff; the counselor leaves the room once the connection is made and visually monitors the prisoner from outside the room but cannot hear the content of the legal call. (*Id.*)

Plaintiff's legal calls are coordinated within these normal procedures, and he has not been targeted for any restrictions on his ability to have legal phone calls. (*Id.*; Ex. A ¶ 10.) Plaintiff's counselor keeps a log of his legal calls, and as of May 31, 2022, the log shows 32 legal calls facilitated by Plaintiff's counselor since October 4, 2021, with most calls lasting an hour. (*Id.*; Ex. A ¶ 11.) The log shows a call on May 4, 2022, between Plaintiff and Joseph Tully, which lasted an hour. (*Id.*) That call was disconnected. (*Id.*) If a call is disconnected, the counselor attempts to reestablish the call. (*Id.;* Ex. A ¶ 12.) In addition, another counselor, Ashworth, placed 16 legal calls to Plaintiff's attorneys between January 5, 2022 and May 27, 2022, with most calls lasting an hour; one call lasted two hours and, another call lasted 35-minutes. (*Id.*; Ex. A ¶ 13, Attach 4.) On May 6, 2022, Case Manager Watson facilitated a call between Plaintiff and Mr. Daugherty. (*Id.*; Ex. H ¶ 5.) The connection was lost during the call, and Watson called Mr. Daugherty back, and the legal call resumed without further incident.

### III. Legal Standards

#### A. Injunctive Relief

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)); *see also Winter v. Natural Res. Def. Council, Inc.*, 555

U.S. 7, 24 (2008) (citation omitted) ("[a] preliminary injunction is an extraordinary remedy never awarded as of right"). Nonetheless, "federal courts must not shrink from their obligation to enforce the constitutional rights of all persons, including prisoners" and must not "allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021) (citation omitted).

A plaintiff seeking injunctive relief under Rule 65 of the Federal Rules of Civil Procedure must show: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When the government opposes a preliminary injunction, "[t]he third and fourth factors of the preliminary-injunction test—balance of equities and public interest—merge into one inquiry ." *Porretti*, 11 F.4th at 1047. The "balance of equities" concerns the burdens or hardships to a prisoner complainant compared with the burden on the government defendants if an injunction is ordered. *Id.* The public interest mostly concerns the injunction's impact on nonparties rather than parties. *Id.* (citation omitted). Regardless, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (citation omitted).

Where a plaintiff seeks a mandatory injunction, rather than a prohibitory injunction, injunctive relief is "subject to a higher standard" and is "permissible when 'extreme or very serious damage will result' that is not 'capable of compensation in damages,' and the merits of the case are not 'doubtful.'" *Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017) (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)). Further, under the Prison Litigation Reform Act, injunctive relief must be narrowly drawn and be the least intrusive means necessary to correct the harm. 18 U.S.C. § 3626(a)(2); *see Gilmore v. People of the State of Cal.*, 220 F.3d 987, 999 (9th Cir. 2000).

. . . .

**B.      First Amendment (Access to the Courts)**

There are two types of access-to-court claims: those concerning a prisoner's right to affirmative assistance in challenging their sentences or conditions of their confinement and those, like the instant action, concerning a prisoner's right to litigate without active interference.  *Silva v. Di Vittorio*, 658 F.3d 1090, 1102 (9th Cir. 2011), *overruled on other grounds by Richey v. Dahne*, 807 F.3d 1202, 1209 n.2 (9th Cir. 2015).

In this second line of cases, the right of meaningful access to the courts prohibits officials from actively interfering with prisoners' attempts to prepare or file legal documents in all types of civil proceedings so long as those proceedings have a reasonable basis in law or fact.  *See Blaisdell v. Frappiea*, 729 F.3d 1237, 1243 (9th Cir. 2013) ("by virtue of their broader right to petition the government for a redress of [their] grievances under the First Amendment, prisoners must also have opportunities to pursue certain other types of civil litigation") (internal quotations and citations omitted).

Regardless of which type of claim is alleged, to prevail on an access-to-court claim, a plaintiff must show: "(1) the loss of a "nonfrivolous" or "arguable" underlying claim; (2) the official acts frustrating the litigation; and (3) a remedy that may be awarded as recompense but that is not otherwise available in a future suit."  *Phillips v. Hust*, 477 F.3d 1070, 1076 (9th Cir. 2007) (citing *Christopher*, 536 at 416), *vacated on other grounds* 555 U.S. 1150 (2009).

The Ninth Circuit has held that "[t]he opportunity to communicate privately with an attorney is an important part" of meaningful access to the courts; thus, "a prisoner's right of access to the courts includes contact visitation with his counsel."  *Ching v. Lewis*, 895 F.2d 608, 609–10 (9th Cir. 1990).  The Ninth Circuit has also held that a prisoner may be deprived of access to the court if he is denied telephone access to his attorney absent a legitimate penological reason.  *Barnett v. Centoni*, 31 F.3d 813, 816 (9th Cir. 1994).  And it is well established that prisoners have a constitutional right to send legal mail, and prison officials cannot take any actions that delay the mailing of legal mail.  *See Houston v. Lack*,

487 U.S. 266, 270–76 (1988) (prison officials cannot take actions that delay mailing of prisoner's legal papers when such a delay effectively denies access to the courts).

### C.    Sixth Amendment (Right to Counsel)

The Sixth Amendment guarantees a criminal defendant the right to counsel, and this right extends to the first appeal of right. U.S. Const. amend. VI; *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987). Courts have long recognized that the right to counsel embodies a right to confidential communication between a defendant and his attorney. *See Hunt v. Blackburn*, 128 U.S. 464, 470 (1888) ("[legal] assistance can only be safely and readily availed of when free from the consequences or apprehension of disclosure"); *Coplon v. United States*, 191 F.2d 749, 757 (D.C. Cir. 1951) ("[i]t is well established that an accused does not enjoy the effective aid of counsel if he is denied the right of private consultation with him"); *see also Nordstrom v. Ryan*, 762 F.3d 903, 910 (9th Cir. 2014) ("the right to privately confer with counsel is nearly sacrosanct").

In *Nordstrom*, the Ninth Circuit distinguished between Sixth Amendment claims asserted as grounds for reversing a conviction and Sixth Amendment civil claims brought under § 1983. Where a defendant challenges his conviction following government intrusion into the attorney-client relationship, a court examines "whether the Sixth Amendment violation caused prejudice requiring reversal of the conviction." *Nordstrom*, 762 F.3d at 911; *see United States v. Fernandez*, 388 F.3d 1199, 1240 (9th Cir. 2004) (where defendants appealed their conviction, to show that government intrusion with the attorney-client relationship violated their Sixth Amendment rights, they had to show "that the intrusion was purposeful, that there was communication of defense strategy to the prosecution, or that the intrusion resulted in tainted evidence"). But where, like here, a plaintiff in a civil rights action alleges that government intrusion into the attorney-client relationship constituted a Sixth Amendment violation, the harm "is not that tainted evidence was used against him but that his right to privately confer with counsel has been chilled." *Nordstrom*, 762 F.3d at 911.

. . . .

## IV.    Discussion

Plaintiff cites to several cases in which the Ninth Circuit has held that a prisoner's right to communicate with an attorney extends to the attorney's paralegal and even non-attorney professionals retained by the attorney in order to render legal advice.  (Doc. 7 at 7, citing, e.g., *United States v. Zegzula*, 42 F.3d 1404 (9th Cir. 1994) (unpublished) ("The attorney-client privilege protects the client's confidential communications with an attorney, or the attorney's agent, for the purpose of securing legal advice."); *United States v. Sanmina Corp.*, 968 F.3d 1107, 1116 (9th Cir. 2020) ("The attorney-client privilege may extend to communications with third parties who have been engaged to assist the attorney in providing legal advice"); *United States v. Rowe*, 96 F.3d 1294, 1297 (9th Cir. 1996) (attorney-client privilege extends to senior attorney's communications with associate attorneys engaged in fact finding); *United States v. Mikhel*, 552 F.3d 961, 964-65 (9th Cir. 2009) ("The inmate's attorney's pre-cleared paralegal(s) and pre-cleared investigators in the regular full-time employment of the attorney may meet with the inmate without the necessity of the inmate's attorney being present.").)

Plaintiff argues that Mr. Chakravorty "serves "precisely this role on behalf of the attorneys of Tully & Weiss," "played an essential role in interpreting computer data for the attorneys," and before Tully & Weiss were retained, Mr. Chakravorty and Plaintiff "spent months discussing, analyzing and theorizing about how this metadata contained in computer files affects Plaintiff's legal case."  (Doc. 7 at 8-9 (emphasis in original).)

While Mr. Chakravorty may have provided assistance to Plaintiff in his legal case, Plaintiff has not provided any evidence that Mr. Chakravorty is a paralegal or agent of any kind employed by Plaintiff's attorney(s).  In each of the cases cited by Plaintiff, the professionals assisting attorneys were actually agents of those attorneys.  There is no evidence that attorney Tully or any other of Plaintiff's attorneys has provided the Warden of USP-Tucson with a signed statement certifying Mr. Chakravorty's ability, that the attorney has pledged to supervise Mr. Chakravorty's activities, or that the attorney accepts personal and professional responsibility for Mr. Chakravorty's activities that may affect

the institution, prisoners, and staff, as set forth in 28 C.F.R. § 543.16(b)(1)-(3).[4] Nor is there evidence before the Court that Plaintiff has been unable to communicate with his attorneys or their agents who have been cleared by the institution to have confidential communications with Plaintiff.

As such, Plaintiff has failed to meet the first *Winter* factor of likelihood of success on the merits.

Likewise, Plaintiff has failed to establish that he will suffer irreparable harm absent injunctive relief. Plaintiff argues that he "is likely to suffer irreparable harm because, absent injunctive relief, he will be deprived of the most basic constitutional protections under the First and Sixth Amendments." (Doc. 7 at 11 (emphasis in original).) This circular argument fails to support that Plaintiff is at risk of losing a "nonfrivolous" or "arguable" underlying claim as needed to support a First Amendment claim or that his "right to privately confer with counsel has been chilled" as needed to support a Sixth Amendment claim. At best, Plaintiff's risk of injury is speculative, and speculative injury is not irreparable injury sufficient for a preliminary injunction. *Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988).

Because Plaintiff fails to produce evidence to show a likelihood of success on the merits or that he faces a likelihood of irreparable harm, the Court will deny the Motion for Preliminary Injunction and will not address any of the other *Winter* factors. *See Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1174 (9th Cir. 2011) (because the plaintiffs failed to show they are likely to suffer irreparable harm in the absence of preliminary relief, the court need not address the remaining elements of the preliminary injunction standard). Because the Motion for TRO seeks the same relief as the Motion for Preliminary Injunction, the Court will deny the Motion for TRO as moot.

**IT IS ORDERED**:

(1)    Plaintiff's Motion for Preliminary Injunction (Doc. 7) is **denied**.

---

[4] Plaintiff does not challenge BOP's regulations and policies related to prisoner visitation and telephone privileges.

(2)     Plaintiff's Motion for Temporary Restraining Order (Doc. 13) is **denied as moot**.

Dated this 17th day of June, 2022.

Honorable Raner C. Collins
Senior United States District Judge

Exhibit J

MGD

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Keith Raniere,

Plaintiff,

v.

Merrick Garland, et al.,

Defendants.

No.   CV 22-00212-TUC-RCC

**ORDER**

Plaintiff Keith Raniere, who is currently confined in the United States Penitentiary (USP)-Tucson and is represented by counsel, filed a civil rights Complaint pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) against United States Attorney General Merrick Garland, Bureau of Prisons (BOP) Director Michael Carvajal, USP-Tucson Warden Barbara Von Blanckensee, and Lieutenant Anthony Gallion.

Before the Court is Plaintiff's Motion for a Temporary Restraining Order or, Alternatively, for Preliminary Injunctive Relief (Doc. 34).  The Court will deny the Motion.

## I.   Background

In Count One of his First Amended Complaint (Doc. 3), Plaintiff asserts a violation of his First Amendment right of access to the courts based on Defendants' alleged interference with Plaintiff's ability to communicate with his attorneys and their agents. Count Two asserts a First Amendment retaliation claim based on Defendants "imminently threatening to cut off Plaintiff's telephonic and in-person communication with his

attorneys" the day after his criminal defense attorney filed a Rule 33 motion for new trial. Count Three asserts a violation of Plaintiff's Sixth Amendment rights based on Defendants' alleged deliberate interference to the confidential relationship between Plaintiff and his criminal defense attorney, which "substantially prejudices" Plaintiff by preventing him from helping his attorney prepare for the hearing on the Rule 33 motion and preventing his attorney from providing effective assistance of counsel. Plaintiff seeks declaratory and injunctive relief prohibiting Defendants from impeding him from communicating with his attorneys and their agents either by telephone or in person.

On screening Plaintiff's First Amended Complaint under 28 U.S.C. § 1915A(a), the Court required Plaintiff to serve Defendants and required Defendants to answer. (Doc. 5.)

## II. Legal Standard

The standards for issuing a temporary restraining order and a preliminary injunction are the same. *White v. Lindermen*, No. CV 11-8152-PCT-RCB, 2012 WL 5040850, at *1 (D. Ariz. 2012). "A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted) ("[a] preliminary injunction is an extraordinary remedy never awarded as of right"). Nonetheless, "federal courts must not shrink from their obligation to enforce the constitutional rights of all persons, including prisoners" and must not "allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021) (citation omitted).

A plaintiff seeking injunctive relief under Rule 65 of the Federal Rules of Civil Procedure must show: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When the government opposes a preliminary injunction, "[t]he

third and fourth factors of the preliminary-injunction test—balance of equities and public interest—merge into one inquiry ." *Porretti*, 11 F.4th at 1047. The "balance of equities" concerns the burdens or hardships to a prisoner complainant compared with the burden on the government defendants if an injunction is ordered. *Id.* The public interest mostly concerns the injunction's impact on nonparties rather than parties. *Id.* (citation omitted). Regardless, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (citation omitted).

Where a plaintiff seeks a mandatory injunction, rather than a prohibitory injunction, injunctive relief is "subject to a higher standard" and is "permissible when 'extreme or very serious damage will result' that is not 'capable of compensation in damages,' and the merits of the case are not 'doubtful.'" *Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017) (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)). Further, under the Prison Litigation Reform Act, injunctive relief must be narrowly drawn and be the least intrusive means necessary to correct the harm. 18 U.S.C. § 3626(a)(2); *see Gilmore v. People of the State of Cal.*, 220 F.3d 987, 999 (9th Cir. 2000).

## III.    Plaintiff's Motion

Plaintiff seeks an order requiring Defendants to move him from the Special Housing Unit (SHU), where he is currently held, back to the general population at USP-Tucson. (Doc. 34.) Plaintiff asserts that on July 26, 2022, he was assaulted by another prisoner, and even though Plaintiff was the victim, he was placed into a disciplinary segregation housing unit, commonly referred to as SHU, where he is allowed, at most, an hour of outside recreation a day, denied most phone communication, and cannot speak with prison command staff on a regular basis. (*Id*. at 3.) On August 23, 2022, a disciplinary hearing officer determined that Plaintiff did not commit a rule violation, and prison officials have acknowledged that Plaintiff was the victim in the July 26 assault, yet "Plaintiff remains sequestered and silenced." (*Id*. at 3-4.) Plaintiff states that the SHU is typically reserved

for those suspected of a violation or those at risk of harm, and he "has never asked to be protected from other prisoners who might intend him harm." (*Id*. at 4.)

Plaintiff contends that his placement in the SHU lacks any penological or security justification and is in retaliation for Plaintiff exercising his First Amendment rights. (*Id*. at 1.) Plaintiff argues that by placing him in the SHU, "Defendants have escalated their efforts to silence him for having publicly filed credible evidence of historical FBI malfeasance in his criminal case." (*Id*. at 2.) Plaintiff also appears to argue that news articles that appeared in September 2022 about Plaintiff's allegations of FBI evidence tampering and "inhumane conditions of confinement" show a "close link in time between Plaintiff's First Amendment activity and the adverse actions of Defendants." (*Id*. at 4–5.) Plaintiff argues that Defendants' efforts to silence him "continue to evolve," and since his latest filing on September 9, 2022, Defendants have assigned Plaintiff a cellmate "who may pose a risk to Plaintiff" because this cellmate (whom Plaintiff says is hermaphroditic and possesses female genitalia) has alleged on at least 75 occasions that she has been the victim of sexual violence by others and so may falsely accuse Plaintiff of sexual misconduct. (*Id*. at 5-6.)

Defendants respond that BOP has facilitated dozens of legal calls and frequent legal visits between Plaintiff and his attorneys, and those legal calls and visits have continued while Plaintiff is housed in the SHU. (Doc. 39 at 4.) Defendants cite to evidence showing that between August 31, 2022 and September 21, 2022, Plaintiff has had legal calls totaling 8.5 hours, and between July 29, 2022 and September 14, 2022, Plaintiff has had 8 legal visits. (*See* Doc. 31-2 at 5-7.) Defendants also present Declaration evidence from USP-Tucson Legal Assistant Lorri Mitchell who states that Plaintiff is also able to send and receive legal correspondence to and from his attorneys and that correspondence is given confidential processing and handling. (Doc. 31-2 at 7 ¶ 15.)

Defendants acknowledge that the incident report for the July 26, 2022 physical altercation was expunged from Plaintiff's record following the investigation of the incident and disciplinary hearing but assert that Plaintiff is currently in SHU "while the Special

- 4 -

Investigative Service (SIS) Department is investigating safety and security issues pertaining to Plaintiff at USP Tucson." (Doc. 39 at 4.) Defendants state they can provide more information about this investigation to the Court in camera if the Court needs more detailed information. (*Id.* at 4 n.2.)

Defendants state that while he is in the SHU, Plaintiff "has been reviewed periodically by the Segregation Review Official (SRO) as required by policy," and Plaintiff may express concerns about cell assignments, cellmates, and other issues during those periodic reviews. (*Id.* at 4.) Defendants assert that Plaintiff has introduced no evidence that he has expressed concerns about his current housing status or cellmate during any of the SRO reviews or through the Administrative Remedy Program, and there are no safety or security concerns with Plaintiff's current housing assignment, including his current cellmate. (*Id.*)

Plaintiff replies that he has filed grievances about his SHU placement, that he has not expressed fear about returning to general population but has expressed fear about remaining in the SHU with his current cellmate, and he has not received the hearings that policy requires. (Doc. 43 at 2.) Plaintiff argues that "the best way to classify Defendant's behavior here is retaliation shrouded in bureaucracy," that there is no ongoing investigation into safety and security issues pertaining to Plaintiff, and there are no reports or documents indicating that the cause of Plaintiff's SHU placement has changed from the initial investigation into the "fight." (*Id.* at 8-9.) Plaintiff argues that the verifiable facts show, at best, incompetence in keeping track of SHU prisoners, and at worst, "a deliberate policy of dragging out [Plaintiff's] detention in order to interfere with his ability to challenge his conviction." (*Id.* at 9.)

**IV.    Discussion[1]**

Plaintiff's Motion fails because he has not alleged any irreparable injury in his Motion. In the section of his Motion discussing irreparable injury, Plaintiff merely cites

---

[1] The Court will address Plaintiff's Motion as a motion for injunctive relief because the Motion is fully briefed, and Plaintiff has failed to show irreparable injury before the adverse party could be heard in opposition.

the legal standards and states in conclusory fashion that he "is likely to suffer irreparable harm because, absent injunctive relief, he will be deprived of the most basic constitutional protections under the First Amendment." (Doc. 34 at 10.) Plaintiff does not allege any injury in this statement, much less irreparable injury. Plaintiff speculates that he is still in the SHU in some effort to silence him, but Plaintiff has not presented any evidence showing that he has been silenced. Plaintiff also speculates his cellmate in SHU may falsely charge Plaintiff with sexual misconduct based on the cellmate's past behavior, but such speculative injury is not irreparable injury sufficient for a preliminary injunction. *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *see also Winter*, 555 U.S. at 22; *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment . . . ."); *Nilsson v. City of Mesa*, 503 F.3d 947, 952 n.2 (9th Cir. 2007) ("[A] conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact . . . .").

To the extent Plaintiff is alleging that his placement in the SHU affects contact with his legal counsel and his legal work, such allegations implicate Plaintiff's constitutional right of access to the courts, which is protected by the First Amendment right to petition the courts and the Fourteenth Amendment right to substantive due process. *Silva v. Di Vittorio*, 658 F.3d 1090, 1103 (9th Cir. 2011), *overruled on other grounds by Richey v. Dahne*, 807 F.3d 1202, 1209 n.2 (9th Cir. 2015). This right is limited to direct criminal appeals, habeas petitions, and section 1983 civil rights actions. *Lewis v. Casey*, 518 U.S. 343, 354 (1996). The constitutional right of access to the courts encompasses a right to litigate without active interference. *See Silva*, 658 F.3d at 1102. To support an active interference claim, a prisoner must allege facts showing that officials' actions hindered the prisoner's ability to litigate and that, as a result, the prisoner suffered an actual injury. *Id.*; *see Lewis*, 518 U.S. 343, 349 (1996) (to maintain an access-to-the-courts claim, a prisoner must show an "actual injury" resulting from the defendant's actions). Actual injury must

be "actual prejudice . . . such as the inability to meet a filing deadline or to present a claim." *Lewis*, 518 at 348–49. The failure to allege an actual injury is "fatal." *Alvarez v. Hill*, 518 F.3d 1152, 1155 n.1 (9th Cir. 2008) ("Failure to show that a 'non-frivolous legal claim had been frustrated' is fatal . . . .") (quoting *Lewis*, 518 U.S. at 353 & n.4).

Plaintiff's Motion, as it relates to his access to the courts, fails because Plaintiff has not presented any evidence supporting that his ability to litigate has been hindered by prison officials, and Plaintiff has not alleged an actual injury such as inability to meet a filing deadline or to present a claim. The only evidence Plaintiff presented with his Motion are letters from his attorneys to the USP-Tucson Warden about Plaintiff's confinement in the SHU in which they state, for example, that they "continue to be concerned about how his confinement poses issues concerning his mental health, physical health and access to attorneys and the courts, and fair treatment." (Doc. 34-1 at 6.) These letters do not even say that the attorneys attempted to contact Plaintiff while in the SHU but were denied access. Plaintiff did file a Declaration with his Reply (to which Defendants have not had an opportunity to respond), but Plaintiff does not say anything in that Declaration indicating that his access to the courts has been denied. (*See* Doc. 43-1 at 2–6.)

Accordingly, the Court will deny Plaintiff's Motion.

**IT IS ORDERED** that Plaintiff's Motion for a Temporary Restraining Order or, Alternatively, for Preliminary Injunctive Relief (Doc. 34) is **DENIED**.

Dated this 3rd day of November, 2022.

Honorable Raner C. Collins
Senior United States District Judge

Exhibit K

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Keith Raniere, | No. 22-cv-00212-RCC-PSOT |
| Plaintiff, | **SECOND DECLARATION OF DANIEL FLORES** |
| vs. | |
| Merrick Garland, US Attorney General, et al., | |
| Defendants. | |

I, Daniel Flores, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records reasonably relied upon by me in the course of my employment, hereby make the following declaration relating to the above-titled matter. All records attached to this declaration are true and accurate copies of Bureau records maintained in the ordinary course of business.

1. As a supplement to my prior declaration (Doc. 14-2), to date, Mr. Raniere's attorneys still have not requested that Suneel Chakravorty be granted paralegal privileges, nor have they sponsored him as a paralegal. Therefore, Suneel Chakravorty is not afforded legal visitation, legal call, or legal correspondence privileges with Mr. Raniere.

## I. LEGAL CALLS

2. Since May 27, 2022, the last date identified in my prior declaration when a legal call was requested/accommodated, I have scheduled and facilitated two legal telephone calls between Mr. Raniere and his attorneys. *See* Att. 1, Legal Call Log I (Redacted) at 2. The below table identifies both legal telephone calls that I have personally scheduled/accommodated since May 27, 2022:

| Date | Attorney Names | Approximate Duration |
|---|---|---|
| 6/1/2021 | Joseph P. Daugherty | 1 hr. |
| | Gregory Stoltz | 1 hr. |

3.      Since May 27, 2022, an additional three legal calls have been accommodated by Counselor Ashworth when I was not available.  *See* Att. 2, Legal Call Log II (Redacted) at 1-2.  As reflected in the below table, since May 27, 2022, Counselor Ashworth has accommodated the following legal calls for Mr. Raniere:

| Date | Attorney Name(s)[1] | Approximate Duration |
|------|---------------------|----------------------|
| 6/7/2022 | Joseph P. Daugherty | 2 hrs. |
| 6/8/2022 | Joseph Tully | 2 hrs. |
| 6/10/2022 | Joseph P. Daugherty | 2 hrs. |

## II.   LEGAL VISITS

4.      Mr. Raniere's attorneys continue to schedule, through me and other substitute Correctional Counselors, frequent legal visits.  These visits have been accommodated per the request of the attorney and in line with the schedule of the institution and any institutional security/safety measures (e.g., lockdown, COVID-19 protocols, etc.).

5.      Since May 19, 2022, Mr. Raniere's legal visits have been accommodated as reflected in the following table, including three that have been requested and scheduled for this week:

| Date | Attorney Name(s) | Approximate Duration |
|------|------------------|----------------------|
| 5/19/2022 | Gregory Stoltz | 2.5 hrs. |
| 5/23/2022 | Gregory Stoltz | > 1 hr. |
| 5/25/2022 | Gregory Stoltz | > 1 hr. |
| 5/31/2022 | Gregory Stoltz | > 1 hr. |

---

[1] As with the previous declaration, the attorney names are not specifically identified on Counselor Ashworth's legal call log, but I was able to cross-reference the telephone numbers to identify the attorney.

| 6/6/2022 | Stacy Scheff | 1.5 hrs. |
|---|---|---|
| 6/9/2022[2] | Gregory Stoltz | 2.5 hrs. |
| 6/14/2022 | Gregory Stoltz | TBD |
| 6/16/2022 | Gregory Stoltz | TBD |
| 6/17/2022 | Gregory Stoltz | TBD |

6.      In addition to these legal calls and legal visits, Mr. Raniere is still able to send and receive legal correspondence at USP Tucson to/from his attorneys that is afforded confidential processing/handling.

//

//

//

//

//

//

//

---

[2] On June 6, 2022, in requesting additional legal visits for Gregory Stoltz, Joseph M. Tully informed me via e-mail that he was "working on motions that are due on June 19 – 13 days away.  I need to get Mr. Raniere's input on some parts of the motions in order to complete them.  I am working closely with Mr. Stoltz – essentially he is my eyes and ears in being able to meet with Mr. Raniere in person to go over pending motions." *See* Att. 3, Tully E-Mail (Redacted) at 1.  Mr. Tully requested that I "please accommodate Mr. Stoltz meeting with Mr. Raniere . . . as it is necessary for us finalizing the motion." *Id.*

1    Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury

2   that the foregoing is true and correct to the best of my information, knowledge, and belief.

3    Executed on this 14th day of June 2022, in Tucson, Arizona.

4

5    Daniel Flores

6    Correctional Counselor
     USP Tucson, Arizona
7    Federal Bureau of Prisons

8   **Enclosures**

9   Att. 1, Legal Call Log I (Redacted)

10   Att. 2, Legal Call Log II (Redacted)

11   Att. 3, Tully E-Mail (Redacted)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 4 -

Exhibit K
Attachment 1

Legal Call Log

| Date | IM Name/Reg. No.<br><br>**RANIERE, Reg. No. 57005-177**<br><br>Attorney Name/Number | Call Duration | Staff |
|---|---|---|---|
| 10/04/2021 | Joseph P. Daugherty ████████ | 1.5 hr. | D. Flores CCC |
| 10/07/2021 | Joseph Tully ███████ | 1 hr. | D. Flores CCC |
| 10/11/2021 | Joseph Tully ███████ | 1hr. | D. Flores CCC |
| 10/14/2021 | Joseph Tully ███████ | 1hr. | D. Flores CCC |
| 10/20/2021 | Joseph Tully ███████ | 1hr. | D. Flores CCC |
| 10/27/2021 | Joseph Tully ███████ | 1 hr. | D. Flores CCC |
| 11/01/2021 | Joseph Tully ███████ | 1hr. | D. Flores CCC |
| 11/09/2021 | Joseph Tully ███████ | 1hr. | D. Flores CCC |
| 11/15/2021 | Paul DerOhannesian ████████ | 1hr. | D. Flores CCC |
| 11/16/2021 | Joseph Tully ███████ | 1hr. | D. Flores CCC |
| 12/01/2021 | Joseph Tully ███████ | 1hr. | D. Flores CCC |
| 12/08/2021 | Joseph Tully ███████ | 1hr. | D. Flores CCC |
| 12/15/2021 | Joseph Tully ███████ | 1hr. | D. Flores CCC |
| 12/15/2021 | Seema Iyer, Esq. ███████ | 1hr. | D. Flores CCC |
| 12/20/2021 | Joseph Tully ███████ | 1hr. | D. Flores CCC |
| 12/21/2021 | Seema Iyer, Esq. ███████ | 1hr. | D. Flores CCC |
| 02/22/2022 | Duncan Levin, Esq. ████████ | 30 min. | D. Flores CCC |
| 02/23/2022 | Joseph Tully ███████ | 1 hr. | D. Flores CCC |

Legal Call Log

| | | | |
|---|---|---|---|
| 02/28/2022 | Arangullo ███████ | 1hr. | D. Flores CCC |
| 03/01/2022 | Joseph Tully ███████ | 1 hr. | D. Flores CCC |
| 03/08/2022 | Joseph Tully ███████ | 1 hr. | D. Flores CCC |
| 03/09/2022 | John Meringolo ████████ | 1 hr. | D. Flores CCC |
| 03/29/2022 | Joseph Tully ███████ | 1 hr. | D. Flores CCC |
| 4/25/2022 | Gregory Stoltz ███████ | 1hr. | D. Flores |
| 4/26/2022 | John Meringolo ████████<br>Gregory Stoltz ███████ | 1hr.<br>1hr. | D. Flores |
| 4/27/2022 | Duncan Levin ███████ | 1hr. | D. Flores |
| 5/04/2022 | Joseph Tully ███████ | 1hr. | D. Flores |
| 5/09/2022 | John Meringolo ████████ | 1 hr. | D. Flores |
| 5/10/2022 | Joseph Tully ███████ | 1 hr. | D. Flores |
| 5/24/2022 | Joseph P. Daugherty ████████ | 1hr. | D. Flores |
| 5/25/2022 | Joseph Tully ███████ | 1hr. | D. Flores |
| 6/1/2022 | Joseph P. Daugherty █████████<br>Gregory Stoltz ███████ | 1hr.<br>1hr. | D.Flores |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**Ex. K, p. 7**

Legal Call Log

| | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Legal Call Log

|  |  |  |  |
|---|---|---|---|
|  |  |  |  |

# Exhibit K
# Attachment 2

# Phone log:

| Date | Inmate Name & # | Phone # | got thru | I/M sign | Length | Staff |
|------|-----------------|---------|----------|----------|--------|-------|
| 4-15-22 | Raniere 57005-177 | | yes | KAR | 1hr. | Ashworth |
| 4-22-22 | Raniere 57005-177 | | yes | KAR | 1hr. | Ashworth |
| 4-28-22 | Raniere 57005-177 | | yes | KAR | 1hr. | Ashworth |
| 4-29-22 | Raniere 57005-177 | | yes | KAR | 1hr. | Ashworth |
| 5-10-22 | | | | | | |
| 5-11-22 | | | | | | |
| 5-11-22 | | | | | | |
| 5-12-22 | Raniere 57005-177 | | yes | KAR | 1hr. | Ashworth |
| 5-18-22 | Raniere 57005-177 | | yes | KAR | 1hr. | Ashworth |
| 5-20-22 | Raniere 57005-177 | | yes | KAR | 1hr. | Ashworth |
| 5-25-22 | | | | | | |
| 5-26-22 | | | | | | |
| 5-27-22 | Raniere 57005-177 | | yes | KAR | 2hr. | Ashworth |
| 6-2-22 | | | | | | |
| 6-7-22 | Raniere 57005-177 | | yes | KAR | 2hr. | Ashworth |
| 6-8-22 | Raniere 57005-177 | | yes | KAR | 2hr. | Ashworth |

# Phone log:

| Date | Inmate Name & # | Phone # | got thru | I/M sign | Length | Staff |
|------|-----------------|---------|----------|----------|--------|-------|
| 6-8-22 | ███████████████ | | | | | |
| 6-10-22 | Raniere 575005177 | | yes | KAR | 2hr. | Ashnoft |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

# Exhibit K
# Attachment 3

(EXTERNAL) RE: [EXTERNAL] Re: (EXTERNAL) Re: [EXTERNAL] Re: (EXTERNAL) Visit request for Keith Raniere on 6-7-22

Joseph Tully <​_____.com>
Mon 6/6/2022 3:11 PM
To: Flores, Daniel (BOP) <​_____gov>; Gregory Stoltz <​_____.com>
Cc: Ashworth, Thomas (BOP) <​_____gov>; Cook, Clay (BOP) <​_____gov>; Stacy Scheff <​_____.com>

Counselors Flores & Ashworth,

For more background, I am working on motions that are due on June 19 – 13 days away. I need to get Mr. Raniere's input on some parts of the motions in order to complete them. I am working closely with Mr. Stoltz - essentially he is my eyes and ears in being able to meet with Mr. Raniere in person to go over the pending motions.

Neither Mr. Stoltz nor myself mean to overburden you with needless requests, however, if you or Counselor Ashworth can please accommodate Mr. Stoltz meeting with Mr. Raniere, it will be greatly appreciated as it is necessary for us finalizing the motion. I promise you that these requests will level off after June 19.

Thank you so much.

Very truly yours,

*Joseph M. Tully*
Joseph M. Tully
Tully & Weiss Attorneys at Law
Certified Specialist, Criminal Law

**Bay Area:**
711 Main St., Martinez, CA 94553; **(925) 229-9700**
388 West Portal, San Francisco, CA 94127, **(415) 360-9007**

**Central Valley:**
1340 Van Ness, Fresno, CA 9172 ; **(559) 321-0907**
1916 E. Front St., Selma, CA 93662, **(559) 860-0970**

**Northern California:**
1388 Court St., Ste. G, Redding, CA 96001 ; **(530) 999-9700**

**Southern California:**
220 E. Pacific Coast Hwy, Ste. 106, Redondo Beach, CA  90277 **(424) 383-9700**

**Toll Free:** (844) 748-9700 (All Branches).
**Text msg:** (866) 788-9700 (All Branches).
**Fax:** (925) 241-7734 (All Branches)

From: Flores, Daniel (BOP) <​_____gov>
Sent: Monday, June 6, 2022 9:09 AM
To: Gregory Stoltz <​_____.com>
Cc: Cook, Clay (BOP) <​_____gov>; Ashworth, Thomas (BOP) <​_____gov>; Stacy Scheff <​_____.com>; Joseph Tully <​_____.com>
Subject: Re: [EXTERNAL] Re: [EXTERNAL] Re: [EXTERNAL] Re: [EXTERNAL] Visit request for Keith Raniere on 6-7-22

I will forward your request to Mr. Asworth to see what will work for him.

From: Gregory Stoltz <​_____.com>
Sent: Monday, June 6, 2022 8:53 AM
To: Flores, Daniel (BOP) <​_____gov>
Cc: Cook, Clay (BOP) <​_____gov>; Ashworth, Thomas (BOP) <​_____gov>; Stacy Scheff <​_____.com>; Joseph Tully <​_____.com>
Subject: [EXTERNAL] Re: [EXTERNAL] Re: [EXTERNAL] Re: [EXTERNAL] Visit request for Keith Raniere on 6-7-22

Mr. Flores, I'm sorry but I can't wait until next week - corrections are due on the 19th and I need to discuss them with the client. Do you have any time available this week? I am willing to try to move my other meetings around to make it work.

Cheers,
Greg Stoltz, Esq.
530 S. Main Ave. Ste 8
Tucson, AZ 85701
_____.com

On Mon, Jun 6, 2022 at 8:38 AM Flores, Daniel (BOP) <​_____gov> wrote:

Mr. Stoltz, can we please schedule your visit the week of 6/13? I will be on vacation this week and counselor Ashworth has other duties that were scheduled prior. Thank you for your understanding.

From: Gregory Stoltz <​_____.com>
Sent: Monday, June 6, 2022 8:26 AM
To: Cook, Clay (BOP) <​_____gov>; Ashworth, Thomas (BOP) <​_____gov>; Flores, Daniel (BOP) <​_____gov>
Subject: [EXTERNAL] Re: [EXTERNAL] Re: [EXTERNAL] Visit request for Keith Raniere on 6-7-22

Good morning, can I please have a visit on Thursday?

Cheers,
Greg Stoltz, Esq.
530 S. Main Ave. Ste 8
Tucson, AZ 85701

On Thu, Jun 2, 2022 at 2:35 PM Gregory Stoltz <​_____.com> wrote:

I can visit Mr. Raniere on Thursday the 9th, if that's possible.

**Ex. K, p. 14**

Regards,
Greg Stoltz

On Wed, Jun 1, 2022, 3:28 PM Gregory Stoltz <_____.com> wrote:

> I wish I could, but I am in court from 10am on until 3pm on the 6th. WHat's the earliest you could get me in that morning? I have to be physically present with a client at 10am in downtown Tucson.
>
>
> Cheers,
> Greg Stoltz, Esq.
> 530 S. Main Ave. Ste B
> Tucson, AZ 85701
>
> ███████████████

On Wed, Jun 1, 2022 at 1:10 PM Flores, Daniel (BOP) <_____.gov> wrote:

> How about Monday June 6th?
>
> **From:** Gregory Stoltz <_____.com>
> **Sent:** Wednesday, June 1, 2022 12:50 PM
> **To:** Flores, Daniel (BOP) <_____.gov>
> **Subject:** [EXTERNAL] Re: [EXTERNAL] Visit request for Keith Raniere on 6-7-22
>
> I am so sorry, but I can't push it off, our filing deadline is coming up on the 19th. CAn I do that visit with Counselor Ashworth?
>
>
> Cheers,
> Greg Stoltz, Esq.
> 530 S. Main Ave. Ste B
> Tucson, AZ 85701
>
> ███████████████

On Wed, Jun 1, 2022 at 12:48 PM Flores, Daniel (BOP) <_____.gov> wrote:

> Please be advised, I will be on vacation from 6/7 till 6/10, can we schedule your visit the following week?
>
> **From:** Gregory Stoltz <_____.com>
> **Sent:** Wednesday, June 1, 2022 12:42 PM
> **To:** Ashworth, Thomas (BOP) <_____.gov>; Flores, Daniel (BOP) <_____.gov>
> **Cc:** Cook, Clay (BOP) <_____.gov>
> **Subject:** [EXTERNAL] Visit request for Keith Raniere on 6-7-22
>
> May I please schedule a visit with Mr. Raniere on Tuesday June 7th at 11am?
>
>
> Cheers,
> Greg Stoltz, Esq.
> 530 S. Main Ave. Ste B
> Tucson, AZ 85701
>
> ███████████████

Exhibit L

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Keith Raniere,

　　　　　　　Plaintiff,

　　vs.

Merrick Garland, US Attorney General, et al.,

　　　　　　　Defendants.

No. 22-cv-00212-RCC-PSOT

**DECLARATION OF SCOTTY WATSON**

　　　I, Scotty Watson, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records reasonably relied upon by me in the course of my employment, hereby make the following declaration relating to the above-titled matter.

　　　1.　　I am a Case Manager for the Federal Bureau of Prisons (Bureau), assigned to the United States Penitentiary in Tucson, Arizona (USP Tucson). In this role, I address inmate institutional needs on a daily basis.

　　　2.　　I am familiar with inmate Keith Raniere, Federal Register No. 57005-177. Mr. Raniere is assigned to C1 Unit at USP Tucson and he is one of the inmates on my caseload.

　　　4.　　As a Case Manager, I assist Correctional Counselor Flores with scheduling and conducting legal telephone calls when he is out of the office.

　　　5.　　On May 6, 2022, I facilitated a legal call between Mr. Raniere and Joseph P. Daugherty because Mr. Flores was out of the office. During the legal call, the connection was lost. I called Mr. Daugherty back and he and Mr. Raniere resumed their call until it concluded. I am not aware of any other times that a legal call has become disconnected between Mr. Raniere and one of his attorneys. When a legal call is disconnected, I simply call the attorney again and re-establish the connection.

　　　//

　　　//

1    Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury

2    that the foregoing is true and correct to the best of my information, knowledge, and belief.

3    Executed on this 23rd day of May 2022, in Tucson, Arizona.

4

5                                    Scotty Watson
6                                    Case Manager
                                     USP Tucson, Arizona
7                                    Federal Bureau of Prisons

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Ex. L, p. 2**

Exhibit M

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Keith Raniere, | No. CV 22-00212-TUC-RCC |
| Plaintiff, | **DECLARATION OF JEREMY ULRICH** |
| vs. | |
| Merrick Garland, US Attorney General, et al., | |
| Defendants. | |

I, Jeremy Ulrich, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records reasonably relied upon by me in the course of my employment, hereby make the following declaration relating to the above-titled matter.

1.      I am a Lieutenant with the Federal Bureau of Prisons (Bureau) at the Federal Correctional Complex in Tucson, Arizona (FCC Tucson).  I have held this position since April 2015.  I have been employed by the Bureau, in positions of increasing responsibility since December 2007.  Since June 2022, I have served as the Acting Special Investigative Agent at FCC Tucson.  In the past, I have served as the Acting Deputy Captain and Acting Complex Captain at FCC Tucson for intermittent periods as assigned.

2.      FCC Tucson includes a high-security United States Penitentiary (USP Tucson), a medium security Federal Correctional Institution, and a minimum security Federal Prison Camp.

3.      As the Acting Special Investigative Agent, I oversee the Special Investigative Services Department at USP Tucson.  I also investigate inmate misconduct and other matters related to the safety and security of the institution and inmates housed therein.  I address inmate institutional needs on a daily basis.

4.      As part of my official duties, I have access to records maintained by the Bureau in the ordinary course of business, including administrative remedy requests of

federal inmates, information maintained in the SENTRY[1] database, inmate administrative tort claim records, and inmate central files. All records attached to this declaration are true and accurate copies of Bureau records maintained in the ordinary course of business.

## I. SPECIAL HOUSING UNIT POLICIES

5. There are two different types of statuses in the SHU: (1) administrative detention status and (2) disciplinary segregation.

6. The Bureau may place an inmate in administrative detention status in order to remove the inmate from general population because the inmate's "presence in the general population poses a threat to life, property, self, staff, other inmates, the publis, or to the security or orderly running of the institution" and the inmate is "under investigation or awaiting a hearing for possibly violating a Bureau regulation or criminal law[.]" *See* 28 C.F.R. § 541.23(c)(1). Bureau officials determine whether an inmate is placed in the Special Housing Unit on administrative detention status, not an inmate.

7. Administrative detention is a non-punitive status which removes the inmate from the general population when necessary to ensure the safety, security, and orderly operation of correctional facilities, or to protect the public. *See* 28 C.F.R. § 541.22(a). An inmate may be placed in administrative detention status for investigation into or awaiting a hearing "for possibly violating a Bureau regulation or criminal law." *See* 28 C.F.R. § 541.23(c)(1).

8. An inmate is placed on disciplinary segregation status "as a disciplinary sanction." *See* 28 C.F.R. § 541.24. In disciplinary segregation status, an inmate's "personal property will be impounded, with the exception of limited reading/writing materials, and religious articles. Also, [an inmate's] commissary privileges may be limited." *See* 28 C.F.R. § 541.31(h)(1). An inmate may be released from disciplinary segregation status "after satisfying the sanction imposed by the DHO. The [Segregation

---

[1] SENTRY is the Bureau's national database which tracks various data regarding an inmate's confinement, including, but not limited to, an inmate's institutional history, sentencing information, participation in programs, administrative remedies, and discipline history.

- 2 -

Review Officer] may release [the inmate] earlier if it is determined [that he] no longer requires disciplinary segregation status." *See* 28 C.F.R. 541.33(b).

9.      Regardless of the status of the inmate in the SHU, standardized conditions of confinement are afforded each inmate in the SHU. *See* 28 C.F.R. § 541.31(a)-(o) ("Your living conditions in the SHU will meet or exceed standards for healthy and humane treatment."). Likewise, "You will receive personal items necessary to maintain an acceptable level of personal hygiene, for example, toilet issue, soap, toothbrush and cleanser, shaving utensils, etc. You will ordinarily have an opportunity to shower and shave at least three times per week." 28 C.F.R. § 541.31(f). Federal regulations outline the specific conditions of confinement in the following categories: (a) Environment; (b) Cell Occupancy; (c) Clothing; (d) Bedding; (e) Food; (f) Personal Hygiene; (g) Exercise; (h) Personal Property; (i) Correspondence; (j) Telephone; (k) Visiting; (l) Legal Activities; (m) Staff Monitoring; (n) Programming Activities; and (o) Administrative Remedy Program. *Id.* Medical and mental health care are mandated as well. *See* 28 C.F.R. § 541.32(a)-(b) ("After every 30 calendar days of continuous placement in . . . administrative detention . . . status, mental health staff will examine you, including a personal interview. Emergency mental health care is always available.").

10.     An inmate's placement in the SHU will be reviewed periodically by the Segregation Review Official (SRO). *See* 28 C.F.R. § 541.26. "Within three work days of your placement in administrative detention status, not counting the day you were admitted, weekends, and holidays, the SRO will review the supporting records." 28 C.F.R. § 541.26(a). There is also a formal review within "seven continuous calendar days of your placement in . . . administrative detention . . . status . . . at a hearing you can attend." 28 C.F.R. § 541.26(b). "After every 30 calendar days of continuous placement in . . . administrative detention . . . status, the SRO will formally review your status at a hearing you can attend." 28 C.F.R. § 541.26(c). "You can submit a formal grievance challenging your placement in the SHU through the Administrative Remedy Program[.]" 28 C.F.R. § 541.26(d).

11.     "An Inmate Request to Staff Member (form BP-S148), commonly called a

- 3 -

Cop-Out, is used to make a written request to a staff member. Any type of request can be made with this form[,]" to include if an inmate believes that his Unit Team is not providing him with administrative remedy forms or is not properly processing administrative remedy forms. These requests or "cop-outs" can be made to any staff member, including Associate Wardens and the Warden. An inmate may file an inmate request to staff (cop-out), informal grievance (BP-8), or formal grievance (BP-9, BP-10, or BP-11) while in general population or while housed in the SHU. *See* 28 C.F.R. § 541.31(o) ("You can submit a formal grievance challenging any aspect of your confinement in the SHU through the Administrative Remedy Program[.]").

12.    Inmates in the SHU are monitored "by staff assigned to the SHU, including program and unit team staff." *See* 28 C.F.R. § 541.31(m). "Program staff, including unit staff, arrange to visit inmates in a SHU within a reasonable time after receiving the inmate's request. In addition to direct supervision by the unit officer, qualified health personnel and one or more responsible officers the Warden designates (ordinarily the Institution Duty Officer) visit each segregated inmate daily, including weekends and holidays. A Lieutenant must visit the SHU during each shift to ensure all procedures are followed." *See* Program Statement 5270.11, *Special Housing Units* at 14.[2]

13.    "Either the Unit Manager, or a Case Manager/[Correctional] Counselor under his/her supervision, must make at least daily visits, during his/her scheduled hours of work, to inmates housed in the . . . [SHU]. The Unit Manager must visit at least weekly. However, if there are no inmates housed in SHU under the supervision of a particular Unit Manager, then Unit Team rounds are not required." *See* Program Statement 5321.08, *Unit Management Manual* at 4.[3] "In instances of leave or other absences, it is appropriate for staff from another unit team to cover [SHU] rounds[.]" *Id.*

14.    If an inmate has an issue that he wants to bring to the attention of staff, he

---

[2] Available at https://www.bop.gov/policy/progstat/5270.11.pdf (last visited on Oct. 7, 2022).

[3] Available at https://www.bop.gov/policy/progstat/5321.08.pdf (last visited on Oct. 7, 2022).

- 4 -

can do so via a written request (cop-out) at any time, as detailed above, or during these in-person rounds with multiple Unit Team, and other, staff.

## II.   RELEVANT FACTS

15.     I am familiar with inmate Keith Raniere, Federal Register No. 57005-177. He has been incarcerated at USP Tucson since January 21, 2021. *See* Att. 1, SENTRY Inmate History - Quarters at 1 ("TCP" is the facility code for USP Tucson).

16.     On July 26, 2022, inmate Raniere was involved in a physical altercation with another inmate in Food Service and was issued an incident report for Code 201, fighting with another person. *See* Att. 2, Incident Report No. 3655238 at 1.  When two inmates are involved in a physical altercation, each inmate is written an incident report that will be investigated to determine whether the charged misconduct was committed by each inmate.  The Discipline Hearing Officer makes the final decision whether to uphold or expunge an incident report, following investigation and a disciplinary hearing.

17.     On August 15, 2022, Incident Report No. 3655238 was expunged following a disciplinary hearing. *See* Att. 3, Expunged Incident Report No. 3655238 at 1.

18.     As a result of receiving Incident Report No. 3655238 and to further investigate the matter, since that time, inmate Raniere has been housed in the Special Housing Unit (SHU) on administrative detention status. *See* Att. 1 at 1 ("Z01-118L AD" is the annotation for the SHU and administrative detention status); *see also* Att. 4, Administrative Detention Order at 1.

19.     While inmate Raniere has been housed in the SHU at USP Tucson, he has undergone various reviews by the SRO. *See* Att. 5, SRO Reviews at 1-6.  Inmate Raniere received an initial three-day review by the SRO on July 29, 2022, and inmate Raniere received successive reviews thereafter throughout August, September, and into October 2022. *Id.*  Inmate Raniere can express concerns about cell assignments, cellmates, and other issues during these periodic reviews.  There are no safety or security concerns with inmate Raniere's current housing assignment, including his current cellmate.

20.     The SIS Department is investigating safety and security issues pertaining to inmate Raniere at USP Tucson.

- 5 -

1    Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury

2  that the foregoing is true and correct to the best of my information, knowledge, and belief.

3    Executed on this 12th day of October 2022, in Tucson, Arizona.

4

5                                            Jeremy Ulrich

6                                            Acting Special Investigative Agent
                                             FCC Tucson, Arizona
7                                            Federal Bureau of Prisons

8

9  **Enclosures**

10  Att. 1, SENTRY Inmate History – Quarters

11  Att. 2, Incident Report No. 3655238

12  Att. 3, Expunged Incident Report No. 3655238

13  Att. 4, Administrative Detention Order

14  Att. 5, SRO Reviews

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 6 -

# Exhibit M
# Attachment 1

```
PHXC4  531.01 *                 INMATE HISTORY              *       09-30-2022
PAGE 001   *                      QUARTERS                  *       10:05:58


  REG NO..: 57005-177 NAME....: RANIERE, KEITH
  CATEGORY: QTR        FUNCTION: PRT       FORMAT:


FCL    ASSIGNMENT DESCRIPTION                       START DATE/TIME STOP  DATE/TIME
TCP    Z01-118LAD HOUSE Z/RANGE 01/BED 118L AD      09-14-2022 2014 CURRENT
TCP    Z01-119LAD HOUSE Z/RANGE 01/BED 119L AD      08-26-2022 2315 09-14-2022 2014
TCP    Z01-120LAD HOUSE Z/RANGE 01/BED 120L AD      08-06-2022 1844 08-26-2022 2315
TCP    Z01-101LAD HOUSE Z/RANGE 01/BED 101L AD      07-26-2022 0727 08-06-2022 1844
TCP    C01-108U   HOUSE C/RANGE 01/BED 108U         03-24-2022 0844 07-26-2022 0727
TCP    F02-108U   HOUSE F/RANGE 02/BED 108U         03-21-2022 1005 03-24-2022 0844
TCP    C01-108U   HOUSE C/RANGE 01/BED 108U         01-24-2022 1332 03-21-2022 1005
TCP    Z06-256LAD HOUSE Z/RANGE 06/BED 256L AD      01-11-2022 2040 01-24-2022 1332
TCP    Z01-101LAD HOUSE Z/RANGE 01/BED 101L AD      01-11-2022 1429 01-11-2022 2040
TCP    C01-108U   HOUSE C/RANGE 01/BED 108U         11-09-2021 1031 01-11-2022 1429
TCP    C01-112U   HOUSE C/RANGE 01/BED 112U         10-27-2021 1252 11-09-2021 1031
TCP    Z02-125LAD HOUSE Z/RANGE 02/BED 125L AD      10-17-2021 1736 10-27-2021 1252
TCP    Z02-123LAD HOUSE Z/RANGE 02/BED 123L AD      09-27-2021 1804 10-17-2021 1736
TCP    Z02-121LAD HOUSE Z/RANGE 02/BED 121L AD      09-07-2021 1818 09-27-2021 1804
TCP    Z02-144LAD HOUSE Z/RANGE 02/BED 144L AD      08-18-2021 1842 09-07-2021 1818
TCP    Z02-143LAD HOUSE Z/RANGE 02/BED 143L AD      07-29-2021 1911 08-18-2021 1842
TCP    Z02-121LAD HOUSE Z/RANGE 02/BED 121L AD      07-22-2021 1404 07-29-2021 1911
TCP    Z01-101LAD HOUSE Z/RANGE 01/BED 101L AD      07-22-2021 1215 07-22-2021 1404
TCP    C01-229L   HOUSE C/RANGE 01/BED 229L         03-11-2021 1035 07-22-2021 1215
TCP    C01-202U   HOUSE C/RANGE 01/BED 202U         02-01-2021 1152 03-11-2021 1035
TCP    B02-119L   HOUSE B/RANGE 02/BED 119L         01-21-2021 2035 02-01-2021 1152
TCP    B02-109L   HOUSE B/RANGE 02/BED 109L         01-21-2021 2003 01-21-2021 2035
TCP    R01-001L   HOUSE R/RANGE 01/BED 001L         01-21-2021 1904 01-21-2021 2003
OKL    H01-003L   HOUSE H/RANGE 01/BED 003L         01-19-2021 1444 01-21-2021 0920
OKL    H01-003L   HOUSE H/RANGE 01/BED 003L         01-19-2021 1330 01-19-2021 1445
LEW    C02-212L   HOUSE C/RANGE 02/BED 212L         01-06-2021 1239 01-19-2021 0730
LEW    R01-001L   HOUSE R/RANGE 01/BED 001L         01-06-2021 0800 01-06-2021 1239
BRO    I03-602U   HOUSE I/RANGE 03/BED 602U         11-24-2020 1433 01-06-2021 0248
BRO    I03-618U   HOUSE I/RANGE 03/BED 618U         11-20-2020 1013 11-24-2020 1433
BRO    Z01-104LAD HOUSE Z/RANGE 01/BED 104L AD      11-16-2020 1819 11-20-2020 1013
BRO    Z03-120LAD HOUSE Z/RANGE 03/BED 120L AD      11-16-2020 1131 11-16-2020 1819
BRO    Z03-125LAD HOUSE Z/RANGE 03/BED 125L AD      10-27-2020 1833 11-16-2020 1131
BRO    Z03-131LAD HOUSE Z/RANGE 03/BED 131L AD      10-27-2020 1827 10-27-2020 1833
BRO    Z03-106UAD HOUSE Z/RANGE 03/BED 106U AD      10-26-2020 1507 10-27-2020 0839
BRO    Z01-102LAD HOUSE Z/RANGE 01/BED 102L AD      10-24-2020 1846 10-26-2020 1507
BRO    I03-605L   HOUSE I/RANGE 03/BED 605L         10-19-2020 1753 10-24-2020 1846
BRO    I03-603L   HOUSE I/RANGE 03/BED 603L         09-20-2020 1413 10-19-2020 1753
BRO    I03-605U   HOUSE I/RANGE 03/BED 605U         08-18-2020 1528 09-20-2020 1413
BRO    I05-605U   HOUSE I/RANGE 05/BED 605U         08-18-2020 1522 08-18-2020 1528
BRO    I03-610L   HOUSE I/RANGE 03/BED 610L         07-10-2020 1629 08-18-2020 1522
BRO    I03-610U   HOUSE I/RANGE 03/BED 610U         07-10-2020 1628 07-10-2020 1629



G0002      MORE PAGES TO FOLLOW . . .
```

**Ex. M, p. 8**

Exhibit M
Attachment 2



BP-A0288 

# INCIDENT REPORT
### Dept. of Justice / Federal Bureau of Prisons

## Part I - Incident Report

| 1. Institution: **TUCSON USP** | | |
|---|---|---|
| 2. Inmate's Name **RANIERE, KEITH** | 3. Register Number **57005-177** | Incident Report Number: **3655238** |
| | | 4. Date of Incident **07-26-2022** · 5. Time **0651 hrs** |
| 6. Place of Incident **Food Service Dining Room** | 7. Assignment **P UNASSGN** | 8. Unit **UNIT C** |
| 9. Incident **201 -- FIGHTING WITH ANOTHER PERSON.** | | 10. Prohibited Act Code(s) **201** |

11. Description Of Incident
   (Date: **07-26-2022**   Time: **0651 hrs**   staff became aware of incident)

**I Food Service D. John was standing mainline in the dining hall. When Inmate RANIERE, KEITH, #57005-177 was walking to the table with his tray when he was assaulted by Inmate** ▮▮▮▮▮▮▮ **with closed fist upon the head and facial region.  I gave verbal directive for Inmate Raniere, and Inmate** ▮▮▮▮▮▮▮ **to stop before radioing for assistance.**

| 12. Typed Name/Signature of Reporting Employee **D John** | 13. Date And Time **07-26-2022 0750 hrs** | |
|---|---|---|
| 14. Incident Report Delivered to Above Inmate By (Type Name/Signature) | 15. Date Report Delivered | 16. Time Report Delivered |

The Government Paperwork Elimination Act (GPEA) of 1998 authorized Federal Agencies the use of electronic forms, electronic filing, and electronic signatures to conduct office business.

Prescribed by P5270

Replaces BP-S288.052

# Exhibit M
# Attachment 3

BP-A0304
JAN 17

# DISCIPLINE HEARING OFFICER REPORT

**U.S. DEPARTMENT OF JUSTICE**         **EXPUNGED**         **FEDERAL BUREAU PRISONS**

| | |
|---|---|
| Institution: USP Tucson | Incident Report number: 3655238 |

| | | |
|---|---|---|
| NAME OF INMATE: RANIERE, KEITH | REG. NO.: 57005-177 | UNIT: C |

| | |
|---|---|
| Date of Incident Report: 07-26-2022 | Offense Code: 201 |

Date of Incident: 07-26-2022

Summary of Charges: CODE 201- Fighting with another person.

I.      NOTICE OF CHARGE(S): 07-26-2022 @ 2005 hrs

II.     STAFF REPRESENTATIVE: None requested

III.    PRESENTATION OF EVIDENCE: None

IV.     FINDINGS OF THE DHO

_____ A. The act was committed as charged. __X__ C. No prohibited act was committed:
Expunge according to Inmate Discipline PS.

_____ B. The following act was committed:

V.      SPECIFIC EVIDENCE RELIED ON TO SUPPORT FINDINGS (Physical evidence, observations, written documents, etc.):

**CONCLUSION AND FINDINGS:** INMATE WAS VICTIM IN ASSULT, EVIDENCE SUPPORTS INMATE DID NOT FIGHT BACK.

VI.     SANCTION OR ACTION TAKEN (List each prohibited act with respective sanctions for that act): Not applicable

VII.    REASON FOR EACH SANCTION OR ACTION TAKEN: Not applicable

I. APPEAL RIGHTS: __X__ The inmate has been advised of the findings, specific evidence relied on action and reasons for the action. The inmate has been advised of the right to appeal this action within 20 calendar days under the Administrative Remedy Procedure. A copy of this report has been given to the inmate.

IX.     Discipline Hearing Officer

| Printed Name | Signature | Date |
|---|---|---|
| A. Estrada | *A. E* | 8-15-2022 |

DHO report delivered to Inmate by: _8/23/22_____

*Fellows*                    *[signature]*                    8/23/22 11:30am
Printed Name (Staff)         Signature:                      Date and Time:

Prescribed by P5270                    Replaces BP-A0304 of AUG 11

1

# Exhibit M
# Attachment 4

BP-A0308
JAN 17

**ADMINISTRATIVE DETENTION ORDER**

**U.S. DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF PRISONS**

TUCSON USP
Institution

Date/Time: 07-26-2022 07:27

TO: Special Housing Unit Officer

FROM: LT. PIERCE, LIEUTENANT _____, (Name/Title)

SUBJECT : Placement of _____ RANIERE, KEITH _____, Reg. No. 57005-177 _____, in Administrative Detention

___✓___(a)  Is pending an Investigation for a violation of Bureau regulations;

_____(b)  Is pending an SIS investigation.

_____(c)  Is pending investigation or trial for a criminal act;

_____(d)  Is to be admitted to Administrative Detention

_____(1)  Since the inmate has requested admission for protection;

I hereby request placement in Administrative Detention for my own protection.

Inmate Signature/Register No.: _____

Staff Witness Printed Name Signature: _____

_____(2)  Since a serious threat exists to individual's safety as perceived by staff, although person has not requested admission; referral of the necessary information will be forwarded for an appropriate hearing by the SRO.

_____(e)  Is pending transfer or is in holdover status during transfer.

_____(f)  Is pending classification; or

_____(g)  Is terminating confinement in Disciplinary Segregation and has been ordered into Administrative Detention by the Warden's designee.

It is this Correctional Supervisor's decision based on all the circumstances that the above named inmate's continued presence in the general population poses a serious threat to life, property, self, staff, other inmates, or to the security or orderly running of the institution because*

PENDING INVESTIGATION FOR A VIOLATION OF BUREAU REGULATIONS

Therefore, the above named inmate is to be placed in Administrative Detention until further notice. The inmate received a copy of this Order on

(date / time) _____

Staff Witness Signature/Printed Name _____ Date 7/26/22

Supervisor 24 hour review of placement: Signature/Printed name_____

* In the case of DHO action, reference to that order is sufficient. In other cases, the Correctional supervisor will make an independent review and decision, which is documented here.

Record Copy - Inmate Concerned (not necessary if placement is a result of holdover status); Copy - Captain; Copy - Unit Manager; Copy - Operation Supervisor ÷ Administrative Detention Unit; Copy – Psychology; Copy - Central File

PDF

Prescribed by P5270

(Replaces BP-A0308 of JAN 88.)

**Ex. M, p. 14**

Exhibit M
Attachment 5

| BP-A295.052<br>APRIL 1994 | **SPECIAL HOUSING UNIT REVIEW** | **U.S. DEPARTMENT OF JUSTICE<br>FEDERAL BUREAU OF PRISONS** |

| Inmate Name: | Register Number: | Unit: | Institution: |
|---|---|---|---|
| **RANIERE, KEITH** | **57005-177** | **4 GP** | **TUCSON USP** |

| Date Entered Special Housing: | Reason for Placement: |
|---|---|
| **07-26-2022** | **PENDING SIS INVESTIGATION** |

| I. Subject: (2 or 3 Days) | Date Reviewed |
|---|---|
| **3 Day Review** | **07-29-2022** |

Action Taken on the Above Date:

**Continue in Special Housing Unit**

Printed Name/Signature:

**DELEON, ANDREIK G**

**II. RECORD REVIEW.**
(To be done weekly in the inmate's absence, beginning after the in-person 7 day review, and continuing every week between each in-person 30 day review.)

| DATE | ACTION TAKEN | REMARKS | SIGNATURE |
|---|---|---|---|
| 08-02-2022 | **Continue in Special Housing Unit** | | DELEON, |
| 08-09-2022 | **Continue in Special Housing Unit** | | DELEON, |
| 08-16-2022 | **Continue in Special Housing Unit** | **21 DAY REVIEW** | FALCONER, |
| 08-23-2022 | **Continue in Special Housing Unit** | | KEHL, |

| III. Subject: (7 or 30 Days) | Review By (SRO): | Reviewing Authority: |
|---|---|---|
| **30 Day Review** | KEHL, | *Feler* |

| Date inmate appeared for a Special Housing Review: | Or Date inmate waived right to appear: |
|---|---|
| | **08-25-2022** |

Has been seen daily by Medical Staff:   ☑ Yes;   ☐ No

Has been seen daily by responsible officer designated by Warden:   ☑ Yes;   ☐ No

Has received prescribed weekly exercise:   ☑ Yes;   ☐ No

Proper documentation and justification in the Central File (Incident Report, DHO Report, copies of Special Housing Review Form):   ☑ Yes;   ☐ No
if no, why not?

Is there a written psychiatric or psychological assessment on the inmate who has spent 30 days in a special housing status?   ☑ Yes;   ☐ No

Is there an additional assessment for every one month interval thereafter?   ☑ Yes;   ☐ No
if no, why not?

Action taken on the above date by the Segregation Review Official or the Reviewing Authority:

☐ Released from Special Housing;   ☑ Continue in Special Housing

Did inmate in Administrative Detention receive a written copy of staff's decision and the basis for the finding at each 30 day review?   ☑ Yes;   ☐ No
if no, why not (Should be given provided institutional security not compromised)?

Remarks: (Any change in the reason for placement is to be noted in this section. If the reason for placement changes, the inmate must receive a copy of this form):

Date of Next Review:

**09-01-2022**

Printed Name and Signature of Segregation Review Official or the Reviewing Authority and Date Signed:

*Pelen*

Ex. M, p. 16

**KEHL,**

Record Copy - Central File
This form replaces BP-295(52) dated January 1988

| BP-A295.052 | **SPECIAL HOUSING UNIT REVIEW** | **U.S. DEPARTMENT OF JUSTICE** |
|---|---|---|
| APRIL 1994 | | **FEDERAL BUREAU OF PRISONS** |

| Inmate Name: | Register Number: | Unit: | Institution: |
|---|---|---|---|
| **RANIERE, KEITH** | **57005-177** | **4 GP** | **TUCSON USP** |

| Date Entered Special Housing: | Reason for Placement: |
|---|---|
| **07-26-2022** | **PENDING SIS INVESTIGATION** |

| I. Subject: (2 or 3 Days) | Date Reviewed |
|---|---|
| **3 Day Review** | **07-29-2022** |

Action Taken on the Above Date:

**Continue in Special Housing Unit**

Printed Name/Signature:

**DELEON,**

**II. RECORD REVIEW.**
(To be done weekly in the inmate's absence, beginning after the in-person 7 day review, and continuing every week between each in-person 30 day review.)

| DATE | ACTION TAKEN | REMARKS | SIGNATURE |
|---|---|---|---|
| 09-01-2022 | **Continue in Special Housing Unit** | | KEHL, |
| 09-08-2022 | **Continue in Special Housing Unit** | | DELEON |
| 09-15-2022 | **Continue in Special Housing Unit** | | DELEON, |
| 09-22-2022 | **Continue in Special Housing Unit** | | DELEON, |

| III. Subject: (7 or 30 Days) | Review By (SRO): | Reviewing Authority: |
|---|---|---|
| **60 Day Review** | **DELEON,** | |

| Date inmate appeared for a Special Housing Review: | Or Date inmate waived right to appear: |
|---|---|
| | **09-26-2022** |

Has been seen daily by Medical Staff:  ☑Yes;  ☐No

Has been seen daily by responsible officer designated by Warden:  ☑Yes;  ☐No

Has received prescribed weekly exercise:  ☑Yes;  ☐No

Proper documentation and justification in the Central File (Incident Report, DHO Report, copies of Special Housing Review Form):  ☑Yes;  ☐No
if no, why not?

Is there a written psychiatric or psychological assessment on the inmate who has spent 30 days in a special housing status?  ☑Yes;  ☐No

Is there an additional assessment for every one month interval thereafter?  ☑Yes;  ☐No
if no, why not?

Action taken on the above date by the Segregation Review Official or the Reviewing Authority:

☐Released from Special Housing;  ☑Continue in Special Housing

Did inmate in Administrative Detention receive a written copy of staff's decision and the basis for the finding at each 30 day review?  ☑Yes;  ☐No
if no, why not (Should be given provided institutional security not compromised)?

Remarks: (Any change in the reason for placement is to be noted in this section. If the reason for placement changes, the inmate must receive a copy of this form):

Date of Next Review:

**10-03-2022**

Printed Name and Signature of Segregation Review Official or the Reviewing Authority and Date Signed:

Ex. M, p. 18

**DELEON,**

Record Copy - Central File
This form replaces BP-295(52) dated January 1988

| BP-A295.052 | **SPECIAL HOUSING UNIT REVIEW** | **U.S. DEPARTMENT OF JUSTICE** |
|---|---|---|
| APRIL 1994 | | **FEDERAL BUREAU OF PRISONS** |

| Inmate Name: | Register Number: | Unit: | Institution: |
|---|---|---|---|
| **RANIERE, KEITH** | **57005-177** | **4 GP** | **TUCSON USP** |

| Date Entered Special Housing: | Reason for Placement: |
|---|---|
| **07-26-2022** | **PENDING SIS INVESTIGATION** |

| I. Subject: (2 or 3 Days) | Date Reviewed |
|---|---|
| **3 Day Review** | **07-29-2022** |

Action Taken on the Above Date:

**Continue in Special Housing Unit**

Printed Name/Signature:

**DELEON,**

**II. RECORD REVIEW.**
(To be done weekly in the inmate's absence, beginning after the in-person 7 day review, and continuing every week between each in-person 30 day review.)

| DATE | ACTION TAKEN | REMARKS | SIGNATURE |
|---|---|---|---|
| 10-03-2022 | **Continue in Special Housing Unit** | | DELEON, |
| | | | |
| | | | |
| | | | |

| III. Subject: (7 or 30 Days) | Review By (SRO): | Reviewing Authority: |
|---|---|---|

Date inmate appeared for a Special Housing Review:       Or Date inmate waived right to appear:

Has been seen daily by Medical Staff:   ☐Yes;  ☐No

Has been seen daily by responsible officer designated by Warden:  ☐Yes;  ☐No

Has received prescribed weekly exercise:  ☐Yes;  ☐No

Proper documentation and justification in the Central File (Incident Report, DHO Report, copies of Special Housing Review Form):  ☐Yes;  ☐No
if no, why not?

Is there a written psychiatric or psychological assessment on the inmate who has spent 30 days in a special housing status?  ☐Yes;  ☐No

Is there an additional assessment for every one month interval thereafter?  ☐Yes;  ☐No
if no, why not?

Action taken on the above date by the Segregation Review Official or the Reviewing Authority:

☐Released from Special Housing;  ☐Continue in Special Housing

Did inmate in Administrative Detention receive a written copy of staff's decision and the basis for the finding at each 30 day review?  ☐Yes;  ☐No
if no, why not (Should be given provided institutional security not compromised)?

Remarks: (Any change in the reason for placement is to be noted in this section. If the reason for placement changes, the inmate must receive a copy of this form):

Date of Next Review:

**10-10-2022**

Printed Name and Signature of Segregation Review Official or the Reviewing Authority and Date Signed:

**DELEON,**

Record Copy - Central File
This form replaces BP-295(52) dated January 1988