# Exhibit A

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Keith Raniere, | No. 22-cv-00561-RCC-PSOT |
| Plaintiff, | **DECLARATION OF DANIEL FLORES** |
| vs. | |
| Merrick Garland, US Attorney General, et al., | |
| Defendants. | |

I, Daniel Flores, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records reasonably relied upon by me in the course of my employment, hereby make the following declaration relating to the above-titled matter.

1.      I am a Correctional Counselor for the Federal Bureau of Prisons (Bureau), assigned to the United States Penitentiary in Tucson, Arizona (USP Tucson).  In this role, my duties include assisting inmates with their personal property, social visiting list, social telephone list, cell sanitation, administrative remedies and tort claims, copouts, inmate indigent stamps, admission and orientation, Inmate Financial Responsibility Program payments, legal visits, legal telephone calls, and legal mail.  I address inmate institutional needs on a daily basis.

2.      As part of my official duties, I have access to records maintained by the Bureau in the ordinary course of business, including administrative remedy requests of federal inmates, information maintained in the SENTRY[1] database, and inmate central files.  All records attached to this declaration are true and accurate copies of Bureau records maintained in the ordinary course of business.

---

[1] SENTRY is the Bureau's national database which tracks various data regarding an inmate's confinement, including, but not limited to, an inmate's institutional history, sentencing information, administrative remedies, and discipline history.

3.      The following statements are based on my review of official Bureau files and records, my own personal knowledge, or on information acquired by me through the performance of my official duties.

4.      I am familiar with inmate Keith Raniere, Federal Register No. 57005-177. Mr. Raniere is one of the inmates on my caseload at USP Tucson.  On October 27, 2020, Mr. Raniere was sentenced to an aggregate 120-year sentence in the United States District Court for the Eastern District of New York for racketeering conspiracy, racketeering, forced labor conspiracy, wire fraud conspiracy, sex trafficking conspiracy, sex trafficking of Jane Doe 5, and attempted sex trafficking of Jane Doe 8 in violation of multiple federal statutes.  *See* Att. 1, SENTRY Public Information at 2-4; Att. 2, Judgment in a Criminal Case at 1-4.  Mr. Raniere's projected release date from Bureau custody is June 27, 2120.  *See* Att. 1 at 1, 5.

5.      As a Special Condition of Supervised Release, the sentencing judge specifically ordered that Plaintiff "shall not associate in person, through mail, electronic mail or telephone with any individual with an affiliation to Executive Success Programs, Nxivm, DOS or any other Nxivm-affiliated organizations[.]"  *See* Att. 2 at 9.

## I.      ATTORNEY VERIFICATION

6.      "The Warden may require an attorney to indicate where he is licensed as an attorney and how that fact may be verified" and "[i]f there is any question about the identity of the visitor or his qualification as an attorney in good standing, the Warden shall refer the matter to the Regional Counsel."  28 C.F.R. § 543.13(d).  "The Warden may not deny correspondence or visiting rights with attorneys generally."  28 C.F.R. § 543.14(c).  "The attorney may appeal any limitation or denial by the Warden of attorney visits or correspondence rights to the Regional Director.  The inmate affected may appeal through the Administrative Remedy Procedures."  28 C.F.R. § 543.14(d).

7.      For attorneys licensed in the United States, I request a copy of the attorney's driver's license and bar card.  I then verify that the attorney is an active member of a state bar and is in good standing to practice law.  I either verify this myself

by going to the state bar or state supreme court website, or I ask for assistance in verifying the attorney's status through the Legal Department.

8.     Once the attorney's active/good standing status has been verified, I schedule a legal call or legal visit pursuant to the attorney's request, in accordance with my schedule, and based on the safety and security needs of the institution.

## II.     DE LA GARZA REQUESTS FOR LEGAL CALL AND LEGAL VISIT

### A.     <u>Legal Call</u>

9.     On April 17, 2022, Mr. de la Garza sent me an e-mail requesting to schedule a legal call with Mr. Raniere.  He informed me that he was licensed to practice law in Mexico, but not the United States.

10.     On April 20, 2022, because Mr. de la Garza was not licensed to practice law in the United States, I asked him to provide me identification and his Mexican attorney licensure information.

11.     On April 21, 2022, Mr. de la Garza e-mailed me a copy of his Mexican passport and attorney business card, but not his Mexican license to practice law, which I needed in order to begin the verification process.

12.     Because of Mr. de la Garza's Mexican license to practice law, he was also required to verify his status as an active/good standing attorney through the Mexican Consulate's Office.  Also, USP Tucson does not have the capability to call international numbers so any future legal call would need to be arranged through the United States-based Mexican Consulate.

13.     On April 28, 2022, Joseph Daugherty of Tully & Weiss Attorneys at Law e-mailed me, stating that Mr. de la Garza needs a legal call with Mr. Raniere.  On May 2, 2022, Mr. Daugherty again requested a legal call between Mr. de la Garza and Mr. Raniere.

### B.     <u>Legal Visit</u>

14.     On May 31, I advised Mr. de la Garza to mail the necessary visiting forms to USP Tucson.  On June 26 & 28, 2022, after receiving a follow-up e-mail from Mr. de

la Garza, I notified him to again mail the necessary visiting forms to USP Tucson because Mr. de la Garza's prior mailing had not yet been received.

15.     On July 25, 2022, I notified Mr. de la Garza that I received, via certified mail, a copy of his Mexican passport and Mexican license to practice law.

16.     On July 26, 2022, I notified Mr. de la Garza that he may receive a legal call through the Mexican Consulate Office and advised him to coordinate the logistics.  Once that was completed, he was to notify me so that scheduling of the legal call could happen.

17.     On July 27, 2022, Mr. de la Garza advised me that he contacted the Mexican Consulate in Tucson, Arizona, and was told that they could not assist him in contacting an inmate that is a United States citizen.  Because we were unable to verify his status as a licensed attorney in good standing in Mexico through the Mexican Consulate, a legal visit and legal call could not be approved by the Warden.

18.     On August 1, 2022, Joseph Daugherty of Tully & Weiss Attorneys at Law e-mailed me, stating that Mr. de la Garza's license to practice law in Mexico can be verified by contacting the Republic of Argentina #28 in Mexico City, Mexico.

19.     On August 7, 2022, I formally notified Mr. de la Garza that "[w]e will not be able to facilitate a visit between you and Mr. Raniere.  The Warden has reviewed your request and determined that a visit is not appropriate at this time, based on the safety and security of the institution."

20.     After a subsequent follow-up e-mail from Mr. de la Garza, on August 10, 2022, I again notified Mr. de la Garza that the "Warden has determined that a visit is not appropriate at this time.  You may appeal the Warden's decision pursuant to 28 C.F.R. § 543.14(d)."

21.     There was no further communication from Mr. de la Garza to me since that time.  To date, Mr. de la Garza's status as a licensed attorney in good standing in Mexico has yet to be verified by the Mexican Consulate.  Therefore, Mr. de la Garza is not afforded legal visitation, legal call, or legal correspondence privileges with Mr. Raniere.

22.     On August 12, 2022, Mr. Daugherty e-mailed me and the other substitute

1  Correctional Counselors, stating, "Thank you for assisting me and my firm with the many
2  calls over the last year or so.  I know it isn't easy to arrange this many calls and visits.  I
3  understand that you have limited resources and other calls and visits to manage in
4  addition to Mr. Raniere's numerous requests.  Overall, you have been able to arrange
5  most calls and most visits with Mr. Raniere.  These calls are extremely helpful and
6  important in our representation of Mr. Raniere."  *See* Att. 3, Daugherty E-Mail
7  (Redacted) at 1-2.

8  **III.    OTHER LEGAL CALLS**

9      23.    Inmate legal calls are prioritized by institutional safety and security,
10  staffing, facility availability, demand among the inmate population and current conditions
11  within the institution (e.g., COVID-19 measures, security threats, lockdown, etc.).  Legal
12  calls for inmates in the Special Housing Unit (SHU) is the same as those of inmates in
13  general population, except that the inmate is placed in an assigned room to complete the
14  legal call, instead of a staff office.  Since September 22, 2022[2], the below table identifies
15  all legal calls that have been scheduled/accommodated for Plaintiff.  *See* Att. 4, Legal
16  Call Log (Redacted) at 3-4.

| Date | Attorney Names | Approximate Duration |
|---|---|---|
| 9/28/2022 | Joseph P. Daugherty | 2 hrs. |
| 10/3/2022 | Joseph P. Daugherty | 1.5 hrs. |
| 10/18/2022 | Joseph P. Daugherty | 1.5 hrs. |
| 10/26/2022 | Joseph P. Daugherty | 1.5 hrs. |
| 11/2/2022 | Joseph P. Daugherty | 1.5 hrs. |

[2] With respect to legal calls, the time period of October 4, 2021, through September 21, 2022, was previously annotated in response to various filings in *Raniere v. Garland, et al.*, Case No. 22-cv-00212-RCC-PSOT (D. Ariz.) at Docs. 14-2, 17-1, and 31-2.  As such, they will not be repeated herein.

| 11/9/2022 | Joseph P. Daugherty | 1 hr. |
|---|---|---|
| 11/16/2022 | Joseph P. Daugherty | 1 hr. |
| 12/7/2022 | Joseph P. Daugherty | 1 hr. |
| 12/14/2022 | Stacy Scheff | 1 hr. |
| 12/14/2022 | Joseph P. Daugherty | 1 hr. |
| 12/21/2022 | Stacy Scheff | 1 hr. |
| 12/21/2022 | Joseph P. Daugherty | 1 hr. |
| 1/3/2023 | Joseph P. Daugherty | 1 hr. |
| 1/23/2023 | Stacy Scheff | 1 hr. |
| 1/23/2023 | Joseph P. Daugherty | 1 hr. |
| 1/30/2023 | Joseph P. Daugherty | 1 hr. |

## IV.    OTHER LEGAL VISITS

24.    Plaintiff's attorneys continue to schedule, through me as his assigned Correctional Counselor, and other substitute Correctional Counselors, legal visits.  *See* Att. 5, Legal Visit Approval Notices (Redacted) at 1-8.  These legal visits have been accommodated per the request of the attorney and in line with the schedule of the institution and any institutional security/safety measures (e.g., lockdown, COVID-19 protocols, staff resources, etc.).

25.    Since September 22, 2022[3], during which time Plaintiff has been housed in the SHU at USP Tucson, Plaintiff's legal visits have been accommodated as reflected in

---

[3] With respect to legal visits, the time period of May 19, 2022, through September 21, 2022, was previously annotated in response to various filings in *Raniere v. Garland, et al.*, Case No. 22-cv-00212-RCC-PSOT (D. Ariz.) at Docs. 17-1 and 31-2.  As such, they will not be repeated herein.

Ex. A, p. 6

the following table:

| Date | Attorney Name(s) |
|------|------------------|
| 9/26/2022 | Stacy Scheff |
| 10/4/2022 | Stacy Scheff |
| 10/24/2022 | Stacy Scheff<br>Gregory Stoltz |
| 11/1/2022 | Stacy Scheff |
| 11/14/2022[4] | Stacy Scheff<br>Gregory Stoltz |
| 1/9/2023 | Stacy Scheff<br>Gregory Stoltz |
| 1/31/2023 | Stacy Scheff<br>Gregory Stoltz |

26.     In addition to these legal calls and legal visits, Plaintiff is still able to send and receive legal correspondence at USP Tucson to/from his verified attorneys that is afforded confidential processing/handling.

**V.     ADMINISTRATIVE REMEDIES**

27.     I am familiar with all four levels of the inmate administrative grievance procedure created by the Bureau Administrative Remedy Program.  *See* 28 C.F.R. §§ 542.10 - 542.19.

28.     The Bureau has a four-tiered Administrative Remedy Program for inmate

---

[4] This scheduled legal visit had to be canceled before it was accommodated due to a security event at FCC Tucson on November 13, 2022, that resulted in a lockdown at USP Tucson.

- 7 -

grievances, which is codified at 28 C.F.R. § 542.10 *et seq.* The first step is informal resolution with prison staff. 28 C.F.R. § 542.13(a). Requests for Informal Resolution Forms (also known as a BP-8) are not assigned a Remedy ID number and are not tracked. B-8 forms require the inmate to identify: (1) the inmate's complaint; (2) the relief the inmate is requesting; and (3) efforts made by the inmate to informally resolve the complaint, including the names of the staff he contacted. *See* 28 C.F.R. § 542.13(a) ("Each Warden shall establish procedures to allow for the informal resolution of inmate complaints."). The second step is the filing of a formal Request for Administrative Remedy (also known as a BP-9) at the institution in which the inmate is incarcerated. *See* 28 C.F.R. § 542.14. The BP-9 must be filed within "20 calendar days following the date on which the basis for the Request occurred." *See* 28 C.F.R. § 542.14(a). If the inmate feels the response to his BP-9 is not satisfactory, within 20 calendar days of the date the Warden signed the response, the inmate may then appeal the complaint to the Regional Director, by filing a Regional Office Administrative Remedy Appeal (also known as a BP-10). *See* 28 C.F.R. § 542.15(a). If dissatisfied with the Regional Director's response, the inmate may appeal to the Director, National Inmate Appeals, in the Office of the General Counsel in Washington D.C., by filing a Central Office Administrative Remedy Appeal (also known as a BP-11). *Id.* An inmate may not raise in an appeal an issue he did not raise in a lower level filing. *See* 28 C.F.R. § 542.15(b)(2). The Administrative Remedy Coordinator at any level may reject and return to the inmate without response a Request for Administrative Remedy or appeal that does not meet procedural requirements as outlined in the Code of Federal Regulations. *See* 28 C.F.R. § 542.17(a).

29.     An inmate has not exhausted his administrative remedies until he has properly sought review at all three formal levels. *Id.*

30.     Since July 1990, the Bureau has maintained information related to administrative complaints filed by inmates under the Bureau Administrative Remedy Program in SENTRY. One of the many functions of the SENTRY database is to track

**Ex. A, p. 8**

administrative remedy complaints and appeals, and it allows one to complete a computerized search of complaints and appeals filed by a specific inmate.

31.     Each formal complaint (i.e., BP-9, BP-10, and BP-11) is logged into SENTRY at the receiving location.  If the complaint is an initial filing, it receives a unique Remedy ID Number upon initial entry, which follows the complaint throughout the appeal process.  Each Remedy ID Number also contains an extender that identifies the level of review.  The extension F-1 indicates the complaint was filed at the institution level (BP-9).  The extension R-1 indicates the complaint or appeal was filed at the regional level (BP-10).  The extension A-1 indicates the appeal was filed at the national level (BP-11).  So, for example, a formal complaint may be identified as 123456-F1 when filed as a BP-9 at the institution level, as 123456-R1 when filed as a BP-10 at the regional level, and as 123456-A1 when filed as a BP-11 at the national level.  That is, the unique Remedy ID number follows the complaint through the process but the extension changes to reflect the level at with the complaint is filed.  The number at the end of the extension may change if the remedy or appeal is initially rejected[5] and is then re-filed due to a technical problem, such as improper form, failing to include documentation, or improper filing at that level (i.e., 123456-F1; 123456-F2, etc.).

**A.     Inmate Access to Remedy Forms at USP Tucson**

32.     Inmates have access to the Code of Federal Regulations and Bureau Program Statements, including Program Statement 1330.18, *Administrative Remedy Program*,[6] through the institution law library and the Electronic Law Library.  *See* Program Statement 1315.07, *Inmate Legal Activities* at 4, Att. A at 1-2 (identifying required main law library materials such as "Title 28 of the Code of Federal Regulations" and "All current Bureau of Prisons Program Statements which contain rules codified in

---

[5] Per 28 C.F.R. 542.17(a), the administrative remedy coordinator at any level (BP-9, BP-10, and BP-11) may reject and return to the inmate without a response an administrative remedy and/or appeal that "does not meet any other requirements of this part."

[6] *See* https://www.bop.gov/policy/progstat/1330_018.pdf (last visited on Feb. 2, 2023).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Chapters III or V of Title 28 of the Code of Federal Regulations" which includes the procedures outlined in the Administrative Remedy Program).[7]

33.     When an inmate arrives at USP Tucson, he participates in an Admission and Orientation (A&O) Program, during which the inmate is introduced to important aspects of the institution and the housing unit to which the inmate is assigned.  The A&O Program includes instructions on the Bureau's Administrative Remedy Program, how to obtain and submit the appropriate forms, and how to exhaust claims through all levels of the Administrative Remedy Program.  *See* Att. 6, USP Tucson Inmate A&O Handbook Excerpt (Jan. 2017) at 38-39.  Additionally, staff members give new inmates a copy of the A&O Handbook, which provides valuable information about the institution's operations, including the Administrative Remedy Program.  *Id.* at 38-39.

34.     At USP Tucson, in order to file an administrative remedy or appeal, an inmate may obtain the appropriate forms from, and submit completed forms to, any Unit Team member.  The Unit Team is comprised of the Unit Manager, Case Manager, Correctional Counselor, and Unit Secretary.  *Id.* at 3, 38 ("All Administrative Remedy forms may be obtained from your assigned Correctional Counselor or Unit Team member."); *see also* 28 C.F.R. § 542.14(c)(1) (Inmates "shall obtain the appropriate form from . . . institution staff (ordinarily, the correctional counselor."); *see also* Att. 7, TCX 1330.18B, *Administrative Remedy Program* at 3 ("Only unit team members may issue form BP-229, Request for Administrative Remedy (BP-9) to inmates, including those housed in the [SHU]").  While the "Correctional Counselor will initial, date, and write the inmate's last name on the top right hand section of the form for accountability purposes[,]" there is no requirement that an inmate provide a reason for needing an administrative remedy form in order to obtain that form.  *See* Att. 7 at 3.

35.     "An Inmate Request to Staff Member (form BP-S148), commonly called a Cop-Out, is used to make a written request to a staff member.  Any type of request can be made with this form[,]" to include if an inmate believes that his Unit Team is not

---

[7] *See* https://www.bop.gov/policy/progstat/1315_007.pdf (last visited on Feb. 2, 2023).

providing him with administrative remedy forms or is not properly processing administrative remedy forms.  *See* Att. 6 at 38.  These requests or "cop-outs" can be made to any staff member, including Associate Wardens and the Warden.  An inmate may file an inmate request to staff (cop-out), informal grievance (BP-8), or formal grievance (BP-9, BP-10, or BP-11) while in general population or while housed in the SHU.  *See* 28 C.F.R. § 541.31(o) ("You can submit a formal grievance challenging any aspect of your confinement in the SHU through the Administrative Remedy Program[.]").

36.   "If the inmate reasonably believes the issue is sensitive and the inmate's safety or well-being would be placed in danger if the Request became known at the institution, the inmate may submit the Request directly to the appropriate Regional Director."  *See* 28 C.F.R. § 542.14(d)(1); Att. 4 at 39 ("If an inmate believes a complaint is of a sensitive nature and he would be adversely affected if the complaint became known to the institution, he may file the complaint directly to the Regional Director.").

37.   If an inmate has an issue that he wants to bring to the attention of staff, he can do so via a written request (cop-out) at any time, as detailed above, or during in-person meetings with multiple Unit Team, and other, staff.

**B.   Plaintiff's Administrative Remedy History**

38.   On January 21, 2021, Mr. Raniere received a copy of the A&O Handbook.  *See* Att. 8, Intake Screening Form & A&O Program Checklist (Redacted) at 1.  On March 9, 2021, Plaintiff was briefed on the Bureau's Administrative Remedy Program as part of the A&O Program.  *Id.* at 2.

39.   I have reviewed the SENTRY information identifying the number and types of administrative remedies and appeals filed by Mr. Raniere.

40.   Since April 17, 2022, when Mr. de la Garza first requested a legal call with Mr. Raniere, he has filed ten administrative remedy appeals.  *See* Att. 9, SENTRY Administrative Remedy Index at 1-6.

41.   Aside from Remedy No. 1111640-A1, which pertains to his appeal of disciplinary sanctions imposed on October 26, 2021, he has not filed any appeals with the Office of General Counsel (BP-11), the final formal stage of the Administrative Remedy

- 11 -

**Ex. A, p. 11**

Program.  *Id.*

42.     He has not filed any final administrative remedy appeals with the Office of General Counsel (BP-11) regarding his lack of access to legal calls, lack of access to legal visits, denial of Mr. de la Garza, or his general access to his attorneys.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

- 12 -

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief. Executed on this 6th day of February 2023, in Tucson, Arizona.

Daniel Flores
Correctional Counselor
USP Tucson, Arizona
Federal Bureau of Prisons

**Enclosures**

Att. 1, SENTRY Public Information

Att. 2, Judgment in a Criminal Case

Att. 3, Daugherty E-Mail (Redacted)

Att. 4, Legal Call Log (Redacted)

Att. 5, Legal Visit Approval Notices (Redacted)

Att. 6, USP Tucson Inmate A&O Handbook Excerpt (Jan. 2017)

Att. 7, TCX 1330.18B, *Administrative Remedy Program*

Att. 8, Intake Screening Form & A&O Program Checklist (Redacted)

Att. 9, SENTRY Administrative Remedy Index

- 13 -

Ex. A, p. 13

# Exhibit A
# Attachment 1

```
PHXC4              *        PUBLIC INFORMATION        *      02-01-2023
PAGE 001           *           INMATE DATA            *      08:59:57
                             AS OF 02-01-2023


REGNO..: 57005-177 NAME: RANIERE, KEITH

                    RESP OF: TCP
                    PHONE..: 520-663-5000    FAX: 520-663-5024
                                             RACE/SEX...: WHITE / MALE
                                             AGE:  62
PROJ REL MT: GOOD CONDUCT TIME RELEASE       PAR ELIG DT: N/A
PROJ REL DT: 06-27-2120                      PAR HEAR DT:
```

```
G0002        MORE PAGES TO FOLLOW . . .
```

```
PHXC4            *        PUBLIC INFORMATION        *      02-01-2023
PAGE 002         *           INMATE DATA            *      08:59:57
                          AS OF 02-01-2023


REGNO..: 57005-177 NAME: RANIERE, KEITH

                    RESP OF: TCP
                    PHONE..: 520-663-5000    FAX: 520-663-5024
FSA ELIGIBILITY STATUS IS: ELIGIBLE


THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S CURRENT COMMITMENT.


HOME DETENTION ELIGIBILITY DATE....: 12-27-2119


THE INMATE IS PROJECTED FOR RELEASE: 06-27-2120 VIA GCT REL


---------------------CURRENT JUDGMENT/WARRANT NO: 010 -----------------------

COURT OF JURISDICTION...........: NEW YORK, EASTERN DISTRICT
DOCKET NUMBER...................: CR 18-0204(S-2)(NGG)
JUDGE...........................: GARAUFIS
DATE SENTENCED/PROBATION IMPOSED: 10-27-2020
DATE COMMITTED..................: 01-21-2021
HOW COMMITTED...................: US DISTRICT COURT COMMITMENT
PROBATION IMPOSED...............: NO

                 FELONY ASSESS  MISDMNR ASSESS   FINES        COSTS
NON-COMMITTED.: $700.00        $00.00          $1,750,000.00 $00.00
  JVTA........: $15,000.00


RESTITUTION...: PROPERTY:  NO  SERVICES:  NO        AMOUNT:  $00.00


-----------------------CURRENT OBLIGATION NO: 010 ---------------------------
OFFENSE CODE....:   545     18:1962 RACKETEER (RICO)
OFF/CHG: 18:1962(D),18:1963(A) RACKETEERING CONSPIRACY CT.1
         18:1962(C),18:1963(A) RACKETEERING CT.2

 SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
 SENTENCE IMPOSED/TIME TO SERVE.:   480 MONTHS
 TERM OF SUPERVISION............:     5 YEARS
 RELATIONSHIP OF THIS OBLIGATION
  TO OTHERS FOR THE OFFENDER....: CS TO 020/030/040
 DATE OF OFFENSE................: 03-31-2018










G0002      MORE PAGES TO FOLLOW . . .
```

```
PHXC4              *       PUBLIC INFORMATION        *      02-01-2023
PAGE 003           *           INMATE DATA           *      08:59:57
                         AS OF 02-01-2023


REGNO..: 57005-177 NAME: RANIERE, KEITH

                     RESP OF: TCP
                     PHONE..: 520-663-5000   FAX: 520-663-5024
-----------------------CURRENT OBLIGATION NO: 020 -------------------------
OFFENSE CODE....:  576    18:1589-90 FORCED LABOR
OFF/CHG: 18:1594(B) FORCED LABOR CONSPIRACY CT.6

  SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
  SENTENCE IMPOSED/TIME TO SERVE.:  240 MONTHS
  TERM OF SUPERVISION............:    3 YEARS
  RELATIONSHIP OF THIS OBLIGATION
   TO OTHERS FOR THE OFFENDER....: CS TO 010/030/040
  DATE OF OFFENSE................: 03-31-2018

-----------------------CURRENT OBLIGATION NO: 030 -------------------------
OFFENSE CODE....:  820    COMMUNICATIONS ACT
OFF/CHG: 18:1349,18:1343 WIRE FRAUD CONSPIRACY CT.7

  SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
  SENTENCE IMPOSED/TIME TO SERVE.:  240 MONTHS
  TERM OF SUPERVISION............:    3 YEARS
  RELATIONSHIP OF THIS OBLIGATION
   TO OTHERS FOR THE OFFENDER....: CS TO 010/020/040
  DATE OF OFFENSE................: 03-31-2018

-----------------------CURRENT OBLIGATION NO: 040 -------------------------
OFFENSE CODE....:  571    18:1591 SEX TRAFFICK CHILD
OFF/CHG: 18:1594(C),18:1591(B)(1) SEX TRAFF CONSP CT.8; 18:1591(A)(1),
         18:1591(B)(1) SEX TRAFF JANE DOE 5 CT.9; 18:1594(A),18:1591(B)
         (1) ATTEMPTED SEX TRAFF JANE DOE 8 CT.10

  SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
  SENTENCE IMPOSED/TIME TO SERVE.:  480 MONTHS
  TERM OF SUPERVISION............: LIFE
  RELATIONSHIP OF THIS OBLIGATION
   TO OTHERS FOR THE OFFENDER....: CS TO 010/020/030
  DATE OF OFFENSE................: 03-31-2018
```

```
G0002        MORE PAGES TO FOLLOW . . .
```

```
PHXC4           *        PUBLIC INFORMATION        *        02-01-2023
PAGE 004        *          INMATE DATA             *        08:59:57
                        AS OF 02-01-2023


REGNO..: 57005-177 NAME: RANIERE, KEITH

                    RESP OF: TCP
                    PHONE..: 520-663-5000   FAX: 520-663-5024


------------------------CURRENT COMPUTATION NO: 010 ------------------------

COMPUTATION 010 WAS LAST UPDATED ON 12-21-2020 AT DSC AUTOMATICALLY
COMPUTATION CERTIFIED ON 12-31-2020 BY DESIG/SENTENCE COMPUTATION CTR

THE FOLLOWING JUDGMENTS, WARRANTS AND OBLIGATIONS ARE INCLUDED IN
CURRENT COMPUTATION 010: 010 010, 010 020, 010 030, 010 040


DATE COMPUTATION BEGAN..........: 10-27-2020
AGGREGATED SENTENCE PROCEDURE...: AGGREGATE GROUP 800 PLRA
TOTAL TERM IN EFFECT............:  120 YEARS
TOTAL TERM IN EFFECT CONVERTED..:  120 YEARS
AGGREGATED TERM OF SUPERVISION..: LIFE
EARLIEST DATE OF OFFENSE........: 03-31-2018


JAIL CREDIT.....................:     FROM DATE    THRU DATE
                                      03-26-2018   10-26-2020


TOTAL PRIOR CREDIT TIME.........: 946
TOTAL INOPERATIVE TIME..........: 0
TOTAL GCT EARNED AND PROJECTED..: 6480
TOTAL GCT EARNED................: 216
STATUTORY RELEASE DATE PROJECTED: 06-27-2120
ELDERLY OFFENDER TWO THIRDS DATE: 03-26-2098
EXPIRATION FULL TERM DATE.......: 03-25-2138
TIME SERVED.....................:     4 YEARS    10 MONTHS      7 DAYS
PERCENTAGE OF FULL TERM SERVED..:   4.0
PERCENT OF STATUTORY TERM SERVED:   4.7













G0002       MORE PAGES TO FOLLOW . . .
```

**Ex. A, Att., 1, p. 4**

```
PHXC4              *        PUBLIC INFORMATION        *       02-01-2023
PAGE 005 OF 005 *                 INMATE DATA         *       08:59:57
                              AS OF 02-01-2023

REGNO..: 57005-177 NAME: RANIERE, KEITH

                     RESP OF: TCP
                     PHONE..: 520-663-5000    FAX: 520-663-5024

PROJECTED SATISFACTION DATE.....: 06-27-2120
PROJECTED SATISFACTION METHOD...: GCT REL
```

```
S0055        NO PRIOR SENTENCE DATA EXISTS FOR THIS INMATE
```

**Ex. A, Att., 1, p. 5**

# Exhibit A
# Attachment 2

AO 245B (Rev. 09/19)  Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

Eastern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | |
| | Case Number:     CR 18-0204 (S-2) (NGG) |
| KEITH RANIERE | USM Number:     57005-177 |
| | Marc A. Agnifilo, Esq. |
| | Defendant's Attorney |

## THE DEFENDANT:

**X**    was found guilty by jury   verdict on Counts 1, 2, 6, 7, 8, 9 & 10 of the Superseding Indictment (S-2).

☐ pleaded nolo contendere to count(s)
which was accepted by the court.

☐ was found guilty on count(s)
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| **Title & Section** | **Nature of Offense** | **Offense Ended** | **Count** |
|---|---|---|---|
| SEE PAGE 2 OF JUDGMENT | | | |

The defendant is sentenced as provided in pages 2 through    11    of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

**X**    Any underlying Indictment is dismissed by motion of   the United States.

**X**    Counts 3, 4, 5 & 11 of the Superseding Indictment (S-2) are dismissed by motion of the United States before trial.

☐ Count(s)      ☐ is   ☐ are dismissed on the motion of the United States.

     It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

October 27, 2020
Date of Imposition of Judgment

Signature of Judge

Nicholas G. Garaufis, U.S.D.J.
Name and Title of Judge

October 30, 2020
Date

DEFENDANT:        KEITH RANIERE
CASE NUMBER:      CR 18-0204 (S-2)(NGG)

Judgment—Page ___2___ of ____11____

# ADDITIONAL COUNTS OF CONVICTION

**Offense:**

**Count 1:**
RACKETEERING CONSPIRACY
18 U.S.C. §1962(d), 18 U.S.C. §1963(a)
Not more than life imprisonment/$250,000 fine
(Class A Felony)

**Count 2:**
RACKETEERING
18 U.S.C. §1962(c), 18 U.S.C. §1963(a)
Not more than life imprisonment/$250,000 fine
(Class A Felony)

**Count 6:**
FORCED LABOR CONSPIRACY
18 U.S.C. §1594(b)
Not more than 20 years imprisonment/$250,000 fine
(Class C Felony)

**Count 7:**
WIRE FRAUD CONSPIRACY
18 U.S.C. §1349, 18 U.S.C. §1343
Not more than 20 years imprisonment/$250,000 fine
(Class C Felony)

**Count 8:**
SEX TRAFFICKING CONSPIRACY
18 U.S.C. §1594(c), 18 U.S.C. §1591(b)(1)
15 years to life imprisonment/$250,000 fine
(Class A Felony)

**Count 9:**
SEX TRAFFICKING OF JANE DOE 5
18 U.S.C. §1591(a)(1), 18 U.S.C. §1591(b)(1)
15 years to life imprisonment/$250,000 fine
(Class A Felony)

**Count 10:**
ATTEMPTED SEX TRAFFICKING OF JANE DOE 8
18 U.S.C. §1594(a), 18 U.S.C. §1591(b)(1)
15 years to life imprisonment/$250,000 fine
(Class A Felony)

AO 245B (Rev. 09/19) Judgment in Criminal Case
       Sheet 2 — Imprisonment

Judgment — Page   3   of   11  

DEFENDANT:       KEITH RANIERE
CASE NUMBER:    CR 18-0204 (S-2) (NGG)

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:    **SEE PAGE 4 OF JUDGMENT.**

.

☐  The court makes the following recommendations to the Bureau of Prisons:

X  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

    ☐  at  _____ ☐ a.m.  ☐ p.m.  on  _____ .

    ☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐  before 2 p.m. on  _____ .

    ☐  as notified by the United States Marshal.

    ☐  as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on  _____ to  _____

at  _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By  _____
      DEPUTY UNITED STATES MARSHAL

**Ex. A, Att. 2, p. 3**

DEFENDANT: KEITH RANIERE
CASE NUMBER: CR 18-0204 (S-2) (NGG)

Judgment—Page __4__ of __11__

# ADDITIONAL IMPRISONMENT TERMS

FORTY (40) YEARS (480 MONTHS) (CAG) ON COUNT ONE (1) OF THE SUPERSEDING INDICTMENT (S-2) TO BE SERVED CONCURRENTLY WITH THE SENTENCE ON COUNT 2 AND CONSECUTIVELY WITH ALL OTHER SENTENCES IMPOSED;

FORTY (40) YEARS (480 MONTHS) (CAG) ON COUNT TWO (2) OF THE SUPERSEDING INDICTMENT (S-2) TO BE SERVED CONCURRENTLY WITH THE SENTENCE IMPOSED ON COUNT 1 AND CONSECUTIVELY WITH ALL OTHER SENTENCES IMPOSED;

TWENTY (20) YEARS (240 MONTHS) (CAG) ON COUNT SIX (6) OF THE SUPERSEDING INDICTMENT (S-2) TO BE SERVED CONSECUTIVELY WITH ALL OTHER SENTENCES IMPOSED;

TWENTY (20) YEARS (240 MONTHS) (CAG) ON COUNT SEVEN (7) OF THE SUPERSEDING INDICTMENT (S-2) TO BE SERVED CONSECUTIVELY WITH ALL OTHER SENTENCES IMPOSED;

FORTY (40) YEARS (480 MONTHS) (CAG) ON COUNT EIGHT (8) OF THE SUPERSEDING INDICTMENT (S-2) TO BE SERVED CONCURRENTLY WITH THE SENTENCES IMPOSED ON COUNTS 9 AND 10, AND CONSECUTIVELY WITH ALL OTHER SENTENCES IMPOSED;

FORTY (40) YEARS (480 MONTHS) (CAG) ON COUNT NINE (9) OF THE SUPERSEDING INDICTMENT (S-2) TO BE SERVED CONCURRENTLY WITH THE SENTENCES ON COUNTS 8 AND 10, AND CONSECUTIVELY WITH ALL OTHER SENTENCES IMPOSED;

FORTY (40) YEARS (480 MONTHS) (CAG) ON COUNT TEN (10) OF THE SUPERSEDING INDICTMENT (S-2) TO BE SERVED CONCURRENTLY WITH THE SENTENCES ON COUNTS 8 AND 9, AND CONSECUTIVELY WITH ALL OTHER SENTENCES IMPOSED.

TO SUMMARIZE, THIS IS A CUMULATIVE SENTENCE OF 120 YEARS (CAG).

Ex. A, Att. 2, p. 4

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 3 — Supervised Release

| Judgment—Page | 5 | of | 11 |

DEFENDANT:       **KEITH RANIERE**
CASE NUMBER:     CR 18-0204 (S-2) (NGG)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of: FIVE (5) YEARS ON COUNT ONE (1)
OF THE SUPERSEDING INDICTMENT (S-2). FIVE (5) YEARS ON COUNT TWO (2) OF THE SUPERSEDING INDICTMENT (S-2). THREE (3) YEARS ON COUNT SIX (6) OF THE SUPERSEDING INDICTMENT (S-2). THREE (3) YEARS ON COUNT SEVEN (7) OF THE SUPERSEDING INDICTMENT (S-2). A LIFETIME TERM ON COUNT EIGHT (8) OF THE SUPERSEDING INDICTMENT (S-2). A LIFETIME TERM ON COUNT NINE (9) OF THE SUPERSEDING INDICTMENT (S-2). A LIFETIME TERM ON COUNT TEN (10) OF THE SUPERSEDING INDICTMENT (S-2). ALL TERMS OF SUPERVISED RELEASE TO BE SERVED CONCURRENTLY WITH ONE ANOTHER.

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☐ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

Ex. A, Att. 2, p. 5

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 3A — Supervised Release

| | Judgment—Page | 6 | of | 11 |

DEFENDANT:       KEITH RANIERE
CASE NUMBER:     CR 18-0204 (S-2) (NGG)

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____    Date _____

Ex. A, Att. 2, p. 6

Case 1:18-cr-00204-RCC Document 969-7 Filed 10-02/03/20 Page 28 of 320

| | | Judgment—Page __7__ of __11__ |
|---|---|---|

DEFENDANT: KEITH RANIERE
CASE NUMBER: CR 18-0204 (S-2)(NGG)

## SPECIAL CONDITIONS OF SUPERVISION

#1. The defendant shall comply with any applicable state and/or federal sex offender registration requirements, as instructed by the probation officer, the Bureau of Prisons, or any state offender registration agency in the state where he resides, works, or is a student;

#2. The defendant shall participate in a mental health treatment program, which may include participation in a treatment program for sexual disorders, as approved by the U.S. Probation Department. The defendant shall contribute to the cost of such services rendered and/or any psychotropic medications prescribed to the degree he is reasonably able, and shall cooperate in securing any applicable third-party payment. The defendant shall disclose all financial information and documents to the Probation Department to assess his ability to pay. As part of the treatment program for sexual disorders, the defendant shall participate in polygraph examinations to obtain information necessary for risk management and correctional treatment;

#3. The defendant shall not associate with or have any contact with convicted sex offenders unless in a therapeutic setting and with the permission of the U.S. Probation Department;

#4. The defendant shall not associate with children under the age of 18, unless a responsible adult is present and he has prior approval from the Probation Department. Prior approval does not apply to contacts which are not known in advance by the defendant where children are accompanied by a parent or guardian or for incidental contacts in a public setting. Any such non-pre-approved contacts with children must be reported to the Probation Department as soon as practicable, but no later than 12 hours. Upon commencing supervision, the defendant shall provide to the Probation Department the identity and contact information regarding any family members or friends with children under the age of 18, whom the defendant expects to have routine contact with, so that the parents or guardians of these children may be contacted and the Probation Department can approve routine family and social interactions such as holidays and other family gatherings where such children are present and supervised by parents or guardians without individual approval of each event;

#5. If the defendant cohabitates with an individual who has residential custody of minor children, the defendant will inform that other party of his prior criminal history concerning his sex offense. Moreover, he will notify the party of his prohibition of associating with any child(ren) under the age of 18, unless a responsible adult is present;

#6. The defendant shall submit his person, property, house, residence, vehicle, papers, computers (as defined in 18 U.S.C. § 1030(e)(1)), other electronic communications or data storage devices or media, or office, to a search conducted by a United States probation officer. Failure to submit to a search may be grounds for revocation of release. The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition. An officer may conduct a search pursuant to this condition only when reasonable suspicion exists that the defendant has violated a condition of his supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner;

**Ex. A, Att. 2, p. 7**

Case 1:22-cr-00561-RC Document 69-7 Filed 10-02-2026 Page 29 of 320

| | | Judgment—Page | 8 | of | 11 |
|---|---|---|---|---|---|

DEFENDANT: KEITH RANIERE
CASE NUMBER: CR 18-0204 (S-2)(NGG)

## SPECIAL CONDITIONS OF SUPERVISION

**#7.** The defendant is not to use a computer, Internet capable device, or similar electronic device to access pornography of any kind. The term "pornography" shall include images or video of adults or minors engaged in "sexually explicit conduct" as that term is defined in Title 18, U.S.C. § 2256(2). The defendant shall also not use a computer, Internet capable device or similar electronic device to view images of naked children. The defendant shall not use his computer to view pornography or images of naked children stored on related computer media, such as CDs or DVDs, and shall not communicate via his computer with any individual or group who promotes the sexual abuse of children. The defendant shall also cooperate with the U.S. Probation Department's Computer and Internet Monitoring program. Cooperation shall include, but not be limited to, identifying computer systems, Internet capable devices, and/or similar electronic devices the defendant has access to, and allowing the installation of monitoring software/hardware on said devices, at the defendant's expense. The defendant shall inform all parties that access a monitored computer, or similar electronic device, that the device is subject to search and monitoring. The defendant may be limited to possessing only one personal Internet capable device, to facilitate the Probation Department's ability to effectively monitor his/her Internet related activities. The defendant shall also permit random examinations of said computer systems, Internet capable devices, similar electronic devices, and related computer media, such as CDs, under his control.

**#8.** The defendant shall report to the Probation Department any and all electronic communications service accounts (as defined in 18 U.S.C. § 2510(15)) used for user communications, dissemination and/or storage of digital media files (i.e. audio, video, images). This includes, but is not limited to, email accounts, social media accounts, and cloud storage accounts. The defendant shall provide each account identifier and password, and shall report the creation of new accounts, changes in identifiers and/or passwords, transfer, suspension and/or deletion of any account within 5 days of such action. Failure to provide accurate account information may be grounds for revocation of release. The defendant shall permit the Probation Department to access and search any account(s) using the defendant's credentials pursuant to this condition only when reasonable suspicion exists that the defendant has violated a condition of his supervision and that the account(s) to be searched contains evidence of this violation. Failure to submit to such a search may be grounds for revocation of release.

**#9.** Upon request, the defendant shall provide the U.S. Probation Department with full disclosure of his financial records, including co-mingled income, expenses, assets and liabilities, to include yearly income tax returns. With the exception of the financial accounts reported and noted within the presentence report, the defendant is prohibited from maintaining and/or opening any additional individual and/or joint checking, savings, or other financial accounts, for either personal or business purposes, without the knowledge and approval of the U.S. Probation Department. The defendant shall cooperate with the probation officer in the investigation of his financial dealings and shall provide truthful monthly statements of his income and expenses. The defendant shall cooperate in the signing of any necessary authorization to release information forms permitting the U.S. Probation Department access to his financial information and records;

DEFENDANT:        KEITH RANIERE
CASE NUMBER:      CR 18-0204 (S-2)(NGG)

## SPECIAL CONDITIONS OF SUPERVISION

#10.  The defendant shall not have contact with any of the named victims of his offenses. This means that he shall not attempt to meet in person, communicate by letter, telephone, or through a third party, without the knowledge and permission of the Probation Department;

#11.  The defendant shall not associate in person, through mail, electronic mail or telephone with any individual with an affiliation to Executive Success Programs, Nxivm, DOS or any other Nxivm-affiliated organizations; nor shall the defendant frequent any establishment, or other locale where these groups may meet pursuant, but not limited to, a prohibition list provided by the U.S. Probation Department;

#12.    The defendant shall comply with the fine payment order;

#13.    The defendant shall comply with the attached Order of Forfeiture.

AO 245B (Rev. 09/19)  Judgment in a Criminal Case
              Sheet 5 — Criminal Monetary Penalties

| | Judgment — Page | 10 | of | 11 |

DEFENDANT:       KEITH RANIERE
CASE NUMBER:   CR 18-0204 (S-2) (NGG)

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | Forfeiture Money Judgment | JVTA Assessment** |
|---|---|---|---|---|---|
| TOTALS | $ 700.00 | $ TBD | $ 1,750,000.00 | $ N/A | $ 15,000.00 |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| TOTALS | $ _____ | $ _____ | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the  ☐ fine  ☐ restitution.

    ☐ the interest requirement for the  ☐ fine  ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

                                                             **Ex. A, Att. 2, p. 10**

AO 245B (Rev. 09/19)  Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

DEFENDANT:  KEITH RANIERE
CASE NUMBER:  CR 18-0204 (S-2) (NGG)

Judgment — Page ___11___ of ___11___

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  X  **Special Assessment of $ _700.00_**  due immediately, balance due

    ☐  not later than _____ , or
    ☐  in accordance with ☐ C,   ☐ D,   ☐ E, or   ☐ F below; or

B  ☐  .         ☐    ☐ D, or   ☐ F below); or

C  X☐  **Fine Payment of $1,750,000.00 due immediately.**
    _____ (      _____ over a period of
    _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

D  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
    _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
    term of supervision; or

E  .
    X  **JVTA assessment of $15,000.00**

F  X  **Order of Restitution to be determined**

    **An Order of Restitution must be submitted within 90 days from October 27, 2020.**

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

    Case Number
    Defendant and Co-Defendant Names   ·
    *(including defendant number)*      **Total Amount**      **Joint and Several Amount**      **Corresponding Payee, if appropriate**

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

Ex. A, Att. 2, p. 11

BDM:KKO
F. #2017R01840

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA       <u>ORDER OF FORFEITURE</u>

       - against -              18-CR-204 (S-2) (NGG)

KEITH RANIERE,

            Defendant.

- - - - - - - - - - - - - - - - X

WHEREAS, on or about June 19, 2019, Keith Raniere, also known as "Vanguard," "Grandmaster," and "Master" (the "defendant"), was convicted after a jury trial of Counts One, Two, and Six through Ten, of the above-captioned Superseding Indictment, charging violations of 18 U.S.C. §§ 1349, 1591(a)(1), 1594(a), 1594(b), 1594(c), 1962(c), and 1962(d); and

WHEREAS, the Court has determined that pursuant to 18 U.S.C. § 1963(a), the defendant shall forfeit: (a) any interest the defendant acquired or maintained in violation of 18 U.S.C. § 1962; (b) any interest in, security of, claim against or property or contractual right of any kind affording a source of influence over any enterprise which the defendant has established, operated, controlled, conducted or participated in the conduct of, in violation of 18 U.S.C. § 1962; (c) any property constituting, or derived from, any proceeds which the defendant obtained, directly or indirectly, from racketeering activity in violation of 18 U.S.C. § 1962; and/or (d) substitute assets, pursuant to 18 U.S.C. § 1963(m), which shall be reduced to a forfeiture money judgment (the "Forfeiture Money Judgment").

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

1.      The defendant shall forfeit to the United States the Forfeiture Money Judgment, pursuant to 18 U.S.C. §§ 1963(a) and 1963(m).

2.      This Order of Forfeiture ("Order") is entered pursuant to Fed. R. Crim. P. 32.2(b)(2)(c), and will be amended pursuant to Fed. R. Crim. P. 32.2(e)(1) when the amount of the Forfeiture Money Judgment has been calculated.

3.      All payments made towards the Forfeiture Money Judgment shall be made by a money order, or certified and/or official bank check, payable to U.S. Marshals Service with the criminal docket number noted on the face of the check. The defendant shall cause said payment(s) to be sent by overnight mail delivery to Assistant United States Attorney Karin K. Orenstein, United States Attorney's Office, Eastern District of New York, 271-A Cadman Plaza East, Brooklyn, New York 11201, with the criminal docket number noted on the face of the instrument. The Forfeiture Money Judgment shall become due and owing in full thirty (30) days after any amendment of this Order pursuant to Rule 32.2(e)(1) (the "Due Date").

4.      If the defendant fails to pay any portion of the Forfeiture Money Judgment on or before the Due Date, the defendant shall forfeit any other property of his up to the value of the outstanding balance, pursuant to 18 U.S.C. § 1963(m).

5.      Upon entry of this Order, the United States Attorney General or his designee is authorized to conduct any proper discovery in accordance with Fed. R. Crim. P. 32.2(b)(3) and (c). The United States alone shall hold title to the monies paid by the

defendant to satisfy the Forfeiture Money Judgment following the Court's entry of the judgment of conviction.

6.     The defendant shall fully assist the government in effectuating the payment of the Forfeiture Money Judgment.

7.     The entry and payment of the Forfeiture Money Judgment is not to be considered a payment of a fine, penalty, restitution loss amount or a payment of any income taxes that may be due, and shall survive bankruptcy.

8.     Pursuant to Fed. R. Crim. P. 32.2(b)(4)(A) and (B), this Order of Forfeiture shall become final as to the defendant at the time of sentencing and shall be made part of the sentence and included in the judgment of conviction. This Order shall become the Final Order of Forfeiture, pursuant to Fed. R. Crim. P. 32.2(c)(2) and (e)(1). At that time, the monies and/or properties paid toward the Forfeiture Money Judgment shall be forfeited to the United States for disposition in accordance with the law.

9.     This Order shall be binding upon the defendant and the successors, administrators, heirs, assigns and transferees of the defendant, and shall survive the bankruptcy of any of them.

10.    This Order shall be final and binding only upon the Court's "so ordering" of the Order.

11.     The Court shall retain jurisdiction over this action to enforce compliance with the terms of this Order and to amend it as necessary, pursuant to Fed. R. Crim. P. 32.2(e).

Dated:   Brooklyn, New York

_____ Oct 26 _____, 2020

SO ORDERED:

HONORABLE NICHOLAS G. GARAUFIS
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF NEW YORK

Exhibit A

Attachment 3

| From: | Joseph Daugherty |
|---|---|
| To: | Flores, Daniel (BOP); Watson, Scotty (BOP); Ashworth, Thomas (BOP) |
| Cc: | Diaz, Michelle (BOP); Hammond, Ryan (BOP) |
| Subject: | [EXTERNAL] Thank You |
| Date: | Friday, August 12, 2022 11:39:07 AM |

Counselor Flores, Counselor Ashworth, and Case Manager Watson,

Thank you for assisting me and my firm with the many calls over the last year or so. I know it isn't easy to arrange this many calls and visits. I understand that you have limited resources and other calls and visits to manage in addition to Mr. Raniere's numerous requests. Overall, you have been able to arrange most calls and most visits with Mr. Raniere. These calls are extremely helpful and important in our representation of Mr. Raniere.

The only thing I would ask is to be notified of planned leaves of absences. I know we can't control everything that happens within a prison, but if I could be notified of planned leaves of absences it would help making sure I can schedule calls accordingly.

I appreciate all the hard work you have been putting into to making sure we have time to talk and visit with Mr. Raniere.

Very truly yours,

*Joseph P. Daugherty*
Joseph P. Daugherty
Tully & Weiss Attorneys at Law
Criminal Defense Attorney
████████████████████████████.com



FIAT JUSTITIA RUAT CAELUM

**Bay Area**:
713 Main St., Martinez, CA 94553, ████████████ tel/text
395 West Portal, San Francisco, CA 94127, ████████████ tel/text

**Central Valley**:
1340 Van Ness, Fresno, CA 93721, ████████████ tel/text
1916 E. Front St., Selma, CA 93662, ████████████ tel/text

**Ex. A, Att. 3, p. 1**

**<u>Northern California</u>**:
1388 Court St., Ste. G, Redding, CA 96001, ███████████ tel/text

**<u>Southern California</u>**:
220 S. Pacific Coast Hwy, Ste. 106, Redondo Beach, CA  90277, ████████
██████ tel/text

**Toll Free:** █████████ (All Branches)
**Fax**: ██████████ (All Branches)

**<u>NOTICE TO RECIPIENT</u>**:  If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents.  If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them. Thank you.

Exhibit A
Attachment 4

Legal Call Log

| Date | IM Name/Reg. No. RANIERE,  Reg. No. 57005-177 Attorney Name/Number | Call Duration | Staff |
|---|---|---|---|
| 10/04/2021 | Joseph P. Daugherty ███████ | 1.5 hr. | D. Flores CCC |
| 10/07/2021 | Joseph Tully █████ | 1 hr. | D. Flores CCC |
| 10/11/2021 | Joseph Tully █████ | 1hr. | D. Flores CCC |
| 10/14/2021 | Joseph Tully █████ | 1hr. | D. Flores CCC |
| 10/20/2021 | Joseph Tully █████ | 1hr. | D. Flores CCC |
| 10/27/2021 | Joseph Tully █████ | 1 hr. | D. Flores CCC |
| 11/01/2021 | Joseph Tully █████ | 1hr. | D. Flores CCC |
| 11/09/2021 | Joseph Tully █████ | 1hr. | D. Flores CCC |
| 11/15/2021 | Paul DerOhannesian ██████ | 1hr. | D. Flores CCC |
| 11/16/2021 | Joseph Tully █████ | 1hr. | D. Flores CCC |
| 12/01/2021 | Joseph Tully █████ | 1hr. | D. Flores CCC |
| 12/08/2021 | Joseph Tully █████ | 1hr. | D. Flores CCC |
| 12/15/2021 | Joseph Tully █████ | 1hr. | D. Flores CCC |
| 12/15/2021 | Seema Iyer, Esq. ██████ | 1hr. | D. Flores CCC |
| 12/20/2021 | Joseph Tully █████ | 1hr. | D. Flores CCC |
| 12/21/2021 | Seema Iyer, Esq. ██████ | 1hr. | D. Flores CCC |
| 02/22/2022 | Duncan Levin, Esq. ██████ | 30 min. | D. Flores CCC |
| 02/23/2022 | Joseph Tully █████ | 1 hr. | D. Flores CCC |

**Ex. A, Att. 4, p. 1**

Legal Call Log

| | | | |
|---|---|---|---|
| 02/28/2022 | Meringolo ████ | 1hr. | D. Flores CCC |
| 03/01/2022 | Joseph Tully ████ | 1 hr. | D. Flores CCC |
| 03/08/2022 | Joseph Tully ████ | 1 hr. | D. Flores CCC |
| 03/09/2022 | John Meringolo ████ | 1 hr. | D. Flores CCC |
| 03/29/2022 | Joseph Tully ████ | 1 hr. | D. Flores CCC |
| 4/25/2022 | Gregory Stoltz ████ | 1hr. | D. Flores |
| 4/26/2022 | John Meringolo ████<br><br>Gregory Stoltz ████ | 1hr.<br><br>1hr. | D. Flores |
| 4/27/2022 | Duncan Levin ████ | 1hr. | D. Flores |
| 5/04/2022 | Joseph Tully ████ | 1hr. | D. Flores |
| 5/09/2022 | John Meringolo ████ | 1 hr. | D. Flores |
| 5/10/2022 | Joseph Tully ████ | 1 hr. | D. Flores |
| 5/24/2022 | Joseph P. Daugherty ████ | 1hr. | D. Flores |
| 5/25/2022 | Joseph Tully ████ | 1hr. | D. Flores |
| 6/1/2022 | Joseph P. Daugherty ████<br><br>Gregory Stoltz ████ | 1hr.<br><br>1hr. | D.Flores |
| 6/13/2022 | Joseph P. Daugherty ████ | 1 hr. | D. Flores |
| 6/19/2022 | Suneel Chakravorty ████ | 2 hrs. | D. Flores |
| 6/21/2022 | Joseph P. Daugherty ████ | 1 hr. | D. Flores |
| 6/27/2022 | Joseph P. Daugherty ████ | 2 hrs. | D. Flores |
| 6/29/2022 | Joseph Tully ████ | 1hr. | D. Flores |

Legal Call Log

| | | | |
|---|---|---|---|
| 07/06/2022 | Joseph Tully ▮ | 1 hr. | D. Flores |
| 07/13/2022 | Meringolo ▮ | 1 hr. | D. Flores |
| 7/20/2022 | Joseph P. Daugherty ▮ | 1 hr. | D. Flores |
| 8/31/2022 | Joseph P. Daugherty ▮ | 2 hr. | D. Flores |
| 9/7/2022 | Joseph P. Daugherty ▮ | 1.5hr. | D. Flores |
| 9/14/2022 | Joseph P. Daugherty ▮ | 2 hrs. | D. Flores |
| 9/21/2022 | Joseph P. Daugherty ▮ | 2 hrs. | D. Flores |
| 9/28/2022 | Joseph P. Daugherty ▮ | 2 hrs. | D. Flores |
| 10/3/2022 | Joseph P. Daugherty ▮ | 1.5 hr. | D.Flores |
| 10/18/2022 | Joseph P. Daugherty ▮ | 1.5 hr. | D. Flores |
| 10/26/2022 | Joseph P. Daugherty ▮ | 1.5 hr. | D. Flores |
| 11/02/2022 | Joseph P. Daugherty ▮ | 1.5 hr. | D. Flores |
| 11/09/2022 | Joseph P. Daugherty ▮ | 1 hr. | D. Flores |
| 11/16/2022 | Joseph P. Daugherty ▮ | 1 hr. | D. Flores |
| 12/07/2022 | Joseph P. Daugherty ▮ | 1 hr. | D. Flores |
| 12/14/2022 | Stacy Scheff ▮ | 1 hr. | D. Flores |
| 12/14/2022 | Joseph P. Daugherty ▮ | 1 hr. | D. Flores |
| 12/21/2022 | Stacy Scheff ▮ | 1 hr. | D. Flores |
| 12/21/2022 | Joseph P. Daugherty ▮ | 1 hr. | D. Flores |
| 01/03/2023 | Joseph P. Daugherty ▮ | 1 hr. | D. Flores |

Legal Call Log

| 01/23/2023 | Stacy Scheff | ████████ | 1 hr. | D. Flores |
|---|---|---|---|---|
| 01/23/2023 | Joseph P. Daugherty | ████████ | 1 hr. | D. Flores |
| 1/30/2023 | Joseph P. Daugherty | ████████ | 1 hr. | D. Flores |
|  |  |  |  |  |
|  |  |  |  |  |

Exhibit A
Attachment 5



# AUTHORIZATION TO ENTER INSTITUTION

**Federal Correctional Complex**             **Tucson, Arizona**

| | |
|---|---|
| **Name of Visitors:** Additional Names may be attached | **Attorney Stacy Scheff** |
| **Purpose of visit:** | Legal Visit   RANIERE, Keith 57005-177 SHU |
| **Date/Time:** | **09/26/2022 1:00 p.m.** |
| **Location:** | USP Tucson |
| **Special Instructions:** | N/A |
| **Contact upon arrival:** | **D. Flores CCC** ▇▇▇▇ |

*The following signatures must be obtained before access will be allowed to the visitor(s).*

☑ Approved   ☐ Disapproved    Sponsoring Staff: D. Flores CCC     Date: 09/19/2022

☑ Approved   ☐ Disapproved    Captain: _____     Date: 09/19/2022

cc:



# AUTHORIZATION TO ENTER INSTITUTION

**Federal Correctional Complex**                    **Tucson, Arizona**

| | |
|---|---|
| **Name of Visitors:** Additional Names may be attached | **Attorney Stacy Scheff** |
| **Purpose of visit:** | Legal Visit  RANIERE, Keith 57005-177 SHU |
| **Date/Time:** | 10/04/2022 1:00 p.m. |
| **Location:** | USP Tucson |
| **Special Instructions:** | N/A |
| **Contact upon arrival:** | **D. Flores CCC** |

*The following signatures must be obtained before access will be allowed to the visitor(s).*

☑ Approved  ☐ Disapproved    Sponsoring Staff: D. Flores CCC      Date: 10/02/2022
☑ Approved  ☐ Disapproved    Captain: _____                Date: 10/02/2022

cc:

**Ex. A, Att. 5, p. 2**



# AUTHORIZATION TO ENTER INSTITUTION

**Federal Correctional Complex**                                    **Tucson, Arizona**

| Name of Visitors:<br>Additional Names may be attached | Attorney  Gregory Stoltz |
|---|---|
| Purpose of visit: | Legal Visit   RANIERE, Keith 57005-177 SHU |
| Date/Time: | 10/24/2022 |
| Location: | USP Tucson |
| Special Instructions: | N/A |
| Contact upon arrival: | D. Flores CCC |

*The following signatures must be obtained before access will be allowed to the visitor(s).*

☑Approved   ☐Disapproved     Sponsoring Staff: D. Flores CCC          Date: 10/17/2022

☑Approved   ☐Disapproved     Captain: _____          Date: 10/17/2022

cc:



# AUTHORIZATION TO ENTER INSTITUTION

**Federal Correctional Complex**                                        **Tucson, Arizona**

| Name of Visitors:<br>Additional Names may be attached | **Attorney Stacy Scheff** |
|---|---|
| Purpose of visit: | Legal Visit   RANIERE, Keith 57005-177 SHU |
| Date/Time: | 10/24/2022 9:00 a.m. |
| Location: | USP Tucson |
| Special Instructions: | N/A |
| Contact upon arrival: | D. Flores CCC |

*The following signatures must be obtained before access will be allowed to the visitor(s).*

☑Approved   ☐Disapproved   Sponsoring Staff: D. Flores CCC          Date: 10/18/2022

☑Approved   ☐Disapproved   Captain: _____          Date: 10/18/2022

cc:



## AUTHORIZATION TO ENTER INSTITUTION

__Federal Correctional Complex__                                                         __Tucson, Arizona__

| | |
|---|---|
| **Name of Visitors:** Additional Names may be attached | **Attorney Stacy Scheff** |
| **Purpose of visit:** | Legal Visit   RANIERE, Keith 57005-177 SHU |
| **Date/Time:** | ~~10/26/22 1:00 pm~~ for 11/1/2022 1:00 pm . |
| **Location:** | USP Tucson |
| **Special Instructions:** | N/A |
| **Contact upon arrival:** | **D. Flores CCC** ▮▮▮▮ |

_The following signatures must be obtained before access will be allowed to the visitor(s)._

☑Approved  ☐Disapproved    Sponsoring Staff: _D. Flores CCC_     Date: _10/26/2022_

☐Approved  ☐Disapproved    Captain: _____ Date: _10/26/2022_

cc:



## AUTHORIZATION TO ENTER INSTITUTION

Federal Correctional Complex                                          Tucson, Arizona

| Name of Visitors:<br>Additional Names may be attached | Attorneys Stacy Scheff/Gregory Stoltz |
|---|---|
| Purpose of visit: | Legal Visit   RANIERE, Keith 57005-177 SHU |
| Date/Time: | 11/14/2022 10:00 a.m. |
| Location: | USP Tucson |
| Special Instructions: | N/A |
| Contact upon arrival: | D. Flores CCC ▮▮▮▮▮ |

*The following signatures must be obtained before access will be allowed to the visitor(s).*

☑Approved  ☐Disapproved   Sponsoring Staff: D. Flores CCC _____   Date: 11/08/2022

☑Approved  ☐Disapproved   Captain: _____   Date: 11/08/2022

cc:



# AUTHORIZATION TO ENTER INSTITUTION

Federal Correctional Complex         Tucson, Arizona

███████████████████████████████████████

| Name of Visitors:<br>Additional Names may be attached | Attorneys Stacy Scheff /Gregory Stoltz |
|---|---|
| Purpose of visit: | Legal Visit   RANIERE, Keith 57005-177 SHU |
| Date/Time: | 01/09/2023 09:00 a.m. |
| Location: | USP Tucson |
| Special Instructions: | N/A |
| Contact upon arrival: | D. Flores CCC ████ |

███████████████████████████████████████

*The following signatures must be obtained before access will be allowed to the visitor(s).*

☑Approved ☐Disapproved  Sponsoring Staff: D. Flores CCC  Date: 01/03/2023

☑Approved ☐Disapproved  Captain: _____  Date: 01/03/2023

cc: ███████████████████████



# AUTHORIZATION TO ENTER INSTITUTION

**Federal Correctional Complex**                                    **Tucson, Arizona**

| Name of Visitors: Additional Names may be attached | Attorneys Stacy Scheff /Gregory Stoltz |
|---|---|
| Purpose of visit: | Legal Visit   RANIERE, Keith 57005-177 SHU |
| Date/Time: | 01/31/2023 09:00 a.m. |
| Location: | USP Tucson |
| Special Instructions: | N/A |
| Contact upon arrival: | D. Flores CCC ▮ |

*The following signatures must be obtained before access will be allowed to the visitor(s).*

☑Approved   ☐Disapproved   Sponsoring Staff: D. Flores CCC          Date: 01/29/2023

☑Approved   ☐Disapproved   Captain:                                  Date: 01/29/2023

cc:

Exhibit A
Attachment 6

# INMATE ADMISSION & ORIENTATION HANDBOOK



## UNITED STATES PENITENTIARY
## TUCSON, ARIZONA

UPDATED:  January 2017

# INTRODUCTION

USP Tucson is a Sex Offender Management Program (SOMP) institution. A primary goal of SOMP institution is to reduce the need to place sexual offenders in protective custody, and to create an institution climate conducive to voluntary participation in treatment. To achieve this goal, SOMP criterion are applied to all inmates at SOMP designated institutions to assist in the effective management of the Bureau's population of sexual offenders and to provide services that minimize this population's risk for sexual re-offense. Effective management of sexual offenders in prisons requires modifications and restrictions in property, mail, correspondence, and visitation for ALL inmates.

## INTAKE, CLASSIFICATION AND THE UNIT TEAM

**Orientation:** Inmates are given a social screening by Unit Management staff and medical screening by Health Services and Mental Health staff at the time of arrival. Inmates are immediately provided with a copy of the institution rules and regulations, which include information on inmate rights and responsibilities. It also includes information on sexual assault and abuse.

Within 28 days of arrival, inmates will participate in the Admission and Orientation (A&O) Program. While in A&O, inmates are advised of the programs, services, policies and procedures regarding the facility.

**Classification Teams (Unit Teams):** Each inmate is assigned to a housing unit. A unit is a self-contained inmate living area that includes both housing sections and office space for unit staff. Each unit is staffed by a Unit Team directly responsible for the inmates living in the unit. The unit offices are located in the units so staff and inmates can have access to each other. The unit staff typically includes a Unit Manager, Case Manager, Correctional Counselor, and Unit Secretary. The Staff Psychologist, Education Advisor and Unit Officer are considered members of the Unit Team and provide input for classification purposes.

Inmates are assigned to a specific Unit Team. Generally, the resolution of issues or matters of interest while at the institution are most appropriately initiated with the Unit Team. Unit Team members are available to assist in many areas, including parole matters, release planning, personal and family problems, counseling and assistance in setting and attaining goals while in prison. A member of the unit staff will be at the institution from 7:30 a.m. to 9:00 p.m., and during the day on weekends and holidays.

## GENERAL FUNCTIONS OF UNIT STAFF

**Unit Manager:** The Unit Manager is the administrative head of the general unit and oversees all unit programs and activities. The Unit Manager is the Chairperson of the team which comprises the Case Manager, Correctional Counselor, with input from Education and Psychology staff. The Unit Manager reviews team decisions and may chair the Unit Discipline Committee (UDC), which is a body that hears disciplinary infractions. The Unit Manager is ordinarily present during initial classification and subsequent program review(s) in which RRC placement is discussed.

**Case Manager:** The Case Manager is responsible for all casework services and prepares classification material, progress reports, release plans, correspondence, and other materials relating to the inmate's commitment. The Case Manager serves as a liaison between the inmate, the administration, and the community.

**Correctional Counselor:** The Counselor provides counseling and guidance for the inmates of the unit in areas of institutional adjustment, personal difficulties, and plans for the future. He/She plays a leading role in segments of unit programs relating to inmate activities. The Unit Counselor may conduct counseling groups for inmates in his/her unit and/or groups open to the general population.

**Unit Secretary:** The Unit Secretary performs clerical and administrative duties, to include the preparation of release paperwork.

**Ex. A. Att. 6, p. 2**

she will then usually begin serving the previously imposed term of supervised release. If an inmate's RIS request is denied, the inmate will be provided a statement of reasons for the denial. The inmate may appeal a denial through the Administrative Remedy Procedure.

Denials by the General Counsel or the Director are final agency decisions and are not appealable. Inmates who feel their request is of an emergency nature (e.g., a terminal medical condition) may state as such in accordance with the regulation.  (See 28 CFR part 542, subpart B).

## PROBLEM RESOLUTION

**Inmate Request to Staff Member:**  An Inmate Request to Staff Member (form BP-S148), commonly called a Cop-Out, is used to make a written request to a staff member. Any type of request can be made with this form. Cop-outs may be obtained in the living units from the Correctional Officer on duty. Staff members will answer the request within a reasonable period of time.

**Administrative Remedy Process:**  The BOP emphasizes and encourages the resolution of complaints. The first step of the Administrative Remedy process is to attempt an **Informal Resolution**, utilizing the appropriate Informal Resolution form.  (See the Administrative Remedy Institution Supplement, Attachment A.) When an informal resolution is not successful, an inmate can access the Administrative Remedy Program.  All Administrative Remedy forms may be obtained from your assigned Correctional Counselor or Unit Team member.

If the issue cannot be informally resolved, a formal complaint may be filed with a Request for Administrative Remedy (formerly BP-229), commonly referred to as a BP-9. The inmate may place a single complaint or related issues on the form. If the form contains multiple unrelated issues, the submission will be rejected. The inmate will return the completed BP-9 to the Correctional Counselor, who will deliver it to the Administrative Remedy Coordinator (BP-9 will be rejected unless processed through staff). The BP-9 complaint must be filed within twenty (20) calendar days from the date on which the basis for the incident or complaint occurred, unless it was not feasible to file within that period of time which should be documented in the complaint. Institution staff has twenty (20) calendar days to act on the complaint and to provide a written response to the inmate. This time limit for the response may be extended for an additional twenty (20) calendar days. The inmate will be notified of the extension.

If the inmate is not satisfied with the Warden's response to the BP-9, he may file an appeal to the Regional Director. This appeal must be received in the Regional Office within twenty (20) calendar days from the date of the BP-9 response. The regional appeal is filed on a Regional Administrative Remedy Appeal (form BP-230), commonly referred to as a BP-10, and must include the appropriate number of copies of the BP-9 form, the Warden's response, and any exhibits.

The regional appeal must be answered within thirty (30) calendar days, but the time limit may be extended an additional thirty (30) days. The inmate will be notified of the extension.

If the inmate is not satisfied with the Regional Director's response, he may appeal to the General Counsel in the Central Office. The national appeal must be made on the Central Office Administrative Remedy Appeal (form BP-231), commonly referred to as a BP-11, and must have the appropriate number of copies of the BP-9, BP-10, both responses, and any exhibits. The national appeal must be answered within forty (40) calendar days, but the time limit may be extended an additional twenty (20) days. The inmate will be notified of the extension.

When filing a Request for Administrative Remedy or an Appeal (BP-9, BP-10, or BP-11), the form should contain the following information:

- Statement of Facts
- Grounds for Relief
- Relief Requested
-

**Ex. A. Att. 6, p. 3**

**Sensitive Complaints:** If an inmate believes a complaint is of a sensitive nature and he would be adversely affected if the complaint became known to the institution, he may file the complaint directly to the Regional Director. The inmate must explain, in writing, the reason for not filing the complaint with the institution. If the Regional Director agrees the complaint is sensitive, it shall be accepted and a response to the complaint will be processed. If the Regional Director does not agree the complaint is sensitive, the inmate will be advised in writing of that determination and the complaint will be returned. The inmate may then pursue the matter by filing a BP-9 at the institution.

**General Information**: When a complaint is determined to be of an emergency and threatens the inmate's immediate health or welfare, the reply must be made as soon as possible, usually within seventy-two (72) hours from the receipt of the complaint.

For detailed instructions see Program Statement 1330.16, <u>Administrative Remedy Program</u>.

## DISCIPLINARY PROCEDURES

Inappropriate sexual behavior towards staff and other inmates will not be tolerated. Inappropriate sexual behavior is defined as verbal or physical conduct perceived as a sexual proposal, act, or threat. Examples of inappropriate inmate sexual behavior include: displaying sexually explicit materials; making sexually suggestive jokes, comments, proposals, and gestures; and engaging in stalking, indecent exposure, masturbation, or physical contact. Inmates who engage in this type of behavior will be disciplined and sanctioned accordingly, through the inmate discipline process.

**Discipline:** The inmate discipline program helps ensure the safety, security, and orderly operation for all inmates. Violations of BOP rules and regulations are handled by the Unit Discipline Committee (UDC) and, for more serious violations, the Disciplinary Hearing Officer (DHO). Upon arrival at an institution, inmates are advised of the rules and regulations and are provided with copies of the Prohibited Acts and Available Sanctions, as well as local regulations.

**Inmate Discipline Information:** When a staff member witnesses or reasonably believes an inmate has committed a prohibited act, a staff member will issue an incident report, a written copy of the charges against an inmate. The incident report will ordinarily be delivered to the inmate within 24 hours of the time staff became aware of the inmate's involvement in the incident. If the incident is referred for prosecution, the incident report is delivered by the end of the next work day after it has been released for administrative processing. An informal resolution of the incident may be attempted at any stage of the discipline process. If an informal resolution is accomplished, the incident report will be removed from the inmate's central file. Informal resolution is encouraged for all violations in the Moderate and Low severity categories. Staff may suspend disciplinary proceedings up to two calendar weeks while informal resolution is undertaken. If an informal resolution is not accomplished, staff will reinstate the discipline process at the stage at which they were suspended. Violations in the Greatest and High severity categories cannot be informally resolved and must be forwarded to the DHO for final disposition.

**Initial Hearing:** Inmates will ordinarily be given an initial hearing within five (5) work days after the incident report is issued, excluding the day it was issued, weekends, and holidays. The Warden must approve, in writing, the any extension over five (5) days. The inmate is entitled to be present at the initial hearing and may make statements and present documentary evidence. The UDC must give its decision in writing to the inmate by the close of the next work day. The UDC may make findings on Moderate and Low severity offenses. The UDC will automatically refer Greatest and High severity offenses to the DHO for final disposition.

### DISCIPLINE HEARING OFFICER (DHO)

The Disciplinary Hearing Officer (DHO) conducts disciplinary hearings on all Greatest and High severity prohibited acts and other violations referred by the UDC at the Moderate and Low severity levels. The DHO may not hear any case not referred by the UDC. An inmate will be provided with advance written notice of the

**Ex. A. Att. 6, p. 4**

# Exhibit A
# Attachment 7

## Certification

The Attached FCC Tucson Supplement: **1330.18B – Administrative Remedy Program** was certified as current on **5/15/2020.**



**U.S. Department of Justice**
Federal Bureau of Prisons
Federal Correctional Complex
Tucson, Arizona

# Complex Supplement

**OPI:** EXEC
**NUMBER:** TCX 1330.18B
**DATE:** 9/9/2019
**SUBJECT:** Administrative
Remedy Program

1.  <u>PURPOSE AND SCOPE</u>.   To implement standard procedures by which inmates confined at the Federal Correctional Complex Tucson (FCC Tucson) may seek formal review of complaints or issues relating to any aspect of their confinement.

2.  <u>DIRECTIVES AFFECTED</u>

   a.  <u>Directives Referenced</u>

| | |
|---|---|
| PS 1320.06 | Federal Tort Claims Act (08/01/03) |
| PS 4500.12 | Trust Fund/Deposit Fund Manual (03/15/18) |
| PS 5212.07 | Control Unit Programs (02/20/01) |
| PS 5214.04 | HIV Positive Inmates Who Pose Danger to Other, Procedures for Handling of (02/04/98) |
| PS 5264.08 | Inmate Telephone Regulations (01/24/08) |
| PS 5270.09 | Inmate Discipline Program (07/08/11) |
| PS 5324.12 | Sexually Abusive Behavior Prevention and Intervention Program (06/04/15) |
| PS 5890.13 | SENTRY - National On-Line Automated Information System (12/14/99) |
| 28 CFR 301 | Inmate Accident Compensation |
| 28 CFR 513 | Fees (for records requested pursuant to the Freedom of Information Act (FOIA)) |

   b.  <u>Directives Rescinded</u>

| | |
|---|---|
| TCX 1330.18A | Administrative Remedy Procedures for Inmates (5/03/14) |

3.  <u>STANDARDS REFERENCED</u>.  American Correctional Association Standards for Adult Correctional Institutions, 4th Edition: 4-4214M, 4-4226, 4-4227, 4-4228, 4-4361.

American Correctional Association Performance Based Standards for Adult Local Detention Facilities, 4th Edition: 4-ALDF-3A-01, 4-ALDF-4C-21.

4.  <u>RESPONSIBILITY</u>

   a.  The Executive Assistant is designated as the Administrative Remedy Coordinator at FCC Tucson.  Requests for Administrative Remedy that are of a sensitive nature or require emergency attention will be brought to the Warden's attention by the Executive Assistant.

   b.  The Associate Warden's Secretary is designated as the Administrative Remedy Clerk for the Complex.

5.  <u>ISSUES IMPROPERLY FILED.</u>  All improperly filed issues will be returned to the inmate with a SENTRY generated rejection notice.  The Administrative Remedy Clerk will initiate the SENTRY transaction and refer the rejection notice to the unit team for distribution to the inmate, and file a copy in the appropriate BP-9 folder.

6.  <u>INITIAL FILINGS</u>

   a.  <u>Informal Resolution.</u>  The Correctional Counselor has the responsibility to make every effort to attempt to successfully informally resolve the issue or complaint with the inmate.  The Unit Manager has the responsibility to review each attempt at informal resolution and to also attempt to successfully informally resolve any issue or complaint in the event the Correctional Counselor was unsuccessful.

Inmates with complaints should complete the first four sections of Attachment A, Informal Resolution and submit the form to their respective Correctional Counselor. Inmates will be allowed to attach one continuation page with their Informal Resolution, with text on one side.

Unit Team will have (5) working days to provide a response  to the inmate's informal resolution.  If the informal resolution is regarding a medical concern, Unit Team will have (7) working

days to provide a response.  If attempts at informal resolution
are unsuccessful, the Correctional Counselor shall issue a BP-
229 form, Request for Administrative Remedy (BP-9), upon
inmate's request.

   b.  Filing.  Once attempts at informal resolution have proven
unsuccessful, the inmate shall obtain a Form BP-229, Request for
Administrative Remedy (BP-9), from their Correctional Counselor.

The Correctional Counselor will initial, date, and write the
inmate's last name on the top right hand section of the form for
accountability purposes.  Copies of Administrative Remedy forms
will not be accepted.

Inmates may obtain BP-229, BP-230, Request for Administrative
Appeal (BP-10) and BP-231, Central Office Administrative Remedy
Appeal (BP-11) forms from their respective Correctional
Counselor.  Only unit team members may issue form BP-229,
Request for Administrative Remedy (BP-9) to inmates, including
those housed in the Special Housing Unit (SHU).

The inmate shall return the completed BP-229 form and the
Informal Resolution documentation to the Correctional Counselor
or Unit Manager.  The Unit Manager shall review the inmate's
complaint and ensure opportunities for informal resolution have
been exhausted.  In the Unit Manager's absence, the acting Unit
Manager will review the BP-229 for compliance.

The Correctional Counselor or other authorized staff member
shall then deliver the BP-229 form, along with the Informal
Resolution documentation, to the Administrative Remedy Clerk the
following workday.

Sentry generated receipts will serve as acknowledgment of a
submission for a Request for Administrative Remedy.  The Unit
Manager, or designee, is responsible for ensuring that SENTRY is
checked daily for inmate notices of "receipts", "extensions",
and "receipt disregards".  These notices to inmates are to be
printed and forwarded to the inmates addressees.

Unit Discipline Committee (UDC) appeals do not require
completion of the Informal Resolution documentation.  However,
the inmate must attach a copy of the Incident Report (including
UDC findings) with the Administrative Remedy BP-229 form.

The Correctional Counselor or other authorized staff shall then
deliver the BP-229 form, along with the Incident Report with UDC
hearing documentation, to the Administrative Remedy Clerk by the
following day.

An inmate can withdraw his BP-229 (BP-9), by either submitting
an Inmate Request to Staff Member or by signing a Withdrawal of
Administrative Remedy Appeal form (Attachment C).  Both forms
shall include the remedy ID number and the reason for
withdrawal.  Upon request, unit staff will assist and/or provide
assistance for inmates in completing the Administrative Remedy
form.  Inmates may obtain assistance from another inmate or
other source in preparing a request.  Inmates, who are
illiterate, disabled, or who are not functionally literate in
English,  will be provided assistance by unit staff.

7.  <u>REMEDY PROCESSING</u>

   a.  <u>Response Time Limits.</u>  A Request for Administrative Remedy
is considered filed when the information is logged in the SENTRY
database, and a Remedy ID Number is assigned.  Once filed, the
Warden's response is due within 20 calendar days from the date
the complaint is received by the Administrative Remedy Clerk.
If the complaint is determined to be of an emergency nature, the
Warden shall respond within 72 hours from the filing of the
complaint.

Extensions to response time limits, up to 20 days, may be
granted for good cause and inmates will be informed in writing
of such extensions.  Unit staff will issue a SENTRY generated
extension memo.

   b.  <u>Response Preparation.</u>  The Administrative Remedy Clerk
will refer the Administrative Remedy to a department head to
conduct an investigation and prepare the response.  Department
heads who have been assigned to review a Request for
Administrative Remedy, will have seven (7) business days from
the date of receipt to review and prepare a draft response.  The
formal written response will be prepared, with a copy stored on
the M:drive in the BP-9 folder, which will be provided with the
investigation.

If a staff member assigned to review the request is alleged to
be specifically involved in the complaint, or another reason

exists why the staff member should not review the complaint, the
staff should immediately (upon receipt) contact the clerk or
coordinator to have the investigation reassigned.  Also, members
of a Unit Discipline Committee will not review UDC appeals from
their assigned unit.  The review and proposed response to an
emergency complaint is to be completed within 24 hours of
assignment.  A response will be forwarded to the inmate within
the time frame established in P.S. 1330.18.

   c.  <u>Remedy Form Distribution.</u>   Upon completion of the
response, the Warden's File Copy will be filed in the
Administrative Remedy Coordinator's office.  Three copies of the
response and any other documentation generated by the inmate
will be forwarded back to the inmate's unit team for
distribution to the inmate.  Unit team will have the inmate sign
an Acknowledgment of Receipt of Administrative Remedy Appeal
(attachment D).  Once signed, Unit Team will then return it to
the Administrative Remedy Coordinator's office for filing.

8.  ISSUING DEPARTMENT.  Executive Assistant.




                    B. von Blanckensee       Jared Rardin
                    Complex Warden           Warden

TCX 1330.18B
9/9/2019
Page 6

Attachment A

# INFORMAL RESOLUTION FORM

<u>NOTICE TO INMATE</u>: You are advised that prior to receiving and filing a Request for Administrative Remedy Form (BP-9), you MUST attempt to informally resolve your complaint through your Correctional Counselor. Briefly state the complaint below and list what effort you have made to resolve your complaint informally. Also, please state names of staff contacted.

| Inmate Name: | Reg. No.: | Unit: |
|---|---|---|

| Informal resolution form issued by Correctional Counselor on: (date) |
|---|

| INMATE'S COMMENTS: (Inmate MUST FILL OUT items 1-4 and signature block) |
|---|

1.  Complaint:

2.  Efforts made by inmate to informally resolve incident (Which staff members did you talk to and what did they say?)

3.  State what action you want staff to take to correct the situation:

Date returned to Correctional Counselor:

| Inmate Signature | Reg. No. | Date |
|---|---|---|

| CORRECTIONAL COUNSELOR'S COMMENTS: |
|---|

Efforts made to informally resolve and staff contacted:
*a.   Discussed the complaint with (staff member) --- and he/she stated...*
*b.   I further explained to the inmate that ...*
*c.   But, the inmate insisted he wanted to file a BP-9 because...*

| Date informally resolved: | Signature: |
|---|---|

Informal Resolution was not accomplished for the following reason:
*After I personally explained that ..., he still insisted that he was wronged because...*

Unit Manager's review and Signature:
*a.   Can this request be resolved at the Unit Level?*
*b.   Steps taken to resolve (who was contacted, results of that contact – do not forward for lack of contact):*

_____
Unit Manager / Date Signed

TCX 1330.18B
9/9/2019
Page 7

Attachment B



**FEDERAL BUREAU OF PRISONS**

**FEDERAL CORRECTIONAL COMPLEX**

**TUCSON, ARIZONA**

## <u>WITHDRAWAL OF ADMINISTRATIVE REMEDY APPEAL</u>

I_____ Reg. No. _____ further acknowledge by

my signature, withdrawal of my Administrative Remedy Appeal No._____

dated _____.  This is voluntary and not of influence on the part of any staff member

of the Federal Bureau of Prisons (FCC Tucson).


_____
Signature of Inmate

_____
Register Number


_____
Date

_____
Signature/Title of Staff Witness

```
TCX 1330.18B
    9/9/2019
     Page 8
```

Attachment C



**FEDERAL BUREAU OF PRISONS**

**FEDERAL CORRECTIONAL COMPLEX**

**TUCSON, ARIZONA**

---

Unit:_____
☐ Region
☐ Central Office
☐ BP-9 Response
☐ BP-9 Rejection

# ACKNOWLEDGMENT OF RECEIPT OF
# ADMINISTRATIVE REMEDY APPEAL

I, _____, Reg. No. _____, further acknowledge by

my signature, receiving Administrative Remedy Appeal No. _____.  The

Administrative Remedy Appeal was hand-delivered to me.

Received on this _____ day of _____, 2020.


_____
Signature of Inmate

_____
Register Number


_____
Date

_____
Signature/Title of Staff Witness

# Exhibit A
# Attachment 8

```
NAME.......: RANIERE, KEITH                UNIT.....:
REGISTER NO: 57005-177                     DOB (AGE):        1960 (60)
RACE / SEX.: WHITE / MALE                  ETHNIC...: OTHER THAN HISP
RESIDENCE..: CLIFTON PARK, NY 12065        RSP OF...: TCP A-DES
```

****************** I N M A T E   I N T E R V I E W   ******************

DATE / TIME ARRIVED:  01-21-2021   19:05      TIME INTERVIEWED: _7/4/m_

1) DO YOU KNOW OF ANY REASON THAT YOU SHOULD NOT BE
   PLACED IN GENERAL POPULATION ?

2) HAVE YOU ASSISTED LAW ENFORCEMENT AGENTS IN ANY WAY ?

3) ARE YOU A CIM CASE ?

4) HAVE YOU TESTIFIED AGAINST ANYONE IN COURT ?

5) ARE YOU A MEMBER/ASSOCIATE OF ANY GANG ?

6A) HAVE YOU EVER BEEN SEXUALLY ASSAULTED ?

6B) HAVE YOU RECENTLY BEEN SEXUALLY ASSAULTED ?

INTERVIEWER COMMENTS:

CIRCLE ONE:
I HAVE / HAVE NOT  RECEIVED A BUREAU OF PRISONS "ADMISSIONS AND
ORIENTATION BOOKLET" DEFINING MY "RIGHTS AND RESPONSIBILITIES" AND THE
"PROHIBITED ACTS AND DISCIPLINARY SEVERITY SCALE".

DO YOU WISH TO SELF-IDENTIFY YOUR SEXUAL
ORIENTATION, GENDER IDENTITY, ANY DISABILITIES,
AND/OR SELF-PERCEPTION OF VULNERABILITY ?

INMATE COMMENT:

INMATE SIGNATURE: _____      DATE: _1/21/21_

INTERVIEWER: _____  TITLE: _U/m_     DATE: 01-21-2021

****************** S T A F F   C H E C K L I S T   ******************

IF GENERAL PHYSICAL APPEARANCE IS NOT GOOD, EXPLAIN: _____
_good_

OK FOR GENERAL POPULATION:  YES _✓_  NO ___  (IF NO, EXPLAIN) _____

BP-A0518
JUN 10

**U.S. DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF PRISONS**

INSTITUTION ADMISSION AND ORIENTATION PROGRAM CHECKLIST

| Inmate's Name Kampere, Keith | Register No. 57005-177 | Institution FCC TUCSON |
|---|---|---|

| | Program Content | AUTHORIZED STAFF | DATE |
|---|---|---|---|
| 1. | UNICOR Interview | Closed | 3 9 21 |
| 2. | Correctional Services | Correctional Svc | 3 9 2021 |
| 3. | Medical Services (including AIDS film & Lecture) | Health Svc | 3 9 2021 |
| 4. | Chaplaincy Services | Religious Svc | 3 9 2021 |
| 5. | Inmate Systems/ Records Office/ R&D/ Mail Room | CSD DP | 3 9 21 |
| 6. | Commissary Services/ Inmate Accounts | Trust Fund | 3 9 21 |
| 7. | Clothing Requests/ Laundry Procedures | Trust Fund | 3 9 21 |
| 8. | Food Service | Food Service | 3 9 21 |
| 9. | Psychology Services/Drug Abuse Program | Psychology | 3 9 21 |
| 10. | Sexual Abuse/Assault Prevention and Intervention | Psychology DH | 3 9 21 |
| 11. | Diversity in the Criminal Justice System | Psychology | 3 9 21 |
| 12. | Safety and Sanitation | Safety AL | 3 9 21 |
| 13. | Inmate Accident Compensation | Safety AL | 3 9 21 |
| 14. | Facilities / Mechanical Services | Facilities | 3 9 21 |
| 15. | Educational Services | Education | 3 9 21 |
| 16. | Veterans / Social Security Benefits | Reentry Coord | 3 9 21 |
| 17. | Treaty Transfer of Offenders to Foreign Countries | CMC JS | 3 9 21 |
| 18. | Selective Service System / BOP Registration Program | Reentry Coord | 3 9 21 |
| 19. | Inmate Financial Responsibility Program | CMC JS | 3 9 21 |
| 20. | Community-Based Activities | CMC JS | 3 9 21 |
| 21. | Release Preparation Program | Education | 3 9 21 |
| 22. | Administrative Remedy Program | Assoc Warden / UM | 3 9 21 |
| 23. | Unit Management | Unit Management | 3 9 21 |
| 24. | Visiting | Correctional Svc | 3 9 21 |
| 25. | Telephone Regulations / Procedures | Correctional Svc | 3 9 21 |
| 26. | Reentry/Second Chance Video/ REENTRY ENVELOPE | Reentry Coord | 3 9 21 |
| 27. | Recreation | Recreation | 3 9 21 |
| 28. | Associate Warden | Associate Warden | 3 9 21 |
| 29. | Warden | Warden | 3 9 2021 |
| 30. | | | |

Comments: A&O Completed via DVD

| I have attended all classes of the A & O Program as listed above. Signature of Inmate ___Keith VanPenere___ | Date 3 9 2021 | Unit @ C unit |
|---|---|---|

Central File - Section 3

FILE IN SECTION 3 UNLESS APPROPRIATE FOR PRIVACY FOLDER      **SECTION 3**

PDF    **\*A&O COMPLETED VIA DVD\***    Prescribed by P5264    Replaces BP-S518.052 dated Sept 99

Exhibit A

Attachment 9

```
PHXC4              *ADMINISTRATIVE REMEDY GENERALIZED RETRIEVAL *        02-01-2023
PAGE 001 OF                                                             09:36:42
        FUNCTION: L-P SCOPE: REG   EQ 57005-177    OUTPUT FORMAT: FULL
     -------LIMITED TO SUBMISSIONS WHICH MATCH ALL LIMITATIONS KEYED BELOW----------
DT RCV: FROM 04-14-2022 THRU 02-01-2023 DT STS: FROM _____ THRU _____
DT STS: FROM ____ TO ____ DAYS BEFORE "OR" FROM ____ TO ____ DAYS AFTER DT RDU
DT TDU: FROM ____ TO ____ DAYS BEFORE "OR" FROM ____ TO ____ DAYS AFTER DT TRT
STS/REAS: _____ _____ _____ _____ _____ _____ _____ _____ _____ _____
SUBJECTS: _____ _____ _____ _____ _____ _____ _____ _____ _____ _____
EXTENDED: _ REMEDY LEVEL: _ _              RECEIPT: _ _ _ "OR" EXTENSION: _ _ _
RCV  OFC : EQ ____      ____      ____      ____      ____      ____
TRACK:  DEPT: _____ _____ _____ _____ _____ _____
      PERSON: ____      ____      ____      ____      ____      ____
        TYPE: ____      ____      ____      ____      ____      ____
EVNT FACL: EQ ____      ____      ____      ____      ____      ____
RCV FACL.: EQ ____      ____      ____      ____      ____      ____
RCV UN/LC: EQ _____ _____ _____ _____ _____ _____
RCV QTR..: EQ _____ _____ _____ _____ _____ _____
ORIG FACL: EQ ____      ____      ____      ____      ____      ____
ORG UN/LC: EQ _____ _____ _____ _____ _____ _____
ORIG QTR.: EQ _____ _____ _____ _____ _____ _____




G0002       MORE PAGES TO FOLLOW . . .
```

**Ex. A, Att. 9, p. 1**

```
PHXC4          *ADMINISTRATIVE REMEDY GENERALIZED RETRIEVAL *      02-01-2023
PAGE 002 OF      *            FULL SCREEN FORMAT          *      09:36:42


REGNO: 57005-177 NAME: RANIERE, KEITH
RSP OF...: TCP UNT/LOC/DST: 4 GP            QTR.: Z01-120LAD RCV OFC: BOP
REMEDY ID: 1111640-A1      SUB1: 20BM SUB2:      DATE RCV:   06-30-2022
UNT  RCV..:UNIT C       QTR RCV.: C01-108U     FACL RCV: TCP
UNT  ORG..:UNIT C       QTR ORG.: C01-108U     FACL ORG: TCP
EVT FACL.: TCP     ACC LEV: WXR  1 BOP  1        RESP DUE:  MON  08-29-2022
ABSTRACT.: DHO HEARING 10-26-21 CODE: 396 / 397
STATUS DT: 09-30-2022  STATUS CODE: CLD STATUS REASON: DNY
INCRPTNO.: 3547878   RCT: P EXT: P DATE ENTD: 07-11-2022
REMARKS..:




REGNO: 57005-177 NAME: RANIERE, KEITH
RSP OF...: TCP UNT/LOC/DST: 4 GP            QTR.: Z01-120LAD RCV OFC: TCP
REMEDY ID: 1133790-F1     SUB1: 18AM SUB2:      DATE RCV:   09-14-2022
UNT  RCV..:4 GP        QTR RCV.: Z01-119LAD   FACL RCV: TCP
UNT  ORG..:4 GP        QTR ORG.: Z01-119LAD   FACL ORG: TCP
EVT FACL.: TCP     ACC LEV: TCP  1 WXR  1        RESP DUE:  MON  10-24-2022
ABSTRACT.: REQUESTING VISIT DENIAL INFORMATION
STATUS DT: 10-07-2022  STATUS CODE: CLD STATUS REASON: DNY
INCRPTNO.:          RCT: P EXT: P DATE ENTD: 09-14-2022
REMARKS..:
```

```
G0002      MORE PAGES TO FOLLOW . . .
```

**Ex. A, Att. 9, p. 2**

```
PHXC4          *ADMINISTRATIVE REMEDY GENERALIZED RETRIEVAL *      02-01-2023
PAGE 003 OF     *                FULL SCREEN FORMAT            *    09:36:42


REGNO: 57005-177 NAME: RANIERE, KEITH
RSP OF...: TCP UNT/LOC/DST: 4 GP              QTR.: Z01-120LAD RCV OFC: TCP
REMEDY ID: 1133798-F1     SUB1: 33EM SUB2:      DATE RCV:  09-14-2022
UNT  RCV..:4 GP        QTR RCV.: Z01-119LAD    FACL RCV: TCP
UNT  ORG..:4 GP        QTR ORG.: Z01-119LAD    FACL ORG: TCP
EVT FACL.: TCP    ACC LEV: TCP  1 WXR  1        RESP DUE:  MON 10-24-2022
ABSTRACT.: RQSTNG INFO DENIAL PHNE CALL PARA LEGAL APPROVE LIST
STATUS DT: 10-07-2022  STATUS CODE: CLD STATUS REASON: DNY
INCRPTNO.:              RCT: P EXT: P DATE ENTD: 09-14-2022
REMARKS..:




REGNO: 57005-177 NAME: RANIERE, KEITH
RSP OF...: TCP UNT/LOC/DST: 4 GP              QTR.: Z01-120LAD RCV OFC: TCP
REMEDY ID: 1133808-F1     SUB1: 16GM SUB2:      DATE RCV:  09-14-2022
UNT  RCV..:4 GP        QTR RCV.: Z01-119LAD    FACL RCV: TCP
UNT  ORG..:4 GP        QTR ORG.: Z01-119LAD    FACL ORG: TCP
EVT FACL.: TCP    ACC LEV: TCP  1               RESP DUE:  MON 10-24-2022
ABSTRACT.: LOSS OF CONTACT IN TRULINCS
STATUS DT: 11-17-2022  STATUS CODE: CLO STATUS REASON: XPL
INCRPTNO.:              RCT: P EXT: P DATE ENTD: 09-14-2022
REMARKS..:
```

```
G0002      MORE PAGES TO FOLLOW . . .
```

**Ex. A, Att. 9, p. 3**

```
PHXC4        *ADMINISTRATIVE REMEDY GENERALIZED RETRIEVAL *     02-01-2023
PAGE 004 OF      *           FULL SCREEN FORMAT          *      09:36:42


REGNO: 57005-177 NAME: RANIERE, KEITH
RSP OF...: TCP UNT/LOC/DST: 4 GP             QTR.: Z01-120LAD RCV OFC: TCP
REMEDY ID: 1137228-F1     SUB1: 22ZM SUB2:      DATE RCV:   10-13-2022
UNT  RCV..:4 GP        QTR RCV.: Z01-119LAD    FACL RCV: TCP
UNT  ORG..:4 GP        QTR ORG.: Z01-119LAD    FACL ORG: TCP
EVT FACL.: TCP     ACC LEV:                        RESP DUE:
ABSTRACT.: REGARDING RESTRAINTS IN SHU FOR ATTORNEY VIST OR CAL
STATUS DT: 10-13-2022  STATUS CODE: REJ STATUS REASON: OTH
INCRPTNO.:            RCT:   EXT:  DATE ENTD: 10-13-2022
REMARKS..: WHAT ARE THE BASIS OF YOUR REQUEST



REGNO: 57005-177 NAME: RANIERE, KEITH
RSP OF...: TCP UNT/LOC/DST: 4 GP             QTR.: Z01-120LAD RCV OFC: TCP
REMEDY ID: 1139873-F1     SUB1: 25ZM SUB2:      DATE RCV:   11-03-2022
UNT  RCV..:4 GP        QTR RCV.: Z01-117LAD    FACL RCV: TCP
UNT  ORG..:4 GP        QTR ORG.: Z01-117LAD    FACL ORG: TCP
EVT FACL.: TCP     ACC LEV:                        RESP DUE:
ABSTRACT.: REQUESTING INFORMATION
STATUS DT: 11-03-2022  STATUS CODE: REJ STATUS REASON: OTH
INCRPTNO.:            RCT:   EXT:  DATE ENTD: 11-03-2022
REMARKS..: ONE REQUEST PER BP-9
```

```
G0002      MORE PAGES TO FOLLOW . . .
```

**Ex. A, Att. 9, p. 4**

```
PHXC4          *ADMINISTRATIVE REMEDY GENERALIZED RETRIEVAL *     02-01-2023
PAGE 005 OF      *              FULL SCREEN FORMAT             *     09:36:42


REGNO: 57005-177 NAME: RANIERE, KEITH
RSP OF...: TCP UNT/LOC/DST: 4 GP             QTR.: Z01-120LAD RCV OFC: TCP
REMEDY ID: 1139878-F1      SUB1: 18AM SUB2:       DATE RCV:  11-03-2022
UNT  RCV..:4 GP         QTR RCV.: Z01-117LAD   FACL RCV: TCP
UNT  ORG..:4 GP         QTR ORG.: Z01-117LAD   FACL ORG: TCP
EVT FACL.: TCP     ACC LEV:                         RESP DUE:
ABSTRACT.: REQUESTING INFORMATION ON VISITORS REMOVAL
STATUS DT: 11-03-2022  STATUS CODE: REJ STATUS REASON: OTH
INCRPTNO.:            RCT:    EXT:   DATE ENTD: 11-03-2022
REMARKS..: ONE REQUEST PER BP-9




REGNO: 57005-177 NAME: RANIERE, KEITH
RSP OF...: TCP UNT/LOC/DST: 4 GP             QTR.: Z01-120LAD RCV OFC: TCP
REMEDY ID: 1140848-F1      SUB1: 25ZM SUB2:       DATE RCV:  11-10-2022
UNT  RCV..:4 GP         QTR RCV.: Z01-117LAD   FACL RCV: TCP
UNT  ORG..:4 GP         QTR ORG.: Z01-117LAD   FACL ORG: TCP
EVT FACL.: TCP     ACC LEV:                         RESP DUE:
ABSTRACT.: REQUESTING TO BE TREATED AS GP DURING LEGAL VISIT
STATUS DT: 11-10-2022  STATUS CODE: REJ STATUS REASON: OTH
INCRPTNO.:            RCT:    EXT:   DATE ENTD: 11-10-2022
REMARKS..: WHAT ARE THE BASIS OF YOUR REQUEST
```

```
G0002      MORE PAGES TO FOLLOW . . .
```

**Ex. A, Att. 9, p. 5**

```
PHXC4          *ADMINISTRATIVE REMEDY GENERALIZED RETRIEVAL *      02-01-2023
PAGE 006 OF 006 *                FULL SCREEN FORMAT         *      09:36:42


REGNO: 57005-177 NAME: RANIERE, KEITH
RSP OF...: TCP UNT/LOC/DST: 4 GP              QTR.: Z01-120LAD RCV OFC: WXR
REMEDY ID: 1133798-R1      SUB1: 33EM SUB2:      DATE RCV:   01-31-2023
UNT  RCV..:4 GP         QTR RCV.: Z01-120LAD   FACL RCV: TCP
UNT  ORG..:4 GP         QTR ORG.: Z01-119LAD   FACL ORG: TCP
EVT FACL.: TCP    ACC LEV: TCP  1 WXR  1          RESP DUE:  THU  03-02-2023
ABSTRACT.: RQSTNG INFO DENIAL PHNE CALL PARA LEGAL APPROVE LIST
STATUS DT: 01-31-2023  STATUS CODE: ACC STATUS REASON:
INCRPTNO.:             RCT: N EXT:  DATE ENTD: 01-31-2023
REMARKS..:




REGNO: 57005-177 NAME: RANIERE, KEITH
RSP OF...: TCP UNT/LOC/DST: 4 GP              QTR.: Z01-120LAD RCV OFC: WXR
REMEDY ID: 1133790-R1      SUB1: 18AM SUB2:      DATE RCV:   01-31-2023
UNT  RCV..:4 GP         QTR RCV.: Z01-120LAD   FACL RCV: TCP
UNT  ORG..:4 GP         QTR ORG.: Z01-119LAD   FACL ORG: TCP
EVT FACL.: TCP    ACC LEV: TCP  1 WXR  1          RESP DUE:  THU  03-02-2023
ABSTRACT.: REQUESTING VISIT DENIAL INFORMATION
STATUS DT: 01-31-2023  STATUS CODE: ACC STATUS REASON:
INCRPTNO.:             RCT: N EXT:  DATE ENTD: 01-31-2023
REMARKS..:
```

```
              10 REMEDY SUBMISSION(S) SELECTED
   G0000          TRANSACTION SUCCESSFULLY COMPLETED
```

**Ex. A, Att. 9, p. 6**

Exhibit B

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Keith Raniere, | No. 22-cv-00212-RCC-PSOT |
| Plaintiff, | **DECLARATION OF DANIEL FLORES** |
| vs. | |
| Merrick Garland, US Attorney General, et al., | |
| Defendants. | |

I, Daniel Flores, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records reasonably relied upon by me in the course of my employment, hereby make the following declaration relating to the above-titled matter.

1.      I am a Correctional Counselor for the Federal Bureau of Prisons (Bureau), assigned to the United States Penitentiary in Tucson, Arizona (USP Tucson). I am currently assigned as the Correctional Counselor for C1 Unit at USP Tucson. In this role, my duties include assisting inmates with their personal property, social visiting list, social telephone list, cell sanitation, administrative remedies and tort claims, copouts, inmate indigent stamps, admission and orientation, Inmate Financial Responsibility Program payments, legal visits, legal telephone calls, and legal mail. I address inmate institutional needs on a daily basis.

2.      As part of my official duties, I have access to records maintained by the Bureau in the ordinary course of business, including administrative remedy requests of federal inmates, information maintained in the SENTRY[1] database, and inmate central

---

[1] SENTRY is the Bureau's national database which tracks various data regarding an inmate's confinement, including, but not limited to, an inmate's institutional history, sentencing information, administrative remedies, and discipline history.

files.  All records attached to this declaration are true and accurate copies of Bureau records maintained in the ordinary course of business.

3.      The following statements are based on my review of official Bureau files and records, my own personal knowledge, or on information acquired by me through the performance of my official duties.

4.      I am familiar with inmate Keith Raniere, Federal Register No. 57005-177. Mr. Raniere is assigned to C1 Unit at USP Tucson and he is one of the inmates on my caseload.  On October 27, 2020, Mr. Raniere was sentenced to an aggregate 120-year sentence in the United States District Court for the Eastern District of New York for racketeering conspiracy, racketeering, forced labor conspiracy, wire fraud conspiracy, sex trafficking conspiracy, sex trafficking of Jane Doe 5, and attempted sex trafficking of Jane Doe 8 in violation of multiple federal statutes.  *See* Att. 1, SENTRY Public Information at 2-4; Att. 2, Judgment in a Criminal Case at 1-4.  Mr. Raniere's projected release date from Bureau custody is June 27, 2120.  *See* Att. 1 at t 1, 5.

5.      As a Special Condition of Supervised Release, the sentencing judge specifically ordered that Plaintiff "shall not associate in person, through mail, electronic mail or telephone with any individual with an affiliation to Executive Success Programs, Nxivm, DOS or any other Nxivm-affiliated organizations[.]"  *See* Att. 2 at 9.

## I.      PARALEGALS, CLERKS, AND LEGAL ASSISTANTS

6.      "The Bureau of Prisons recognizes the use of assistants by attorneys to perform legal tasks and, with proper controls and exceptions enumerated . . . accords such assistants the same status as attorneys with respect to visiting and correspondence."  28 C.F.R. § 543.16(a).  "The special visiting/correspondence status accorded to parelegals, clerks, and legal assistants depends on an ongoing, supervisory relationship with an attorney on an approved visiting/correspondence list.  Absent any current supervisory relationship, such persons may only receive social visiting or general correspondence privileges."  *See* Program Statement 1315.07, *Inmate Legal Activities* at 19.[2]

[2] Available at https://www.bop.gov/policy/progstat/1315_007.pdf (last visited on May 27,

7.    "The attorney who employs an assistant and who wishes the assistant to visit or correspond with an inmate on legal matters shall provide the Warden with a signed statement including: (1) Certification of the assistant's ability to perform in this role and awareness of the responsibility of this position; (2) A pledge to supervise the assistant's activities; and (3) Acceptance of personal and professional responsibility for all acts of the assistant which may affect the institution, its inmates, and staff.  The Warden may require each assistant to fill out and sign a personal history statement and a pledge to abide by Bureau regulations and institution guidelines.  If necessary to maintain security and good order in the institution, the Warden may prohibit a legal assistant from visiting or corresponding with an inmate."  28 C.F.R. § 543.16(b)(1)-(3).  "The Warden may require each paralegal, clerk, or legal assistant to complete a BP-S243.013" Application to Enter Institution as Representative form[3] as well as the BP-S242.013 Paralegal or Legal Assistant Agreement form.[4]  *See* Program Statement 1315.07, *Inmate Legal Activities* at 18-19.[5]

8.    To date, Mr. Raniere's attorneys have not requested that Suneel Chakravorty be granted paralegal privileges, nor have they sponsored him as a paralegal. Therefore, Suneel Chakravorty is not afforded legal visitation, legal call, or legal correspondence privileges with Mr. Raniere.

## II.    LEGAL CALLS

9.    As a Correctional Counselor, I schedule legal calls as part of my regular duties.  When an attorney requests a legal call, I ensure he/she is licensed and in good standing.  Inmate legal calls are prioritized by institutional safety and security, staffing,

2022).

[3] Available at https://www.bop.gov/policy/forms/BP_A0243.pdf (last visited on May 27, 2022)

[4] Available at https://www.bop.gov/policy/forms/BP_A0242.pdf (last visited on May 27, 2022).

[5] Available at https://www.bop.gov/policy/progstat/1315_007.pdf (last visited on May 27, 2022).

facility availability, demand among the inmate population, and current conditions within the institution (*e.g.,* COVID-19 measures, security threats, lockdown, etc.). I ensure the attorney is active and in good standing. When legal calls occur in the housing unit, the inmate will report to my office at the appointed time and I will facilitate the call. Inmate legal telephone calls are not audio-recorded or monitored. When a legal call takes place in a staff office, I place the call, remain in the office until the connection is made with the inmate's attorney or appropriate staff. Once the attorney or staff member is on the line, I leave the room and visually monitor the inmate from outside the room. Once outside the room, I cannot hear the content of the legal telephone call.

10. Mr. Raniere's legal calls have been and will continue to be coordinated within the institution's normal procedures. He has not been targeted for any restrictions on his ability to place legal telephone calls.

11. From October 2021, when I began logging in legal calls for Mr. Raniere, through May 31, 2022, I have scheduled and facilitated approximately 32 legal telephone calls between Mr. Raniere and his attorneys with one future call scheduled for June 1, 2022. *See* Att. 3, Legal Call Log I (Redacted) at 1-2. The below table identifies each legal telephone call that I personally scheduled/accommodated:

| Date | Attorney Name(s) | Approximate Duration |
|------|------------------|----------------------|
| 10/04/2021 | Joseph P. Daugherty | 1.5 hr. |
| 10/07/2021 | Joseph Tully | 1 hr. |
| 10/11/2021 | Joseph Tully | 1hr. |
| 10/14/2021 | Joseph Tully | 1hr. |
| 10/20/2021 | Joseph Tully | 1hr. |
| 10/27/2021 | Joseph Tully | 1 hr. |
| 11/01/2021 | Joseph Tully | 1hr. |

| 11/09/2021 | Joseph Tully | 1hr. |
|---|---|---|
| 11/15/2021 | Paul DerOhannesian | 1hr. |
| 11/16/2021 | Joseph Tully | 1hr. |
| 12/01/2021 | Joseph Tully | 1hr. |
| 12/08/2021 | Joseph Tully | 1hr. |
| 12/15/2021 | Joseph Tully | 1hr. |
| 12/15/2021 | Seema Iyer, Esq. | 1hr. |
| 12/20/2021 | Joseph Tully | 1hr. |
| 12/21/2021 | Seema Iyer, Esq. | 1hr. |
| 02/22/2022 | Duncan Levin, Esq. | 30 min. |
| 02/23/2022 | Joseph Tully | 1 hr. |
| 02/28/2022 | Arangullo | 1hr. |
| 03/01/2022 | Joseph Tully | 1 hr. |
| 03/08/2022 | Joseph Tully | 1 hr. |
| 03/09/2022 | John Meringolo | 1 hr. |
| 03/29/2022 | Joseph Tully | 1 hr. |
| 4/25/2022 | Gregory Stoltz | 1hr. |
| 4/26/2022 | John Meringolo<br>Gregory Stoltz | 1hr.<br>1hr. |
| 4/27/2022 | Duncan Levin | 1hr. |
| 5/04/2022 | Joseph Tully | 1hr. |
| 5/09/2022 | John Meringolo | 1 hr. |

| | | |
|---|---|---|
| 5/10/2022 | Joseph Tully | 1 hr. |
| 5/24/2022 | Joseph P. Daugherty | 1 hr. |
| 5/25/2022 | Joseph Tully | 1 hr. |
| 6/1/2022 | Joseph P. Daugherty<br>Gregory Stoltz | TBD |

12.     None of the above legal calls that I accommodated, including May 4, 2022, between Mr. Raniere and Mr. Tully, was disconnected.  If a legal call becomes disconnected, I attempt to call the attorney again to re-establish the legal call.

13.     On occasion when I am out of the office, other Correctional Counselors, including Counselor Ashworth, fill in for me by placing and logging legal calls for Mr. Raniere.  *See* Att. 4, Legal Call Log II (Redacted) at 1-2.  As reflected in the below table, From January 2022 and May 31, 2022, Counselor Ashworth has placed the following legal calls for Mr. Raniere:

| Date | Attorney Name(s)[6] | Approximate Duration |
|---|---|---|
| 1/5/2022 | Joseph Tully | 35 min. |
| 3/31/2022 | Joseph P. Daugherty | 1 hr. |
| 4/1/2022 | John Meringolo or Arangullo | 1 hr. |
| 4/5/2022 | Joseph Tully | 1 hr. |
| 4/7/2022 | Joseph P. Daugherty | 1 hr. |
| 4/13/2022 | Joseph P. Daugherty | 1 hr. |
| 4/14/2022 | Joseph Tully | 1 hr. |

---

[6] While the attorney names are not specifically identified on Counselor Ashworth's legal call log, I was able to cross-reference the telephone numbers to identify the attorney.

| 4/15/2022 | Joseph P. Daugherty | 1 hr. |
| 4/15/2022 | John Meringolo or Arangullo | 1 hr. |
| 4/22/2022 | Joseph P. Daugherty | 1 hr. |
| 4/28/2022 | Joseph P. Daugherty | 1 hr. |
| 4/29/2022 | Joseph Tully | 1 hr. |
| 5/12/2022 | Joseph P. Daugherty | 1 hr. |
| 5/18/2022 | Joseph Tully | 1 hr. |
| 5/20/2022 | Joseph P. Daugherty | 1 hr. |
| 5/27/2022 | Joseph P. Daugherty | 2 hrs. |

## III.  LEGAL VISITS AND LEGAL CORRESPONDENCE

14. "The Warden shall . . . permit visits by the retained, appointed, or prospective attorney for an inmate or by an attorney who wishes to interview an inmate as a witness."  28 C.F.R. § 543.13(a).  "The attorney shall make an advance appointment for the visit through the Warden prior to each visit; however, the Warden shall make every effort to arrange for a visit when prior notification is not practical."  28 C.F.R. § 543.13(c).

15. Mr. Raniere's attorneys have scheduled, through me and other substitute Correctional Counselors, frequent legal visits in accordance with these provisions.  These visits have been accommodated per the request of the attorney and in line with the schedule of the institution and any institutional security/safety measures (e.g., lockdown, COVID-19 protocols, etc.).

16. Correspondence from attorneys and their approved/authorized paralegals, legal assistants, and clerks, are afforded special handling privileges in accordance with Bureau regulations and policy.  *See* 28 C.F.R. § 540.19(a)-(e) ("Mail to an inmate from an attorney's assistant or legal aid student or assistant, in order to be identified and

Ex. B, p. 7

treated by staff as special mail, must be properly identified on the envelope as required in paragraph (b) of this section, and must be marked on the front of the envelope as being mail[ed] from the attorney or from the legal aid supervisor.").

17.      Mr. Raniere is able to send and receive legal correspondence at USP Tucson that is afforded special handling/processed per the above-cited regulations.

## IV.      ADMINISTRATIVE REMEDIES

18.      I am familiar with all four levels of the inmate administrative grievance procedure created by the Bureau Administrative Remedy Program.  *See* 28 C.F.R. §§ 542.10 - 542.19.

19.      The Bureau has a four-tiered Administrative Remedy Program for inmate grievances, which is codified at 28 C.F.R. § 542.10 *et seq.*  The first step is informal resolution with prison staff.  28 C.F.R. § 542.13(a).  Requests for Informal Resolution Forms (also known as a BP-8) are not assigned a Remedy ID number and are not tracked. B-8 forms require the inmate to identify: (1) the inmate's complaint; (2) the relief the inmate is requesting; and (3) efforts made by the inmate to informally resolve the complaint, including the names of the staff he contacted.  *See* 28 C.F.R. § 542.13(a) ("Each Warden shall establish procedures to allow for the informal resolution of inmate complaints.").  The second step is the filing of a formal Request for Administrative Remedy (also known as a BP-9) at the institution in which the inmate is incarcerated. *See* 28 C.F.R. § 542.14.  The BP-9 must be filed within "20 calendar days following the date on which the basis for the Request occurred."  *See* 28 C.F.R. § 542.14(a).  If the inmate feels the response to his BP-9 is not satisfactory, within 20 calendar days of the date the Warden signed the response, the inmate may then appeal the complaint to the Regional Director, by filing a Regional Office Administrative Remedy Appeal (also known as a BP-10).  *See* 28 C.F.R. § 542.15(a).  If dissatisfied with the Regional Director's response, the inmate may appeal to the Director, National Inmate Appeals, in the Office of the General Counsel in Washington D.C., by filing a Central Office Administrative Remedy Appeal (also known as a BP-11).  *Id.*  An inmate may not raise in an appeal an issue he did not raise in a lower level filing.  *See* 28 C.F.R. § 542.15(b)(2).

The Administrative Remedy Coordinator at any level may reject and return to the inmate without response a Request for Administrative Remedy or appeal that does not meet procedural requirements as outlined in the Code of Federal Regulations. *See* 28 C.F.R. § 542.17(a).

20.     An inmate has not exhausted his administrative remedies until he has properly sought review at all three formal levels. *Id.*

21.     Since July 1990, the Bureau has maintained information related to administrative complaints filed by inmates under the Bureau Administrative Remedy Program in SENTRY. One of the many functions of the SENTRY database is to track administrative remedy complaints and appeals, and it allows one to complete a computerized search of complaints and appeals filed by a specific inmate.

22.     Each formal complaint (i.e., BP-9, BP-10, and BP-11) is logged into SENTRY at the receiving location. If the complaint is an initial filing, it receives a unique Remedy ID Number upon initial entry, which follows the complaint throughout the appeal process. Each Remedy ID Number also contains an extender that identifies the level of review. The extension F-1 indicates the complaint was filed at the institution level (BP-9). The extension R-1 indicates the complaint or appeal was filed at the regional level (BP-10). The extension A-1 indicates the appeal was filed at the national level (BP-11). So, for example, a formal complaint may be identified as 123456-F1 when filed as a BP-9 at the institution level, as 123456-R1 when filed as a BP-10 at the regional level, and as 123456-A1 when filed as a BP-11 at the national level. That is, the unique Remedy ID number follows the complaint through the process but the extension changes to reflect the level at with the complaint is filed. The number at the end of the extension may change if the remedy or appeal is initially rejected[7] and is then re-filed due to a technical problem, such as improper form, failing to include documentation, or improper filing at that level (i.e., 123456-F1; 123456-F2, etc.).

---

[7] Per 28 C.F.R. 542.17(a), the administrative remedy coordinator at any level (BP-9, BP-10, and BP-11) may reject and return to the inmate without a response an administrative remedy and/or appeal that "does not meet any other requirements of this part."

### A.  **Inmate Access to Remedy Forms at USP Tucson**

23.     Inmates have access to the Code of Federal Regulations and Bureau Program Statements, including Program Statement 1330.18, *Administrative Remedy Program*,[8] through the institution law library and the Electronic Law Library.  *See* Program Statement 1315.07, *Inmate Legal Activities* at 4, Att. A at 1-2 (identifying required main law library materials such as "Title 28 of the Code of Federal Regulations" and "All current Bureau of Prisons Program Statements which contain rules codified in Chapters III or V of Title 28 of the Code of Federal Regulations" which includes the procedures outlined in the Administrative Remedy Program).[9]

24.     When an inmate arrives at USP Tucson, he participates in an Admission and Orientation (A&O) Program, during which the inmate is introduced to important aspects of the institution and the housing unit to which the inmate is assigned.  The A&O Program includes instructions on the Bureau's Administrative Remedy Program, how to obtain and submit the appropriate forms, and how to exhaust claims through all levels of the Administrative Remedy Program.  *See* Att. 5, USP Tucson Inmate A&O Handbook Excerpt (Jan. 2017) at 38-39.  Additionally, staff members give new inmates a copy of the A&O Handbook, which provides valuable information about the institution's operations, including the Administrative Remedy Program.  *Id.* at 38-39.

25.     At USP Tucson, in order to file an administrative remedy or appeal, an inmate may obtain the appropriate forms from, and submit completed forms to, any Unit Team member.  The Unit Team is comprised of the Unit Manager, Case Manager, Correctional Counselor, and Unit Secretary.  *Id.* at 3, 38 ("All Administrative Remedy forms may be obtained from your assigned Correctional Counselor or Unit Team member."); *see also* 28 C.F.R. § 542.14(c)(1) (Inmates "shall obtain the appropriate form from . . . institution staff (ordinarily, the correctional counselor."); *see also* Att. 6, TCX

---

[8] Also available at https://www.bop.gov/policy/progstat/1330_018.pdf (last visited on Jan. 7, 2022).

[9] Available at https://www.bop.gov/policy/progstat/1315_007.pdf (last visited on Jan. 7, 2022).

1330.18B, *Administrative Remedy Program* at 3 ("Only unit team members may issue form BP-229, Request for Administrative Remedy (BP-9) to inmates, including those housed in the [SHU]"). While the "Correctional Counselor will initial, date, and write the inmate's last name on the top right hand section of the form for accountability purposes[,]" there is no requirement that an inmate provide a reason for needing an administrative remedy form in order to obtain that form. *See* Att. 5 at 3.

26.     "An Inmate Request to Staff Member (form BP-S148), commonly called a Cop-Out, is used to make a written request to a staff member. Any type of request can be made with this form[,]" to include if an inmate believes that his Unit Team is not providing him with administrative remedy forms or is not properly processing administrative remedy forms. *See* Att. 4 at 38. These requests or "cop-outs" can be made to any staff member, including Associate Wardens and the Warden. An inmate may file an inmate request to staff (cop-out), informal grievance (BP-8), or formal grievance (BP-9, BP-10, or BP-11) while in general population or while housed in the SHU. *See* 28 C.F.R. § 541.31(o) ("You can submit a formal grievance challenging any aspect of your confinement in the SHU through the Administrative Remedy Program[.]").

27.     "If the inmate reasonably believes the issue is sensitive and the inmate's safety or well-being would be placed in danger if the Request became known at the institution, the inmate may submit the Request directly to the appropriate Regional Director." *See* 28 C.F.R. § 542.14(d)(1); Att. 4 at 39 ("If an inmate believes a complaint is of a sensitive nature and he would be adversely affected if the complaint became known to the institution, he may file the complaint directly to the Regional Director.").

28.     If an inmate has an issue that he wants to bring to the attention of staff, he can do so via a written request (cop-out) at any time, as detailed above, or during in-person meetings with multiple Unit Team, and other, staff.

**B.     Plaintiff's Administrative Remedy History**

29.     I have reviewed the SENTRY information identifying the number and types of administrative remedies and appeals filed by Mr. Raniere.

30.     During Mr. Raniere's incarceration with the Bureau, he has filed one appeal

(BP-10). *See* Att. 7, SENTRY Administrative Remedy Index at 1-2. He has not filed a Request for Administrative Remedy (BP-9) or appeal to the General Counsel (BP-11) on any subject. *Id.*

31. In Remedy No. 1111640-R1, Mr. Raniere appealed discplinary sanctions imposed against him following an October 26, 2021, disciplinary hearing associated with Incident Report No. 3547878. *Id.* at 2. His appealed was denied and he did not appeal further.

32. He has not filed any administrative remedies or appeals regarding lack of access to legal calls, his social telephone contact list, or his general access to his attorneys.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on this 31st day of May 2022, in Tucson, Arizona.

Daniel Flores
Correctional Counselor
USP Tucson, Arizona
Federal Bureau of Prisons

**Enclosures**

Att. 1, SENTRY Public Information

Att. 2, Judgment in a Criminal Case

Att. 3, Legal Call Log I (Redacted)

Att. 4, Legal Call Log II (Redacted)

Att. 5, USP Tucson Inmate A&O Handbook Excerpt (Jan. 2017)

Att. 6, TCX 1330.18B, *Administrative Remedy Program*

Att. 7, SENTRY Administrative Remedy Index

- 12 -

Exhibit B

Attachment 1

```
PHXC4              *        PUBLIC INFORMATION          *      05-05-2022
PAGE 001           *            INMATE DATA             *      10:30:08
                            AS OF 05-05-2022

REGNO..: 57005-177 NAME: RANIERE, KEITH

                    RESP OF: TCP
                    PHONE..: 520-663-5000     FAX: 520-663-5024
                                              RACE/SEX...: WHITE / MALE
                                              AGE: 61
PROJ REL MT: GOOD CONDUCT TIME RELEASE        PAR ELIG DT: N/A
PROJ REL DT: 06-27-2120                       PAR HEAR DT:




G0002       MORE PAGES TO FOLLOW . . .
```

```
PHXC4              *    PUBLIC INFORMATION       *     05-05-2022
PAGE 002           *       INMATE DATA           *     10:30:08
                         AS OF 05-05-2022


REGNO..: 57005-177 NAME: RANIERE, KEITH

                    RESP OF: TCP
                    PHONE..: 520-663-5000   FAX: 520-663-5024
FSA ELIGIBILITY STATUS IS: INELIGIBLE


THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S CURRENT COMMITMENT.


HOME DETENTION ELIGIBILITY DATE....: 12-27-2119


THE INMATE IS PROJECTED FOR RELEASE: 06-27-2120 VIA GCT REL


----------------------CURRENT JUDGMENT/WARRANT NO: 010 -----------------------

COURT OF JURISDICTION...........: NEW YORK, EASTERN DISTRICT
DOCKET NUMBER...................: CR 18-0204(S-2)(NGG)
JUDGE...........................: GARAUFIS
DATE SENTENCED/PROBATION IMPOSED: 10-27-2020
DATE COMMITTED..................: 01-21-2021
HOW COMMITTED...................: US DISTRICT COURT COMMITMENT
PROBATION IMPOSED...............: NO

                FELONY ASSESS  MISDMNR ASSESS   FINES        COSTS
NON-COMMITTED.: $700.00        $00.00          $1,750,000.00 $00.00
  JVTA........: $15,000.00


RESTITUTION...: PROPERTY:  NO  SERVICES:  NO       AMOUNT:  $00.00


----------------------CURRENT OBLIGATION NO: 010 --------------------------
OFFENSE CODE....:  545     18:1962 RACKETEER (RICO)
OFF/CHG: 18:1962(D),18:1963(A) RACKETEERING CONSPIRACY CT.1
         18:1962(C),18:1963(A) RACKETEERING CT.2

 SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
 SENTENCE IMPOSED/TIME TO SERVE.:   480 MONTHS
 TERM OF SUPERVISION............:     5 YEARS
 RELATIONSHIP OF THIS OBLIGATION
  TO OTHERS FOR THE OFFENDER....: CS TO 020/030/040
 DATE OF OFFENSE................: 03-31-2018
```

```
 G0002      MORE PAGES TO FOLLOW . . .
```

**Ex. B, p. 15**

```
PHXC4              *      PUBLIC INFORMATION        *      05-05-2022
PAGE 003           *         INMATE DATA            *      10:30:08
                          AS OF 05-05-2022


REGNO..: 57005-177 NAME: RANIERE, KEITH

                   RESP OF: TCP
                   PHONE..: 520-663-5000   FAX: 520-663-5024
------------------------CURRENT OBLIGATION NO: 020 -------------------------
OFFENSE CODE....:  576     18:1589-90 FORCED LABOR
OFF/CHG: 18:1594(B) FORCED LABOR CONSPIRACY CT.6


SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
SENTENCE IMPOSED/TIME TO SERVE.:  240 MONTHS
TERM OF SUPERVISION............:    3 YEARS
RELATIONSHIP OF THIS OBLIGATION
  TO OTHERS FOR THE OFFENDER....: CS TO 010/030/040
DATE OF OFFENSE................: 03-31-2018


------------------------CURRENT OBLIGATION NO: 030 -------------------------
OFFENSE CODE....:  820     COMMUNICATIONS ACT
OFF/CHG: 18:1349,18:1343 WIRE FRAUD CONSPIRACY CT.7


SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
SENTENCE IMPOSED/TIME TO SERVE.:  240 MONTHS
TERM OF SUPERVISION............:    3 YEARS
RELATIONSHIP OF THIS OBLIGATION
  TO OTHERS FOR THE OFFENDER....: CS TO 010/020/040
DATE OF OFFENSE................: 03-31-2018


------------------------CURRENT OBLIGATION NO: 040 -------------------------
OFFENSE CODE....:  571     18:1591 SEX TRAFFICK CHILD
OFF/CHG: 18:1594(C),18:1591(B)(1) SEX TRAFF CONSP CT.8; 18:1591(A)(1),
        18:1591(B)(1) SEX TRAFF JANE DOE 5 CT.9; 18:1594(A),18:1591(B)
        (1) ATTEMPTED SEX TRAFF JANE DOE 8 CT.10


SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
SENTENCE IMPOSED/TIME TO SERVE.:  480 MONTHS
TERM OF SUPERVISION............: LIFE
RELATIONSHIP OF THIS OBLIGATION
  TO OTHERS FOR THE OFFENDER....: CS TO 010/020/030
DATE OF OFFENSE................: 03-31-2018








G0002       MORE PAGES TO FOLLOW . . .
```

Ex. B, p. 16

```
PHXC4          *        PUBLIC INFORMATION        *      05-05-2022
PAGE 004       *          INMATE DATA             *      10:30:08
                        AS OF 05-05-2022


REGNO..: 57005-177 NAME: RANIERE, KEITH

                    RESP OF: TCP
                    PHONE..: 520-663-5000   FAX: 520-663-5024

------------------------CURRENT COMPUTATION NO: 010 ------------------------

COMPUTATION 010 WAS LAST UPDATED ON 12-21-2020 AT DSC AUTOMATICALLY
COMPUTATION CERTIFIED ON 12-31-2020 BY DESIG/SENTENCE COMPUTATION CTR

THE FOLLOWING JUDGMENTS, WARRANTS AND OBLIGATIONS ARE INCLUDED IN
CURRENT COMPUTATION 010: 010 010, 010 020, 010 030, 010 040


DATE COMPUTATION BEGAN..........: 10-27-2020
AGGREGATED SENTENCE PROCEDURE...: AGGREGATE GROUP 800 PLRA
TOTAL TERM IN EFFECT............:   120 YEARS
TOTAL TERM IN EFFECT CONVERTED..:   120 YEARS
AGGREGATED TERM OF SUPERVISION..: LIFE
EARLIEST DATE OF OFFENSE........: 03-31-2018


JAIL CREDIT.....................:    FROM DATE     THRU DATE
                                     03-26-2018    10-26-2020


TOTAL PRIOR CREDIT TIME.........: 946
TOTAL INOPERATIVE TIME..........: 0
TOTAL GCT EARNED AND PROJECTED..: 6480
TOTAL GCT EARNED................: 216
STATUTORY RELEASE DATE PROJECTED: 06-27-2120
ELDERLY OFFENDER TWO THIRDS DATE: 03-26-2098
EXPIRATION FULL TERM DATE.......: 03-25-2138
TIME SERVED.....................:     4 YEARS      1 MONTHS     10 DAYS
PERCENTAGE OF FULL TERM SERVED..:   3.4
PERCENT OF STATUTORY TERM SERVED:   4.0







G0002      MORE PAGES TO FOLLOW . . .
```

**Ex. B, p. 17**

```
PHXC4              *          PUBLIC INFORMATION           *      05-05-2022
PAGE 005 OF 005 *                 INMATE DATA              *      10:30:08
                             AS OF 05-05-2022

REGNO..: 57005-177 NAME: RANIERE, KEITH

                    RESP OF: TCP
                    PHONE..: 520-663-5000    FAX: 520-663-5024

PROJECTED SATISFACTION DATE.....: 06-27-2120
PROJECTED SATISFACTION METHOD...: GCT REL
```

```
G0000        TRANSACTION SUCCESSFULLY COMPLETED
```

Exhibit B

Attachment 2

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

Eastern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | |
| | Case Number: CR 18-0204 (S-2) (NGG) |
| KEITH RANIERE | USM Number: 57005-177 |
| | Marc A. Agnifilo, Esq. |
| | Defendant's Attorney |

## THE DEFENDANT:

**X**  was found guilty by jury  verdict on Counts 1, 2, 6, 7, 8, 9 & 10 of the Superseding Indictment (S-2).

☐ pleaded nolo contendere to count(s)
which was accepted by the court.

☐ was found guilty on count(s)
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| **Title & Section** | **Nature of Offense** | **Offense Ended** | **Count** |
|---|---|---|---|
| SEE PAGE 2 OF JUDGMENT | | | |

The defendant is sentenced as provided in pages 2 through ___11___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

**X**   Any underlying Indictment is dismissed by motion of  the United States.

**X**   Counts 3, 4, 5 & 11 of the Superseding Indictment (S-2) are dismissed by motion of the United States before trial.

☐ Count(s) _____   ☐ is   ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

October 27, 2020
Date of Imposition of Judgment

Signature of Judge

Nicholas G. Garaufis, U.S.D.J.
Name and Title of Judge

October 30, 2020
Date

Case 1:22-cv-18000-ZRK-DDo Document 6674-21 Filed 03/09/22 Page 220 of 1390

| | |
|---|---|
| DEFENDANT: | KEITH RANIERE |
| CASE NUMBER: | CR 18-0204 (S-2)(NGG) |

# ADDITIONAL COUNTS OF CONVICTION

**Offense:**

**Count 1:**
RACKETEERING CONSPIRACY
18 U.S.C. §1962(d), 18 U.S.C. §1963(a)
Not more than life imprisonment/$250,000 fine
(Class A Felony)

**Count 2:**
RACKETEERING
18 U.S.C. §1962(c), 18 U.S.C. §1963(a)
Not more than life imprisonment/$250,000 fine
(Class A Felony)

**Count 6:**
FORCED LABOR CONSPIRACY
18 U.S.C. §1594(b)
Not more than 20 years imprisonment/$250,000 fine
(Class C Felony)

**Count 7:**
WIRE FRAUD CONSPIRACY
18 U.S.C. §1349, 18 U.S.C. §1343
Not more than 20 years imprisonment/$250,000 fine
(Class C Felony)

**Count 8:**
SEX TRAFFICKING CONSPIRACY
18 U.S.C. §1594(c), 18 U.S.C. §1591(b)(1)
15 years to life imprisonment/$250,000 fine
(Class A Felony)

**Count 9:**
SEX TRAFFICKING OF JANE DOE 5
18 U.S.C. §1591(a)(1), 18 U.S.C. §1591(b)(1)
15 years to life imprisonment/$250,000 fine
(Class A Felony)

**Count 10:**
ATTEMPTED SEX TRAFFICKING OF JANE DOE 8
18 U.S.C. §1594(a), 18 U.S.C. §1591(b)(1)
15 years to life imprisonment/$250,000 fine
(Class A Felony)

Judgment — Page    3    of    11

DEFENDANT:        KEITH RANIERE
CASE NUMBER:      CR 18-0204 (S-2) (NGG)

## IMPRISONMENT

      The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:      **SEE PAGE 4 OF JUDGMENT.**

.

☐  The court makes the following recommendations to the Bureau of Prisons:

X  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

    ☐  at  _____  ☐  a.m.    ☐  p.m.    on  _____  .

    ☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐  before 2 p.m. on  _____  .

    ☐  as notified by the United States Marshal.

    ☐  as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on  _____  to  _____

at  _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By  _____
DEPUTY UNITED STATES MARSHAL

**Ex. B, p. 22**

Case 4:22-18-00002-00 Document 06-1 42-4 Filed 006/09/222 Page 402 of 390

DEFENDANT:        KEITH RANIERE

CASE NUMBER:      CR 18-0204 (S-2) (NGG)

## ADDITIONAL IMPRISONMENT TERMS

FORTY (40) YEARS (480 MONTHS) (CAG) ON COUNT ONE (1) OF THE SUPERSEDING INDICTMENT (S-2) TO BE SERVED CONCURRENTLY WITH THE SENTENCE ON COUNT 2 AND CONSECUTIVELY WITH ALL OTHER SENTENCES IMPOSED;

FORTY (40) YEARS (480 MONTHS) (CAG) ON COUNT TWO (2) OF THE SUPERSEDING INDICTMENT (S-2) TO BE SERVED CONCURRENTLY WITH THE SENTENCE IMPOSED ON COUNT 1 AND CONSECUTIVELY WITH ALL OTHER SENTENCES IMPOSED;

TWENTY (20) YEARS (240 MONTHS) (CAG) ON COUNT SIX (6) OF THE SUPERSEDING INDICTMENT (S-2) TO BE SERVED CONSECUTIVELY WITH ALL OTHER SENTENCES IMPOSED;

TWENTY (20) YEARS (240 MONTHS) (CAG) ON COUNT SEVEN (7) OF THE SUPERSEDING INDICTMENT (S-2) TO BE SERVED CONSECUTIVELY WITH ALL OTHER SENTENCES IMPOSED;

FORTY (40) YEARS (480 MONTHS) (CAG) ON COUNT EIGHT (8) OF THE SUPERSEDING INDICTMENT (S-2) TO BE SERVED CONCURRENTLY WITH THE SENTENCES IMPOSED ON COUNTS 9 AND 10, AND CONSECUTIVELY WITH ALL OTHER SENTENCES IMPOSED;

FORTY (40) YEARS (480) MONTHS (CAG) ON COUNT NINE (9) OF THE SUPERSEDING INDICTMENT (S-2) TO BE SERVED CONCURRENTLY WITH THE SENTENCES ON COUNTS 8 AND 10, AND CONSECUTIVELY WITH ALL OTHER SENTENCES IMPOSED;

FORTY (40) YEARS (480) MONTHS (CAG) ON COUNT TEN (10) OF THE SUPERSEDING INDICTMENT (S-2) TO BE SERVED CONCURRENTLY WITH THE SENTENCES ON COUNTS 8 AND 9, AND CONSECUTIVELY WITH ALL OTHER SENTENCES IMPOSED.

TO SUMMARIZE, THIS IS A CUMULATIVE SENTENCE OF 120 YEARS (CAG).

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                Sheet 3 — Supervised Release

DEFENDANT:      KEITH RANIERE
CASE NUMBER:   CR 18-0204 (S-2) (NGG)

# SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of: FIVE (5) YEARS ON COUNT ONE (1) OF THE SUPERSEDING INDICTMENT (S-2). FIVE (5) YEARS ON COUNT TWO (2) OF THE SUPERSEDING INDICTMENT (S-2). THREE (3) YEARS ON COUNT SIX (6) OF THE SUPERSEDING INDICTMENT (S-2). THREE (3) YEARS ON COUNT SEVEN (7) OF THE SUPERSEDING INDICTMENT (S-2). A LIFETIME TERM ON COUNT EIGHT (8) OF THE SUPERSEDING INDICTMENT (S-2). A LIFETIME TERM ON COUNT NINE (9) OF THE SUPERSEDING INDICTMENT (S-2). A LIFETIME TERM ON COUNT TEN (10) OF THE SUPERSEDING INDICTMENT (S-2).  ALL TERMS OF SUPERVISED RELEASE TO BE SERVED CONCURRENTLY WITH ONE ANOTHER.

# MANDATORY CONDITIONS

1.    You must not commit another federal, state or local crime.
2.    You must not unlawfully possess a controlled substance.
3.    You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
        ☐ The above drug testing condition is suspended, based on the court's determination that you
           pose a low risk of future substance abuse. *(check if applicable)*
4.    ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.    ☐ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.    ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.    ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

Ex. B, p. 24

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                       Sheet 3A — Supervised Release

| | | Judgment—Page | 6 | of | 11 |

DEFENDANT:          KEITH RANIERE
CASE NUMBER:        CR 18-0204 (S-2) (NGG)

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.   You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.   After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.   You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.   You must answer truthfully the questions asked by your probation officer.
5.   You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.   You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.   You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.   You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.   If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10.  You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11.  You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12.  If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13.  You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____          Date _____

DEFENDANT: KEITH RANIERE
CASE NUMBER: CR 18-0204 (S-2)(NGG)

## SPECIAL CONDITIONS OF SUPERVISION

#1. The defendant shall comply with any applicable state and/or federal sex offender registration requirements, as instructed by the probation officer, the Bureau of Prisons, or any state offender registration agency in the state where he resides, works, or is a student;

#2. The defendant shall participate in a mental health treatment program, which may include participation in a treatment program for sexual disorders, as approved by the U.S. Probation Department. The defendant shall contribute to the cost of such services rendered and/or any psychotropic medications prescribed to the degree he is reasonably able, and shall cooperate in securing any applicable third-party payment. The defendant shall disclose all financial information and documents to the Probation Department to assess his ability to pay. As part of the treatment program for sexual disorders, the defendant shall participate in polygraph examinations to obtain information necessary for risk management and correctional treatment;

#3. The defendant shall not associate with or have any contact with convicted sex offenders unless in a therapeutic setting and with the permission of the U.S. Probation Department;

#4. The defendant shall not associate with children under the age of 18, unless a responsible adult is present and he has prior approval from the Probation Department. Prior approval does not apply to contacts which are not known in advance by the defendant where children are accompanied by a parent or guardian or for incidental contacts in a public setting. Any such non-pre-approved contacts with children must be reported to the Probation Department as soon as practicable, but no later than 12 hours. Upon commencing supervision, the defendant shall provide to the Probation Department the identity and contact information regarding any family members or friends with children under the age of 18, whom the defendant expects to have routine contact with, so that the parents or guardians of these children may be contacted and the Probation Department can approve routine family and social interactions such as holidays and other family gatherings where such children are present and supervised by parents or guardians without individual approval of each event;

#5. If the defendant cohabitates with an individual who has residential custody of minor children, the defendant will inform that other party of his prior criminal history concerning his sex offense. Moreover, he will notify the party of his prohibition of associating with any child(ren) under the age of 18, unless a responsible adult is present;

#6. The defendant shall submit his person, property, house, residence, vehicle, papers, computers (as defined in 18 U.S.C. § 1030(e)(1)), other electronic communications or data storage devices or media, or office, to a search conducted by a United States probation officer. Failure to submit to a search may be grounds for revocation of release. The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition. An officer may conduct a search pursuant to this condition only when reasonable suspicion exists that the defendant has violated a condition of his supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner;

Case 1:18-cr-00204-NGG Document 1017-2 Filed 10/30/23 Page 106 of 320

| | | Judgment—Page | 8 | of | 11 |
|---|---|---|---|---|---|

DEFENDANT: KEITH RANIERE
CASE NUMBER: CR 18-0204 (S-2)(NGG)

## SPECIAL CONDITIONS OF SUPERVISION

#7. The defendant is not to use a computer, Internet capable device, or similar electronic device to access pornography of any kind. The term "pornography" shall include images or video of adults or minors engaged in "sexually explicit conduct" as that term is defined in Title 18, U.S.C. § 2256(2). The defendant shall also not use a computer, Internet capable device or similar electronic device to view images of naked children. The defendant shall not use his computer to view pornography or images of naked children stored on related computer media, such as CDs or DVDs, and shall not communicate via his computer with any individual or group who promotes the sexual abuse of children. The defendant shall also cooperate with the U.S. Probation Department's Computer and Internet Monitoring program. Cooperation shall include, but not be limited to, identifying computer systems, Internet capable devices, and/or similar electronic devices the defendant has access to, and allowing the installation of monitoring software/hardware on said devices, at the defendant's expense. The defendant shall inform all parties that access a monitored computer, or similar electronic device, that the device is subject to search and monitoring. The defendant may be limited to possessing only one personal Internet capable device, to facilitate the Probation Department's ability to effectively monitor his/her Internet related activities. The defendant shall also permit random examinations of said computer systems, Internet capable devices, similar electronic devices, and related computer media, such as CDs, under his control.

#8. The defendant shall report to the Probation Department any and all electronic communications service accounts (as defined in 18 U.S.C. § 2510(15)) used for user communications, dissemination and/or storage of digital media files (i.e. audio, video, images). This includes, but is not limited to, email accounts, social media accounts, and cloud storage accounts. The defendant shall provide each account identifier and password, and shall report the creation of new accounts, changes in identifiers and/or passwords, transfer, suspension and/or deletion of any account within 5 days of such action. Failure to provide accurate account information may be grounds for revocation of release. The defendant shall permit the Probation Department to access and search any account(s) using the defendant's credentials pursuant to this condition only when reasonable suspicion exists that the defendant has violated a condition of his supervision and that the account(s) to be searched contains evidence of this violation. Failure to submit to such a search may be grounds for revocation of release.

#9. Upon request, the defendant shall provide the U.S. Probation Department with full disclosure of his financial records, including co-mingled income, expenses, assets and liabilities, to include yearly income tax returns. With the exception of the financial accounts reported and noted within the presentence report, the defendant is prohibited from maintaining and/or opening any additional individual and/or joint checking, savings, or other financial accounts, for either personal or business purposes, without the knowledge and approval of the U.S. Probation Department. The defendant shall cooperate with the probation officer in the investigation of his financial dealings and shall provide truthful monthly statements of his income and expenses. The defendant shall cooperate in the signing of any necessary authorization to release information forms permitting the U.S. Probation Department access to his financial information and records;

Ex. B, p. 27

DEFENDANT:        KEITH RANIERE
CASE NUMBER:     CR 18-0204 (S-2)(NGG)

## SPECIAL CONDITIONS OF SUPERVISION

#10.  The defendant shall not have contact with any of the named victims of his offenses. This means that he shall not attempt to meet in person, communicate by letter, telephone, or through a third party, without the knowledge and permission of the Probation Department;

#11.  The defendant shall not associate in person, through mail, electronic mail or telephone with any individual with an affiliation to Executive Success Programs, Nxivm, DOS or any other Nxivm-affiliated organizations; nor shall the defendant frequent any establishment, or other locale where these groups may meet pursuant, but not limited to, a prohibition list provided by the U.S. Probation Department;

#12.   The defendant shall comply with the fine payment order;

#13.   The defendant shall comply with the attached Order of Forfeiture.

AO 245B (Rev. 09/19)  Judgment in a Criminal Case
          Sheet 5 — Criminal Monetary Penalties

| | |
|---|---|
| DEFENDANT: | KEITH RANIERE |
| CASE NUMBER: | CR 18-0204 (S-2) (NGG) |

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | Forfeiture Money Judgment | JVTA Assessment** |
|---|---|---|---|---|---|
| TOTALS | $ 700.00 | $ TBD | $ 1,750,000.00 | $ N/A | $ 15,000.00 |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |
| TOTALS | $ | $ | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the ☐ fine ☐ restitution.

    ☐ the interest requirement for the ☐ fine ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

Ex. B, p. 29

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

DEFENDANT:   KEITH RANIERE
CASE NUMBER:   CR 18-0204 (S-2) (NGG)

Judgment — Page    11    of    11

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A   X   **Special Assessment of $ 700.00** _____ due immediately, balance due

    ☐ not later than _____ , or
    ☐ in accordance with ☐ C,   ☐ D,   ☐ E, or   ☐ F below; or

B   ☐   .           ☐     ☐ D, or   ☐ F below); or

C   X
   ☐   **Fine Payment of $1,750,000.00 due immediately.**
            _____ (                 over a period of
    _____ , *(e.g., months or years)*, to commence ___ _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

D   ☐   Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
    _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
    term of supervision; or

E   .
   X   **JVTA assessment of $15,000.00**

F   X   **Order of Restitution to be determined**

    **An Order of Restitution must be submitted within 90 days from October 27, 2020.**

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

    Case Number
    Defendant and Co-Defendant Names   .
    *(including defendant number)*      **Total Amount**      **Joint and Several Amount**      **Corresponding Payee, if appropriate**

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

Ex. B, p. 30

BDM:KKO
F. #2017R01840

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

         - against -

KEITH RANIERE,

             Defendant.

- - - - - - - - - - - - - - - - X

<u>ORDER OF FORFEITURE</u>

18-CR-204 (S-2) (NGG)

WHEREAS, on or about June 19, 2019, Keith Raniere, also known as "Vanguard," "Grandmaster," and "Master" (the "defendant"), was convicted after a jury trial of Counts One, Two, and Six through Ten, of the above-captioned Superseding Indictment, charging violations of 18 U.S.C. §§ 1349, 1591(a)(1), 1594(a), 1594(b), 1594(c), 1962(c), and 1962(d); and

WHEREAS, the Court has determined that pursuant to 18 U.S.C. § 1963(a), the defendant shall forfeit: (a) any interest the defendant acquired or maintained in violation of 18 U.S.C. § 1962; (b) any interest in, security of, claim against or property or contractual right of any kind affording a source of influence over any enterprise which the defendant has established, operated, controlled, conducted or participated in the conduct of, in violation of 18 U.S.C. § 1962; (c) any property constituting, or derived from, any proceeds which the defendant obtained, directly or indirectly, from racketeering activity in violation of 18 U.S.C. § 1962; and/or (d) substitute assets, pursuant to 18 U.S.C. § 1963(m), which shall be reduced to a forfeiture money judgment (the "Forfeiture Money Judgment").

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

1.      The defendant shall forfeit to the United States the Forfeiture Money Judgment, pursuant to 18 U.S.C. §§ 1963(a) and 1963(m).

2.      This Order of Forfeiture ("Order") is entered pursuant to Fed. R. Crim. P. 32.2(b)(2)(c), and will be amended pursuant to Fed. R. Crim. P. 32.2(e)(1) when the amount of the Forfeiture Money Judgment has been calculated.

3.      All payments made towards the Forfeiture Money Judgment shall be made by a money order, or certified and/or official bank check, payable to U.S. Marshals Service with the criminal docket number noted on the face of the check. The defendant shall cause said payment(s) to be sent by overnight mail delivery to Assistant United States Attorney Karin K. Orenstein, United States Attorney's Office, Eastern District of New York, 271-A Cadman Plaza East, Brooklyn, New York 11201, with the criminal docket number noted on the face of the instrument. The Forfeiture Money Judgment shall become due and owing in full thirty (30) days after any amendment of this Order pursuant to Rule 32.2(e)(1) (the "Due Date").

4.      If the defendant fails to pay any portion of the Forfeiture Money Judgment on or before the Due Date, the defendant shall forfeit any other property of his up to the value of the outstanding balance, pursuant to 18 U.S.C. § 1963(m).

5.      Upon entry of this Order, the United States Attorney General or his designee is authorized to conduct any proper discovery in accordance with Fed. R. Crim. P. 32.2(b)(3) and (c). The United States alone shall hold title to the monies paid by the

defendant to satisfy the Forfeiture Money Judgment following the Court's entry of the judgment of conviction.

6. The defendant shall fully assist the government in effectuating the payment of the Forfeiture Money Judgment.

7. The entry and payment of the Forfeiture Money Judgment is not to be considered a payment of a fine, penalty, restitution loss amount or a payment of any income taxes that may be due, and shall survive bankruptcy.

8. Pursuant to Fed. R. Crim. P. 32.2(b)(4)(A) and (B), this Order of Forfeiture shall become final as to the defendant at the time of sentencing and shall be made part of the sentence and included in the judgment of conviction. This Order shall become the Final Order of Forfeiture, pursuant to Fed. R. Crim. P. 32.2(c)(2) and (e)(1). At that time, the monies and/or properties paid toward the Forfeiture Money Judgment shall be forfeited to the United States for disposition in accordance with the law.

9. This Order shall be binding upon the defendant and the successors, administrators, heirs, assigns and transferees of the defendant, and shall survive the bankruptcy of any of them.

10. This Order shall be final and binding only upon the Court's "so ordering" of the Order.

---

18-CR-204 (S-2) (NGG)

*United States v. Keith Raniere*
Order of Forfeiture

Page 3

11. The Court shall retain jurisdiction over this action to enforce compliance with the terms of this Order and to amend it as necessary, pursuant to Fed. R. Crim. P. 32.2(e).

Dated: Brooklyn, New York
_____ Oct 26 _____, 2020

SO ORDERED:

HONORABLE NICHOLAS G. GARAUFIS
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF NEW YORK

.

# Exhibit B
# Attachment 3

Legal Call Log

| Date | IM Name/Reg. No.<br><br>**RANIERE, Reg. No. 57005-177**<br><br>Attorney Name/Number | Call Duration | Staff |
|---|---|---|---|
| 10/04/2021 | Joseph P. Daugherty ██████████ | 1.5 hr. | D. Flores CCC |
| 10/07/2021 | Joseph Tully ██████ | 1 hr. | D. Flores CCC |
| 10/11/2021 | Joseph Tully ██████ | 1hr. | D. Flores CCC |
| 10/14/2021 | Joseph Tully ██████ | 1hr. | D. Flores CCC |
| 10/20/2021 | Joseph Tully ██████ | 1hr. | D. Flores CCC |
| 10/27/2021 | Joseph Tully ██████ | 1 hr. | D. Flores CCC |
| 11/01/2021 | Joseph Tully ██████ | 1hr. | D. Flores CCC |
| 11/09/2021 | Joseph Tully ██████ | 1hr. | D. Flores CCC |
| 11/15/2021 | Paul DerOhannesian ██████ | 1hr. | D. Flores CCC |
| 11/16/2021 | Joseph Tully ██████ | 1hr. | D. Flores CCC |
| 12/01/2021 | Joseph Tully ██████ | 1hr. | D. Flores CCC |
| 12/08/2021 | Joseph Tully ██████ | 1hr. | D. Flores CCC |
| 12/15/2021 | Joseph Tully ██████ | 1hr. | D. Flores CCC |
| 12/15/2021 | Seema Iyer, Esq. ██████ | 1hr. | D. Flores CCC |
| 12/20/2021 | Joseph Tully ██████ | 1hr. | D. Flores CCC |
| 12/21/2021 | Seema Iyer, Esq. ██████ | 1hr. | D. Flores CCC |
| 02/22/2022 | Duncan Levin, Esq. ██████ | 30 min. | D. Flores CCC |
| 02/23/2022 | Joseph Tully ██████ | 1 hr. | D. Flores CCC |

Legal Call Log

| | | | |
|---|---|---|---|
| 02/28/2022 | Arangullo ███████ | 1hr. | D. Flores CCC |
| 03/01/2022 | Joseph Tully ███████ | 1 hr. | D. Flores CCC |
| 03/08/2022 | Joseph Tully ███████ | 1 hr. | D. Flores CCC |
| 03/09/2022 | John Meringolo ███████ | 1 hr. | D. Flores CCC |
| 03/29/2022 | Joseph Tully ███████ | 1 hr. | D. Flores CCC |
| 4/25/2022 | Gregory Stoltz ███████ | 1hr. | D. Flores |
| 4/26/2022 | John Meringolo ███████<br><br>Gregory Stoltz ███████ | 1hr.<br><br>1hr. | D. Flores |
| 4/27/2022 | Duncan Levin ███████ | 1hr. | D. Flores |
| 5/04/2022 | Joseph Tully ███████ | 1hr. | D. Flores |
| 5/09/2022 | John Meringolo ███████ | 1 hr. | D. Flores |
| 5/10/2022 | Joseph Tully ███████ | 1 hr. | D. Flores |
| 5/24/2022 | Joseph P. Daugherty ███████ | 1hr. | D. Flores |
| 5/25/2022 | Joseph Tully ███████ | 1hr. | D. Flores |
| 6/1/2022 | Joseph P. Daugherty ███████<br><br>Gregory Stoltz ███████ | | D.Flores |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

# Exhibit B
# Attachment 4

Phone log:

| Date | Inmate Name & # | Phone # | got thru | I/M sign | Length | Staff |
|---|---|---|---|---|---|---|
| 1-17-21 | | | | | | Ashworth / BB Legal |
| 12-9-21 | | | | | | Ashworth / BB Legal |
| 1-5-22 | | | | | | Ashworth / BB Legal |
| 1-5-22 | Raniere 57005-177 | | yes | DNantiere | 1 hr. | Ashworth / BB Legal |
| 3-23-22 | | | | | | Ashworth / BB Legal |
| 3-29-22 | | | | | | Ashworth / BB Legal |
| 3-29-22 | | | | | | Ashworth / BB Legal |
| 3-30-22 | | | | | | Ashworth / BB Legal |
| 3-30-22 | | | | | | Ashworth / BB Legal |
| 3-31-22 | Raniere 57005-177 | | yes | JNR | 1 hr. | Ashworth / BB Legal |
| 4-1-22 | Raniere 57005-177 | | yes | JNR | 1 hr. | Ashworth / BB Legal |
| 4-5-22 | | | | | | Ashworth / BB Legal |
| 4-5-22 | Raniere 57005-177 | | yes | JNR | 1 hr. | Ashworth / BB Legal |
| 4-7-22 | Raniere 57005-177 | | yes | JNR | 1 hr. | Ashworth / BB Legal |
| 4-13-22 | Raniere 57005-177 | | yes | JNR | 1 hr. | Ashworth / BB Legal |
| 4-14-22 | Raniere 57005-177 | | yes | JNR | 1 hr. | Ashworth / BB Legal |
| 4-15-22 | Raniere 57005-177 | | yes | JNR | 1 hr. | Ashworth / BB Legal |

Phone log:

| Date | Inmate Name & # | Phone # | got thru | I/M sign | Length | Staff |
|------|-----------------|---------|----------|----------|--------|-------|
| 4-15-22 | Raniere 57005-177 | | yes | RAR | 1hr. | Ashworth |
| 4-22-22 | Raniere 57005-177 | | yes | RAR | 1hr. | Ashworth |
| 4-28-22 | Raniere 57005-177 | | yes | RAR | 1hr. | Ashworth |
| 4-29-22 | Raniere 57005-177 | | yes | RAR | 1hr. | Ashworth |
| 5-10-22 | | | | | | Ashworth |
| 5-11-22 | | | | | | Ashworth |
| 5-11-22 | | | | | | Ashworth |
| 5-12-22 | Raniere 57005-177 | | yes | RAR | 1hr. | Ashworth |
| 5-18-22 | Raniere 57005-177 | | yes | RAR | 1hr. | Ashworth |
| 5-20-22 | Raniere 57005-177 | | yes | RAR | 1hr. | Ashworth |
| 5-25-22 | | | | | | Ashworth |
| 5-26-22 | | | | | | Ashworth |
| 5-27-22 | Raniere 57005-177 | | yes | RAR | 2hr. | Ashworth |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Exhibit C

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Keith Raniere, | No. 22-cv-00212-RCC-PSOT |
| Plaintiff, | **DECLARATION OF LORRI MITCHELL** |
| vs. | |
| Merrick Garland, US Attorney General, et al., | |
| Defendants. | |

I, Lorri Mitchell, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records reasonably relied upon by me in the course of my employment, hereby make the following declaration relating to the above-titled matter.

1.      I am employed by the United States Department of Justice, Federal Bureau of Prisons (Bureau) as a Legal Assistant at the Federal Correctional Complex in Tucson, Arizona (FCC Tucson).  I have been employed by the Bureau, in positions of increasing responsibility since April 2012.  I have been employed in my current position since February 2013.

2.      As part of my official duties, I have access to records maintained by the Bureau in the ordinary course of business, including administrative remedy requests of federal inmates, information maintained in the SENTRY[1] database, and inmate central files.  All records attached to this declaration are true and accurate copies of Bureau records maintained in the ordinary course of business.

---

[1] SENTRY is the Bureau's national database which tracks various data regarding an inmate's confinement, including, but not limited to, an inmate's institutional history, sentencing information, participation in programs, administrative remedies, and discipline history.

## I.   RELEVANT BUREAU REGULATIONS AND POLICIES

3.     As to inmate friends and associates, "[t]he visiting privilege ordinarily will be extended to friends and associates having an established relationship with the inmate prior to confinement, unless such visits could reasonably create a threat to the security and good order of the institution.  Exceptions to the prior relationship rule may be made, particularly for inmates without other visitors, when it is shown that the proposed visitor is reliable and poses no threat to the security or good order of the institution."  28 C.F.R. § 540.44(c).  "Regardless of the institution's security level, the inmate must have known the proposed visitor(s) prior to incarceration.  The Warden must approve any exception to this requirement."  *See* Program Statement 5267.09, *Visiting Regulations* at 6.[2]

4.     "Use of TRULINCS is a privilege; therefore, the Warden may limit or deny the privilege of a particular inmate."  *See* Program Statement 4500.12, *Trust Fund/Deposit Fund Manual* at 126.[3]  "Inmates may be subject to telephone restrictions imposed by the Warden to protect the safety, security, and good order of the institution, as well as to protect the public."  *See* Program Statement 5264.08, *Inmate Telephone Regulations* at 14.[4]  (Ex. D, ¶ 13.)

5.     "The Bureau of Prisons recognizes the use of assistants by attorneys to perform legal tasks and, with proper controls and exceptions enumerated . . . accords such assistants the same status as attorneys with respect to visiting and correspondence."  28 C.F.R. § 543.16(a).  "The special visiting/correspondence status accorded to paralegals, clerks, and legal assistants depends on an ongoing, supervisory relationship with an attorney on an approved visiting/correspondence list.  Absent any current supervisory relationship, such persons may only receive social visiting or general correspondence privileges."  *See*

---

[2] Available at https://www.bop.gov/policy/progstat/5267_09.pdf (last visited on Sept. 23, 2022).
[3] Available at https://www.bop.gov/policy/progstat/4500.12.pdf (last visited on Sept. 23, 2022).
[4] Available at https://www.bop.gov/policy/progstat/5264_008.pdf (last visited on Sept. 23, 2022).

Program Statement 1315.07, *Inmate Legal Activities* at 19.[5]

## II.    VISITATION

6.    Nicki Clyne is a former associate of NXIVM who has been banned from communicating with Plaintiff.  *See* Att. 1, Visitor Denial Memos (Redacted) at 2.  Ms. Clyne is an unindicted co-conspirator.  *See* Att. 2, Special Investigative Services Investigation (Redacted) at 5.  Plaintiff circumvented mail monitoring by communicating with her through another inmate and by using her to communicate with Clare Bronfam, another associate of NXIVM and co-defendant of Plaintiff who is currently incarcerated in federal prison.  *Id.* at 1-6.

7.    Danielle Roberts is a former associate of NXIVM who has been removed from Plaintiff's visiting list due to her extensive involvement with NXIVM.  *See* Att. 1 at 1.  She was removed "for safety and security of institution."  *Id.*  Her attorney contacted the Bureau and was informed that Plaintiff could file a request through the Administrative Remedy Program regarding her removal.  *See* Att. 3, E-Mail Correspondence (Redacted) at 1.

8.    In March 2022, Plaintiff's counsel wrote to the Bureau asserting that the denial of social visitation privileges for Suneel Chakravorty, Ms. Clyne, and Ms. Roberts was improper.  *See* Att. 4, Letter from C. Cook to J. Tully at 1-4.  In response, Mr. Cook informed Plaintiff's counsel that only the Warden can reinstate a suspended individual to an inmate's visiting list and that Plaintiff had not challenged the denial of his social visitors through the Administrative Remedy Program.  *Id.* at 5-6.

## III.    ADMINISTRATIVE REMEDIES

9.    During Plaintiff's incarceration with the Bureau, he has filed five administrative remedies or appeals.  *See* Att. 5, SENTRY Administrative Remedy Index at 1-4.

---

[5] Available at https://www.bop.gov/policy/progstat/1315_007.pdf (last visited on May 27, 2022).

10.     To date, Plaintiff has not submitted any administrative remedies or appeals challenging the denial social visitation for Mr. Chakravorty, Ms. Clyne, or Ms. Roberts. *Id.*

11.     On September 8, 2022, Plaintiff filed a Request for Administrative Remedy questioning why a different NXIVM associate was denied visitation.  *See* Att. 6, Remedy No. 1133790-F1 at 3.  On the same date, Plaintiff filed a Request for Administrative Remedy stating that Mr. Chakravorty had been banned a second time from communicating with him at USP Tucson after having been reinstated.  *See* Att. 7, Remedy No. 1133798-F1 at 3.  On the same date, Plaintiff filed a Request for Administrative Remedy seeking to know the reasons for his contact list being "scrubbed."  *See* Att. 8, Remedy No. 1133808-F1 at 3.

## IV.     LEGAL CALLS

12.     Since June 10, 2022, the last date identified in Mr. Flores second declaration (Doc. 17-1) when a legal call was requested/accommodated, the below table identifies all legal calls that have been scheduled/accommodated for Plaintiff by Mr. Flores.  *See* Att. 9, Legal Call Log (Redacted) at 2-3.

| Date | Attorney Names | Approximate Duration |
|------|----------------|----------------------|
| 6/13/2022 | Joseph P. Daugherty | 1 hr. |
| 6/19/2022 | Suneel Chakravorty[6] | 2 hrs. |
| 6/21/2022 | Joseph P. Daugherty | 1 hr. |
| 6/27/2022 | Joseph P. Daugherty | 2 hrs. |

[6] Previously, the Warden, in his discretion, allowed Plaintiff a single legal phone call, but not a legal visit, with Mr. Chakravorty, due to the then-imminent Rule 33 deadline.

**Ex. C, p. 4**

| | | |
|---|---|---|
| 6/29/2022 | Joseph Tully | 1 hr. |
| 7/6/2022 | Joseph Tully | 1 hr. |
| 7/13/2022 | John Meringolo | 1 hr. |
| 7/20/2022 | Joseph P. Daugherty | 1 hr. |
| 8/31/2022 | Joseph P. Daugherty | 2 hrs. |
| 9/7/2022 | Joseph P. Daugherty | 1.5 hrs. |
| 9/14/2022 | Joseph P. Daugherty | 2 hrs. |
| 9/21/2022 | Joseph P. Daugherty | 2 hrs. |

## V.    LEGAL VISITS

13.    Plaintiff's attorneys continue to schedule, through his assigned Correctional Counselor and other substitute Correctional Counselors, legal visits.  *See* Att. 10, Legal Visit Approval Notices (Redacted) at 1-8.  These legal visits have been accommodated per the request of the attorney and in line with the schedule of the institution and any institutional security/safety measures (e.g., lockdown, COVID-19 protocols, staff resources, etc.).

14.    Since Plaintiff's placement in the Special Housing Unit at USP Tucson in late July 2022, Plaintiff's legal visits have been accommodated as reflected in the following table:

| Date | Attorney Name(s) |
|---|---|
| 7/29/2022 | Stacy Scheff |
| 8/5/2022 | Stacy Scheff<br>Gregory Stoltz |

**Ex. C, p. 5**

| 8/12/2022 | Gregory Stoltz |
| 8/22/2022 | Stacy Scheff |
| 8/24/2022 | Gregory Stoltz |
| 8/29/2022 | Stacy Scheff |
| 9/6/2022 | Stacy Scheff |
| 9/14/2022 | Gregory Stoltz |

15.     In addition to these legal calls and legal visits, Plaintiff is still able to send and receive legal correspondence at USP Tucson to/from his attorneys that is afforded confidential processing/handling.

## VI.     DISICPLINARY ACTION

16.     On August 15, 2022, Incident Report No. 3655238 was expunged.  *See* Att. 11, Expunged Incident Report No. 3655238 at 1.  However, Plaintiff remains in the Special Housing Unit at USP Tucson in administrative detention status (non-punitive) pending placement into general population or other suitable housing.

//

//

//

//

//

//

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on this 23rd day of September 2022, in Tucson, Arizona.

Lorri Mitchell
Legal Assistant
USP Tucson, Arizona
Federal Bureau of Prisons

**Enclosures**

Att. 1, Visitor Denial Memos (Redacted)

Att. 2, Special Investigative Services Investigation (Redacted)

Att. 3, E-Mail Correspondence (Redacted)

Att. 4, Letter from C. Cook to J. Tully

Att. 5, SENTRY Administrative Remedy Index

Att. 6, Remedy No. 1133790-F1

Att. 7, Remedy No. 1133798-F1

Att. 8, Remedy No. 1133808-F1

Att. 9, Legal Call Log (Redacted)

Att. 10, Legal Visit Approval Notices (Redacted)

Att. 11, Expunged Incident Report No. 3655238

**Ex. C, p. 7**

# Exhibit  C
# Attachment 1



**U.S. Department of Justice**

Federal Bureau of Prisons

Federal Correctional Complex

*Office of the Unit Team*

*Tucson, Arizona 85756*

January 4, 2022

**MEMORANDUM FOR D. COLBERT, ACTING COMPLEX WARDEN**

FROM:          T. Ashworth, Correctional Counselor

SUBJECT:       Visitor Removal for inmate
               Raniere, Keith
               Reg. No. 57005-177

Requesting visitor Danielle, Roberts to be removed from inmate Raniere, Keith's visiting list due to the fact that she had extensive involvement in the NXIVM case. Additionally, his Judgement and Commitment indicants under special conditions that he shall not have contact to include in person with any of the NXIVM associates. Attached below is supporting documentation for your review.

Comments: remove for safety and security of institution.

A. Stangl, Unit Manager

[ X ] APPROVED          [   ] DISAPPROVED

FOR

J. Walker, SIS Lieutenant          Comments: Removal due to security concerns

[ X ] APPROVED          [ X ] DISAPPROVED

FO/

J. Rey, Complex Captain          Comments: Concur with S.S + Unit team

[ X ] APPROVED          [   ] DISAPPROVED

A. Tubb, Associate Warden          Comments: Agree with recommendation to remove from visitation list.

[ ✓ ] APPROVED          [   ] DISAPPROVED

Comments: _____

D. Colbert
Acting Complex Warden

[ ✓ ] APPROVED          [   ] DISAPPROVED

F.O.I. EXEMPT

Ex. C, p. 9



U.S. Department of Justice

Federal Bureau of Prisons

*FCC Tucson*

*Tucson, Arizona 85756*

July 27, 2021

MEMORANDUM FOR CATRICIA HOWARD, COMPLEX WARDEN

THRU:     Randy Cañabajal, Special Investigative Agent

FROM:     Xavier Calvillo, S.I.S. Technician

SUBJECT: Inmate Keith Raniere, Reg. No. 57005-177 contact block

I am requesting Nicki Clyne be removed from inmate Keith Raniere,
Reg. No. 57005-177, contacts, visiting, phone and email lists. I am
also requesting Nicki Clyne be blocked from all inmates at FCC
Tucson indefinitely. Inmate Raniere is utilizing email and phone
accounts of other inmates to bypass the communication monitoring
process. The email address ███████████.com, is being
utilized to contact Nicki Clyne when inmate Keith Raniere is not
able to communicate with her. The phone number that is also being
utilized to circumvent the monitoring system is ███████████.  This
is a violation of Program Statements 5265.14, and 5264.08, being
unable to properly monitor the phone and correspondence
appropriately. It is to be noted inmate Keith Raniere had a
previous incident at MDC Brookly. Supporting documentation is
attached.



F.O.I.A. EXEMPT

**Ex. C, p. 10**

# Exhibit  C
# Attachment 2



**U.S. Department of Justice**

**Federal Bureau of Prisons**

### Inmate Investigative Report

**Institution:** Tucson USP

**Case Number:** ▮▮▮▮▮▮▮

**Investigation Type:** ▮▮▮▮▮▮▮▮▮▮▮▮▮

**Inmates Involved:**

| Register Number | Name | Role |
|---|---|---|
| ▮▮▮▮▮ | ▮▮▮▮▮▮▮▮▮ | ▮▮▮▮▮ |
| 57005177 | RANIERE, KEITH | Suspect |



**Investigator:** CALVILLO, XAVIER     **Date:** 8/19/2021 11:30:32 AM CST

**Captain:** REY, JESSE     **Date:** 9/2/2021 4:43:44 PM CST

**Associate Warden:** DYER, JACOB     **Date:** 9/15/2021 2:27:15 PM CST

**Warden:** HOWARD, CATRICIA     **Date:** 9/16/2021 9:26:59 AM CST

**Summary:**

On July 22, 2021, at approximately 10:00 a.m., S.I.S. staff reviewed required monitoring phone calls when a call made on July 22, 2021, at approximately 6:58 a.m., to phone number ⬛⬛⬛⬛⬛⬛, identified as " Nicki Clyne", on inmate Keith Raniere's, Reg. No. 57005-177, TRUVIEW account. Further review of the phone call and caller, it was discovered via TRUINTEL, " Nikki Clyne" has been removed from Raniere's telephone and visitation list, from his previous institution for illicit activity conducted in and outside of MDC Brooklyn. An investigation continues...

**Inmate Data:**





**Name:** 57005177 - RANIERE, KEITH

**Role:** Suspect

**Age:** 60    **Race:** WHITE

**Facility Arrival Date:** 1/22/2021

**Projected Release Date:** 6/27/2120

**Charges:**

| Description | Sentencing District |
|---|---|
| 18:1349,18:1343 WIRE FRAUD CONSPIRACY CT.7 | NEW YORK, EASTERN DISTRICT |
| 18:1594(B) FORCED LABOR CONSPIRACY CT.6 | NEW YORK, EASTERN DISTRICT |
| 18:1594(C),18:1591(B)(1) SEX TRAFF CONSP CT.8; 18:1591(A)(1), 18:1591(B)(1) SEX TRAFF JANE DOE 5 CT.9; 18: 1594(A),18:1591(B) (1) ATTEMPTED SEX TRAFF JANE DOE 8 CT.10 | NEW YORK, EASTERN DISTRICT |
| 18:1962(D),18:1963(A) RACKETEERING CONSPIRACY CT.1 18:1962(C),18:1963(A) RACKETEERING CT.2 | NEW YORK, EASTERN DISTRICT |



**Other Statements:**

**Date:** 7/22/2021 1:30 PM                    **Location:** Housing Unit, Special (SHU)

**Interviewer:** Rhynard, M                    **Title:** SIS Cadre

**Interviewee:** 57005177 - RANIERE, KEITH

During an interview with inmate Keith Raniere, Reg. No. 57005-177, he stated inmate                    , sent emails to a Nikki Clyne for small things like visits. I asked inmate Raniere how he knew Ms. Clyne? Inmate Raniere stated she is his " partner" and an original member of NXIVM. Inmate Raniere said she visits him and a Clare Bronfman, Reg. No. 91010-053, who is his Co-defendant. I asked inmate Raniere if Ms. Clyne passes messages between him and Bronfman? He said yes. She tells me what's going on with her and how she's doing. I asked inmate Raniere if he has any other contact with Bronfman? Inmate Raniere said she pays my legal fees, but I do not talk to her directly. I asked inmate Raniere why Clyne is under several different inmate email accounts and uses several different names? Inmate Raniere stated Nikki is famous, so she uses other names, so staff will not mess with her emails and letters. Raniere said Nikki Clyne is part of an inmate advocacy group, and she's just trying to help. I asked inmate Raniere if Nikki Clyne has ever been blocked by the BOP before? He stated yes, and my emails were taken away.

**Date:** 7/22/2021 1:00 PM                    **Location:** Housing Unit, Special (SHU)

**Interviewer:** Rhynard, M                    **Title:** SIS Cadre

**Interviewee:**

During an interview with inmate                    he stated he did send emails to a Nikki Clyne in regards to and for inmate Keith Raniere, Reg. No. 57005-177.                    stated he referred to inmate Raniere as " K-dog" in his emails to Clyne.                    further stated he did not think it was a big deal but understands how it is a BOP rule violation.

**FOIA Exempt**
**Ex. C, p. 15**



| Type | Subtype | File Name | Original Entered By |
|------|---------|-----------|---------------------|

**Conclusion:**

At the completion of this investigation it was found that inmates ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ , and Keith Raniere, Reg. No. 57005-177, did knowingly circumvent the Bureau of Prisons communications policy. Specifically, inmate Brooks sent email correspondence to a " Nicki Clyne" at the email of "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.com" and stated if there was a need to have contact with Raniere that they can do it through the email. In the email it also describes a nickname for Raniere of " K-Dog" to be discreet in their communications. Inmate Raniere's TRULINCS account has been restricted for public messaging. In a memorandum authored by the Bureau of Prisons, Counter Terrorism Unit, discovered " Nicki Clyne" was under several inmates TRULINCS accounts under false pretenses while inmate Raniere was housed at MDC Brooklyn. " Nicki Clyne" at this time is an un-indicted co-conspirator of Raniere's " Inner Circle" or " First line masters" of the NXIVM cult. In an interview with inmate Raniere, he admits to utilizing ▮▮▮▮▮▮▮▮ to send messages to " Nicki Clyne" on his TRULINCS account and in visitation to pass along messages to his co-conspirator, Carol Bronfman, Reg. No. 91010-053, who is housed at FDC Philadelphia.

A review of CCTV video footage, SENTRY, and TRUSCOPE, did not provide any factual findings pertaining to this investigation.

**Recommendation:**

It is recommended inmates Keith Raniere, Reg. No. 57005-177, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, receive an incident report of 196-Use of the mail for an illegal purpose, 197-Use of the telephone for an illegal purpose, and 199-Conduct which disrupts or interferes with orderly running of the institution or the Bureau of Prisons. Upon completion of the disciplinary process, they should return to general population to continue their programming needs.

# Exhibit C
# Attachment 3

Re: Fwd: [EXTERNAL] Inmate Communication Issue

Tempski, ▮▮▮ BOP) < ▮▮▮ @bop.gov>
To: ▮▮▮ .com < ▮▮▮ .com>

BOP's inmate Visiting Regulations are outlined in Program Statement 5267.09
(https://www.bop.gov/policy/progstat/5267 09.pdf). There is no formal appeals process for visitation denials, but as with any issue of an inmate's conditions of confinement, the involved inmate may personally file a request through the BOP's Administrative Remedy process.

To the extent telephonic or written correspondence are at issue here, the processes involved are addressed in Program Statements 5264.08 and 5265.14 (https://www.bop.gov/policy/progstat/5264 008.pdf and https://www.bop.gov/policy/progstat/5265 014.pdf).

Regards,

▮▮▮ *Tempski*
Senior Attorney
U.S. Department of Justice
Federal Bureau of Prisons
FCC Tucson

>>> TCN-ExecAssistant-S 1/11/2022 1:45 PM >>>
>>>

| From: | Panagiotis Prountzos < ▮▮▮ com> |
| To: | <TCP-ExecAssistant@bop.gov> |
| Date: | 1/10/2022 15:43 |
| Subject: | [EXTERNAL] Inmate Communication Issue |

To whom it may concern,

Happy new year! I am following up with a couple of voicemails I have left with your legal department which have gone unanswered. I have a client who is NOT an inmate, but has been blocked from communicating with an inmate from your facility. I would like to speak with legal regarding this matter. Please have someone call me at ▮▮▮. I thank you for your time.

Best,
Panagiotis

--

Panagiotis Prountzos, Esq.
Law Offices of Panagiotis Prountzos
333 West Portal Avenue
Suite A
San Francisco, CA 94127

Telephone ▮▮▮
Facsimile ▮▮▮
www.prountzoslaw.com

**CONFIDENTIALITY NOTICE**

This communication and any accompanying documents are confidential and privileged. They are intended for the sole use of the addressee. If you receive this transmission in error, you are advised that any disclosure, copying, distributing, or the taking of any action in reliance upon this communication is strictly prohibited.

Moreover, any such inadvertent disclosure shall not compromise or waive the attorney client privileges as to this communication or otherwise. (See *State Compensation Insurance Fund v. WPS, Inc.* (1999) 70 Cal. App. 4th 644.) If you have received this communication in error, please contact the sender at: ███████████████.com

# Exhibit D

Date: 02/24/2020
Time: 11:01 AM

Federal Bureau of Prisons
TRULINCS
**Message**
Sensitive But Unclassified

Facility: DC

| Message |
| --- |

FROM: 57005177 RANIERE, KEITH ALAN
TO: "Marianna ▮▮▮▮▮▮▮▮▮▮▮▮▮
SUBJECT: 903-2
DATE: 09/03/2019 01:41 PM


Sent 1:39pm, Tuesday 9/3/19. I thought I might share the endings of the three articles I have written: a potential Op. Ed., about the Sorority, and about the absurdity of some of the charges of my case.

I hope you enjoy! I suspect they are more powerful in context but here goes (I need to type these for, as you know, there is no copy-paste functionality). Tell me if you like them once you read them...

Here are the ending paragraphs:
1. Op. Ed. (note: much is explained before this ending. It is nationalistic (mainly for USA) and quotes the end of our pledge of allegiance all children recite each day.
As a metaphor, I find myself a non-violent soldier on a battlefield: my sole weapon is my character. I am not the lowest ranking foot soldier, but certainly not a high-ranking officer. Our ranks represent our contribution to team humanity, and our earned right to lead that team. The battle we are fighting is for virtuous justice, and our opponent: hate. In particular, this battle is waged over the conduct of the Sovereign: Is it dedicated to truth (virtuous) or to winning (hateful)? Are the accused upheld (virtuous) or is punishment and damage inflicted upon the accused, his or her loved ones, friends, associates businesses (hateful)? In short, is our Sovereign virtuous or hateful? There is no gray area, in-between, or part-time!

Here I stand in the middle of this massive conflict which affects so many people and the very notion of freedom. Suddenly, I find myself alone, in a fortuitous clearing, where I can potentially make a global difference. I don't know why I've been granted this visibility or potential power, but here I am. Yes, I can, and should, potentially reverse my trial verdict, but just as importantly-- even more so--something good can be done!

As I am caught amidst a swirling miasma of prejudicial hate, much of which is flat-out untrue, but none of which related, or even should relate, to the law of my case, will this hate win? Will the prejudice infect justice so the law is ignored and innocence not upheld?

I need at least one experienced, vociferous, unrelenting justice advocate to join this effort, bring meaning and social value to this dark time, and turn the monologue of hate about my case into a dialogue--a conversation--about truth. Although my personal situation is wrongful and inhumane, it has even greater consequences for anyone who is affected by our justice system--hopefully all people under the sun who have recited the pledge, "for liberty and justice for all"!

For me, as a chance, nationally visible figure, immersed in an amplified, hateful, injustice: I am innocent, but can I be free?

2. The sorority:
I believe the sorority is good--not just good and even noble, but great--and vitally important for women and humanity. It is tragic the current organization has been stymied by a few envious men abusing position of power in government, media, and film; some women who didn't live up to their sacred honor and vows; and people in general who just feel threatened by this idea. The missing part of our society, found in a secret group of women like this, aches to be embraced; we should deeply mourn it's possible loss. It is a living thing, a precious thing, and an essential thing to complete the human story: groups that are different are not necessarily bad, and ways of journeying through our lives, only for the few, and too intense for the many, are foundationally important for all of us. This sorority is such a thing: living, precious, intense, and some would say even sacred. If the current group of committed women, for whatever reason, do not carry his considerable body of knowledge, practices, and skills forward, some other group of brave courageous, women should--even must--somehow, somewhere. It's here, waiting for the right women, right now. Who will carry forth this burning torch of light?

3. Some of my absurd charges:
The prosecution claims the "victims" cry they are "scared for their lives". As a non-violent, peace movement leader, with no violence--not even yelling--reported in the sorority, the assertion, "I am scared for my life" is disingenuous at best: I, Keith Raniere, would rather risk my life than threaten another's.

**Ex. D, p. 1**

EXHIBIT D-001

Date:     02/24/2020                          Federal Bureau of Prisons                          Facility: DC
Time:     11:01 AM                                      TRULINCS
                                                        **Message**
                                              Sensitive But Unclassified

Even starting before my kidnapping, this situation has been a purely political, envy-driven, money-powered lie to destroy a community, and keep me either incarcerated for life or otherwise "disposed of". This lie is perpetrated by certain politicians, prosecutors, lobbyist, agents, judges, and people of influence, who likely received great benefits of recognition, social capital, favors, and maybe even money: it should all be closely examined.

An immediate family member of a powerful multi-billionaire, overtly against me, stated that this billionaire flew to New York, and stayed for over a week to work with, and carefully influence, authorities. This billionaire has stated he will do anything in his power to put me in jail for life--and money is not object. He also owns, and controls, one of the largest media conglomerates in South America. He is considered ruthless, very powerful, and dangerous. It is no surprise my case is so publicized, exaggerated, and untrue. It is also no surprise the men, dressed as Mexican Federal Officers, who kidnapped me were complete strangers to the few bona fide Mexican officials I did see. One of them, who had worked at his post for more than 12 years, was scared and said repeatedly, "I've never seen these men before."

There are many arguments which could attempt to show I was given due process, and a fair trial. No matter how detailed, definitive, incisive--or even persuasive--the argument, I know it is false, and absolutely wrongful. One might ask how I can be so sure? The answer is simple: I was found guilty through this process, and a trial by jury, but...

I am innocent.

**Ex. D, p. 2**

EXHIBIT D-002

Date: 02/24/2020                                                Facility: DC

Time: 10:55 AM

Federal Bureau of Prisons
TRULINCS
**Message**
Sensitive But Unclassified

**Message**

**Message**

**Message**

FROM: 57005177 RANIERE, KEITH ALAN
TO: "Nicki Clyne" ███████████████ >
SUBJECT: Sorority (part 2)
DATE: 11/07/2019 07:25 PM

The meaningfulness of surety is difficult to assess because the collateral underlying it is relative: $10,000 is different for a waitress than for a millionaire, nude pictures are different for a nun than for a porn star. The objective was as strong and complete a pledge of surety as possible.

   Surety is always pledged and received with the intention it will never be forfeited, therefore it needs to be personally meaningful, and needs to at all times, match or exceed the value of that which it collateralizes. Problems soon arose with keeping pledged surety safe and current (If a woman pledges access to an account she later closes, that surety is no longer current.) Additionally I, as the structural creator, wanted to be certain, as the sorority grew, there were not corruptions of the power bestowed upon each master through these earnest, life-serious, vows. A series of eight endeavors and structures were undertaken to provide healthy, safe, growth:

1.      The 8 founding sisters started to develop areas specialization: one specialization was ethics to ensure morality, consistency, and safety;

2.      Circles were codified: groups of sisters, normally with the same master, working together and with each other. This inspired camaraderie and also fostered a mutually helping environment;

3.      The beginnings of a grand master system wherein each sister had an additional higher, or non-lineage, grand master as a resource and sounding board;

4.      Some of the lawyers within the sorority (and some not in the sorority) where consulted to formalize the relationships, consequences, rights, and safeties;

5.      The group responsible for the safety, sufficiency, and integrity of pledged surety began creating methods for securing, updating, maintaining, and standardizing it;

6.      One of the founding sisters was the first to formally try a "switch" of master and slave wherein the slave became the master and the master became the slave for a time. This gave a wonderful perceptual shift and an experiential sense of the responsibilities, and difficulties, of each role. I suggested this should be a mainstay process throughout the organization;

7.      Two help lines were being developed: one through which a sister could personally raise issues to the ethics committee, and the second an anonymous system for emergency abuses which could be used without fear of identification; and

8.      I had created a secret society of men which now would interface with the sorority. Initially, having male members within the sorority was considered--everything from husbands to friends--it was ultimately thought best to keep men separate in general. An ethics/resources committee was created consisting of three founding members of the partner men's group (the group had already grown to 60 in number), and three founding members from the sorority, through which both organizations could benefit from the insights of the other.

   Although I was, through life vows, "master" to the 8 founding sisters of the sorority, I did not want to lead, nor was I in, the sorority. I did however lead the fraternity. As with SOP (The Society of Protectors--the non-secret men's group), in the fraternity I had ultimate power, balanced by the other founding member's ability to, as a group, veto my orders. I also had the ultimate veto power of any initiative the board created. Initially, in SOP, the high counsel (which I led) gave me ultimate, unchecked

**Ex. D, p. 3**

EXHIBIT D-003

Federal Bureau of Prisons
TRULINCS
**Message**
Sensitive But Unclassified

power. I considered this for literally 24 hours, once it was given, and decided to set up the check and balance system because I was concerned of my personal flaws, blindness, errors, and even the potential I might someday lose my faculties.

Thus, I led the fraternity (the secret men's organization) with balanced power, and had final veto power over both it and the sorority. Within the sorority, my influence was even further limited by my own beliefs: For example, one lineage head refused to adopt some of the more edgy (but optional for each participant) BDSM-type practices desired by several of the other lineages. I felt it was not my place to attempt to interfere, although I believed it was a vital option for all lineages.

I did design a number of therapeutic procedures for the sorority-- things we called, "sourcings" in the companies I created-- that were feminine by construction and, I feel, some of the most extraordinary work I have done. There were also a number of specialized, optional, sub-groups planned wherein women learned skills of interest within the sorority community and these women would become resources for the rest of the sisterhood. Note: The primary witness in my sex trafficking charge initially helped design her own personal vulnerability challenge. After this challenge, she aspired to be one of the heads of the specialized group that provided sisters with both emotional and physical challenges. This included outward bound activities, any of the alternative sexual activities, vulnerability challenges, and self-defense/fighting competence. Her personal challenge was used against me as the centerpiece of the sex trafficking charge.

The sorority was to be a "no holds barred" organization, going boldly where no other organization had yet gone--so women could have access to many unique things without the structures or permissions of men. I certainly did not want to limit these freedoms with any involvement I might have!

While I was in Mexico, the hate and untruth towards myself and the sorority raged; I was further distanced and completely apart from the functioning of this group. The day of my arrest had been scheduled to be a restarting; a more mature, wise, reforming of the group. What happened with it after my arrest is uncertain as of this writing. I believe there are still a strong number of women committed.

I believe the sorority is good--not just good and even noble, but great--and vitally important for women and humanity. It is tragic the current organization has been stymied by a few envious men abusing positions of power in government, media, and film; some women who didn't live up to their sacred honor and vows; and people in general who just feel threatened by this idea. The missing part of our society, found in a secret group of women like this, aches to be embraced; we should deeply mourn it's possible loss. It is a living thing, a precious thing, and an essential thing to complete the human story: groups that are different are not necessarily bad, and ways of journeying through our lives, only for the few, and too intense for the many, are foundationally important for all of us. This sorority is such a thing: living, precious, intense, and some would say even sacred. If the current group of committed women, for whatever reason, do not carry this considerable body of knowledge, practices, and skills forward, some other group of brave, courageous, women should--even must--somehow, somewhere. It's here, waiting for the right women, right now. Who will carry forth this burning torch of light?

| Message |
| --- |

FROM: 57005177 RANIERE, KEITH ALAN
TO: "Nicki Clyne" ▮▮▮▮▮▮▮▮▮▮▮▮ >
SUBJECT: Sorority
DATE: 11/07/2019 07:25 PM

The sorority, also known as DOS or "The Vow", was still undergoing formation pains when it became the subject of world discussion. The initial group of members were all life-committed (the highest level of commitment) although many lesser commitment levels were planned. At the time it reached international prominence, and infamy, the average age of the sorority sisters was just under 40 (I think the youngest was 24) and consisted of single women, married women, mothers, and even grandmothers. Many were professional, even world influential: a daughter of a past head of a country, a leader of a key national think tank, a daughter of a multi-billionaire and media mogul (this particular father is one of the key motivators behind the actions against the sorority), the wife of the CEO of a major corporation, third generation royalty, call girls, lawyers, doctors, research scientists, Emmy nominated performers, peace movement leaders, many nationalities and races (African, Mexican, U.S. American, Chinese, Arabic, Canadian, European), many religions and beliefs (Christian, Jewish, Agnostic, Islamic, Catholic, Spiritualist), and from 7 countries.

**Ex. D, p. 4**

EXHIBIT D-004

Federal Bureau of Prisons
TRULINCS
**Message**
Sensitive But Unclassified

Was it bad? No. It was great. Was it well defined? No. It was forming and changing daily. Were there problems? Yes, many. But earnest people were creating solutions every day. Was it sinister? No. The intent was to help women and humanity through a woman's organization unlike any that existed. Could there be an "old girl's" network as powerful as the "old boy's" network? Could there be a woman's worldwide secret society, based on personal growth, with a no-glass-ceilings, no nets, no excuses, environment wherein women are "women of their word"?

The sorority was a group of women with a four-fold desire to: 1. Be part of a close, intimate, sisterhood, where it is safe and supportive to have total disclosure (they were invited by a woman they respected, normally their best friend); 2. Be brave and courageous, taking full risk to overcome limitations, with specific disciplines, practices, and skills, taking away excuses and the cultural female "net" of social safety, in ways not available in the outside world; 3. Build power and influence for themselves; and 4. Be part of completely trusted, secret network of women dedicated to obtaining power and influence to be used to forward the compassionate feminine principle in society.

Some of the sisters questioned if many women could really keep the faith, taking secrets to the grave no matter what, and live up to these conditions and aspirations.

The initial sisters of the sorority were set to be the most trusted of friends to the women already in the sisterhood. This was a temporary recruitment allowance: select women were permitted to join directly as a life-committed member (a dramatic shortcut compared to the future, multi-year process of trust-building, tests, and commitment needed to assure qualified "lifers"). In the future, most of the women within the sorority would likely not want to be "lifers", but would find a lesser commitment level more suitable for their lives. Analogous to the Church, not all members want to be clergy.

The seminal notions of the sorority had been in my thoughts for decades. It is part of my life-work to create new social structures and organs of society. Several persistent, independent, thought-clusters and questions informed the creation of the sorority:

1.      What are the advantages and disadvantages of good intentioned, compared to bad intentioned, people? How can theadvantages of being good be amplified so, combined with the inextricable disadvantages, a group can be stronger than the damage of bad intentioned people? (Since a bad intentioned person is willing to do anything, he or she has more options.)

2.      What is the nature, and possible need for, secret societies in the pursuit of a better civilization? Many bad actions utilize thetool of secrecy. How can this tool best be used for the good by having a secret group? Is it necessary, or does it give an advantage, in our current world?

3.      Why were secret societies male oriented and the secret societies of the world almost completely of male membership? Thisleaves a void in civilization. What good would it do to fill this void? What in the behavior of women caused this void? Could women form a secret society without this behavioral weakness getting in the way? Would it be good to do so?

4.      Could one build a society based on self-determined penance and collateral, instead of based on outwardly imposed,punishment and rules, backed by violence? Penance and collateral move a society away from violence used to enforce rules, and towards conscience upholding ethics. Hopefully, by using practices of penance and collateral, one moves from fear-based, external authority, to conscience-based, internal authority.

Collateral is anything of value. In this case, it is pledged as surety by placement with the sorority for safe keeping, or bonded through agreement allowing it to be possessed if necessary.

Conscience-driven people see pledged surety as merely an effect upholding, valuing, and representing, their word. Such people keep their word because it has an independent, internal value to them, from their own internal authority. The pledged surety is a proud demonstration of that value (as the signers of the U.S. Declaration of Independence who proudly pledged surety of their words with their lives, fortunes, and sacred honors). Conscience-driven women within the sorority world not fear losing their pledged surety because they know they will keep their vow, and their pledged surety is a proud representation of their vow's strength.

Fear-driven people, not using their conscience, reluctantly keep their word because of the pledged surety. They make the pledged surety the source, and their word an effect of it, believing they keep their word to avoid losing their pledged surety.

**Ex. D, p. 5**

EXHIBIT D-005

Date: 02/24/2020                                                                                    Facility: DC

Time: 10:55 AM

Federal Bureau of Prisons
TRULINCS
**Message**
Sensitive But Unclassified

They value their word, in the moment, by what it can get them, and only keep it if they fear negative consequences enforced by an external authority. Such people often break their word if they are assured, or perceive, there will not be negative consequences. This gives them positive reinforcement for not seeing, or caring about, consequences, thereby inspiring a lack of conscience and conscience building. People who indulge this pattern, break their word when convenient, do not develop a deep conscience, and regard only obvious effects in their decisions.

There were three, non-defendant, sorority sisters who testified for the prosecution at my trial. Each of them had broken vows in multiple ways--one admitted to seemingly outright criminal behavior outside of the sorority--each admitted to fear-driven behavior. Their motivation to cause a conviction was intensified by the promise of money. They are all represented by the same civil(!) attorney who has stated he is putting together a class-action lawsuit: the heiress in this case is worth an estimated $200 million, and other defendants have considerable assets.

What is the likely outcome when one of these apostate sorority sisters testifies directly protected by the prosecution (including her identity), for the prosecution? Would she tell the truth if it went against the prosecution's narrative and eliminated the chance of financial reward? Would she be charged with perjury if she lied to support the prosecution's story? (Answer: no.) In such a situation, can the defense charge her with perjury? (Answer: no.) It seems like this prosecutorial witnesses is pretty motivated and safe lying!

Additionally, one of my partners, a founding sister, testified for the prosecution in order to reduce her sentence. This is sad and a betrayal, but complicated: At her age, 40, not only is a prison sentence very scary, it might preclude her from having children which she strongly desires. She also has a mother who is gravely ill, and she did not want to be incarcerated during her mother's, potentially, final days. Her cooperation is compassionately understandable, but very bad morally: Even if she felt I was guilty--and even bad--supporting a hate-type campaign in any way is wrongful. It is also a profound betrayal and breaking of both her vows to the sorority and me.

Note: I am unmarried and have a number of long-term, life-committed, relationships simultaneously. Their durations: 42 years, 30 years (deceased), 23 years (deceased), 22 years, and a number more of 15+ years. This generates a tremendous number of questions, and a lot of hate, in this country.

This is how the sorority "started": At one point, for deeply personal yet independent reasons, three of my long-term partners decided to have a deeper, more total, commitment by making life-vows to me; one of them because of a personal crisis. They wanted me to hold them to the highest of standards, "pull no punches", and tell them all of my preferences, so they could be as intimate and close with me as possible. It is not my way to voice my preferences, or push for my wants, so I thought doing so was an important practice for me. Additionally, they pledged collateral as surety to prove their earnestness, although I did not hold it.

The benefits of this commitment were palpable to them almost immediately, and two of these women felt a few of my other partners should be added (and at least 2 women who were not my partners). Within a short time, there were a total of seven women who took life-commitment vows to me; one of them had no sexual involvement with me and never did. She was the person I chose to hold, and keep track of, everyone's pledged surety.

After the first seven women had taken life-vows, although the one in crisis remained apart from the group, the remaining six felt the vow and program would benefit some of their closest friends. At this point, the decision was made to create a sorority-apart from my life-vows with them--yet built with the same principles and benefits. I was to "train" these founding women as they, the leadership circle, were to "train" the rest of the organization. My longest-term partners did not fit the spirit of the group; it did not apply to their personality types or their goals in life. So they were never invited into the sorority and never knew about it. An additional one of my partners was added much later as a founder. She was good for the group (and the group for her) but was not added initially because some of the other founding sisters simply did not trust her and felt unsafe with her.

Ultimately, each of the eight founding women created a lineage. Over the coming months, as the group grew to over 150 women, many challenges were addressed and contemplated which helped form the organization. The first hurdle out of the gate was how to determine an invited friend was truly worthy and committed to such a life-trust? This was a secret organization that, for purposes of privacy and freedom, needed to remain secret. How would the group know they could trust a woman that much?

**Ex. D, p. 6**

EXHIBIT D-006

Federal Bureau of Prisons
TRULINCS
**Message**
Sensitive But Unclassified

To start, there was a two-step initiation process: First, the candidate was told of a secret group. In order to find out about it she needed to pledge surety to back-up her word, convince the group of her trustworthiness, and guarantee she would keep the secret to the grave. This would give every member confidence intimate secrets would remain safe.

A good percentage of "best friends" provided this to find out about the group. What each woman learned were the four basic tenets of initiation verified in court: 1. The relationship was one of total, unqualified, obedience for life (this renders the forced labor charge a virtual impossibility, especially if it's for such minor tasks as reading articles or getting coffee); 2. The Master/Slave terminology would be used within the relationship to affirm this; 3. She would be required to be branded with an undisclosed symbol; and 4. She would be required to wear a permanent piece of jewelry to visibly show this bond. At this point, some women were interested, some not.

The second stage, if the qualified applicant desired to go forward, involved pledging as much meaningful surety as possible to affirm life-time loyalty and commitment. This surety was evaluated by the group, and the group decided if the applicant was committed enough to uphold the obedience and fidelity for life. There is a joy in affirming one's word through pledging surety-also a genuine desire to show one is serious and one's word is good (Remember the signers of the US Declaration of Independence). With some applicants, this was evident. If this second collection of pledged surety was deemed sufficient, the applicant was accepted, as a sister, into the group's life-time vow of obedience and loyalty.

**Ex. D, p. 7**

EXHIBIT D-007

.

Sensitive But Unclassified

## Message

FROM: 57005177 RANIERE, KEITH ALAN

**Message**

TO: "Eduardo Asunsolo" <███████████████>

EXHIBIT D-008

Date: 02/24/2020                                                                   Facility: DC

Time: 10:09 AM

Federal Bureau of Prisons<br>TRULINCS

SUBJECT: RE: Contest feedback
DATE: 01/07/2020 01:54 PM

Read 1:46pm, Tuesday 1/7/20. I would need to understand the parameters: costs, timing etc. We do not want so much filtering that nobody signs up (and we need to get started right away). I would rather have 100,000 lookers than filter out all people who will not guarantee to look at it 100 hours and end up with 2. So there is a balance. One way I was thinking of doing it is to have them sign up by a certain date for segment 1 ($25,000 plus other prizes of Sex trafficking etc) then need to "give up" by a certain date to get to segment 2 ($25,000 for the next charge plus even more prizes -- maybe being eligible to receive $100$250 per provable malicious error within Eastern District press releases. Mine has at least one!). This way you can say we had 100,000 try and admit failure. Not sure if we should do this approach or just let them sign up. What do you think? ---- Asunsolo, Eduardo on 1/7/2020 1:03 PM wrote:

>

Hey there.
Some people have have feedback that it might be good to have a PR firm linked to the contest. It can filter people who'd just want attention and not to seriously analyze the case. And help in general with the contest. What do you think?

EXHIBIT D-009

```
RECORDING:          57005177_Mar_12_2020_12_36_38_PM

DATE:               March 12, 2020

TIME:               12:36:38 PM

PARTICIPANTS:       Keith Raniere      [RANIERE]
                    Suneel Chakravorty [CHAKRAVORTY]
```

EXHIBIT D-010

CHAKRAVORTY:    Hey, Keith.

RANIERE:        Hey, what's going on?

CHAKRAVORTY:    Uh, good, you sound clear.

RANIERE:        That's good! Hey!

CHAKRAVORTY:    [Laughs]

RANIERE:        So, I tried calling a little earlier, two times, you didn't get it or…

CHAKRAVORTY:    Yeah, uh, it, it rang once and then just dropped.

RANIERE:        Huh, interesting. So, anything new since I last spoke to you?

CHAKRAVORTY:    Uh, yeah. Uh, two things that are new. One is that Eduardo's been in touch with David Fritz…

RANIERE:        Yeah.

CHAKRAVORTY:    …and he is pretty direct, uh, pretty, uh, not mean, but I think pretty strong with him, he was like, "Look, you know, you're going to help us or not?"

RANIERE:        Right.

CHAKRAVORTY:    And then he gave us the truth of Jason Flom and, and he's been texting with David on, on… I think he's on a plane right now…

RANIERE:        Yeah.

EXHIBIT D-011

CHAKRAVORTY:    …uh, to get him to the point where he'll set up
                the call with Jason. He knows him enough that it
                will be kind of a strong stance with him and,
                and I think we can get on a call with Jason
                with, uh…

RANIERE:        With Nicki [Clyne]?

CHAKRAVORTY:    With Nicki to talk to.

RANIERE:        Suneel…

CHAKRAVORTY:    I think Nicki will be the main person that would
                be…

RANIERE:        …you know who else might be interesting?

CHAKRAVORTY:    Who?

RANIERE:        Have Nicki and Michelle on.

CHAKRAVORTY:    Aahhh!

RANIERE:        Both of them…

CHAKRAVORTY:    Yeah.

RANIERE:        …both of them [U/I] are branded, they're
                different lines, one's right next to… Michelle,
                you know, side by side with [Nicole] or
                whatever.  Michelle is also very articulate.

CHAKRAVORTY:    Yeah.

RANIERE:        Ask Nicki. Let Nicki be the lead on how she
                feels about that.

EXHIBIT D-012

CHAKRAVORTY:    Yeah.

RANIERE:    But having… two, two of the women, and I think… I don't know how many women actually did the branding ceremony. Something like 15 to 20.

CHAKRAVORTY:    Hmm.

RANIERE:    You know, out of 150.

[Voices overlap]

CHAKRAVORTY:    That's not many at all.

RANIERE:    No. [Laughs]. And, you know, most of them were First, First Line people, but, so, yeah I have to count them up, but it's from… I, I imagine, I'm… I think it's like 20 total, maybe less.

CHAKRAVORTY:    Hmm.

RANIERE:    And I don't know.

CHAKRAVORTY:    [U/I].

RANIERE:    Do I know? At this point I know all of them, I think.

CHAKRAVORTY:    Hmm.

RANIERE:    So. So do you know of the top three things I should talk about are?

CHAKRAVORTY:    I do. I have the top three, uh, so the top three I have, uh, from a bunch of people, are why, why multiple partners?

EXHIBIT D-013

RANIERE:        Why what?

CHAKRAVORTY:    Why multiple partners with polyamory.

RANIERE:        Uh-huh.

CHAKRAVORTY:    Um, the collateral and the brand and the specific themes within that are, um, the, you know, your partners were helpless victims, were manipulated, people were forced or coerced to have sex with you.

                [Voices overlap]

RANIERE:        Uh-huh.

CHAKRAVORTY:    And DOS, ESP, etc, was used to get women to have sex with you? And, uh, I guess…

RANIERE:        Wow.

CHAKRAVORTY:    …uh, in general.  Sorry, I don't…

RANIERE:        Yeah, I know…

CHAKRAVORTY:    …I'm just trying to tell you that. [Laughs]

RANIERE:        Yeah, no, I'm just trying to figure out, so "the room" doesn't show up there.

CHAKRAVORTY:    And only one person mentioned the room, but I think it is important, I think just most people that, that I'm in touch with, um, and I think the sex stuff if more out for people, but I think our community knows like, this is crazy and they know the family, so I think that is also…

EXHIBIT D-014

RANIERE:        Is it what family?

CHAKRAVORTY:    Uh, that people know the family, so the… uh, uh,
                these people are, you know, community and then…


                [Voices overlap]

RANIERE:        Yeah, but I can, I can talk…

CHAKRAVORTY:    Yeah.

RANIERE:        ….about the… I can talk about like branding the
                room, and my sex polyamory type thing.

CHAKRAVORTY:    Yeah.

RANIERE:        Something like that.

CHAKRAVORTY:    Yeah, I think a lot of people intend, uh, think
                it's bad intended or whatever and they just
                don't understand, so, I think this would be
                good.

RANIERE:        Oh, okay, uh… yeah, let's see, anything, uh,
                yeah…

CHAKRAVORTY:    [U/I] business, so…

RANIERE:        …I, I won't, I won't talk about the, the Vow or
                things like that… I think I'll just talk about
                those three. Uh…

CHAKRAVORTY:    Okay.

RANIERE:        Yeah. Like Farouk has a really intense emotional

**Ex. D, p. 15**

EXHIBIT D-015

reaction to the Vow and all that type of thing.

[Laughter]

CHAKRAVORTY: Maybe he should take the Vow. [Laughs]

RANIERE: No, but I do understand why.

CHAKRAVORTY: Oh, okay.

[Voices overlap]

RANIERE: Uh, I mean, there is, you know, there is a vested reason why… a few, actually [U/I].

CHAKRAVORTY: Um, maybe, maybe because of Li… maybe because of Lyvia.

RANIERE: Yeah… of course.

CHAKRAVORTY: Hmm, interesting.

RANIERE: So.

CHAKRAVORTY: [Laughs]

RANIERE: Why, why? Who, who? What… does that make sense?

[Voices overlap]

CHAKRAVORTY: You know what I mean, it, it makes, it makes sense, but it also doesn't make sense because…

**Ex. D, p. 16**

EXHIBIT D-016

RANIERE:         What doesn't make sense?

CHAKRAVORTY:     Uh, I mean, I, I don't know if that would be… I
                 mean, I, I get why that would be upsetting,
                 given like [clears throat] like the macho
                 Mexican culture and stuff.

RANIERE:         Uh-huh.

CHAKRAVORTY:     Uh, like, you know, I guess, uh, and Indian,
                 Indian culture is similar, but less like overt,
                 uh…

RANIERE:         Uh-huh.

CHAKRAVORTY:     …uh, but I mean, that's someone who knows you
                 for probably 15, 20 years and also, uh, ideally
                 knows the people involved in knows this is a
                 conscientious thing…

RANIERE:         Yeah.

CHAKRAVORTY:     … but I guess, intellect [U/I] is different.

RANIERE:         Yeah, that's true. And also, you know, different
                 people have different struggles. Ultimately some
                 people like to be able to do what… whatever they
                 like, or comfort or whatever, you know, so the
                 thought of that, an absolute vow is like…

CHAKRAVORTY:     Very uncomfortable.

RANIERE:         Yeah, so, all right, um, yeah, I think I'd talk
                 to about what… uh, branding, uh, my polyamory
                 and the room, so the branding, the room,
                 polyamory, something like that.

CHAKRAVORTY:     Okay.

**Ex. D, p. 17**

EXHIBIT D-017

RANIERE:         Okay.

CHAKRAVORTY:     I will give you the count then.

RANIERE:         Okay.

CHAKRAVORTY:     Three, two, one, go.

RANIERE:         So I'm going to mention three subjects, three
                 quick things which I'll obviously going into
                 more depth at a, a later point, but these are
                 three things that I think upset people a lot.
                 There is the branding, there is the room and
                 there is polyamory.

                 The first thing I'm going to talk about is the
                 branding, you know, it's, it's interesting, if
                 you follow the media, if you listen to a lot of
                 the media, from what I understand, and then I
                 understand this from lawyers and people like
                 that, that I am seen as having branded women
                 against their will and often they think of it as
                 like something with a coat hanger or a cattle
                 branding sort of a thing. Now, a little bit
                 before I get into what the truth of it is, you
                 know, when I went to college, there were a few
                 different fraternities that did branding and
                 they actually did them with like, you know,
                 metal things made out of hangers and stuff like
                 that and there is a, a major, uh, fraternity,
                 uh, the Omegas, and you'll often see like an
                 Olympic athlete, you'll see an Omega on the skin
                 or whatever, but, uh, very much, they do very
                 large brands of that symbol. Multiple places
                 sometimes you can look up that fraternity, uh,
                 it's an African-American fraternity. It is
                 extremely influential, there are a lot of people
                 who are, you know, chancellors of colleges and,
                 uh, political people and things like that.

                 As a matter of fact, uh, we have one person that
                 is in the Nxivm/ESP community and he, uh, he was
                 actually the first African-American Supreme

**Ex. D, p. 18**

EXHIBIT D-018

Court, State Supreme Court Justice of Arkansas and he's extremely influential and he, uh, you know, works with Bill Clinton on the Clinton campaign, all these different things and when it was first brought to his attention that this news and this stuff came out about this branding, he said, "I'm branded," you know, because he's in the Omega Fraternity.

So what is, what is the truth here? Yeah, women were branded, there… when a woman gets into the sorority and this was testified to in court, one of the conditions they have to agree to, to get into the sorority is they will have a brand on their hip, it's a small thing, um, and they agree to that ahead of time and then ultimately the brand, uh, they were going to put a tattoo over it and things like that, etc. Out of 150 women or so in the sorority, I think there might be more, I think there might have been more, I estimate 20 of them, maybe, got the brand. Um, the brand is something that the initial 8 women, uh, decided they wanted and, uh, I think a guy from, I won't say what state to keep his anonymity, came and did the branding with them and taught them, uh, about it and how to do it and things like that, and then there was a woman in the sorority who is a doctor, who… it's a, a type of a light cauterizing pen, they use it in surgeries, um, and she was experienced with that and that's what was used. So, and what was going on? Women were branded, I did not have anything to do with it. I didn't brand them, I wasn't there. I wasn't even there when my partners were branded. There have been, uh, at least two men involved in the branding. The, uh, man who branded the first eight women gave them that symbol, uh, and then another man, I think who did a few other women to demonstrate how to do it, uh, and then, uh, the rest were done by a doctor with [chuckles] a surgical instrument. It's always been a surgical instrument, so there are no hot irons, no coat hangers, no putting them in a fireplace, getting, uh, you know, white hot or anything like that. It's done with a doctor, with a surgical type of instrument. Uh, a type of, uh, almost like a light pen type of a thing, and it was agreed to ahead of time.

EXHIBIT D-019

They are not held down, it is not involuntary and there is a small number of women in upstate New York that did it.

Now, branding, if you were to go look on the Internet relating to things like scarification and stuff like that, is becoming the new tattoo and there are a lot of people who do them. They do them all over. They do them on their heads, they do them on their bodies. There is a famous guy who is a ballet dancer who did like tiger brands across his body, uh, so this is becoming a type of self-ornamentation. And I don't know, whether it's a tattoo, or a brand or who knows what different people do. Some people do it with like cutting, doing stuff like that, uh, you know, it's up to a person what sort of ornamentation they want to do in their body. There are people who do piercing. You know, there is some people who actually, they pierce their ear. They go through, they pierce their ear… they put a hole right through the thing, you know, well, we know that commonly. So, this sort of body, you know, ornamenting the body, uh, designing the, the body, you know, using the body as a manifold for different things in a voluntary way, done with a doctor, with a safe instrument, you know, that's… it's not, it's a, a far cry from, you know, my chasing after a woman, pinning her down and branding her with like some sort of, uh, I don't know what. So, I wanted to clear some of the factual information and stuff that was brought out in court about this branding thing. So, yeah, some people did, uh, brand themselves, uh, and they have, uh, it's a small thing on their hip. Maybe, I don't know, uh, uh, two inches by two inches or an inch by inch, I, I don't even know exactly how big it is.

Then there is the second issue, which is the infamous room. Here is a woman that if, if you listen to the news, a woman that was confined to a room against her, her will, although she pled and pled to get out and was in the room for 22 months. Well, a little bit of background with respect to this woman, this woman was someone

EXHIBIT D-020

who within her family and within her community in the past, from the time she was young, had many, many problems that I won't go into them here, it's maybe not even my place to talk about them. There was a point in her life that she turned 12 or 13, she had so many problems, she, uh, uh, from what I understand, didn't want to go to school, didn't want to relate with people, and would lock herself in her room, apparently sometimes for weeks at a time, I don't know, but what happened with this woman? The truth is she was in a room in her parents' house with her family taking care of her, the room was unlocked, she was able to leave anytime she wanted.

If she wanted to leave and rejoin the community, I think her visa had run out at that point. She would have to either do go back to Mexico or she had to explain to people how she was going to stop from all the stealing and the other things that she was doing. She also had to finish a book report. She had a number of different book reports she was supposed to do and she was seen as being very prideful about it and no matter what, she would do anything, you know, say anything, but never just sit down and simply finish the book report.

Uh, so, the initial hope was, she would go into her room, the room would be unlocked, she gets whatever sort of food she wanted, her family is taking care of her, all this sort of a thing and that she would really think about, "Okay, I've done enough of this pattern, I've done enough of the stealing, I've stolen from people, I've stolen from NXIVM, I've stolen from the stores, I've stolen sometimes, you know, $5,000 of cash, things like that. Um, how am I going to stop, how am I going to conduct myself and will I get this one book report done that they've been trying to have me do for a year, and I keep on making excuses and doing all sorts of things?"

The hope was that she would be in there, a day, a day, maybe a weekend and then produce the

EXHIBIT D-021

report, produce this plan. But it became a battle of wills and she stayed in the room for 22 months. She was sneaking out at night doing all sorts of things like that, you know, uh, she ended up stealing computers and all sorts of stuff, but this was this was someone who, [laughs] threw like, what would be a massive sort of a tantrum and it became a battle of wills and finally she just decided, "Okay, I want to leave," and when she wanted to leave, her father drove her to the border and arranged for one of his employees to pick her up on the other side of the border when she crossed and that was it, so this is her family, this is her dad, her dad was there doing this.

[Pause]

CHAKRAVORTY:   Hello. [Clears throat]

RANIERE:   It's about to cut off. So, good bye.

[END OF CALL]

EXHIBIT D-022

```
RECORDING:          57005177_Apr_06_2020_13_32_30_PM

DATE:               April 6, 2020

TIME:               13:32:30 PM

PARTICIPANTS:       Keith Raniere      [RANIERE]
                    Suneel Chakravorty [CHAKRAVORTY]
```

EXHIBIT D-023

CHAKRAVORTY:   Hey, Keith.

RANIERE:   Hey, how is it going?

CHAKRAVORTY:   It's good, how are you?

RANIERE:   Okay. Did I wake you? [Laughs]

CHAKRAVORTY:   [Laughs] No, no.

RANIERE:   So, uh, anything new on your side?

CHAKRAVORTY:   Uh, yeah. So the judges, uh, we have, uh, more calls this week. Uh, David Williams is helping me figure out, um, you know, what kind of… uh, what compensation options, like what's the value of ads on iHeart, maybe that would be attractive to some of the judges.

RANIERE:   Uh-huh.

CHAKRAVORTY:   The, the one thing with judges that we're kind of a little bit hitting up against the wall is that a lot of them seem to get the impression that it's like a lot of time and effort, and you know…

RANIERE:   Uh-huh.

CHAKRAVORTY:   …it's [U/I] how do we get them to see this is so bogus and, so, uh, one thing we are going to try is to have them take the challenge or look at the challenge like not from the brief, but…

RANIERE:   Okay.

CHAKRAVORTY:   …as a participant, um…

**Ex. D, p. 24**

EXHIBIT D-024

RANIERE:        Or you can also have triage people. In other
                words, you guys can look if you have a bunch of
                applications, uh, if they can't… if they don't
                meet certain basic standards, the judges don't
                have to read them.

CHAKRAVORTY:    Got it.

RANIERE:        And judges can set those standards, so that they
                can say, "Well, that we set these standards," if
                you know, if, if you know, if there is no
                intrastate commerce, period, gone, you know.

CHAKRAVORTY:    Yeah.

RANIERE:        So they'll have people working for them to do
                this.

CHAKRAVORTY:    Understood. Um, cool. Uh, I also had on the
                podcast that, uh, on monetization we've been
                trying to get a hold of Fritz [ph] but he
                responded once, but he thinks he can help, but
                then he disappeared again, so we'll have to hunt
                him down and, and get… but, um, David says that
                iHeart, um, that there is another show that it's
                like similarly a hated person, maybe, maybe not
                as, as big as you…

RANIERE:        Yeah.

CHAKRAVORTY:    …but, uh, they, their ad networks weren't
                interested, so he ended up doing like, uh,
                selling vitamins and monetizing that way, so
                just the thought of that, maybe if we can
                merchandise or something else as, as an option.

RANIERE:        Uh-huh. Sell, sell T-shirts.

CHAKRAVORTY:    [Laughs] Oh, yeah, or like, you know, make your

EXHIBIT D-025

```
                        own like brand, like a tattoo, you know.


     RANIERE:        Yeah, yeah.


     CHAKRAVORTY:    Something. [Laughs] Uh, and then, uh, I, I
                     remember that [U/I] a while ago, uh, you told me
                     some stuff about the hard drive location and I
                     took some notes.


     RANIERE:        Right.


                     [Voices overlap]


     CHAKRAVORTY:    So I talked to the, uh, there were like very
                     specific notes that you get… you know, told me a
                     while back, so…


     RANIERE:        Right, right, [U/I].


     CHAKRAVORTY:    Anything else that you want me to send there?


     RANIERE:        The pages and all that, yeah.


     CHAKRAVORTY:    Yeah.


     RANIERE:        Good, excellent. Uh, also I have, uh, you know,
                     I haven't been able to speak to the attorneys at
                     all.


     CHAKRAVORTY:    Uh-huh.
```

EXHIBIT D-026

RANIERE:         And then, you know, I mean, some of this stuff,
                 like, I, I would like… and I don't know if you
                 can take permissions over the phone, but I would
                 like you guys to be able to get to my phone and
                 get data off of it. They have a mirror of the
                 phone, I believe, from uh, you know, a security
                 agency that did the custody, so, you should be
                 able to go on the phone and take off my WhatsApp
                 chats, my Telegram chats, things like that. Um,
                 so, I, I give you guys, you, you know, Nicki,
                 uh, permission to do that. And I want them to
                 enable you to do that because some of the things
                 on those chats show, you know, that I, I wasn't
                 not using the phone, you know, and things along
                 those lines.

CHAKRAVORTY:     Got it.

RANIERE:         Um, also, I, I was trying to figure out for the,
                 uh, uh, the affidavit…

CHAKRAVORTY:     Mhmm.

RANIERE:         …if there is any problem, I want you and Nicki
                 also to be able to get like my visa records and
                 passport stuff.

CHAKRAVORTY:     Got it.

RANIERE:         Because that will go in one of the, the things,
                 and also the, uh, if Marc has a thing of the
                 prosecutorial abuse, a draft of it, I also give
                 my permission for you guys to see that.

CHAKRAVORTY:     Got it.

RANIERE:         Um, and also, you know, if they… if you could
                 get all the curriculum videos like the Jness
                 downloads and things like that where I do the
                 downloads, uh, you know, I know they, they're
                 trying to work a thing with my medical

**Ex. D, p. 27**

EXHIBIT D-027

condition.

I have this asthmatic cough, that I've never talk to anyone per se about, because I, you know, I didn't want to treat it that way, but it is a dangerous thing for me and I'm coughing all over the place in these things. So you may, you may want to [chuckles] make a cough compendium, uh, and also if you could get the computer guy to get a summary to me, and also, please, tell Marc and Paul, it is vitally important as far as I'm concerned to get a mirror, the, the mirrored data from that drive. We have to get more granular. This report isn't granular enough. There are so many things that can't be seen, and there are pictures on that, that backup that were never… backed up. There's pictures of like a tree and things like that. I think that even came off the phone, not necessarily the SD card. Uh, it's, this seems so outlandish, so tampered with this disk, this, uh, drive, you know?

CHAKRAVORTY:   Yeah, absolutely.

RANIERE:       I would also like to know from Marc how, how long until that new motion is ready to go, even if he doesn't file it, I want to know when it's ready. I would love to see it if I could and then, of course, there's the jurisdictional motion and, uh, a, a motion for new evidence, which I think this motion that he's doing now might open the door for that and I wanted to know, because I don't speak to him, so I'm gonna, I guess I have to speak to him through you.

CHAKRAVORTY:   Okay. Is it okay if I, I just share this recording with, with Paul, Marc and Teny?

RANIERE:       Yeah, yeah.

CHAKRAVORTY:   Okay.

**Ex. D, p. 28**

EXHIBIT D-028

RANIERE:        At least it's part of it.

CHAKRAVORTY:    Yeah.

RANIERE:        With my, my permissions, my hearty permissions.

CHAKRAVORTY:    Yeah, of course.

RANIERE:        So, um, anything else needed, let's say, for podcast and stuff like that?

CHAKRAVORTY:    Um, I, I don't… uh, I don't think so, for this, uh, um, yes, actually there is, uh… I don't think we need it, but right now we're, we're putting together the, the better, ideally better first episode and, uh, there, we have it as you with the social repugnance intro, where you say "be prepared."

RANIERE:        Yeah.

CHAKRAVORTY:    And then going and, and some scripts and then going into your talking about the challenge and then we're trying to figure out a way to end it. We have a couple of options, uh, the appeal to reason, uh, also Lady Justice being blind. Uh, we have a few things like that.

RANIERE:        Yeah.

CHAKRAVORTY:    I don't know if there is another option, or way that you want to end the first episode that, um, could be interesting, but, uh, nothing else comes to mind right now.

RANIERE:        Uh, I'll have to think about that. Maybe for next time if I can call you.

**Ex. D, p. 29**

EXHIBIT D-029

CHAKRAVORTY:     Okay.

RANIERE:         Um, yeah, you know, uh, uh, you… you… how many
                 of these 10 points do you have now documented
                 and done, you know, here's the evidence?

CHAKRAVORTY:     Uh, six out of ten that, the things are
                 collected. Today I'm going to put those together
                 so it's documented and done.

RANIERE:         Done, done… yeah.

CHAKRAVORTY:     Yeah. Uh, and then you…

RANIERE:         And where you have some, but not enou… not…

CHAKRAVORTY:     So, for two of them is, uh, Marc's motion.

RANIERE:         His new motion or his old one?

CHAKRAVORTY:     The new motion, like the wit… how witnesses were
                 handled and stuff like that.

RANIERE:         Oh, I see, yeah.

CHAKRAVORTY:     So that would us to eight and then, uh, the fear
                 for your life and uh, the flight risk… I'm
                 tracking down those documents and, and using
                 some videos from [U/I], uh, Diego and, uh, some
                 people coming up with videos of like the peace
                 movement, the peace statement, V-week and stuff
                 like that.

RANIERE:         As far as… I've done, I've done that in Forums
                 too, you know. There are Forums, if they have
                 them by key words that can find stuff with non-
                 violence and…

EXHIBIT D-030

CHAKRAVORTY:    Yeah.

RANIERE:    So, yeah, it's interesting, the whole fear for my life is such a lie.

CHAKRAVORTY:    It's [U/I], it's like the most absurd lie if they actually knew you.

RANIERE:    Uh, Sahajo actually has some experience with that, Sahajo's ex-boyfriend…

CHAKRAVORTY:    Uh-huh.

RANIERE:    …um, he said at one point, he said, uh, you know, "I'm scared for my life," and then he did an arbitration with Nancy and that basically turned out to be just nothing, he was just saying that. [Laughs] You know, [U/I], you get her testimonial that he did that. So, you know, this whole drumming of "I'm scared for my life, I'm scared for my life, I'm scared for my life" is crazy.

CHAKRAVORTY:    Okay, I'll, I'll follow up with her.

RANIERE:    Yeah, at some point, I was thinking of addressing also the Cami, uh, charges without going too far, without splitting up her family, without hurting appeal, without, because, you know, no matter how I address it, it, uh… you know,[chuckles]. It, it doesn't… they… no one will believe me, but that's not the issue, the issue is, it actually doesn't matter as… uh, you know, it's just like if I were a murderer and I'm being charged with arson, you can say "he's a murderer, he's a murderer, he's a murderer" all you want and even prove that, but if I'm not charged with it, it's not relevant, you know.

CHAKRAVORTY:    Yeah.

EXHIBIT D-031

RANIERE:          And the prosecution loves this, and then in the
                  press release they try to say, you know, they
                  say somehow showed I had sex with her and I
                  didn't, it's just not, you know.

CHAKRAVORTY:      Yeah.

RANIERE:          So, but then, uh, you know, when it comes down
                  to the technical things, the absurdity of a
                  computer that isn't yours, being backed-up on a
                  drive you could never access and that you
                  wouldn't even known about, that wasn't yours,
                  and that somehow gets possession. It's crazy,
                  because to possess something, you have to be
                  able to control it, [U/I] access it, you have to
                  at least know where it is, you know.

CHAKRAVORTY:      Uh, yeah, it's insane. So, uh, do you, do you
                  have any sense of how much longer your modified
                  lockdown is going to be or...

RANIERE:          Um, at least another, uh, eight days.

CHAKRAVORTY:      Okay.

RANIERE:          It's a 14-day thing.

CHAKRAVORTY:      Okay.

                  [Voices overlap]

RANIERE:          So, yeah, did, did you get, did you get to speak
                  to the computer guy about those, uh, notes that
                  I've given you, anytime…

CHAKRAVORTY:      Uh.

RANIERE:          …did he have them when he wrote this report or…?

**Ex. D, p. 32**

EXHIBIT D-032

CHAKRAVORTY:    Uh, he didn't have them, I, I forgot that I, I
                had those notes, those specific ones…

RANIERE:        Oh.

CHAKRAVORTY:    …but I'm gonna, uh, but I'm gonna speak with him
                today and, uh, and, uh, give, give those to him.

RANIERE:        Yeah, okay, because hopefully he can look
                through, because there is… uh, if I remember,
                they are based on the report that I had written
                on while I was in the middle of trial and I had
                to, you know, I only had it for a few minutes
                and the, uh, the judge didn't want me, and uh,
                nor did my team want me looking through the
                voluminous report, so I, you know, sort of
                thumbed through it quickly to try to grab some
                things.

CHAKRAVORTY:    Uh-hum. He said he had an..

RANIERE:        What?

CHAKRAVORTY:    …[U/I], no, he said he had an, an email that
                Paul wrote, I think,  maybe it's like a written
                version of those notes and not the originals, so
                I'll ask, uh, I'll ask him.

RANIERE:        Oh, okay.

CHAKRAVORTY:    Yeah.

RANIERE:        All right, yeah, the important things are, of
                course, the rotated picture or pictures and the
                things…

CHAKRAVORTY:    Uh-huh.

**Ex. D, p. 33**

EXHIBIT D-033

RANIERE:          …that are in the wrong directories.

CHAKRAVORTY:      Yeah… Got it.

RANIERE:          So, and wrong directories. And also pictures that shouldn't even be anywhere, like pictures of me in someone's directory, pictures of a tree or, you know… stuff like that.

CHAKRAVORTY:      Uh-huh. Got it.

RANIERE:          All right, uh, I can't think of anything else at the, the moment. Anything else on your… because we only have a few minutes left.

CHAKRAVORTY:      Um, it's just the update on, on your health stuff, uh, we're looking into um, apparently a, a doctor that you've seen, [U/I] 2003, uh, I guess the, the term is called cardiomegaly, I don't know if that's the term, but so Brandon told me, so we're trying to find those records. Uh, no luck on, on, uh, anything to do with the asthmatic stuff yet, but the pharma… you know, but the pharmacy…

                  [Voices overlap]

RANIERE:          [U/I] is all over pharmacies…

CHAKRAVORTY:      Yeah.

RANIERE:          [U/I] or Clifton Park, but it's also possible there is a place in Watervliet we got it, I don't know, but I think it was just Clifton Park or Latham, probably Latham at that time period.

CHAKRAVORTY:      So we called all the ones in Latham and Clifton Park and, uh, CVS and Rite Aid don't keep records past two years, but CDPHP didn't have

**Ex. D, p. 34**

EXHIBIT D-034

it, so, um, maybe they don't.

RANIERE:        Is there another HMO besides CDPHP in the Albany
                area?

CHAKRAVORTY:    I'm not sure, but I'll, I'll ask them and find
                out, I'll speak with Brandon and Danielle.

RANIERE:        Okay.

CHAKRAVORTY:    [U/I].

RANIERE:        All right, well, hopefully we figure it out at
                some point. Ay.

CHAKRAVORTY:    Uh.

RANIERE:        …uh, you know, because I don't carry my ailments
                with me, as a suffering thing, now I get hurt
                for it. [Laughs]

CHAKRAVORTY:    [Laughs]

RANIERE:        If I [U/I] I suffered all my life, it would have
                been…

CHAKRAVORTY:    It would have been different.

RANIERE:        Yeah.

CHAKRAVORTY:    I mean, I, I, I, I guess, well, [U/I].

RANIERE:        Yeah.

CHAKRAVORTY:    Uh, um…

EXHIBIT D-035

RANIERE:        I wonder if my childhood physicians, probably
                not alive or whatever, if they would have any… I
                don't think he diagnosed it as an asthmatic
                cough back then, though.

CHAKRAVORTY:    Huh.

RANIERE:        But I definitely had a hard cough.

CHAKRAVORTY:    Uh-hum.

RANIERE:        He was, he was a guy in Rockland County named
                Dr. Demarco.
                D-e-m-a-r-c-o.

CHAKRAVORTY:    Do you remember his first name… or not?

RANIERE:        No.

CHAKRAVORTY:    Okay.

RANIERE:        But he was in Suffern, Suffern, New York.

CHAKRAVORTY:    Okay.

RANIERE:        So… all right, yeah, I don't know, if they would
                just have that I have this, these coughs and
                these high fevers and sinus infections probably.

CHAKRAVORTY:    Uh-huh. Okay, we'll try to run down that lead as
                well.

RANIERE:        Yeah, and I think it was a Dr. Shore [ph] in
                Brooklyn when I was a little, little kid, but
                that was like, you know, 55 years ago or
                something, so.

**Ex. D, p. 36**

EXHIBIT D-036

CHAKRAVORTY:     Uh-huh.

RANIERE:         All right, well, we only have about 15 seconds
                 left, so say hello to everyone for me [chuckles]
                 I guess I'll speak to you guys Wednesday or
                 something.

CHAKRAVORTY:     Okay, be well, I will.

RANIERE:         Yeah, yeah, and then try to move on these
                 things, if possible, I know it's hard.

CHAKRAVORTY:     Yeah, we will, we will, we'll do our best.

RANIERE:         Okay, all right.

                 [END OF CALL]

EXHIBIT D-037

```
RECORDING:        57005177_Apr_08_2020_09_19_51_AM

DATE:             April 8, 2020

TIME:             09:19:51 AM

PARTICIPANTS:     Keith Raniere       [RANIERE]
                  Suneel Chakravorty  [CHAKRAVORTY]
```

EXHIBIT D-038

RANIERE:          Hello.

CHAKRAVORTY:    Hello.

RANIERE:          Hey, what's going on?

CHAKRAVORTY:    Uh, uh, not, not much. Uh, how are you?

RANIERE:          Uh, okay, there is a rumor this is going to go
                  on for another 14 days. From here.

CHAKRAVORTY:    What? Okay. Damn!

RANIERE:          So.

CHAKRAVORTY:    Okay.

RANIERE:          I'm not sure, but it sounds like it.

CHAKRAVORTY:    Okay, that's not, that's not good.

RANIERE:          No, it's not. What's, what's new on your end?

CHAKRAVORTY:    So new on our end here, uh, for the affidavit,
                  uh, I have a bunch of, uh, stuff from the
                  lawyers on different, uh, motions, so they can
                  compile that today.

                  [Voices overlap]

RANIERE:          Hold on, hold on.

CHAKRAVORTY:    Uh, getting…

EXHIBIT D-039

```
RANIERE:         Okay, I'm sorry about that… Go on.


CHAKRAVORTY:     Oh, okay, uh, as far as getting your cell phone,
                 uh, apparently that's, that's considered
                 contraband, um . . .


RANIERE:         Yeah, I just read an email from Marc. I wasn't
                 able to respond to any of them because since I
                 have to do this so quickly…


CHAKRAVORTY:     Okay.


RANIERE:         …uh, tell him I just… You can tell him I just
                 got his email this morning. I was not able to
                 respond, uh, but did read through them  quickly.


                 Uh, I think the phone is still my property. That
                 was… I don't think it was ever even subpoenaed.


CHAKRAVORTY:     Oh, okay.


RANIERE:         Um, so, you know and I… as, as far as pictures…
                 there is nothing there, I believe is considered…
                 I don't know, I mean, I guess they can try to
                 say certain pictures were considered illegal or
                 something like that, but, um, you know, uh, uh,
                 see what, see what he can do because that phone
                 has not been subpoenaed.


CHAKRAVORTY:     Okay, and I, I just need like screenshots of the
                 different messages during that specific date
                 range…


RANIERE:         Right.


CHAKRAVORTY:     …so.


RANIERE:         Right.
```

**Ex. D, p. 40**

EXHIBIT D-040

RANIERE:        So, and it's on WhatsApp and Telegram. There are things…

CHAKRAVORTY:    Yeah.

RANIERE:        …with respect to Sylvie that could be like… um, in something else, but, uh, the Telegram and the WhatsApp are the big… WhatsApp in particular, uh, but also Telegram. I think I…

CHAKRAVORTY:    Okay.

RANIERE:        …dealt with like Sean Bergeron in WhatsApp and a few other people like that. Not a lot, but you know.

CHAKRAVORTY:    Got it.

RANIERE:        It's definitely I used it… so.

CHAKRAVORTY:    Got it.

RANIERE:        And the government knows it.

CHAKRAVORTY:    Yeah, hmm, yeah, I guess, uh, the other difficulty is just them getting to the hard drive. Because [U/I] Marc is saying he may not be able to because I, I guess the office is closed or some… something like, so that, uh…

RANIERE:        Push as hard as they can.

CHAKRAVORTY:    [U/I]. Yeah.

RANIERE:        You know what I mean?

**Ex. D, p. 41**

EXHIBIT D-041

CHAKRAVORTY:     Okay.

RANIERE:        Keep on pushing.

CHAKRAVORTY:     Yeah.

RANIERE:        Don't stop.

CHAKRAVORTY:     I won't, yeah, I, I'll… okay.

RANIERE:        Yeah. Sorry about that, but…

CHAKRAVORTY:     Yeah. No, no, it's necessary, and I, I
                appreciate it. Uh…

RANIERE:        Anything else from judges?

CHAKRAVORTY:     Judges, we're speaking to to, uh, Ashley
                McMahan, she is a part of The Law Ladies today.

RANIERE:        Uh-huh.

CHAKRAVORTY:     I, I think it's the first call with her beyond,
                uh, Marc's like introductory [U/I] call.

RANIERE:        Uh-huh.

CHAKRAVORTY:     So we'll see how… where we're at with that, um,
                in a couple of hours.

RANIERE:        Uh-huh. I, I also read from Marc that the, uh,
                judge responded to the Motion 33, as, as we
                expected, saying that "Well, I guess the
                witnesses lied, the government, the government
                didn't know about it, and the evidence was so
                overwhelming."

EXHIBIT D-042

```
CHAKRAVORTY:    Wow. Wow.

RANIERE:        Yeah, what do you expect? This judge wants me
                away forever. Either he's been… he just wants it
                from his opinion or has been told that, you
                know, I, I lean towards he being corrupt, but
                I don't know.

CHAKRAVORTY:    It looks that way.

RANIERE:        Yeah.

CHAKRAVORTY:    [U/I].

RANIERE:        Yeah, I mean, it's, it's absurd, the major
                witnesses all lied. [Laughs] And they, they
                don't prove any of the points of the basic
                charges. Most, uh, uh, you know, not most of
                them. [Laughs] And yet, you know.

CHAKRAVORTY:    Yeah.

RANIERE:        It's, uh… How is Marc's attitude? Do you think,
                do you think he's riled up to…?

                [Voices overlap]

CHAKRAVORTY:    I don't think so. That's not my impression. My
                impression is, uh, more, more of the same, like
                intellectually upset, but, you know, more
                committed to working within the system and
                accepting this is how it is and…

RANIERE:        How?

CHAKRAVORTY:    [U/I]. That's my feeling, I don't… it's not
                based on a lot of data. It's just our
                interactions, and how, how he speaks, how we
                speak, um, he doesn't seem amped up to really
```

EXHIBIT D-043

                        push. But I mean, I could be wrong.

RANIERE:        Well, maybe he needs to hear that every once in
                a while, so you know, you sound just so mild-
                mannered and uh, you know, that seems, you seem
                intellectually upset, but really not emotionally
                behind this. Like a beaten puppy.

CHAKRAVORTY:    You know, it, it, it seems like that, and uh, I
                think Nicki spoke with him last weekend and
                conveyed that, and I think he got upset, so
                I've, I've been trying to like not…

RANIERE:        No.

CHAKRAVORTY:    …push too many buttons, but…

RANIERE:        No.

CHAKRAVORTY:    …uh, maybe [U/I].

RANIERE:        Maybe she is the one that has to deliver that.
                You you are the good cop. She's the bad cop, I
                don't know.

CHAKRAVORTY:    [Laughs] I, I don't, I don't even think I'm seen
                as the good cop, I'm just the okay cop, but…

RANIERE:        Yeah.

CHAKRAVORTY:    …but uh, I hope we'll balance it between us and
                keep on pushing as much as we can.

RANIERE:        Okay.

CHAKRAVORTY:    Um, as, as far as the other stuff, um, the
                podcast, we're moving forward with. It's taking
                a little longer than I thought, but I think
                we'll end up with something good within a few

**Ex. D, p. 44**

EXHIBIT D-044

<pre>
                    days with the teaser, and then hopefully over
                    the weekend, for the first, first episode…

RANIERE:        Uh-huh.

CHAKRAVORTY:    …and I guess iHeart to get, get like, uh, first
                [U/I] to help us with monetization. He has
                ideas, he's working over some of the
                correspondence, which you've done so far.

RANIERE:        Yeah.

CHAKRAVORTY:    I think, I think there is more, um, stuff
                missing there.

RANIERE:        Uh, Fritz has actually been spoken with?

CHAKRAVORTY:    He's been spoken with, texted with, [U/I] emails
                yesterday. [U/I], now it's like, uh, the danger
                zone of the follow-up, so I will, will keep on
                him for that.

RANIERE:        The danger zone of what?

CHAKRAVORTY:    Of the follow-up. [U/I].

RANIERE:        Oh, yeah, yeah, yeah. [Laughs] Yeah, by the way,
                be sure to send everyone my regards because I, I
                have such limited communication.

CHAKRAVORTY:    Yeah, I, I do and I, I will. I will.

RANIERE:        Yeah, I was, I was contemplating doing for a
                podcast, something on the Cami thing, but I have
                to tread because of appeal, because of love,
                because of prejudice and because of her family.
                So…
</pre>

EXHIBIT D-045

CHAKRAVORTY:    Yeah.

RANIERE:        I don't know, at, at, at some point I think I
                will. I might, you know.

CHAKRAVORTY:    Okay.

RANIERE:        But, you know, the, the thing is, and one of the
                things I mentioned is anything I say about my
                innocence won't be believed.

CHAKRAVORTY:    Right.

RANIERE:        So I may as well not try to protest, because
                then it sounds like, "Oh, he's protesting too
                much," or you know, then they'll try to
                criticize it, they are going to criticize what I
                say anyway, but at least try to separate the
                prejudice away from the, the law, you know.

CHAKRAVORTY:    Yeah, I know, that, that's the key point that
                people don't get. Even like lawyers don't get.

                [Voices overlap]

RANIERE:        Yeah, it's, it's, it's amazing and like for
                example, this judge saying the evidence is
                overwhelming. I mean, first of all I know the
                truth, so I know the evidence isn't overwhelming
                because it's untrue. But second of all I, I know
                what I've seen of the law and we… even with my…
                if you will, esteemed team has said and the
                evidence isn't overwhelming at all. It, it's
                just not. It's massively prejudicial.

CHAKRAVORTY:    It's non, it's non-existent.

RANIERE:        What?

EXHIBIT D-046

CHAKRAVORTY:    Yeah. It's non-existent.

RANIERE:    So, yeah, it's, it's crazy. Yeah, I feel like…

CHAKRAVORTY:    Yeah.

RANIERE:    …I'm definitely in an upside-down world.

CHAKRAVORTY:    You are in a, a, a Kafka "The Trial" or something. [Laughs]

RANIERE:    Yeah, could you find out from Marc when he's anticipating filing this next motion too, this broader one?

CHAKRAVORTY:    Yes, I will. I, I'll talk to him today on that.

RANIERE:    And also the jurisdic… the two other motions I would… you know, the narrow jurisdictional motion. Um, and the wisdom of filing that, which I believe there's not much downside. And then the broader issue of, um, does this new motion he's going to file, open the door for the new evidence motion?

CHAKRAVORTY:    Okay, I'll, I'll ask him those questions today.

RANIERE:    Yeah, all three of those things.

CHAKRAVORTY:    Oh, uh, okay, yes, yes there were three. [Chuckles]

RANIERE:    Yeah, so, I, um, yeah, I don't know what to say, you know, it just feels like no matter what we say, ha, he, he will defend… I mean that the prosecution didn't know about it is an absurdity.

EXHIBIT D-047

CHAKRAVORTY:     Yeah, I think that's why the affidavit is really important for this. I wanted to ask you like on a timing stuff, like what should we be thinking timing-wise because some of these things are uncertain.

RANIERE:        Well, first of all, we get this all done, we get this ready to go. Okay, so it's ready to go out the door, including the podcast, including the affidavit, including the challenge, you know…

CHAKRAVORTY:     Okay.

RANIERE:        …and then we decide to strategically release them depending on how the media and all is. We do also want to get some media signatures on the petition.

CHAKRAVORTY:     Yeah.

RANIERE:        Because first, first we get the affidavit, [U/I] the petition and then we go…

                [Voices overlap]

CHAKRAVORTY:     Yeah.

RANIERE:        …with the follow up.

CHAKRAVORTY:     Understood.

RANIERE:        So,  Okay, uh, I'm… trying to think if there is anything else right now. What else do you know?

CHAKRAVORTY:     Uh, I think that, that was it from, that was it from, from my end. Uh, I guess there was one, one thought just, uh, on how we can communicate better, like that the challenge is just [U/I]

EXHIBIT D-048

the prosecution case [U/I].

RANIERE:        The challenge is what? I can't hear you, I think
                you're walking.

CHAKRAVORTY:    Oh, no, I, I, I, uh…

RANIERE:        You're what?

CHAKRAVORTY:    …I [U/I] a little bit. Oh, no, I was just saying
                that with, with judges, one, one thing that
                they, uh, uh, seem not to get is that this is
                just checking the prosecutor's homework, like
                they can't wrap their mind around it yet, so I
                don't know if you have [U/I] metaphor or any way
                that we can [U/I] better, [U/I] think about it.
                Uh, we [U/I] definitely, that's, that's the
                [U/I] for them to grasp.

RANIERE:        Okay. I'm having a lot of trouble hearing you
                because there seems to be a, a lot of
                interference and it almost sounds like you're
                either walking or there is wind or something, I
                don't know.

CHAKRAVORTY:    There was a little wind because I just got out
                of the car, but now, is it better?

RANIERE:        Oh, yeah, much.

CHAKRAVORTY:    Okay, sorry.

RANIERE:        It's like everything is clear. So what's the
                thing they, they can't get? That they're
                checking the prosecutor's homework, so to speak?

CHAKRAVORTY:    Yeah, they think, is that like, like that
                concept is, is a very narrow challenge, but they
                think they have this big really hard thing
                that's going to take a lot of time, and that

EXHIBIT D-049

```
                     thing is just checking the argument itself,
                     [U/I]
```

RANIERE:          Or maybe…

CHAKRAVORTY:      …it's been done and…

RANIERE:          …well maybe asking them that. So, you know, here
                  is the, here is the problem that you, you may be
                  able to help with. Some people are potential
                  judges, even lawyers of esteem, you know, see,
                  this is a massive problem when it's actually
                  checking the prosecution's homework. I like that
                  phrase very much… you know?

CHAKRAVORTY:      Okay.

RANIERE:          And really, it's much more narrow than that
                  because this is so absurd. You know this is,
                  this is like checking a, you know, a murder case
                  that doesn't have a body, doesn't have a weapon,
                  you know, and they established the motive that's
                  shown to be false.

CHAKRAVORTY:      Got it, okay… Okay, we, we will, uh, try that
                  today.

RANIERE:          And there, there is certain things… What?

CHAKRAVORTY:      I said, we'll, we'll try that today with, with
                  Ashley, potentially.

RANIERE:          Yeah, yeah, good, because, uh, yeah, I'd like to
                  get some of these people ready and, and they
                  should know that they'll have help too. So in
                  other words, if there is the… the more mundane
                  eliminations that can be done, which… of people
                  that actually, uh, feel they've solved it, which
                  it's hard to imagine they would. Um, if, you
                  know, they're going to have very few that, uh,

**Ex. D, p. 50**

EXHIBIT D-050

actually come up to them.

CHAKRAVORTY:     Yep.

RANIERE:        You know, some… you'll even have some people
                say, "Well, it's interesting because she's, uh,
                she travelled from Brooklyn to Albany." Well,
                that's not true. I mean, it's, it's… that's
                true, but that doesn't make it interstate.

CHAKRAVORTY:     Right, yeah. [Chuckles] We're on the same page.

RANIERE:        You know, or, uh, it's interstate because when
                she was young, she lived in Arizona. That
                doesn't make it interstate either, you know.

CHAKRAVORTY:     Yeah.

RANIERE:        So, yeah, it is, it is disturbing about the
                Motion 33, even though it's exactly what we
                expected… to see, to see such a big splat-out is
                crazy.

CHAKRAVORTY:     Exactly. I didn't know that, that things were
                like this in actuality, you know, because it's
                like a movie, but it's, way worse, because it
                was real.

RANIERE:        Yeah.

CHAKRAVORTY:     Uh…

RANIERE:        Yeah, and I'm, and I'm looking, you know, I'll
                be in here for the rest of my life if we don't
                do something. Or… and the rest of my life might
                not be that long considering the way things are
                in here, you know. Once I get to a, a
                destination point, because I'll go to a pen.

**Ex. D, p. 51**

EXHIBIT D-051

CHAKRAVORTY:    Huh.

RANIERE:        So.

CHAKRAVORTY:    Yeah.

RANIERE:        So we gotta get… we, what we have to do also is get scrutiny on this judge, get some pundit who is willing to speak out about what this judge is saying, which is crazy, and the judge needs to know he's being watched…

CHAKRAVORTY:    Yeah.

RANIERE:        …by someone who is wise.

CHAKRAVORTY:    Yeah.

RANIERE:        So. Now we gotta figure out the next step with Dershowitz.

CHAKRAVORTY:    Yes, okay.

RANIERE:        All right, but we have left, we have five seconds, so, I guess I will, uh, speak to you Friday.

CHAKRAVORTY:    Okay.

RANIERE:        Okay, bye.

EXHIBIT D-052

```
RECORDING:              57005177_Apr_24_2020_13_28_02_PM

DATE:                   April 24, 2020

TIME:                   1:28 P.M.

PARTICIPANTS:           Keith Raniere            [RANIERE]
                        Suneel Chakravorty       [CHAKRAVORTY]
```

EXHIBIT D-053

CHAKRAVORTY:     Hey Keith

RANIERE:         Hey, that's the third call.

CHAKRAVORTY:     Oh, this is the third one? The first one I got
                 but I was on another call and I tried to switch
                 to you, and by the time I switched you were
                 gone.

RANIERE:         Ah. Yeah, no it rolls over to answering and then
                 there's a pattern like that. I sort of think it
                 blocks you from picking up.

CHAKRAVORTY:     Oh. Sorry about that.

RANIERE:         So, how are things?

CHAKRAVORTY:     Things are… uh, things are good, I think. Um, on
                 the podcast, there we have a teaser out to one,
                 one person that David was going to get feedback
                 on today.  The producer?

RANIERE:         Yeah.

CHAKRAVORTY:     And then if that's good, [U/I] send to iHeart
                 and start that process.

RANIERE:         I, I have a terrible thing about the teaser.

CHAKRAVORTY:     O.K.

RANIERE:         I might have a better way even to do it.

CHAKRAVORTY:     [Laughs] O.K.

RANIERE:         Here's what I imagined.  And a lot of my ideas
                 are either ridiculous, over the top, not usable.

**Ex. D, p. 54**

EXHIBIT D-054

So, you'd run the idea by before, but it would be pretty easy to produce. Pretty much the same way. You know how you start with… you know, uh, the stuff you had said at one point. You guys were going to start with like newscasts and stuff? Are you still doing that sort of a collage of like newscast stuff?

CHAKRAVORTY: Yeah, we have some clips of that. Yeah.

RANIERE: O.K. So if you have that sort of a thing and either right after that or maybe having the woman's voice in there, then have another collage of news-seeming type things. But now it's all the things, like, um, you might have me saying "This is untrue and a fabrication." And then it says, "The media has gone crazy" and then someone else says "Over 10 million dollars has been placed to, against him. The judge says all of the witnesses have lied. Because of all these different, uh, things about what happened. You know in the middle of key witness testimony, she was just dismissed. You know, all different newscasters saying like the crazy stuff, including some of the crazy conditions that I lived in here.

CHAKRAVORTY: Hmm.

RANIERE: So, it sounds like something awful from a third world country which is exactly what it's like, and then, you know, maybe it even stops with the like sound of a gavel, or something like that. And then I say, I've been convicted of crimes I didn't commit and I'm innocent. You know, something like that.

CHAKRAVORTY: That's awesome. The second collage, do those exist or those are ones you create?

RANIERE: No, I think you'd have to create them, but use factual things. Including, for example, the judge in his, uh, response to Marc's last motion

EXHIBIT D-055

said the witness has lied.

CHAKRAVORTY:     Wow.

RANIERE:        So, what does that mean. The judge did say that all the major witnesses in Mr. Raniere's case lied.

CHAKRAVORTY:    Wow. I love it.  I think it's also…we just need to see some voiceover people do [U/I] that kind of stuff.  I think it's perfect.

RANIERE:        Yeah. Well, ask David. You know, you guys have a better feel, so you bring about all this controversy about me, then you bring up what happened. Including, you know, here it is, there's no power and no heat. Right? And it's actually.  I'm in the cell that the wind hits directly. There's the heavy winds. Wind chill factor of 40 below zero. The two coldest times, the polar vortex or whatever. The two coldest days. We had no power and no heat. Uh, you know water was freezing in my room and in the toilets. You know.

CHAKRAVORTY:    Hmm.

RANIERE:        There's the, but even comments like that. And one comment would be, and I think it should be some of the controversial stuff you know. Richard Donoghue, head of the Eastern District of New York, lied to the press today saying there were forced abortions.

CHAKRAVORTY:    Wow.

RANIERE:        Right?

CHAKRAVORTY:    Yeah.

EXHIBIT D-056

RANIERE:        And another voice says, uh, the prosecution tampered with evidence. Take some of the stuff off the affidavit.

CHAKRAVORTY:    Wow. O.K. I will convey, I will convey that… I was thinking about….

RANIERE:        So that's, uh, that's just one of my crazy thoughts.

CHAKRAVORTY:    It's definitely, it's definitely crazy, in a good way.  So, I'll ask for the… see I know, I know David doesn't like the, the things that are like more "woe is me," like you're badly treated, but people should care but apparently people, you know… but I think everything else.

RANIERE:        Well, it's not, it's not "woe is me", it's just the craziness of even what happened. Unfortunately, well fortunately David wasn't here. But, uh, no, I mean, uh, people could know that within the prison of the United States, you know, this sort of thing could happen. It doesn't mean you have to put those in. But the purpose of those things is not "woe is me". The purpose of those things is to illustrate conditions that people wouldn't believe. That are…

CHAKRAVORTY:    Right.

RANIERE:        And you can tell him that. That are… and you can tell him this.  That are as fantastical as the story against me. And I use that word fantastical. You know what I mean?  It's much harder to deflate a story with the banal, boring truth. But if you take the crazy aspects of the truth. People wanna… "Oh, my God that's even crazier, you mean all that stuff is not true?."
                 "This is what's true!  Oh, my God". You know what I mean?

EXHIBIT D-057

CHAKRAVORTY:    Yeah. Yeah.

RANIERE:        So, creating that effect might help. Maybe not.

CHAKRAVORTY:    O.K.  Cool.

RANIERE:        So, uh, I had another potential podcast thing I
                tried to [U/I]. Do you have anything on your
                side?

CHAKRAVORTY:    Um, on the podcast? Uh, not, uh, no.

RANIERE:        Judges? Anything?

CHAKRAVORTY:    Oh, uh, judges, we're speaking with Ashley today
                at 5:00, Marty [U/I], who was a formerly
                wrongfully-convicted lawyer tomorrow, ah, [U/I]
                just responded to me by email that she has some
                personal and professional tragedies right now
                and she'll write soon more….so I'll….

RANIERE:        She what?  What did she say? Some personal
                tragic…

CHAKRAVORTY:    She's been dealing with that and sorry for not
                responding and she'll write soon, she'll write
                more soon.  And then, we'll see. After that.

RANIERE:        Alright, alright, so it sounds like she's still
                open.

CHAKRAVORTY:    Sounds like she's still open and she said that
                she would need income, though, so we can maybe
                figure that out with her.

RANIERE:        Ah, O.K. Alright.

EXHIBIT D-058

CHAKRAVORTY:     And we're going to try to meet with Nicole sooner than, what we initially scheduled for a follow up.

RANIERE:     Good.

CHAKRAVORTY:     So that's all… that's all I'm…

RANIERE:     Well, we got, we have to have an urgency

CHAKRAVORTY:     Yes, absolutely.

RANIERE:     So.  Alright, um, should I do a little podcast?

CHAKRAVORTY:     Absolutely. I'll give you the countdown. 3-2-1. Go.

RANIERE:     This next part talks about fear and the "like me" disease. There's a system that's currently in and actually compromises…comprises most of our justice system. And that is the system of judges, prosecutors and defense attorneys. Often we've seen on T.V., you know, two attorneys are going at it in court, you know, one against the other, and then, afterwards, they go out and, you know, play tennis or have, you know, 18 rounds of golf or whatever it is together, 18 holes, and, uh, you know,  they're friends. And that is actually a wonderful demonstration that in a game, in a contest, you can be really opponents, going after each other the best you can within that contest and yet still be friends. And this is very, very important.

But that can be perverted, that can be abused. When you're playing a game with someone, or in some sort of professional contest, and the person does something that is immoral. The person does something that demonstrates not their character within the game as being aggressive or strategic or whatever but

**Ex. D, p. 59**

EXHIBIT D-059

literally their morality about the game. For
example, if you're playing some sort of a game,
say you're having a chess match with someone and
you see that they cheat and there's actually a
lot on the line. Maybe even, you either put up
money, or there's, I don't know, it's a big
tournament and this person has illustrated to
you that they're willing to sacrifice the honor
of the game, just to win. That, by moral
necessity, should change the way you treat them
in the outside world. So, if there are two
attorneys in a court of law and one attorney
does something that is immoral that doesn't mean
that outside of the court of law they're
automatically friends and it's as if nothing had
happened.


Because if you're in a contest with someone and
you're both acting morally and you're both
uphold…, and you're both upholding principles,
that upholds the humanity and the connection
between you. I mean, for example if I have, you
know, an opponent that's doing incredible things
and really decimating me, you know, and
strategically maybe duping me and doing all
these things, but it's all within the way the
game works, all within the rules, then I admire
them more. And afterwards, it's fantastic, I'll
just be in awe of them. But by the same thing,
the same token, if that opponent is doing things
that are immoral, that are just really base,
then after the game I…I don't really want to
associate with them anymore.


But in the system of defense attorneys,
prosecutors and judges, you know they go to
conferences together. They often have parties
together, Christmas parties together and things
like that. And there is a "like me" disease. And
it's interesting with, between prosecutors and
defense attorneys, often defense attorneys were
prosecutors and they have a type of horse-
trading that goes on. In other words, if the
defense attorney, if they have a client that's
guilty and going to plea, they help that client,
they make the whole thing go easier that makes
the prosecution like them more, so that when

EXHIBIT D-060

they need another favor down the road, they can
get that favor. This is because they start
trading favors, and when you listen to them
speak, when you listen… even defense attorneys
speak, sometimes your mouth just drops open.
When you start looking at, they're talking about
favors, they're talking about horse trading,
they're talking about having the prosecution
like them, or upsetting the prosecution or
things like that and the truth of the matter is
the prosecution should not have emotions about
the case. And there should be no fear of
upsetting the prosecution.

Likewise, with the judge. Unfortunately, in our
society now, judges, judges are seldom
criticized, you seldom see them criticized in
the media, people seldom talk about their errors
and things like that. They are held in a
position that is above even the President's type
of power. It has very little check and balance,
except for the appeals process. But it's
interesting. There's a person, Preet Bharara,
who was head of the Southern District at one
point. He even said that there are corrupt
judges. Some judges are corrupt. And some of the
consultants we have had, had, said things along
the lines that, it doesn't matter, we don't have
to be able get to any judge.

The thing that people do that is dishonest is
they get the case in front of a judge that they
have positioned within each of the circuits. So,
there are some judges that are corrupt, within
the circuits, including in the appeals courts,
and they just make sure that cases go in front
of those judges. Those judges that are moveable
or those judges that are even in some cases
buyable and things like that and judges are
never questioned.

Now if a judge is, I mean, if you look the way a
judge is elected you know they're elected, they
look at their backgrounds and things like that
but there's not rigorous psychological testing
done, moral testing, things along those lines.

EXHIBIT D-061

**Ex. D, p. 61**

And especially… let's suppose you have a judge who's a very nice person, but very immature. When that judge gets on the bench 20 years later, they could become a little tyrant. And some judges are. My judge in particular shows a lot of emotion on the stand. And some people might say, "well, I don't know. That's maybe good." But think about it. A judge should be completely stoic. If there's a piece of evidence that comes up, and the judge, like in my case, with my judge shows the disgust, it almost looks like the judge is about to retch, what does that say to the jury? And that's not in the transcript, that's not anything that anyone measures at this point.

It should be that every single court case is videoed, it doesn't cost a lot right now and judges need to be evaluated. Because a judge is put in their seat, and it's a lifetime appointment, and they can really go astray. And some judges really have. So, we need to question judges and we need to stop the social nature between prosecutors, defense attorneys and judges and turn that into more of a moral interaction.

CHAKRAVORTY:     Hello?

RANIERE:     Hello? So, I was a little bit on a soapbox there, but then I realized we were running out of time.

So, we have less than a minute. So I hope…I could go on about that subject; that's the social club of defense attorneys, prosecutors and judges.

I might have called them prostitutes by accident [Laughs]. Prostitutes! Well, yes, they are. So. Thirty seconds. Anything else?

Did you get… did you get through to Marc?

EXHIBIT D-062

CHAKRAVORTY:    Uh, nothing… yes. So I got through to Marc. He's
                going to send me a motion he said today. He
                asked about the sentencing memo. I told him your
                [U/I] situation…

RANIERE:        Right.  We have 10 seconds. You may want to
                somehow become his client, so you'll have
                attorney client privilege. But I mentioned that
                in an email to him just a few minutes ago.

CHAKRAVORTY:    Roger that.

RANIERE:        Alright.  Goodbye.

                [END OF CALL]

EXHIBIT D-063

```
RECORDING:              57005177_Apr_27_2020_10_07_26_AM

DATE:                   April 27, 2020

TIME:                   10:07:26 A.M.

PARTICIPANTS:           Keith Raniere [RANIERE]
                        Suneel Chakravorty [CHAKRAVORTY]
```

EXHIBIT D-064

```
CHAKRAVORTY:   Hey, Keith.

RANIERE:       Hey, what's going on?

CHAKRAVORTY:   Uh, uh not much. Just, uh, getting started with
               a few things.  How are you?

RANIERE:       Well, O.K. Not much? What do you mean "not
               much"?

CHAKRAVORTY:   Oh, I mean, I don't know, I just, uh, maybe it's
               like a bad phrase. I was, I was writing a little
               bit of code actually.

RANIERE:       Oh, O.K. That's for your business. Yes?

CHAKRAVORTY:   That's just for my business.  Pay, pay some of
               the rent. I guess that's what I meant by not
               much. Yes on the [U/I]

               [Voices overlap]

RANIERE:       What does your business do exactly?

CHAKRAVORTY:   Um, right now I'm just doing some consulting.
               So I'm consulting on some data science projects,
               and getting a better, uh, R & B or like
               prototyping for, uh, for some software products.
               Like, uh….

RANIERE:       Do you do mainly software consultant type stuff,
               or is it more generally mathematical type
               consulting? [U/I]

CHAKRAVORTY:   70/30. It's 70 software, 30 math and stuff.

RANIERE:       Uh, huh. O.K. Do you do operations research type
```

**Ex. D, p. 65**

EXHIBIT D-065

                              stuff and things?

    CHAKRAVORTY:      Um, no, it's, it's mainly like product
                      development, so, uh, I'll… like in this case I'm
                      looking at some data sets, doing, uh,  building
                      some predictive models and seeing if it hits the
                      you know enough accuracy and then, if it does,
                      productionize it and put it up in the cloud.


    RANIERE:          I see. I had an idea. You know, there's the
                      trailer. Does the trailer… 'cause, I haven't
                      heard this.  Does it have the challenge in it?


    CHAKRAVORTY:      [Clears throat] Currently it does not. I, um…


    RANIERE:          I, I think there should have a separate trailer
                      for the challenge. And you know, instead of,
                      uhm, you know, maybe have a collage of, what you
                      might call testimonials. But they're more
                      reactions to the data. Finding out about what
                      people will find out about when they do the
                      challenge.  You know, "when I did the challenge
                      and then when I saw the additional data", blah,
                      blah, blah, blah.  "I read…", "I couldn't
                      believe…", "I was totally sure", you know, "if
                      this is true, this is unbelievable." You know,
                      you know, just, a whole bunch of things like
                      that.


    CHAKRAVORTY:    Yeah, O.K. that's cool. Yeah, definitely.


    RANIERE:          Can you really resist knowing? You know, that
                      sort of a thing?


    CHAKRAVORTY:    Yeah, cool.


    RANIERE:          Forbidden knowledge. You know?


    CHAKRAVORTY:    Yeah, I… that's awesome. Um, cool and it sort of
                      parallels the current [U/I] too in some ways.
                      Like what you think but like what it really is.


**Ex. D, p. 66**

EXHIBIT D-066

Cause it's like, you know…

RANIERE:    Oh, it's. O.K. Yeah, yeah, because those are the things that draw people, the difference like that.  Oh my God, they show some sort of late night commercial or something. You know, just a bunch of people going, "Oh. Oh, my goodness I can't believe…. "No, you're kidding". You know, come and see what they're all talking about. So they [U/I] and if it's, you know, it's an infomercial for a tricycle, or something.

CHAKRAVORTY: Yes.  Are you're thinking of this as an audio trailer or potentially a video trailer?

RANIERE:    Oh, I don't know. I mean you guys decide I think it has to be done quickly, so I have no idea.

CHAKRAVORTY: O.K.  O.K. Got it.

RANIERE:    So what else? Other news on judges, things like that.

CHAKRAVORTY: Yes, I can give you…I got a rundown ready for you. So, judges, um, no word from Sima yet. I emailed her on Friday. I'll call up again today. Um, Ashley, uh, Marc E. is calling over today. She hadn't responded.  She had like a family sickness so she might just be out for that. This weekend she was. Um, we have a call with Lisa who's an attorney this afternoon at 3:00. And Mary hasn't responded to any of the last couple of attempts so I'm going to speak with Marc and see what we can try or what, what an option is, but, uhm,  and then Nicole she was going to read through that stuff yesterday so today Marc going to touch base and  schedule, uhm, a follow up, sooner than Thursday ideally.

RANIERE:    I wonder if Mary's somehow not getting the communication or something. 'Cause I mean, you would think she'd at least say, stop calling me.

**Ex. D, p. 67**

EXHIBIT D-067

CHAKRAVORTY:    Yeah, hmm. You know, we could call or try from a
                different email or something. Yeah.


RANIERE:        Or say, you know what, please, just tell us to
                stop.  I, I have a joke about attorney classes
                that they have to take and excel at. And the
                number one. One is the response class. They have
                to learn to not respond. So like you have a
                class of students and the teacher asks a simple
                question. Someone raises their hand and they
                immediately are punished and disciplined. No,
                you can't respond. The very final exam is, you
                know, the whole side of the classroom is blown
                out with a bomb and they just have to be just
                like something happened. So what it is… Yes,
                unresponsiveness.


CHAKRAVORTY:    It is impressive, I haven't encountered that in
                the software world at all. People are you the
                opposite, they response like within minutes.
                That's the way it is.


RANIERE:        What's it?  What? Who responds within minutes?


CHAKRAVORTY:    Like in the tech startup world people respond
                very quickly. You know, I found it to be the
                opposite of, like, the lawyer situation.


RANIERE:        In which world? I'm not hearing.


CHAKRAVORTY:    Oh, sorry in the tech startup world.


RANIERE:        Oh, yeah, yeah, yeah.  And then there's another
                one about derrière osculation.


CHAKRAVORTY:    Derrière osculation?


RANIERE:        Derrière osculation. Butt-kissing.


**Ex. D, p. 68**

EXHIBIT D-068

CHAKRAVORTY:    [Laughs]. Yeah, I was. I got the derrière.

RANIERE:        So, yeah, uh, osculation is the general term for kissing.

CHAKRAVORTY:    Oh, O.K.

RANIERE:        You walk into that class and it has one of these CPR type dummies except it's just that part. And it's like someone with a clipboard there and they're doing like, you know, uh, some sort of skills evaluation test. You know things like that. And then there's another one, they are… there's a whole bunch of little chicks in a box and they all have to watch the chicks and then eventually each of them get a chick of their own that they have to study and you know, do a complete chick study. And be like the chick and understand the chick. You know?

CHAKRAVORTY:    [Laughs]

RANIERE:        Study of being a chicken. And then there's another one where there's a limbo pole and they're doing what looks like limbo, and it's groveling.

CHAKRAVORTY:    I was thinking finalist or something. But yeah,

RANIERE:        Yeah, so. So, the legal studies.

CHAKRAVORTY:    Uh, huh. Got it.

RANIERE:        So, um, yeah, I was also going to do a continuation of the last one, with the prosecutors, judge, uh, defense attorney system. I'm going to talk more about the judge. Cause I think…you know, I think part of the, the thing when someone gets into… takes the challenge and then gets into our world where they get the

EXHIBIT D-069

additional data that was never allowed in court, goes through the judge's decisions and they can vote on them. You know what I mean? So in other words they can read the data, the decision. Maybe even some of the basis, like when it's a hearsay thing or something, what the hearsay rules are so they can actually, um, learn about that and then, you know, take… look at the decision and say, was this a good decision or a bad decision. Do they think the judge, you know, a good judge, a bad judge, a corrupt judge. You know what I mean? So.

CHAKRAVORTY:   You want to do the countdown? Sorry.

RANIERE:       What? Do the countdown whenever.

CHAKRAVORTY:   3-2-1 go.

RANIERE:       In our society judges are held out in a very special way. As they should be. I believe it was around the turn of the century judges were actually exempt from taxation, because it was believed if they were part of the taxation system it would impart a type of bias to them. In a sense judges have to be impervious to politics, to all sorts of different things so that they can stay in a very stoic and pristine state to be able to execute justice and be the voice of the law.

               But sadly it is impossible to have that sort of a pristine state, especially in the age of global media, social media, the politics that go on and the intense nature of what some of the decisions mean. Some of these decisions literally weigh on world businesses and do all sorts of things. If you look at the Arthur Anderson business that is 85,000 people that were, essentially, displaced because of legal things, because of criminal things that just weren't true.

EXHIBIT D-070

So there needs to be an evaluation of judges.
Judges tend not to be evaluated in media, and
it's interesting even apparently in social
situations, you know, when people are speaking
to a judge, there's all these different
concerns. As there should be. You know, you
don't want to influence a judge, you don't to be
seen as trying to influence a judge, even
accidently.

Uh, in some ways maybe judges shouldn't be in
social circumstances like that. Should a judge
be able to socialize? Should a judge have these
things? Well, if you want a human judge, there
needs to be a way to allow, not only judges to
do these things, but to evaluate the judge.
There needs to be a judgement of the judges,
beyond the appeal court.

One of the things that can happen, what I
learned from my trial. If I were a judge now I
could go and sway a verdict. If I were corrupt
or if I were biased from the beginning, I could
sway in the jury selection, because I would
knock out certain jury members. I would also
sway, throughout the whole thing, my reaction to
the evidence, my reaction to the different, the
prosecutors, my reaction to the defense attorney
my reaction to even the defendant. By making
that evidence I impart a bias upon the jury and
in my particular case, my judge is a very…
people call him a mercurial judge, he switches,
he has these emotional reactions, rolling his
eyes which affect the jury. And, yes, a judge
can affect the jury. Somedays there may be an AI
that either aids with the judge or replaces the
judge that really helps with these things. But
the scariest thing that was every told to me and
has been told to me and has been told to me
several times over the past 20 years is, not
only the fate of what will happen to me and the
fate was always they will create public outrage
in the media and it will be untrue but it

EXHIBIT D-071

doesn't matter, that public outrage will cause
political pressure which will cause pressure on
the justice system.  They will indict you, they
will convict you, they will put you in prison
for life and in prison it's possible you will
reach, have a very bad demise. And it's pretty
awful some of the things that were told to me.

And some of the things that happened that showed
that to be true and showed that we don't have
what we think of as a justice system. There's a
whole… a lot of people do have a certain degree
of justice in the justice system. But there is a
channel where the whole justice system can be
circumvented, perverted and used. And it appears
that is true. You know, what I was told is that
these people who are the political pushers of
judges and media, they don't need to be able to
influence a particular judge.  All they have to
do is influence the judge assigned to the case.
So if they have a certain number of judges that
are under their control in the Second Circuit,
all they have to do is make sure that your case
gets in front of one of those judges. And when
those judges make bad decisions all they have to
do is make sure that your case gets in front of
the appropriate appeal board. And they don't
have to affect all of the judges. At all. And
that's one of the difficult things. So, if I
were the sort of a judge who made all of these
faces and I had all sorts of reactions, and I
influenced the decision, if you looked at my
transcript it would look completely legitimate
from an appeals perspective. It would look very
legitimate because you wouldn't see the
intonations. You wouldn't see the faces and
things like that, that I..I did.

CHAKRAVORTY:    Hello?

RANIERE:    Hey, so we only have a few seconds or a half of
            minute so I stopped. Alright, anything else
            that's important? I'll probably call on
            Wednesday from what it seems like. Monday,
            Wednesday, Friday.

EXHIBIT D-072

```
CHAKRAVORTY:    Sounds good, I'll follow up with the trailer and
                then he's trying to sort through legal logistics
                and what we can post in the challenge, what
                transcripts.


                [END OF CALL]
```

EXHIBIT D-073

Exhibit E

NS:TH
F. #2017R01840

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

      - against -                 Docket No. <u>18-CR-204 (S-2) (NGG)</u>

KEITH RANIERE,

         Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - X


THE GOVERNMENT'S SENTENCING MEMORANDUM
<u>AS TO DEFENDANT KEITH RANIERE</u>


                          SETH D. DUCHARME
                          ACTING UNITED STATES ATTORNEY
                          Eastern District of New York
                          271 Cadman Plaza East
                          Brooklyn, New York 11201


Tanya Hajjar
Mark J. Lesko
Karin Orenstein
Assistant U.S. Attorneys
    (Of Counsel)

## PRELIMINARY STATEMENT

For fifteen years, the defendant Keith Raniere was the leader of a criminal enterprise based in New York. Raniere recruited individuals into organizations he founded, purportedly for their own benefit, and then exploited them—for power, for profit, or for sex. The sentence imposed on Raniere should reflect the immeasurable damage he has done to his victims. To protect the public from the defendant, and to justly punish his years of crime and exploitation, the Court should impose a Guidelines sentence of life imprisonment.

Raniere's post-conviction conduct reflects his total denial of culpability for the crimes of which he was convicted. While in prison, Raniere continues to regularly contact his supporters and has expressed contempt for his victims, the prosecution, and the Court. Raniere's complete lack of acceptance of responsibility also counsels in favor of a sentence of life imprisonment.

For the reasons set forth below, the defendant's challenges to the Presentence Investigation Report ("PSR") are meritless, and the Court should adopt the PSR's Guidelines calculation and recitation of the relevant facts. The government respectfully submits that the applicable Guidelines range and the relevant factors under 18 U.S.C. § 3553(a) warrant a sentence of life imprisonment. The Court should also order payment of restitution and a fine.

<u>BACKGROUND</u>

The Court is familiar with the offense conduct in this case, having presided over the defendant's six-week jury trial in May and June 2019. The following factual summary is intended to provide an overview sufficient to situate the government's arguments with respect to sentencing in the relevant factual context, but not to provide a comprehensive recitation of all aspects of the offense conduct proven at trial.

In 2018 and 2019, Keith Raniere and five co-defendants were indicted for racketeering, racketeering conspiracy and related crimes, including sex trafficking, forced labor, alien smuggling, identity theft and extortion. On June 19, 2019, Raniere was convicted of all seven counts (and all eleven racketeering acts) submitted to the jury.[1] Raniere's convictions fall into the following categories of illegal conduct:

    i.    Sexual exploitation of Camila (Jane Doe 2);

    ii.    Alien smuggling and visa fraud;

    iii.    Trafficking of Daniela (Jane Doe 4) for labor and services;

    iv.    Unlawful surveillance of individuals believed to be enemies of Nxivm and of Raniere;

    v.    Obstruction of justice;

    vi.    Sex trafficking, wire fraud, and extortion related to DOS; and

    vii.    Identity theft related to tax evasion.

---

[1]    The other five defendants pleaded guilty.

I.    Offense Conduct

The evidence presented at trial demonstrated that for over a decade, Raniere led a criminal enterprise ("the Enterprise") and relied on an "inner circle" of individuals to carry out his orders.  PSR ¶¶ 36-41.  Raniere and his co-conspirators recruited individuals into various purported self-help organizations that Raniere founded, including Nxivm and affiliated programs, and DOS.  Id.; see, e.g., Trial Transcript ("Tr.") at 619-24 (testimony of Mark Vicente regarding Nxivm recruitment strategies); id. at 1619-20 (testimony of Lauren Salzman that Raniere preferred DOS recruits to be individuals "in positions of power and influence").

Raniere demanded absolute commitment from those he recruited and those within his inner circle, including as to his teachings and ideology.  PSR ¶ 38; see, e.g., Tr. at 308 (testimony of Sylvie that "a lot of the time it doesn't make any sense but we all just would agree . . . . it was so rare that someone would disagree with [the Nxivm curriculum], so rare"); id. at 502 (testimony of Vicente that "one couldn't question the higher ranks and questioning [Raniere] was seen as a very, very bad thing"); id. at 1875 (testimony of Lauren Salzman as to shunning).  Raniere and his co-conspirators maintained control over the Enterprise by, among other means, obtaining sensitive information about members and associates of the Enterprise; inducing shame and guilt in order to influence and control members and associates of the Enterprise; isolating associates and others from friends and family and making them dependent on the Enterprise for their financial well-being and legal status within the United States; and encouraging associates and others to take expensive Nxivm courses, and incur debt to do so.  PSR ¶ 38.  Members of the Enterprise recruited and groomed sexual partners for Raniere, both within and outside of DOS, and many were

Ex. E, p. 4

themselves in sexual relationships with Raniere that involved pledges of loyalty, penances for "ethical breaches," and collateral.  PSR ¶ 39.

     i.    <u>Sexual Exploitation of Camila</u>

In September 2005, the defendant began a sexual relationship with Camila, then a fifteen-year-old child.  PSR ¶¶ 60-64; Tr. at 3457-65, 3524; Government Exhibit ("GX") 1400-44; <u>see also</u> GX 301-R (appended to this memorandum in Exhibit A).  Camila and her family had arrived in Clifton Park at the defendant's invitation, and he arranged for her to work as a maid in Nancy Salzman's house, which was a distance away from her siblings.  <u>See</u> Tr. at 2465-2473 (Daniela's testimony).  Camila lived in a house with other members of the Nxivm community, including Monica Duran, a woman who—like Camila— would later become a first-line master in DOS.  <u>Id.</u>

On November 2, 2005 and again on November 24, 2005, the defendant took photographs of Camila constituting child pornography.  Several of the photographs depict Camila lying on a bed fully nude.  At least five photographs depict close-ups of Camila's genitals.[2]  PSR ¶¶ 60-64.

     ii.    <u>Trafficking of Daniela</u>

As proven at trial, between March 2010 and April 2012, Raniere, Lauren Salzman, and others trafficked Daniela for labor and services by confining her to a room for nearly two years on the threat of being sent to Mexico and withholding her birth certificate.  PSR ¶¶ 65-69.

---

    [2]    <u>See</u> GX503, 504, 528-534.  Pursuant to the Adam Walsh Act, these exhibits are available to the Court for review in advance of sentencing.

Raniere initiated a sexual relationship with Daniela, Camila's sister, when Daniela was eighteen.  PSR ¶ 66.  After Daniela re-entered the United States in 2004, she began to work for Raniere, including by cleaning, organizing his books, digitizing his music collection, and compiling reports summarizing lengthy textbooks on various topics.  Id.; Tr. at 2511.  As he did in his relationships with other women, Raniere controlled Daniela's diet and weight and insisted that Daniela keep the relationship secret.  PSR ¶ 66.  When she was 20, Daniela became pregnant by Raniere.  Raniere's partner, Pamela Cafritz, paid for Daniela's abortion and instructed Daniela to lie about the identity of the father to medical staff.  Id.

After Daniela developed romantic feelings for another man, Raniere told Daniela's parents that Daniela had committed an "ethical breach."  PSR ¶ 67.  Raniere ordered that Daniela be confined to a room in her parents' home without human contact.  At Raniere's instruction, Lauren Salzman threatened Daniela if she left the room, she would be sent to Mexico without any identification documents.  Id.; see GX 1578, 1535, 1534, 1563, 1603, 1934.

Daniela was confined to the room for nearly two years, during which she went months without human contact.  PSR ¶ 68; Tr. at 1927.  Family members left meals for Daniela outside her door.  Daniela was denied prompt medical care and slept on a foam pad on the floor.  During this time, Daniela wrote hundreds of letters to Raniere with various proposals to "heal" her purported "ethical breach."  Daniela believed that if she stopped writing, she would be sent to Mexico without money or her identification documents.  Id.

Lauren Salzman reported to Raniere regarding Daniela's "progress," but Raniere frequently told Salzman that Daniela was "game-playing" and manipulating Salzman

**Ex. E, p. 6**

and needed to stay in the room longer.  Tr. at 1930-34 (Salzman's testimony).  Raniere

forbade Salzman from telling Daniela anything or giving her any information "about what

was going on, on the outside with anybody."  Tr. at 1936-37.  At one point, when Daniela cut

off her hair, Raniere instructed Lauren Salzman to tell Daniela that Daniela would have to

stay in the room until her hair grew back.  Id.; Tr. at 2899.  Over time, Daniela's

psychological health deteriorated:

> [S]ometimes I would beg:  Please let me know. I don't know
> why, just—just let me out.  Nobody cared.  My family didn't.
> Nobody cared.  So, it was also—it was also knowing that
> nobody wanted me.  I'm in a world where nobody cares that I'm
> losing my life. . . . it was clearly never gonna end."

Tr. at 2905 (Daniela's testimony).  In approximately February 2012, after considering

suicide, Daniela left the room.  PSR ¶ 69.  Daniela was then driven to Mexico at Raniere's

direction and was told that unless she completed book reports for Raniere, she would not

receive her birth certificate.  Daniela ultimately obtained a copy of her birth certificate with

the assistance of an attorney working for a human rights commission.   Id.

### iii.    Alien Smuggling

Raniere and his co-conspirators participated in efforts to recruit and secure

immigration status for non-citizens so that they could work in one or more Nxivm-affiliated

organizations or as his sexual partners.  PSR ¶ 42.  Among the individuals that Raniere and

his co-conspirators assisted in entering or remaining in the United States unlawfully were

siblings Marianna, Daniela, Adrian and Camila.  Id.  By 2008, all four siblings were out of

status and unlawfully in the United States.  See Tr. at 2491-2505 (testimony of Daniela); see

GX 1554.

a.  <u>Daniela</u>

In 2004, Raniere arranged for Daniela to enter the United States unlawfully using a false identification document with the last name and date of birth of Ashana Chenoa, a deceased woman.  PSR ¶ 44.  Daniela's parents had paid for her to take a Nxivm course in Monterrey, Mexico, and encouraged Daniela to join the Nxivm community in Albany, New York.  <u>Id.</u>; Tr. at 2301 (Daniela's testimony).  On October 26, 2004, Daniela was denied entry into the United States and returned to her home town in Mexico.  PSR ¶ 44; Tr. at 2408.  Raniere instructed Daniela to fly to Toronto, Canada and enter the United States with a false sheriff's ID card containing the name and date of birth of a deceased woman who, according to Raniere, bore a resemblance to Daniela.  PSR ¶ 44; Tr. at 2410.  On December 24, 2004, Daniela met Kathy Russell at the border.  <u>Id.</u>  Russell handed Daniela the false sheriff's ID bearing the name "Lisa Chenoa," and drove Daniela across the border into the United States and back to the defendant's community in Clifton Park, New York.  Tr. at 2411-2414.

b.  <u>Camila</u>

Between approximately 2011 and September 2018, Raniere directed his co-defendant Kathy Russell to lease 120 Victory Way, a property in Clifton Park, New York.  PSR ¶ 43.  The residence was used to house Camila, who did not have legal status within the United States.  <u>Id.</u>  Russell leased the property for over seven years under an assumed name and, each year, paid the rent in cash and in full.  <u>Id.</u>

c.  <u>Marianna</u>

Raniere and his co-conspirators made significant efforts to assist Marianna in entering and remaining in the United States.  PSR ¶¶ 49-53.  Marianna arrived in the United

States in or about 2003, shortly after completing high school, in order to study the Nxivm curriculum with Raniere. In 2004, Marianna began a sexual relationship with Raniere and Pamela Cafritz. Some time thereafter, Marianna's status in the United States on a visitor's visa expired. Tr. at 2491 (testimony of Daniela). Notwithstanding that Marianna had been living with Raniere without legal status in the Nxivm community for nearly a decade, Clare Bronfman falsely claimed that Marianna had always been compliant with U.S. immigration laws and that Marianna had been employed by her father's rock-drilling company in Mexico. PSR ¶ 51.

### iv. Identity Theft and Unlawful Surveillance (Keylogging)

Raniere and his co-conspirators engaged in unlawful surveillance and investigation of his perceived enemies. PSR ¶¶ 70-75. The targets of these efforts included federal judges overseeing litigation in which Nxivm was a party, high-ranking politicians, reporters who had published articles critical of Raniere or Nxivm, Nxivm's own lawyers, legal adversaries and their families, an accountant (James Loperfido) who worked for an attorney who had previously done work for Nxivm, and Edgar Bronfman Sr., the father of Clare Bronfman. Id.; Tr. at 3357 (testimony of Loperfido). On multiple occasions, Bronfman approached Stephen Herbits, a colleague of her father, whom she believed to have political influence, in an attempt to persuade him to help her intimidate individuals perceived to be hostile to Nxivm or Raniere. PSR ¶¶ 70-75; Tr. at 1322-24 (testimony of Herbits), 1330-33.

Between August 2005 and October 2008, Raniere directed Daniela to obtain the usernames and passwords for email accounts belonging to individuals they perceived to be Nxivm enemies, in order to gain access to those individual's email accounts and monitor

their communications.  PSR ¶¶ 70-75; <u>see</u> GX 1518; Tr. at 2535-40 (Daniela's testimony).

After the publication of a October 2003 Forbes article in which Edgar Bronfman was quoted

as calling Nxivm a "cult," Raniere considered Edgar Bronfman an enemy of his and of

Nxivm.  <u>See</u> GX 1456.  As a result, Raniere tasked Daniela with creating keylogging

software in order to access and monitor Edgar Bronfman's email account.  Tr. at 2552-54

(Daniela's testimony).  Bronfman installed the keylogging software on her father's computer,

and Daniela was thereafter able to access Edgar Bronfman's email account.  Tr. at 2554-55.

For years, Daniela reported the results to Raniere.  PSR ¶ 72; Tr. at 2556-57.  At Raniere's

direction, Daniela also created and installed keylogging software on the computer of James

Loperfido, an accountant who had worked for Joseph O'Hara, an attorney who had

previously done work for Nxivm.  Tr. at 2553 (Daniela's testimony), 3370 (Loperfido's

testimony).

       Daniela thereafter regularly emailed the results of the keylogging software,

which reflected Loperfido's computer activity, to Raniere.  PSR ¶ 73; Tr. at 2560.  In

November 2008, Raniere also enlisted Daniela to install keylogging software on Daniela's

sister Marianna's computer after Raniere suspected Marianna of rekindling a relationship

with an ex-boyfriend.  PSR ¶ 74; Tr. at 2621-2622.  Through installation of the keylogging

software, Daniela provided Raniere with her sister's Facebook password.  <u>Id.</u>

       On behalf of Nxivm, Bronfman hired several private firms, including

Canaprobe and Interfor, in order to investigate perceived enemies of Nxivm and Raniere.

PSR ¶ 75; Tr. at 5010. Between approximately 2007 and 2009, Canaprobe sent the results of

purported "bank sweeps" for bank account and balance information belonging to Nxivm's

adversaries.  <u>Id.</u>  On March 27, 2018, a search warrant was executed on the residence of

Nancy Salzman.  Among the items recovered was a large box containing what appears to be

private banking information of many individuals perceived to be Nxivm enemies, including

Edgar Bronfman, Joseph O'Hara, Rick Ross, and others.  Id.; Tr. at 4997-99 (describing

purported banking information for, among other individuals, the author of the October 2003

Forbes article and prominent New York politicians and lobbyists).

       v.    <u>Obstruction of Justice</u>

       Raniere obstructed justice by altering videotapes that were to be produced in

discovery in a federal lawsuit in New Jersey.  PSR ¶¶ 80-83.   In 2003, Nxivm and affiliated

entities filed suit against Stephanie Franco, a former Nxivm student, and Rick Ross.  Tr.

at 4683-84 (Ross's testimony).  The lawsuit alleged copyright infringement and centered on a

claim that Franco had violated a non-disclosure agreement by providing Nxivm course

materials to Rick Ross, a cult deprogrammer, who published the course materials on his

website.  Tr. at 910, 1299 (Vicente's testimony); Tr. at 1988-89 (Salzman's testimony); Tr. at

4700-4703 (Ross's testimony).  In around 2008, Franco's attorneys requested the production

of certain videotapes in support of their claim that the Nxivm curriculum contained false

statements and violated certain state consumer protection laws.  Id.  In June 2008, Raniere

tasked Mark Vicente, among others, to alter videotapes and to remove certain segments from

them without having the videotapes appear altered.  Tr. at 745 (Vicente's testimony).

Vicente was provided with videotapes to remove content, including segments in which

Nancy Salzman made unsubstantiated health claims about Nxivm's curriculum.  Tr. at 1256.

These altered videotapes were then produced in discovery by Nxivm's attorneys with the

false claim that they were provided in "unedited fashion."

vi.   <u>DOS</u>

In late 2015, Raniere created DOS, a secret organization led by Raniere and comprised of "masters" who recruited and commanded groups of "slaves."  PSR ¶¶ 84-96; Tr. at 1506 (testimony of Lauren Salzman).  Aside from Raniere, all members of DOS were female.  Raniere gave himself the title "Grandmaster."  <u>Id.</u>  Raniere's direct slaves (the "First Line") were Camila, Daniella Padilla, Nicki Clyne, Loreta Garza, Rosa Laura Junco, Monica Duran, Allison Mack, and Lauren Salzman.  Tr. at 1509.  Each of these "first-line slaves" recruited their own "slaves" by approaching young women and falsely describing DOS as a secret women's empowerment group or sorority.  <u>Id.</u>  Raniere instructed the First Line never to disclose his participation in and leadership of DOS.  Prospective "slaves" were required to provide "collateral"—including damaging confessions about themselves and loved ones (truthful or not), rights to financial assets, and sexually explicit photographs and videos—to prevent them from leaving the group or disclosing its existence to others.  Tr. at 1508-09, 1602-05.

Through DOS, Raniere used the First Line to recruit other women to make a "collateralized vow of obedience" to their masters (and, by extension, to Raniere) and then required these "slaves" to perform labor, take nude photographs, and, in some cases, to engage in sex acts with Raniere.  Tr. at 1707, 1750, 2183.  Raniere at one point told Camila that it would be "good" for her to "own a fuck toy slave" for him that she could "groom and use as a tool to pleasure" him.  GX 1779-285; Tr. at 3569.  Raniere also instructed Daniella Padilla, Loreta Garza, Rosa Laura Junco and Camila to find a young virgin "successor" for Raniere.  Tr. at 3590, 3597.

**Ex. E, p. 12**

The First Line of DOS met three times a week for about ten hours a week. PSR ¶¶ 84-96; Tr. at 1510-11 (Lauren Salzman's testimony).  At the start of each meeting, the First Line took a fully nude photograph of themselves and sent it to Raniere.  In the meetings that Raniere attended, Raniere sat on a chair, dressed, while the First Line sat on the floor beneath him naked.  Id.  Raniere engaged in sexual relationships with the First Line, occasionally at the same time, and directed them to purchase a "sorority house" which would contain BDSM equipment, including a human-sized cage.  Tr. at 1510; 1538.  These sexualized components of DOS, along with Raniere's leadership of DOS, were deliberately concealed from recruits.  PSR ¶¶ 84-96; Tr. at 1509.  In April 2017, the First Line of DOS purchased a "sorority house," located at 9 Milltowne Drive, Waterford, New York 12188. PSR ¶¶ 84-96; Tr. at 1623.

Raniere and other DOS "masters" recruited women as "slaves" into DOS by deliberately concealing Raniere's role in DOS.  PSR ¶¶ 84-96; Tr. at 1509.  Women were recruited into DOS from California, Mexico, Canada and elsewhere, and DOS "masters" used encrypted messaging applications located overseas, including Telegram and Signal, to communicate with their "slaves" and to collect collateral.  Tr. at 1604-05.  After women were recruited into DOS and their collateral was collected, the DOS "slaves" were told that they needed to provide additional collateral each month.  DOS "slaves," including Sylvie, Nicole, and Jay, among others, believed that if they did not obey their "masters," their collateral would be released.  PSR ¶¶ 84-96; see, e.g., Tr. at 213-14.

Raniere and DOS "masters" used a variety of means to coerce their "slaves" into submission.  In accordance with Raniere's instructions, DOS "slaves" were required to be branded with a symbol that, unknown to the "slaves," represented Raniere's own initials.

Tr. at 1621. DOS "slaves" were also controlled in a number of other ways, including physical isolation (by being required to stay in Clifton Park); forced participation in "readiness" drills; requirements to seek permission from Raniere or their "master"; sleep-deprivation and extremely restrictive diets. PSR ¶¶ 84-96.

At Raniere's instruction, the DOS victim being branded was held down by other DOS "slaves" and was required to state, among other things, "Master, please brand me, it would be an honor." PSR ¶¶ 84-96. Raniere gave these directives to Allison Mack to implement:

| | |
|---|---|
| Raniere: | Do you think the person who's being branded should be completely nude and sort of held to the table like a, sort of almost like a sacrifice? I don't know if that, that's a feeling of submission, you know. So, [U/I] |
| Allison: | Yea |
| Raniere: | Ah, you could also of course videoing it, and videoing it ah from different angles or whatever gives collateral. |
| Allison: | Mmhm |
| Raniere: | So, it probably should be a more vulnerable position type of a thing. |
| Allison: | OK |
| Raniere: | Laying on the back, legs slightly, or legs spread straight like, like feet, feet being held to the side of the table, hands probably above the head being held, almost like being tied down, like sacrificial, whatever. |
| Allison: | OK |
| Raniere: | And the person should ask to be branded. |
| Allison: | OK |

**Ex. E, p. 14**

| Raniere: | Should say, please brand me it would be an honor, or something like that. An honor I want to wear for the rest of my life, I don't know. |
| Alison: | OK |
| Raniere: | And they should probably say that before they're held down, so it doesn't seem like they are being coerced. |
| Allison: | OK |

GX 497-T.  The branding itself was performed without anesthesia and using a cauterizing pen, which burned the skin and left a permanent mark.  PSR ¶¶ 84-96.  Most of the brandings were performed by Danielle, a DOS "slave" who was also a licensed medical professional. PSR ¶¶ 84-96.

DOS "masters" also benefitted financially from recruiting and maintaining DOS "slaves."  DOS "slaves" were coerced into providing labor and services for their "masters" under the threat of the release of their collateral, including editing and transcription work, taking naked photographs, and other tasks.  DOS "masters" were expected to receive approximately 40 hours of labor each week from their "slaves."  PSR ¶¶ 84-96; Tr. at 1618-1619 (testimony of Lauren Salzman that Raniere decided that "if we each had six slaves who each had six slaves under them . . . you would have 40 hours, approximately 36, but approximately 40 hours of work per week for life from these individuals").

a.   Sylvie

Sylvie had worked for Clare Bronfman for nearly ten years when Monica Duran, a "first-line" master in DOS, approached Sylvie about joining DOS.  PSR ¶¶ 99-102; Tr. at 85 (Sylvie's testimony).  At that time, Sylvie had recently been married to another

member of the Nxivm community.  PSR ¶ 99; Tr. at 261.  Both Raniere and Bronfman, at various points, instructed Sylvie not to have sex with her husband for the first two years of their marriage.  Id.; Tr. at 447.

Duran approached Sylvie and invited Sylvie to a secret project that Duran said had nothing to do with Nxivm.  PSR ¶ 100; Tr. at 207.  Sylvie was told that, in order to learn more, she had to provide "collateral," which was something capable of destroying her relationships with her family. Tr. at 211, 264.  Sylvie provided a stamped letter addressed to her parents falsely confessing to being a prostitute.  Tr. at 277.  Sylvie also provided a naked photograph of herself as collateral.  Id.

Soon thereafter, Duran gave Sylvie an assignment to "seduce" Raniere.  PSR ¶ 101; Tr. at 219.  Sylvie was assigned to send Raniere naked photographs every day.  Sylvie was not attracted to Raniere and found him "creepy."  Tr. at 118.  Duran later arranged for Sylvie to meet Raniere at a house, where Raniere took Sylvie upstairs, instructed her to undress and lie down on the bed.  Tr. at 250-54.  Raniere then performed unwanted oral sex on Sylvie and took close-up photographs of Sylvie's vagina with Sylvie's phone.  Tr. at 257.  Sylvie felt disgusted by this encounter and acquiesced to it only because she believed her collateral would be released if she did not obey Raniere.  Tr. at 220.  The photographs were then sent to Duran using Telegram, an encrypted messaging service.  Tr. at 257-58.

After Sylvie completed the assignment she had been given, Sylvie deleted the photograph in disgust and shame.  Tr. at 257-58.  The next day, Duran called Sylvie, panicked, because the photographs had been deleted from Duran's phone.  Id.  Duran told Sylvie that she would have to go back to Raniere and have him take new photographs, which Sylvie did.  Id.

b. <u>Nicole</u>

Nicole, an actress in her early 30s, began taking Nxivm classes in 2015, including acting classes with Allison Mack. In February 2016, Mack invited Nicole to join a "women's mentorship group," but asked that Nicole first provide collateral. PSR ¶¶ 103-112; Tr. at 3845-47 (Nicole's testimony). At the time, Nicole was living in Brooklyn, New York. Nicole was told, and believed, that the organization was women-only and had no connection to Nxivm. After Mack made some suggestions of sufficient collateral, Nicole wrote a series of letters falsely alleging sexual abuse by a family member and other damaging allegations. Tr. at 3850. After Mack assured Nicole that the letters would be "locked in a box" where nobody could see them, Nicole provided the letters and a sexually explicit video of herself to Mack. Tr. at 3853.

Once Nicole had provided this collateral, Mack told Nicole about DOS, referring to it as "the Vow." Tr. at 3854-55. Nicole agreed to become Mack's DOS "slave." Tr. at 3863-64. When Nicole agreed to join DOS, she was not aware and was not told that she would later be required to provide additional collateral. Tr. at 4017. Nicole was later required to provide, and did provide, additional collateral on a monthly basis, including credit card authorizations and the right to her grandmother's wedding ring. Tr. at 4021-22.

Mack directed Nicole to be celibate for six months and subsequently assigned Nicole to contact Raniere. Tr. at 3868. One night when Nicole was staying with Mack in Clifton Park, New York, Raniere called Mack. Tr. at 3921-22. Mack told Nicole to go outside and meet Raniere, which Nicole obeyed. <u>Id.</u> Raniere blindfolded Nicole, led her into a car and drove her to a house. Tr. at 3925. Raniere then led Nicole, still blindfolded, through some trees and inside a building, where he ordered her to undress and tied her to a

table.  Tr. at 3926-29.  Another person in the room, unknown to Nicole, began performing oral sex on Nicole.  Raniere asked if Nicole was ok and told Nicole that she was "very brave" and not to tell anyone what had happened.  Tr. at 3921.  Nicole believed that if she left DOS, her collateral would be released.  Id.

Unknown to Nicole, the individual who performed oral sex on Nicole was Camila, one of Raniere's First-Line "slaves," and the sexual abuse took place at 120 Victory Way.  Tr. at 1870.  A photograph recovered from Camila's Google account reflects a photograph of the table on which Nicole had been tied, along with a video camera that was pointed in the direction of the table.  GX 1190; Tr. at 3657.

Nicole met the other DOS "slaves" under Allison Mack, including India, Michelle, and Danielle.  Tr. at 4011-12.  Throughout Nicole's time in DOS, Mack regularly required her "slaves" to pose for nude photographs, including close-up photographs of their vaginas, either as assignments or collateral.  Tr. at 4016, 4024.  These photographs were sent to Raniere.

Mack also assigned her other slaves—India, Michelle and Danielle—with the task of "seducing" Raniere, all of whom had sexual interactions with Raniere or attempted to do so.  As a First Line master, Mack expected to receive and did receive financial opportunities and privileges as a result of her slaves' compliance with orders, including her orders to engage in sex acts with Raniere.  Id.

c.   Jay

Jay is an actress and model who began taking Nxivm classes in or about 2016, during which time she became friendly with India, one of Mack's slaves.  PSR ¶¶ 113-17; Tr.

at 4318 (Jay's testimony). In approximately November 2016, India recruited Jay in DOS.
Tr. at 4324. Jay was told that DOS was a women's-only organization. Id.

After several months, Mack and India gave Jay a "special assignment" to
"seduce" Raniere and have Raniere take a photograph of Jay to prove that she had done it.
Tr. at 4416-17. Mack told Jay, "I give you permission to enjoy it," and Jay understood the
assignment as a direction to have sex with Raniere. Tr. at 4418-20. Jay asked Mack directly
if Raniere was part of DOS, which Mack denied. Id. Jay refused to engage in a sex act with
Raniere. Tr. at 4419. Before leaving DOS in approximately May 2017, Jay captured images
of collateral belonging to other DOS "slaves," believing that she could protect the release of
her own collateral by having other DOS members' collateral as leverage. Tr. at 4423-25.

vii. DOS Aftermath

The existence of DOS became known within the Nxivm community in early
June 2017, when the husband of Sarah Edmondson, a DOS "slave," publicly confronted
Nxivm members about DOS. Tr. at 1796 (testimony of Lauren Salzman that she told
Raniere that Sarah's husband was "really upset"). Immediately after the existence of DOS
was publicly disclosed, Raniere directed the First Line of DOS to lie about his involvement
in DOS, as well as to compile materials related to DOS and secure them. PSR ¶¶ 123-31; Tr.
at 1798-1800 (Salzman testimony). Raniere also instructed the First Line to collect
"positive" testimonials about DOS and to create a DOS website. Tr. at 1815.

In July and September 2017, Raniere and Bronfman received letters from
separate DOS victims requesting the return or destruction of their collateral, which included
descriptions of the collateral, including nude photographs and videos. Id. ¶ 124; Tr. at 1805-
14. Bronfman hired private investigators and public relations firms to rehabilitate DOS's

public image and to distance it from Nxivm.  Bronfman also made attempts to have criminal charges instituted against Sarah Edmondson.

In September 2017, Raniere and Bronfman were alerted to the fact that The New York Times would shortly be publishing an article about DOS.  Bronfman and Raniere drafted intimidating cease-and-desist letters to DOS victims that Bronfman and Raniere feared would publicly disclose the existence of DOS.  These letters were later sent to several DOS victims by attorneys in Mexico.  PSR ¶ 126; see Exhibit B.  For instance, on September 13, 2017, Raniere sent Bronfman the following email with the subject line, "What are your thoughts?":

> Ms. [DOS victim],
>
> I am the chief attorney of a criminal investigation in Mexico of more than 20 individuals tied together in a cooperative destructive network. These individuals, including yourself, have been acting against individuals who participate in the NXIVM corporation community.
>
> You are currently connected to the criminal investigations involving fraud, coercion, extortion, harassment, stalking, theft of trade secrets (which includes use of trade secrets compromised of, amongst other things, client lists), criminal conspiracy, computer crimes and corporate espionage.
>
> I strongly suggest that you cease and desist, undo, reverse, cancel, and retract, participation in all past, present, and future, conversations, conference calls, meetings, news media, social media, blogs, or websites, relating to this subject matter until the criminal matters are resolved. You should do everything in your power to affect this.
>
> Your best course of action to minimize your exposure, in addition to the above, is to repair all damages to parties you have acted against, reconciling with them, and fully cooperating with the criminal investigations. In this regard, I can help you for I represent some of your victims and have access to others.
>
> I know that people in the media (and also bloggers and the like) can be coercive, abusive in their power, and force unwitting, uninformed, participants to complicate situations and potentially even waive rights. You still have the ability to pull away from all participation with these people.

Please contact me as soon as possible,

Exhibit B-001. Less than thirty minutes later, Bronfman emailed the text of the email of the

email to Alejandro Betancourt, a co-conspirator based in Mexico. The following day,

September 14, 2017, the referenced DOS victim received an email from a Mexican attorney,

Ricardo Olmedo of Olmedo Gaxiola & Abogados, with the subject line "CAUSA PENAL

EN MEXICO." Attached to the email was a Microsoft Word document containing, word-

for-word, the text of the email sent by Raniere to Bronfman. <u>See</u> Exhibit B-002. The

metadata of the Word document received by the DOS victim reflects that the creator of the

document was Bronfman.

On September 18, 2017, Raniere sent Bronfman the following email with the

subject line "Draft":

Ms. [DOS victim],

You are the only person receiving this letter. This overture is against my better
judgement as I feel there is little probability of success yet more expense, but I am
writing you on my clients' behalf. If you do not respond affirmatively to this letter by
1:00pm September 19th I will need to proceed as previously required. I will then not
contact you informally again.

My clients want to give you this opportunity to cooperate and minimize the impact on
your life. The criminal investigations will increase in number, and thoroughness, and
will not stop until justice is served. This will not go away.

The group with which you are involved contains individuals who have already served
prison time, others who are currently indicted, and some that face extradition
proceedings. The others are under investigation for quite serious crimes. The form of
justice to which they subscribe is trial and conviction by media, personal opinion, and
abuse of power. They appear to have no issue with committing a crime when it suites
[sic] them. They use the actions of others to justify this. Whether the person they
target is right or wrong, this method of persecution is very wrongful. You must
separate from them completely to mitigate the effects on yourself.

Please divest yourself from this wrongfulness and this group. Please write to me affirmatively by the above deadline indicating you will cooperate fully. I can also help you with any criminal investigations within the United States.

Sincerely,

Exhibit B-003.  That same day, the DOS victim received an email from Mr. Olmedo Gaxiola attaching a second letter as a document in Microsoft Word, which contained nearly exactly the same text as that sent to Bronfman by Raniere, and, the metadata of the Word document reflects that the creator of the document was Bronfman.  Exhibit B-004.

Other DOS victims, including Jay, received similar intimidating letters from another attorney, Diego Ruiz Durán of Bufete Ruiz Durán S.C.  On October 11, 2017—six days before The New York Times published its reporting on DOS[3]—Jay received an email from Mr. Durán.  In the email, Mr. Durán stated that he was taking "the liberty to writing to you to let you know that the State's Attorney's Office in Mexico, has issued some directives against you and other individuals."  Exhibit B-005.  Mr. Durán enclosed a letter in Spanish and a document containing an English translation directing Jay to "[s]top, abstain and refrain from incurring in any type of intimidation, acts of nuisance or disturbances[.]"  Id.

Months later, in December 2017, Bronfman released a public statement characterizing DOS as a "sorority," stating that it had "truly benefited the lives of its members, and does so freely.  I find no fault in a group of women (or men for that matter) freely taking a vow of loyalty and friendship with one another to feel safe while pushing back against the fears that have stifled their personal and professional growth."  GX 1393R.

---

[3]    See Barry Meier, Inside a Secretive Group Where Women Are Branded, N.Y. Times (Oct. 17, 2017).

Raniere also issued a public statement denying his association with DOS and claiming that "experts" had concluded that "members of the sorority . . . haven't been coerced." GX 1009.

After multiple DOS victims spoke publicly about their experiences, Raniere and Nicki Clyne, a member of the First Line, considered releasing an edited video of Sarah's branding ceremony. Tr. at 1836. The branding video depicted Sarah naked and being branded and stating, as she had been instructed, "Master, please brand me, it would be an honor." In May 2019, during the trial against Raniere, the video of Sarah's branding video was publicly disseminated and broadcast in Mexican media. Tr. at 5149.

Shortly after the media reports were published regarding DOS, Raniere and Bronfman traveled to Mexico. As media outlets began reporting that the United States Attorney's Office had launched a criminal investigation, Raniere stopped using the phone number he had previously used for over fifteen years and he and Bronfman began using encrypted email accounts. Tr. at 1855-56.

viii.   Financial Crimes

Between approximately November 2016 and March 2018, Raniere and Bronfman conspired to commit identity theft in connection with Raniere's continued use of a credit card account number and bank account number belonging to Pamela Cafritz, knowing Cafritz was deceased. PSR ¶ 78. This scheme was part of a long-standing practice of deliberately keeping money and assets out of Raniere's name. Id.; see e.g., Tr. at 607-08 (testimony of Mark Vicente that Raniere expressed desire to be "bankruptcy remote").

Bronfman facilitated the scheme by arranging for regular payment of Pamela Cafritz's credit card after she died on November 7, 2016. Id.; Tr. at 4540 (testimony of Investigator Richard Guerci). Among the charges on Pamela Cafritz's credit card were

charges to Prosvent LLC, Amazon Marketplace, Restoration Hardware, a pet shop,

Domino's Pizza, a sock store in Brooklyn, Neiman Marcus, Bergdorf Goodman, Saks Direct,

Netflix, and various baby companies.  Tr. at 4556-4629.  In total, approximately $135,000

was charged to Pamela Cafritz's credit card from November 7, 2016, the date of her death, to

February 8, 2018.  Tr. at 4620.  In addition, disbursements were made from Pamela Cafritz's

Key Bank account after she died.  Tr. at 4556-64.  Approximately $320,305 in checks and

$736,856 total disbursements were drawn from Cafritz's account, which included payments

to Russell.  Tr. at 4582.

## APPLICABLE LAW

"[A] district court should begin all sentencing proceedings by correctly

calculating the applicable Guidelines range.  As a matter of administration and to secure

nationwide consistency, the Guidelines should be the starting point and the initial

benchmark."  Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted); see also

United States v. Booker, 125 S. Ct. 738, 743 (2005) (although the Guidelines are advisory,

district courts are still "require[d] . . . to consider Guidelines ranges" in determining a

sentence).

Next, courts should "consider all of the § 3553(a) factors to determine whether

they support the sentence requested by a party.  In so doing, [the Court] may not presume

that the Guidelines range is reasonable.  [It] must make an individualized assessment based

on the facts presented."  Gall, 552 U.S. at 50 (citation and footnote omitted).  Section

3553(a) requires courts to "impose a sentence sufficient, but not greater than necessary, to

comply with the purposes of [18 U.S.C. § 3553(a)(2)]."  The factors courts shall consider in

imposing sentence include "the nature and circumstances of the offense and the history and

characteristics of the defendant," 18 U.S.C. § 3553(a)(1), as well as the need for the sentence imposed:

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)    to afford adequate deterrence to criminal conduct;
>
> (C)    to protect the public from further crimes of the defendant; and
>
> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2).

In addition, 18 U.S.C. § 3661 provides that, "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

<u>THE GUIDELINES</u>

The United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") calculation detailed in the PSR is accurate, and, based on a total offense level of 52 and a criminal history category of I, results in an advisory Guidelines range of life in prison.

| Group | Count | Adjusted Offense Level | Units |
|-------|-------|------------------------|-------|
| 1 | Counts 1(A) and 7: Visa Fraud and Wire Fraud | 23 | 0.0 |
| 2 | Counts 1, 2, RA1(a), RA1(b): Identity Theft | 23 | 0.0 |

| 3 | Counts 1, 2, RA2 and 4: Sexual Exploitation of Camila on November 2, 2005 | 42 | 1.0 |
| 4 | Counts 1, 2, RA3 and 4: Sexual Exploitation of Camila on November 24, 2005 | 42 | 1.0 |
| 5 | Counts 1, 2, RA5(a) and 5(b): Identity Theft of Loperfido | 23 | 0.0 |
| 6 | Counts 1, 2, RA5(a) and 5(b): Identity Theft of Edgar Bronfman | 23 | 0.0 |
| 7 | Counts 1, 2, RA6: Alter Records in an Official Proceeding | 23 | 0.0 |
| 8 | Counts 1, 2, RA7: Identity Theft of Marianna | 23 | 0.0 |
| 9 | Counts 1, 2, RA9(a) and 9(b): Trafficking and Document Servitude of Daniela | 31 | 0.0 |
| 10 | Counts 1, 2, RA10: Extortion | 23 | 0.0 |
| 11 | Counts 1, 2, RA12(a), 12(b), 8 and 9: Sex Trafficking and Forced Labor of Nicole | 36 | 0.5 |
| 12 | Counts 1, 2, RA14: Identity Theft of Pamela Cafritz | 23 | 0.0 |
| 13 | Counts 1 and 8(a): Sex Trafficking of Additional DOS Victim 1 | 38 | 1.0 |
| 14 | Counts 1 and 8(b): Sex Trafficking of Additional DOS Victim 2 | 38 | 1.0 |
| 16 | Counts 1, 8, 10: Attempted Sex Trafficking of Jay | 38 | 1.0 |

|  |  |  | **5.5** |
|--|--|--|---------|

The offense level applicable to the Group with the highest offense level is 42, which is the Group relating to the sexual exploitation of Camila.  Because 5.5 units results in an increase of five levels pursuant to Guidelines Section 3D1.4, the combined adjusted offense level is 47.  A five-level enhancement pursuant to Section 4B1.5(b)(1) for engaging in a "pattern of activity involving prohibited sexual conduct" is also applicable, which results in a total offense level of 52.  PSR ¶ 292; Addendum to the PSR dated May 18, 2020.

In his objections to the PSR, Raniere raises seven challenges to the calculation of the Guidelines.  Specifically, Raniere objects to (1) the application of the four-level leader or organizer role enhancement pursuant to Guidelines Section 3B1.1(a); (2) offense-level enhancements related to the sexual exploitation of Camila  (Racketeering Acts Two, Three and Four); (3) an offense-level enhancement for "serious bodily injury" to Daniela as to Racketeering Act Nine; (4) the application of the cross-reference to the sex trafficking Guidelines as to the forced labor of Nicole (Racketeering Act 12(b) and 6); (5) the inclusion in the Guidelines of sex trafficking as to two additional DOS victims; (6) the calculation of the attempted sex trafficking of Jay (Counts 8 and 10); and (7) the five-level enhancement for engaging in a "pattern of activity involving prohibited sexual conduct" under Guidelines Section 4B1.5(b)(1).  Def. Letter Dated March 11, 2020.  As set forth below, these objections are meritless.

I.	A Leadership Role Enhancement is Warranted

Under section 3B1.1(a) of the United States Sentencing Guidelines, a defendant's base offense level should be increased by four levels "[i]f the defendant was an

organizer or leader of a criminal activity that involved five or more participants or was

otherwise extensive."  To qualify for the enhancement, the defendant must have been the

organizer or leader "of one or more other participants" in the criminal activity.  U.S.S.G.

§ 3B1.1, app. note 2.  The court determines whether a role enhancement is applicable based

on all relevant conduct as defined by Guidelines Section 1B1.3, see U.S.S.G. § 3B1.1,

introductory commentary, and considers factors such as the defendant's "exercise of decision

making authority, the nature of participation in the commission of the offense, the

recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the

degree of participation in planning or organizing the offense, the nature and scope of the

illegal activity, and the degree of control and authority exercised over others," id., app. note

4; see also United States v. Katsman, 551 F. App'x 601, 603 (2d Cir. 2014) (summary order).

   The applicability of the role enhancement is evaluated based on the

defendant's role in the overall racketeering enterprise, not his role as to each underlying

predicate act.  See United States v. Ivezaj, 568 F.3d 88, 99 (2d Cir. 2009) ("[I]t makes little

sense to allow a defendant who acts in a leadership capacity in a wide-ranging criminal

enterprise to have his offense level adjusted on the basis of his participation in discrete

racketeering acts."); see also United States v. Damico, 99 F.3d 1431, 1438 (7th Cir. 1996).

As proven at trial, the defendant was the leader of a criminal enterprise comprising over a

dozen individuals over whom he exerted control and authority and who he trusted to carry

out his criminal directives.  See, e.g., Tr. at 1563-1580; GX 362.  The four-level leadership

role enhancement is warranted.

II.     Raniere Had Sexual Contact with Camila and She Was in His Custody, Care
        and Supervisory Control

The trial record overwhelmingly established that in September 2005, the

defendant began sexually abusing Camila, who was then a fifteen-year-old child, and that

Camila was in the custody, care and supervisory control of the defendant during this time.

Therefore, as to Racketeering Acts Two, Three and Four, a two-level enhancement pursuant

to Guidelines Section 2G2.1(b)(2)(A) and a two-level enhancement pursuant to

Section 2G2.1(b)(5) are warranted.

Guidelines Section 2G2.1(b)(2)(A) provides for a two-level enhancement if

the offense involved the commission "of a sexual act or sexual contact."  As detailed at trial,

Raniere and Camila exchanged numerous sexually explicit emails referencing the beginning

of their sexual relationship as September 2005 and their "anniversary"—that is, the first date

they had sex—as September 18, 2005.  See, e.g., Exhibit A, GX 301-R-17; Tr. at 3462-65.

As just one example, on March 18, 2009, Camila sent an email to Raniere expressing her

concern that their relationship was "limited" to "sex" and that Raniere did not "want

anything more."  In that email, Camila also stated the following:  "I just realized that it is the

18th of march today….  We've been together for 3 1/2 yrs. whoa that's a long time!"  See

GX 1400-44.  The email is signed, "your vc," which is a reference to "virgin Camila,"

Raniere's nickname for Camila.  Additional communications make clear that Raniere first

began having sex with Camila when she was 15 years old, when he took child pornography

photographs of her.  See, e.g., Exhibit A, GX 301-R-679 (Camila referring to herself as an

"inexperienced 15 year old"); GX 302-R-44 (Raniere: You know I guard the other pictures

right? You know I have the others yes? Camila: From way back when..? Raniere: I wanted the original forever. I thought it was truly mine. Yes, from way back…").

        The child pornography photographs that Raniere took of Camila in November 2005 themselves indicate a contemporaneous sexual relationship between Raniere and Camila.[4] The photographs depict Camila lying on a bed fully nude, and several photographs depict close-ups of Camila's genitals. Not only do the content of photographs themselves suggest that Camila was engaging in sexual activity with the taker of the photographs, Raniere, but the photographs were located in a folder containing nude photographs of eleven other women with whom Raniere had a sexual relationship at that time. See also Tr. at 1535-36 (testimony of Lauren Salzman describing Raniere taking "up-close crotch shot" photographs of her in "around 2005"); Tr. at 2571-72 (testimony of Daniela having discovered photographs of "naked women" on Raniere's computer). The collection of images are similar in content; each folder contains images of a nude woman on a bed and close-up photographs of the woman's pubic hair and vaginal area.

        Daniela's testimony at trial confirmed the existence of a sexual relationship between Camila and Raniere before Camila turned 18. Specifically, Daniela testified that she had a conversation with Raniere about his sexual relationship with her sister Camila and that the conversation took place at some point prior to fall 2006. Tr. at 2472-74 ("I asked him if he was having sex with my sister [Camila]. He asked me if I minded.").

        Further, Camila's gynecological records reflect that in 2011, Camila reported to medical professionals that she had been with the same sexual partner for "five years." GX

---

[4]    See GX 503, 504, 528-534.

539-18; see Tr. at 3312-13.  In addition, a diary kept by Camila as a minor also reflects that she was in a sexual relationship with Raniere.[5]  The diary, authored by Camila and dated July 2007 (when Camila was 17 years old), indicates that Camila was in a sexual relationship with an individual who was also "with [her] sister in front of [her]" and who encouraged her to lose weight.[6]  See Exhibit C at 2.  The diary also contains references to Nxivm members, including her sister Marianna and brother Adrian; Camila's work as a caretaker of Raniere's son; and grocery lists and weight loss.

The defendant's sexual abuse of Camila in the months prior to the commission of the crimes of conviction clearly supports an enhancement pursuant to § 2G2.1(b)(2)(A).  See, e.g., United States v. Weisinger, 586 F. App'x 733, 739 (2d Cir. 2014) (summary order) (affirming application of § 2G2.1(b)(2)(A) on the grounds that the defendant had sexual contact with the victim in "grooming her for the crimes of conviction" even where the child pornography at issue did not depict sexual contact with another person); United States v. Holt, 408 F. App'x 229, 238 (11th Cir. 2010) (affirming application of enhancement where

---

[5]      Camila's diary, which was produced to the defendant prior to trial as VDM_NXIVM00028665-VMD_NXIVM00028761, will be provided to the Court under separate cover as Exhibit C.  Due to the sensitive nature of these materials, the government respectfully requests that they remain under seal.

[6]      The voluminous WhatsApp messages between Camila and Raniere admitted at trial reflect Camila's distress at Raniere's sexual relationship with her sister Marianna.  See, e.g., GX 301-R-265 ("Were you serious about having children with my sister or were you using that to scare me?"); id. ("You know how much we went through because of your relationship with her.  I always felt that you chose her over me."); GX 1779 ("Make sure your sister doesn't see you texting…"); GX 1779-419 ("I really thought I was not going to be part of your life [because] I was so afraid that it looked like you were going to choose my sister").

defendant's "inappropriate sexual relationship with [the victim] groomed her to participate in [his] production of pornographic images.").

The evidence at trial also established that after Camila arrived in Clifton Park at the defendant's invitation, the defendant arranged for her to take Nxivm classes and to work as a maid in Nancy Salzman's house, which was a distance away from her siblings. See, e.g., Tr. at 2469 (Daniela's testimony that the "plan that Keith had for [Camila] was that she was going to be essentially Nancy's maid. She was going to be cleaning Nancy's house for money and attending Ethos classes and the house that they found for her was also far away from where I lived."). The defendant also arranged for Camila to live in Nxivm-affiliated housing with other women, including Monica Duran. See, e.g., Tr. at 2465-73. Camila was in the custody, care and supervisory control of the defendant during this time and a two-level enhancement pursuant to § 2G2.1(b)(5) is therefore applicable. See U.S.S.G § 2G2.1(b)(5) app. note 5 (noting that § 2G2.1(b)(5) "is intended to have broad application and includes offenses involving a minor entrusted to the defendant, whether temporarily or permanently").

### III. An Enhancement for Daniela's Serious Bodily Injury is Warranted

The trial record amply demonstrated that Racketeering Act Nine involved serious bodily injury to Daniela and that a two-level enhancement pursuant to U.S.S.G. § 2H4.1(b)(1)(B) is applicable. "Serious bodily injury" is defined as "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S.S.G. § 1B1.1, app. note 1. While she was confined to a room at the defendant's direction, Daniela repeatedly requested medical care for a toothache that

caused her constant pain.  Tr. at 1958-59; 2939-2942.  The defendant did not permit Daniela to visit a dentist for six weeks.  The defendant finally allowed Lauren Salzman to accompany Daniela to a dentist only after a part of Daniela's tooth broke off, leaving a hole.  Id.; Tr. at 2955.  Daniela also suffered extreme emotional and psychological pain as a result of her confinement, see, e.g., Tr. at 2891-901, and only escaped after she seriously contemplated suicide and started accumulating cleaning supplies in order to accomplish it, Tr. at 2905-06.  These events constitute serious bodily injury in connection with Daniela's condition of forced labor.  See, e.g., United States v. Callahan, 801 F.3d 606, 627 (6th Cir. 2015) (a victim sustained "serious bodily injury" in connection with her condition of forced labor when the defendant kicked her in the face, "knocking a tooth loose").

> IV.    The Cross-Reference to Guideline Section 2H4.1(b)(4)(B) Is Accurate

The defendant's objection to the cross-reference, pursuant to U.S.S.G. § 2H4.1(b)(4)(B), to the guideline governing sex trafficking is meritless.  Section 2H4.1(b)(4) provides that if "any other felony offense was committed during the commission of, or in connection with, the [forced labor] offense, increase to . . . 2 plus the offense level from the offense guideline applicable to that other offense, but in no event greater than level 43."  "Any other felony offense is defined as "any conduct that constitutes a felony offense" under federal, state or local law.  Raniere argues that the cross-reference to the sex trafficking guideline results in double counting because he will be punished twice for the same conduct (sex trafficking of Jane Doe 5).  The Second Circuit has "repeatedly held, however, that a district court calculating a Guidelines sentence may apply multiple Guidelines provisions based on the same underlying conduct where that is the result clearly intended by Congress and the Sentencing Commission [because while] such calculations

may involve 'double counting' in a literal sense, they do not involve <u>impermissible</u> double counting." <u>United States v. Maloney</u>, 406 F.3d 149, 152 (2d Cir. 2005) (emphasis in original). Because the sex trafficking guideline calculation results in a higher offense level than that of the forced labor guideline, pursuant to § 2H4.1(b)(4)(B), the sex trafficking guideline calculation "essentially replaced the forced labor calculation," which does not have the effect of impermissibly double counting the same underlying conduct. <u>United States v. Callahan</u>, 801 F.3d 606, 628-29 (6th Cir. 2015) (rejecting defendant's claim that the cross-reference, pursuant to § 2H4.1(b)(4)(B), to the guidelines governing a different offense constituted impermissible double counting).

> V.    <u>The Trial Evidence Established that Raniere Participated in Sex Trafficking as to Other DOS Victims</u>

The trial record also established, either by evidence admitted at trial that proved such facts explicitly or from which the facts reasonably could be inferred, that Raniere participated in sex trafficking as to two additional DOS victims, or, at a minimum, attempted to do so. Specifically, Raniere and other DOS "masters" recruited women, including Sylvie and India, as "slaves" into DOS by deliberately concealing Raniere's role in DOS and the sexualized components of DOS. PSR ¶¶ 84-96; Tr. at 1509-11. Sylvie was recruited into DOS by Monica Duran, who gave Sylvie an assignment to "seduce Raniere." PSR ¶ 101; Tr. at 219. Sylvie testified that she was not attracted to Raniere and found him "creepy." Tr. at 118. Duran later arranged for Sylvie to meet Raniere at a house, where Raniere took Sylvie upstairs, instructed her to undress and lie down on the bed. Tr. at 250-54. Raniere then performed unwanted oral sex on Sylvie and took close-up photographs of Sylvie's vagina with Sylvie's phone. Tr. at 257. Sylvie felt disgusted by this encounter and

acquiesced to it only because she believed her collateral would be released if she did not

obey Raniere.  Tr. at 220.  After Sylvie completed the assignment she had been given, Sylvie

deleted the photograph in disgust and shame.  Tr. at 257-58.  The next day, Duran called

Sylvie, panicked, because the photographs had been deleted from Duran's phone.  Id.  Duran

told Sylvie that she would have to go back to Raniere and have him take new photographs,

which Sylvie did.  Id.

The evidence at trial also established that the First Line received benefits,

financial and otherwise, by facilitating Raniere's access to their slaves.  For example, on

March 3, 2016, Raniere sent an email to Allison Mack asking if India knew that "to complete

her [assignment] she needs to take all her clothes off" so that Raniere could take a

photograph of her.  GX 1805.  The following day, Mack sent an email to Raniere apologizing

for "bug[ging] him" but explaining that she "had not been paid as head trainer for the source"

and that she was "struggling a little with income."  GX 1803.  Mack wrote that Bronfman

could not approve the payments until Raniere reviewed them.  Raniere responded the same

day with the following email:  "Yes.  Any news on India?"  Lauren Salzman testified at trial

that when she asked Mack whether Raniere was "fucking her slaves," Mack responded that

she and Raniere were going to "start working with India and Jay" and clarified to Salzman

that "working" meant sex.  Tr. at 1794.  Taken as a whole, this evidence establishes that

Raniere participated in sex trafficking as to Sylvie and as to India.

VI.     Raniere is Not Entitled to a Three-Point Reduction Under Section 2X1.1(b)(1)

The defendant is not entitled to a three-point reduction under U.S.S.G.

§ 2X1.1(b)(1) because the evidence at trial established that the defendant "completed all of

the acts [he] believed necessary for successful completion of the substantive offense[,]" that

is, the sex trafficking of Jay (Jane Doe 8).  See Tr. at 4416-26, 4433.  Under 18 U.S.C.

§ 1591, it is not required that the victim actually perform a commercial sex act as long as the

defendant recruited, enticed, harbored, transported, provided, obtained, maintained,

patronized or solicited Jay for purposes of engaging in commercial sex acts.  See Jury

Charge, ECF Docket Entry No. 728, at 100.  The defendant completed all the acts he

believed necessary for successful completion of the substantive offense, and is not entitled to

the three-point reduction.  See United States v. Medina, 74 F.3d 413, 418 (2d Cir. 1996)

(explaining that § 2X1.1(b)(2) "determines punishment based on the conduct of the

defendant, not on the probability that a conspiracy would have achieved success"); United

States v. Deas, 768 F. App'x 81, 82 (2d Cir. 2019) (summary order) (same as to attempt);

United States v. Jenkins, 69 F. App'x 499, 501 (2d Cir. 2003) (summary order) (same).

     VII.   Raniere Engaged in a Pattern of Activity Involving Prohibited Sexual Conduct

      The government submits that the five-level enhancement under § 4B1.5(b)(1)

for engaging in a "pattern of activity involving prohibited sexual conduct" is warranted.  As

set forth above, Raniere began a sexual relationship with Camila in or about September 2005,

and thereafter, on two occasions in November 2005, produced child pornography depicting

Camila.  The Second Circuit has held that "[p]roof of any two separate occasions of

prohibited sexual conduct" is sufficient to find "that a defendant poses the sort of continuing

danger supporting a § 4B1.5(b) enhancement."  See United States v. Broxmeyer, 699 F.3d

265, 284-86 (2d Cir. 2012) (finding that the defendant's conviction of attempted production

of child pornography, coupled with a single other occasion of prohibited sexual conduct, was

indicative of a pattern of prohibited sexual conduct); see also United States v. Batson, 749 F.

App'x 804, 807 (11th Cir. 2018) (multiple sexual offenses involving the same minor victim qualified as a pattern of sexual activity under § 4B1.5(b)(1)).

<u>FINANCIAL PENALTIES AND RESTITUTION</u>

I.      <u>Assessments and Fines</u>

In addition to assessments imposed by 18 U.S.C. § 3013, the Court should impose a payment of a $5,000 special assessment pursuant to the Justice for Victims of Trafficking Act of 2015, as well as a fine within the Guidelines range of $50,000 to $250,000.[7]  PSR ¶¶ 356-60.

The Guidelines provide that a district court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine," and employs an eight-factor test to determine the amount of any such fine.  U.S.S.G. §§ 5E1.2(a), 5E1.2(d).  The Guidelines further provide that "[t]he amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive."  <u>Id.</u>  The defendant bears the burden of demonstrating an inability to pay a fine.  <u>See</u> <u>United States v. Camargo</u>, 393 F. App'x 796, 798 (2d Cir. 2010) (summary order); <u>United States v. Salameh</u>, 261 F.3d 271, 276 (2d Cir. 2001).

The Guidelines fine range for the offenses of conviction is $50,000 to $250,000.  PSR ¶ 359 (citing U.S.S.G. § 5E1.2(c)(3)).  It appears that Raniere has the ability to pay a fine; Raniere reported an interest in the $8 million estate of his deceased former

---

[7]      Although the PSR states that the $5,000 special assessment is to be imposed "per count," the government notes that the Second Circuit has recently "conclude[d] that the text of § 3014, taken as a whole and in its context, is . . . meant to be applied on a per-offender, not a per-count, basis."  <u>United States v. Haverkamp</u>, 958 F.3d 145, 149 (2d Cir. 2020).

partner, Pamela Cafritz, and also reported to the Probation Officer that he also had earnings from Executive Success Programs ("ESP") and Nxivm.  PSR ¶¶ 343, 347.  Although the defendant's true financial situation is opaque, see PSR ¶ 347, the defendant has not met his burden of establishing his inability to pay a fine.  For the reasons set forth herein, there is a need for a financial penalty in light of the seriousness of Raniere's crimes, his disregard for the law, and the need for deterrence.

II.     Restitution

In Title 18, United States Code, Section 1593, Congress provided for mandatory restitution for victims of sex trafficking, forced labor, and document servitude, among other crimes.  18 U.S.C. § 1593(a); see United States v. Sabhnani, 599 F.3d 215, 254 (2d Cir. 2010).  Defendants convicted under Section 1593 are required to pay the "full amount of the victim's losses," as defined in 18 U.S.C. § 2259(b)(3).  Section 1593 defines the term "victim" as an "individual harmed as a result of a crime under this chapter[.]"

Unless otherwise provided by statute (e.g., 18 U.S.C. § 2259, providing mandatory restitution for Chapter 110 offenses, including the production of child pornography), restitution for all other Title 18 offenses are calculated under 18 U.S.C. § 3663A (mandatory restitution for certain offenses) or § 3663 (discretionary restitution).  Under Section 3663A, a victim is a person "directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered, including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern."  18 U.S.C. § 3663A(a)(2).

Under either statute, a defendant's "economic circumstances should have no bearing on a court's decision to enter such an order. 18 U.S.C. § 3664(f)(1)(A); In re Morning Star Packing Co., 711 F.3d 1142, 1144 (9th Cir. 2013) (holding district court committed legal error in denying restitution because of defendant's claimed financial status and potential availability of civil remedies).

At present, the government has received over 25 declarations of loss from individuals who identify themselves as victims of the defendant's criminal conduct and expects it may receive more. In light of the number of victims and the scope, complexity and duration of the defendant's criminal activity, the government respectfully requests that the Court set a date no later than 90 days after sentencing for a final determination of victim losses for purposes of restitution. See 18 U.S.C. § 3664(d)(5).

In addition, the government anticipates that it will make a request that Raniere's restitution order identify victims of sex trafficking, forced labor and document servitude (the "1593 Victims") and prioritize restitution to such victims. The government recognizes that the restitution order entered by the Court may exceed Raniere's ability to pay such order and the total value of assets to be criminally forfeited. Therefore, the government intends to request that, pursuant to 18 U.S.C. § 3664(i), the Court prioritize restitution to the 1593 Victims in Raniere's restitution order. 18 U.S.C. § 3664(i) ("If the court finds that more than 1 victim has sustained a loss requiring restitution by a defendant, the court may provide for a different payment schedule for each victim based on the type and amount of each victim's loss and accounting for the economic circumstances of each victim."); see, e.g., United States v. Newcomb, No. 6:14-CR-00001-1, 2015 WL 4878940, at *3 (W.D. Va. Aug. 14, 2015) (relying on § 3664(i) in prioritizing one corporate victim over another).

The Attorney General, acting through the Department of Justice's Money Laundering and Asset Recovery Section ("MLARS"), may exercise discretion to remit forfeited funds to persons who have incurred a pecuniary loss directly caused by the offense underlying the forfeiture, or a related offense. 28 C.F.R. §§ 9.2, 9.8(b)(1). A "related offense" includes an offense committed "as part of the same scheme or design, or pursuant to the same conspiracy, as was involved in the offense for which forfeiture was ordered." 28 C.F.R. § 9.2. Upon the final forfeiture of the assets subject to preliminary forfeiture orders in this case, the United States Office for the Eastern District of New York presently intends to request that the Department of Justice approve the restoration of the forfeited funds to the Clerk of Court to distribute pursuant to any restitution order entered by the Court as to Raniere.[8] However, pursuant to 28 C.F.R. § 9.1(b)(2), the sole discretion to approve the Office's request lies with the chief of the Department's Money Laundering and Asset Recovery Section ("MLARS"), and the losses in the restitution order must otherwise comport with 28 C.F.R. Part 9.

Offenses involving human trafficking have special provisions concerning dispositions of forfeited funds. Congress has directed that all property forfeited under Section 1594 "shall" be used to pay any restitution ordered in the criminal case. See 18 U.S.C. § 1594(f)(1); see also 18 U.S.C. § 1594(f)(2) (providing that such transfers of

---

[8]    When MLARS approves restoration of forfeited funds, MLARS typically directs the funds to the most comprehensive restitution order issued in the case. This ensures that no victims will be omitted from compensation and that all are treated fairly, and also ensures that restoration accomplishes the same objectives as 28 C.F.R. § 9.8. The government anticipates that any restitution ordered entered against Keith Raniere will be the most comprehensive of those entered in this Court, in light of Raniere's leadership role and his conviction on all charges in the indictment.

forfeited funds shall have priority over any other claims to the assets or their proceeds). Because, however, at least some of the assets to be forfeited in this case were not forfeited pursuant to an offense covered by Section 1594, should MLARS approve restoration of any judicially-forfeited funds to the Clerk of Court, the Clerk would distribute such funds to victims on a <u>pro rata</u> basis absent an order from the Court that specifically prioritizes the 1593 Victims.[9]

Given the primary of the sex trafficking and forced labor offenses in this case, the degree of harm caused by these violations, and Congress's interest in prioritizing forfeited funds for remission to victims of these crimes, the government respectfully submits that any restitution order entered by the Court should specifically identify the 1593 Victims and prioritize restitution to them, to ensure that they receive the funds they need to fully recover and rebuild their lives.

---

[9] In addition to judicial forfeiture proceedings, the government has commenced administrative forfeiture proceedings against approximately $330,847.86 turned over to the government by counsel for Nicki Clyne (the "Clyne Funds"). The Clyne Funds represent the proceeds of the sale of the DOS "sorority house." <u>See</u> Tr. at 1510; 1538. Under 18 U.S.C. § 1594, the forfeiture statute applicable to the Clyne Funds, the Department of Justice is required to remit such funds for payment of restitution to the 1593 Victims. For such a transfer to comply with Section 1594, Raniere's restitution order must identify such victims and their losses.

<u>ARGUMENT</u>

It is difficult to overstate the seriousness of the defendant's crimes. As reflected in the impact statements submitted by the victims in this case, Raniere wreaked a path of destruction through his victims' lives.[10] The defendant was able to engage in criminal activity for so long because he successfully cultivated followers loyal to him who carried out his orders and shielded him from scrutiny. Raniere sought out those who could provide financial support or the connections to enhance his reputation and increase his power to intimidate critics and detractors. Raniere concealed his abuse behind the smokescreen of his supposed "personal growth" programs—a charade he continues to this day. Since his conviction, Raniere has continued to demonstrate a complete lack of remorse for his crimes.

The government respectfully submits that a Guidelines sentence of life imprisonment is necessary to provide appropriate punishment, to protect the public from further crimes by Raniere, to promote respect for the law, and to discourage others from committing similar crimes.

I.    <u>The Nature and Circumstances of the Offenses and the Need to Provide Just Punishment Warrant a Sentence of Life Imprisonment</u>

There is no question about the seriousness of the offenses for which Raniere was convicted. As demonstrated at trial, among the many acts of manipulation, coercion, and exploitation that Raniere committed were the following:

- Raniere ordered the confinement of Daniela to a room, without human contact, for nearly two years;

[10]    The government is currently in receipt of a significant number of victim impact statements, which have been provided to counsel for the defendant. These statements, along with any others the government receives, will be provided to the Court as directed in advance of the October sentencing.

**Ex. E, p. 42**

- Raniere sexually exploited Camila, a 15-year-old child, and took photographs of his abuse;

- Raniere created and led DOS, in which women were recruited under the false pretense of joining a women-only mentorship group, later discovering that they had taken collateralized "vows of obedience" to women who were "slaves" to Raniere;

- Raniere directed that several DOS "slaves" be assigned to have sex with him;

- Raniere directed the unlawful surveillance of individuals perceived to be enemies or critics of Nxivm;

- Raniere obstructed justice by ordering the tampering of evidence to be used in a civil lawsuit; and

- After some DOS victims began to share their experiences of abuse publicly, Raniere and Clare Bronfman drafted threatening cease-and-desist letters, which were then sent to several DOS "slaves" by attorneys in Mexico retained by Bronfman.

The defendant's crimes are among the most serious under the law, both in their character and in the amount of time and manipulation dedicated to their commission. The government will not here belabor the fact that the criminal conduct proved at trial shocks the conscience. The brother of Camila and Daniela, Adrian, has described the devastating impact of Raniere's actions on his family:

> The emotional and physical torture that my sisters had to endure should never be allowed to happen to anybody. My whole family is still suffering because of him. . . . Keith made my whole family think Dani was a dangerous psychopath, and to this day my father will not speak to her, or me, or our mother, because we are somehow going against Keith. He still has that kind of hold over half of my family. Keith Raniere is a menace to society; he cares about nobody and nobody can ever be safe with him around.

Their mother also submitted an impact statement describing the effect of Raniere's criminal conduct on her children: "Keith played with each of us at will. He set us as enemies,

Case 1:18-cr-00204-NGG-VMS Document 1143 Filed 02/06/23 Page 259 of 320 PageID #: 15292

separated us. He did inhuman things to my daughters behind my back. . . . Keith took away the freshness of my children, their spontaneity, their curiosity, their love for themselves."

Raniere began preying on Camila, whom he called "virgin Camila," in 2005. The power imbalance between them could not have been more stark: Camila was fifteen years old, with no legal status in the United States, and Raniere was forty-five and the leader of the community to which Camila's parents belonged. Raniere did not just abuse Camila sexually. For over a decade, he psychologically tortured a young woman, withdrawing affection or approval if she did not accede to his demands. As demonstrated in the thousands of messages exchanged between Raniere and Camila, a small subset of which are appended to this memorandum as Exhibit A, Raniere's conduct towards Camila was controlling and emotionally abusive. See, e.g., Exhibit A, GX 301-R-96 ("If you want me to come tonight, I will under these conditions: there will be no talking. You will meet me at the door in the outfit you think I would find sexiest. You will arouse me, we will make love for my satisfaction and pleasure. You will do everything you can to provide that. I will finish and leave. Do you agree yes or no?"); 301-R-239 ("I expect you to text me this vow [of obedience] now. I will text you later. I expect you to answer this right away. Otherwise no go. You need to be happy wherever you are with me because my time means that much.").

Raniere required Camila to ask permission of him for everything she did, even in order to contact her own family and to cut her hair. See, e.g., GX 301-128 ("I really hate that I feel like I have to ask you for permission to do anything outside of my schedule"); GX 1779-25 ("Can I text my family?"), GX1779-87 (Camila's request for Raniere's permission to remove pubic hair), GX 1779-166 (Camila's request for Raniere's permission to take "4 days away for a flamenco workshop," to which Raniere responded, "Give me a

Ex. E, p. 44

day...likely a yes"). When Camila resisted him, Raniere threatened to evict her from the residence she was living in and, because she had no legal status, deport her to Mexico. <u>See, e.g.</u>, GX 301-R-222 (Raniere: "That's the last chance move your stuff out tonight."); GX 1779-2 (Camila: "Can you please not send me back to mx?"); GX301-R-280 (Raniere: "The apartment will need to be done first thing tomorrow 8am. Put all my things, money, etc… together").

Raniere's messages to Camila reflect Raniere's preoccupation with Camila's weight and her sexual submission to him. <u>See, e.g.</u>, GX 301-R-249 (demanding that Camila "eat less"), <u>see also</u> GX 302-R ("You need to not be prideful and lovingly satisfy me. Let's see if you can."); GX 308-R ("You need to make me far superior to everyone ([Robbie Chiappone] and Jim [Del Negro]) in every way conceivable no question."). Raniere was obsessed with Camila's previous romantic interest in Chiappone. Tr. at 3466-69; GX301-R-20; GX1779. Raniere required Camila to provide him with details of her interactions with Chiappone, including what clothes Camila wore and Chiappone's sexual performance. <u>Id.</u>; Tr. at 3557. Raniere told Camila that her relationship with Chiappone affected her "purity" and her suitability as his "successor" and that Camila would have to "fix" it, by, among other things, finding him a "virgin" to be his "successor" and "pure vessel." <u>See, e.g.</u>, Tr. at 3469, 3588-89 ("There are potential successors but they are so young. This creates several problems. Will I live long enough? Will they stay pure? Will they connect so deeply with me being so much older?").

During the course of the "relationship" between the defendant and Camila, Camila slowly became withdrawn. She no longer socialized with family and friends. She lost weight at Raniere's insistence. As recounted in her brother's impact statement, Camila

"became extremely private. She wouldn't tell anyone where she lived.  She struggled losing

weight and was malnourished.  She always appeared to be busy, but I never knew with what,

and she never had any money.  I had [no] idea how much Keith was manipulating her.  He

was very good at keeping his actions hidden from me and from other people."  <u>See also</u> Tr. at

1597 (Lauren Salzman's testimony that there was "a lot of curiosity and speculation about

what was going on with Camila.  How come nobody could go to the house? . . . And

eventually Lucy told me that she figured out where Cami lived because she saw Keith

coming and going from Cami's house.  And I wasn't permitted to know or nobody told me.")

Camila's own messages to the defendant reflect her despair and distress at this time:

| | |
|---|---|
| October 10, 2014: | I feel like I have a gun pointed at me and I'm and I'm just trying to say what you want to hear so you won't shoot but I don't know what it is you want to hear. |
| November 24, 2014: | I feel like your puppet. |
| December 8, 2014: | You have taken everything that is important and meaningful to me.  But it is more than that.  You have branded me for life.  Your words have destroyed me.  I feel helpless and worthless.  I feel dead inside. |
| February 8, 2015: | I'm angry at you because you couldn't see how being with me at such a young age was probably taking away from my life and opportunities. |

Exhibit A, GX 301-R-89, 233, 284; GX 302-R-77.

　　　　For decades, Camila told no one about her sexual relationship with Raniere,

the man who was without question the most powerful person in her family and community.

Camila had suicidal thoughts.  She harmed herself—a common response to sexual abuse and

a coping mechanism to feel in control.[11]  See, e.g., Tr. at 2474 (testimony of Daniela describing Camila's cutting).  These effects are not uncommon in similarly-victimized individuals, and for this reason, Raniere's post hoc justification for DOS as having been created "as part of ensuring that [Camila] would never" again attempt suicide, see Tr. at 1895 (Lauren Salzman's testimony), is perverse.

    Raniere's treatment of Daniela, Camila's sister, was also shocking.  As he did with Camila, the defendant instructed Daniela to keep their coercive sexual relationship a secret and pressured her to lose weight.  Tr. at 2379 (testimony of Daniela); id. at 2633 (Pamela Cafritz instructed Daniela to conceal that Raniere was the father of her child to medical professionals); id. at 2636 (after her abortion, Raniere told Daniela that it was a "great opportunity" for her to lose weight, a conversation that left Daniela "in shock").  After Daniela told Raniere about her relationship with another man, Daniela's "life changed overnight."  Tr. at 2675 ("I was highly dependent on him and his community which he controlled and he was also my only friend.  Like, there was nobody else for me to talk to at that point.  I had a coach.  I didn't talk to my mother anymore.  My relationships [were] secret and, therefore, a large part of my life was.").

---

  [11] See Judith L. Herman, Trauma and Recovery: The Aftermath of Violence-- From Domestic Abuse to Political Terror 109 (2015) ("The connection between childhood abuse and self-mutilating behavior is by now well documented.  Repetitive self-injury and other paroxysmal forms of attack on the body seem to develop most commonly in those victims whose abuse began early in childhood. . . . Self-injury is intended not to kill but rather to relieve unbearable emotional pain, and many survivors regard it, paradoxically, as a form of self-preservation."); Lori G. Plante, Bleeding to Ease the Pain: Cutting, Self-Injury and the Adolescent Search for Self 17-18 (2007) ("Many experts have concluded that the most common causal factor related to cutting and other forms of self-injury is a history of sexual abuse and trauma."); Self-Harm, Rape, Abuse & Incest National Network (RAINN), https://rainn.org/articles/self-harm ("Some survivors of sexual assault may use self-harm to cope with difficult or painful feelings.").

Raniere enlisted the assistance of Daniela's family members and Lauren Salzman in confining Daniela to a room in her parents' home without human contact for nearly two years.  Tr. at 2686-87 (testimony of Daniela); see also Tr. at 1926 (testimony of Lauren Salzman that Daniela's family members "seemed sad and ashamed about their participation").  Raniere ensured that Daniela's confinement was kept secret and told Lauren Salzman not to speak to him over the phone about it.  Tr. at 1927.  Daniela was miserable and wrote letters to Raniere every day, often multiple times a day, letters which went unopened.  Tr. at 1934.  At trial, Lauren Salzman testified:

> I think it's horrendous.  I—of all the things that I did in this case and the crimes that I committed, too, I think that this is the worst thing that I did.  I—I don't know what to say.  I kept her in her room for two years . . . . And the family, they were close as a family when they came to us.  And those relationships were incredibly severed through this and other things that happened.  And I don't know how you can ever recover from that.

Tr. at 1936.  As was made clear by Daniela's testimony at trial, Raniere's actions had a lasting effect on her psychological health.  Daniela testified, "I broke pretty quickly . . . I think I went crazy . . . I would be completely numb for days."  Tr. at 2891; see Tr. 2892 ("I had no books.  I had nothing to read.  Nothing to listen to or nothing to grab onto or somebody else's words to grab on to."); id. at 2904 ("[i]t was harder and harder to keep the darkness at bay.").

Through DOS, Raniere escalated the scope of his abuse and exploitation of women.  Raniere urged his First Line DOS "slaves" to recruit hundreds of women into DOS.  Tr. at 1619-20 (testimony of Lauren Salzman that Raniere expressed a preference for DOS "slaves" in "positions of power and influence").  After these women provided "collateral," such as sexually explicit photographs and videos and damaging confessions, they were

coerced into submitting to providing additional collateral, doing tasks for their "masters,"

and, in some instances, engaging in sexual activity with Raniere.  Raniere's role as

"Grandmaster" and the sexual nature of DOS was deliberately concealed from recruits,

including paddling, sexual activity with "slaves," and "up-close vagina pictures."  Tr. at

1790-94 (testimony of Lauren Salzman).  These sexually explicit photographs, which were

required of nearly every woman recruited into DOS, were of the same type that Raniere took

and kept of his own sexual partners.  See, e.g., Tr. at 1537 (testimony of Lauren Salzman

describing Raniere's preference with respect to pubic hair); id. at 1626 (testimony of Lauren

Salzman that Raniere preferred DOS pictures "with our legs spread or up close vaginal

pictures"); id. at 2378 (testimony of Daniela that, as to pubic hair, "one did not touch it").

Raniere expressed callous disregard for the women recruited to be DOS

"slaves."  When, for example, the First Line expressed concerns about branding their recruits

with Raniere's initials without their knowledge or consent, Raniere responded that "it

shouldn't matter" and "insisted" that it "would not be a problem."  Tr. at 1621-22 (testimony

of Lauren Salzman).  But for the bravery in the DOS victims speaking about their abuse,

there is little doubt that Raniere would have continued to commit crimes.  Raniere even

attempted to use the First Line of DOS to locate a virgin "successor," who, as Lauren

Salzman testified, would serve as a "replacement" for Camila.  Tr. at 1899-1901.  Lauren

Salzman testified that the first-line DOS masters, including Rosa Laura Junco, made attempts

to recruit virgins for this role for the defendant's benefit.  Id.  Raniere's communications

with Camila also refer frequently to finding a young "successor candidate."  See Exhibit A,

GX 301-R-29; see GX 301-R-332 ("Does Ana know suitable virgins?"); GX 1779-485 ("[I]f

my lineage does not withstand competition, my unique genetic combo will not be able to

either.  It will not be a basis of other generations, it will be absorbed and combined with

others until a superior combination comes about."); GX 1779-485 (Raniere telling Camila

that "Rosa Laura" could assist her in becoming "friends with young future candidates" and

"shepherding them over time").  These efforts were confirmed in a October 4, 2015 email

from Rosa Laura Junco to Raniere, in which Rosa Laura Junco apologized for her

"shortcomings" in keeping her teenage daughter, Lauris, away from the defendant and the

effect on the defendant's "possibility for succession."  GX 1325.  In the email, Rosa Laura

Junco states that she is "100 clear that you are what I want for my daughter (and obviously

for myself)."

        Sex trafficking is a crime that strips victims of their dignity and self-worth,

causing them unimaginable damage.  For many of his victims, Raniere's actions had a

destructive impact on their psychological health, emotional stability, and understandings of

relationships and trust.  At trial, Sylvie testified about her disgust and shame after Raniere

performed unwanted oral sex on her and took photographs of her vagina:

> I felt so disgusting and ashamed, so I just thought—I felt like it
> was all lies.
>
> I felt—I think I just felt shame, all around that time I felt so
> much shame and still do honestly about this whole thing . . . I
> just felt like everything was just lies and secrets and darkness.
> Like I say, it was such a horrible time.

Tr. at 255-259.  As Nicole explains in her victim impact statement, "[t]he massive effect this

had on my psychological state is hard to fully explain. On one hand, the fear I felt in being

both blackmailed and bullied, of slowly realizing I no longer had control of my own life. And

on the other hand, the deep confusion and struggle to believe Allison when she told me how

much she cared for me and reminded me that what I was being put through was for my own

good. The cruelty of that abuse of power and trust will be with me forever." Nicole states

that she "regularly felt like [she] was losing her mind." Similarly, Jay states that her

"confidence in [her]self, [her] talents, and who [she] is has been completely shattered" by her

experience in DOS. She explains, "My sunny disposition has been shifted. I find myself

darker, more negative on my outlook of humanity. . . . Not wanting to make new friends or

connect with others. Feeling constantly alienated."

            Other victim impact statements from DOS victims, which will be provided in

full to the Court, reflect that the defendant is responsible for causing profound levels of stress

and emotional injury:

> "I NEVER would have joined if I had known that Keith was the top master. . . . I have no words to explain how this affected me. I have never felt so vulnerable and exposed."

> "Just thinking about the possibility of Keith being set free gives me tremendous anxiety and stress. He hurt me and some of my friends in ways that can never be undone."

> "With the branding, I was physically injured and it's a scar that is very difficult to erase. There was a lot of physical pain also. . . . But the most harm that I experience was emotional. To be deceived by people that I really trusted. They knew everything about me, they knew I wanted to help others and like me, a lot of people were in the same situation. And that's the worst part, to take advantage of people who wanted to build better people, better communities, better families, and be better human being. And everything was a lie."

The unprecedented magnitude, duration and scope of Raniere's crimes demand the most

serious penalty available.

II.     Raniere's Denial of Responsibility, the Need to Protect the Public and Specific
        Deterrence

        Raniere has demonstrated a complete lack of acceptance of responsibility for

his crimes of conviction.  Raniere's post-conviction prison calls and emails reflect that he is

unrepentant, has no empathy for his victims, and would continue to commit crimes if

released.  See Exhibit D.  Raniere still communicates with Nicki Clyne, a member of the

First Line, and even though DOS caused incalculable harm to the women who were recruited

into it, on November 7, 2019, Raniere wrote an email to Nicki Clyne stating:

> I believe the sorority is good—not just good and even noble, but
> great—and vitally important for women and humanity.  It is
> tragic the current organization has been stymied by a few
> envious men abusing position of power in government, media,
> and film; some women who didn't live up to their sacred honor
> and vows; and people in general who just feel threatened by this
> idea.  The missing part of our society, found in a secret group of
> women like this, aches to be embraced; we should deeply mourn
> it[s] possible loss.  It is a living thing, a precious thing, and an
> essential thing to complete the human story: groups that are
> different are not necessarily bad, and ways of journeying
> through our lives, only for the few, and too intense for the many,
> are foundationally important for all of us.  This sorority is such a
> thing: living, precious, intense, and some would say even
> sacred.  If the current group of committed women, for whatever
> reason, do not carry [t]his considerable body of knowledge,
> practices, and skills forward, some other group of brave
> courageous, women should—even must—somehow,
> somewhere.  It's here, waiting for the right women, right now.
> Who will carry forth this burning torch of light?

Exhibit D-004.  Similarly, in a March 12, 2020 call with Suneel Chakravorty, one of

Raniere's supporters, Raniere addressed his conduct with respect to Daniela, stating that she

"would have to go back to Mexico or she had to explain to people how she was going to stop

from all the stealing and the other things that she was doing.  She also had to finish a book

report.  She had a number of different book reports she was supposed to do and she was seen

**Ex. E, p. 52**

as being very prideful about it and no matter what, she would do anything, you know, say anything, but never just sit down and simply finish the book report." Exhibit D-021. Raniere described Daniela as engaging him a "battle of wills" and who "threw, like, uh, what would be a massive sort of tantrum." Exhibit D-022.

The defendant's unwillingness or inability to express understanding of, and remorse for, his actions is deeply troubling. It suggests that a Guidelines sentence is particularly important for specific deterrence and protection of the public. See United States v. Broxmeyer, 699 F.3d 265, 295 (2d Cir. 2012) (stating that defendant's "lack of remorse for, or even appreciation of, the seriousness of the totality of his conduct . . . further expand[s] the range of substantively reasonable sentences to allow the district court to afford adequate specific deterrence and protection of the public"); United States v. Kaziu, 559 F. App'x 32, 39 (2d Cir. 2014) (summary order); accord United States v. Martinucci, 561 F.3d 533, 535 (2d Cir. 2009) (lack of remorse is a pertinent sentencing factor under Section 3553(a)). A sentence of life imprisonment is particularly warranted where, as here, the defendant has committed offenses for which Congress has made specific findings about the likelihood of recidivism. See H.R. Rep. No. 107-527, at 2 (2002) (noting that "studies have shown that sex offenders are four times more likely than other violent criminals to recommit their crimes" and that "recidivism rates do not appreciably decline as offenders age").

In addition, Raniere has demonstrated a disregard for the law and for the system of justice. In many phone calls with Mr. Chakravorty, Raniere expresses contempt for the prosecution and the Court. For instance, during an April 8, 2020 phone call with Mr. Chakravorty, Raniere stated that "the major witnesses all lied" and expressed his view that "this judge"—referring to the Court—was corrupt. Exhibit D-043. Raniere further stated

**Ex. E, p. 53**

that they had to "get scrutiny on this judge, get some pundit who is willing to speak out about what this judge is saying, which is crazy, and the judge needs to know he's being watched . . . ." Exhibit D-052.

Raniere also directed his supporters to develop a podcast and to set up a "contest" in which members of the public would be invited to find purported errors in Raniere's prosecution and trial in exchange for a cash prize. In many phone calls, Mr. Chakravorty describes his efforts to find "judges"—i.e., members of the public—to evaluate submissions for the contest and "check[] the prosecutor's homework." Exhibit D-049; see, e.g., Exhibit D-024; D-042. In an email on January 8, 2020 to Eduardo Asunsolo, Raniere explains that prizes should be in the amount of $25,000.[12] Exhibit D-009; see also id. (Asunsolo: "Some people have feedback that it might be good to have a PR firm linked to the contest. It can filter people who'd just want attention and not to seriously analyze the case. And help in general with the contest.") In subsequent calls, Raniere offers lengthy diatribes on the criminal justice system for Mr. Chakravorty to record, similar to the "verbal downloads" that were described at Raniere's trial, see, e.g., Tr. at 339 (Sylvie's testimony); Tr. at 524 (Vicente's testimony), presumably for publication on a podcast. In these calls, Raniere claims that his conviction resulted from corruption. Exhibit D-061 ("There's a person, Preet Bharara, who was head of the Southern District at one point. He even said that there are corrupt judges. Some judges are corrupt.").

Further, even though counsel for Raniere stated, at trial, that he did not have access to Raniere's phone, Raniere has given his supporters "permission" to "get to [his]

---

[12]     The source of funds for these cash prizes is not apparent.

phone." [13]  In an April 6, 2020 call with Mr. Chakravorty, Raniere told Mr. Chakravorty that

"they have a mirror of the phone, I believe, from, uh, you know, a security agency that did

the custody, so, you should be able to go on the phone and take off my WhatsApp chats, my

Telegram chats, things like that . . . so, I, I give you guys, you, you know, Nicki [Clyne],

permission to do that."  Exhibit D-027.  In a call on April 8, 2020, Raniere and Mr.

Chakravorty had the following exchange:

> CHAKRAVORTY:  Oh, okay, uh, as far as getting your cell phone, uh, apparently that's, that's considered contraband, um . . .
>
> RANIERE:  Yeah, I just read an email from Marc. I wasn't able to respond to any of them because since I have to do this so quickly…
>
> CHAKRAVORTY:  Okay.
>
> RANIERE:  . . . Um, I think the phone is still my property. That was… I don't think it was ever even subpoenaed.

[13]     At trial, Mr. Agnifilo stated that he did not have access to Raniere's phone:

> THE COURT:  Yes, where is the phone anyway?
>
> Mr. Agnifilo:  I don't have the phone.
>
> THE COURT:  Surprising.
>
> Mr. Agnifilo:  It's surprising or not.
>
> THE COURT:  You have no idea where it is?
>
> Mr. Agnifilo:  I don't know where the phone is.

Tr. at 4225-26.

CHAKRAVORTY:     Oh, okay.

RANIERE:        Um, so, you know and I . . . as, as far as
                pictures. . . there is nothing there, I believe is
                considered. . . I don't know, I mean, I guess they
                can try to say certain pictures were considered
                illegal or something like that, but, um, you
                know, uh, uh, see what, see what he can do
                because that phone has not been subpoenaed.

Exhibit D-040.

      In his communications with his supporters, Raniere repeatedly attempts to cast himself as a victim of persecution and harassment from the government and from unknown enemies.[14]  See, e.g., Exhibit D-002 ("[T]his situation has been a purely political, envy-driven, money-powered lie to destroy a community, and keep me either incarcerated for life or otherwise "disposed of."  This lie is perpetrated by certain politicians, prosecutors, lobbyist [sic], agents, judges, and people of influence, who likely received great benefits of recognition, social capital, favors, and maybe even money: it should all be closely examined."); Exhibit D-072 ("[T]hese people who are the political pushers of judges and media, they don't need to be able to influence a particular judge. . . . So if they have a certain number of judges that are under their control in the Second Circuit, all they have to do is make sure that your case gets in front of one of those judges.")

_____

[14]      Raniere has continued to regularly contact his supporters, even entering aliases for them in the Bureau of Prisons contact list in order to prevent detection.  For instance, it appears that in July 2020, the Bureau of Prisons suspended calls between Raniere and Mr. Chakravorty for a period of time.  On August 11, 2020, Raniere entered an individual under the name "Issac Edwards."  The address provided by Raniere for "Issac Edwards" is fabricated and the phone number provided by Raniere for "Issac Edwards" belongs to a burner phone.  Subsequent calls between Raniere and "Issac Edwards" reflect that "Issac Edwards" is Mr. Chakravorty.

Raniere's post-conviction conduct reflects his total lack of empathy for his victims. The government submits that his continued lack of acceptance of responsibility is a factor the Court should consider seriously and that only a sentence of life imprisonment is significant enough to prevent and deter future wrongdoing.

III.     The Need to Promote Respect for the Law and General Deterrence

The need to promote respect for the law and to deter others also warrants a significant sentence. Raniere was able to commit these crimes because, for years, he and his co-conspirators retained scores of attorneys, public relations firms, and consultants to shield his activities and to pursue individuals he perceived to be detractors or critics. The targets of these efforts included reporters; vocal critics of Nxivm or Raniere, including Rick Ross and Raniere's ex-girlfriends; former Nxivm members; former Nxivm attorneys; and even federal judges overseeing litigation involving Raniere and Nxivm. See, e.g., Tr. at 4728-29 (testimony of Rick Ross); id. at 4999 (testimony of Special Agent Weniger);

General deterrence is particularly significant in sex trafficking cases, where victims are often reluctant to speak to law enforcement and where, as Congress has recognized in enacting the sex trafficking statute, "traffickers often escape deserved punishment." United States v. Estrada-Tepal, 57 F. Supp. 3d 164, 169 (E.D.N.Y. 2014) (quoting legislative history and discussing legislative goals in enactment of 18 U.S.C. § 1591). In addition, Raniere's crimes were difficult to investigate and were uncovered as a result of more than a year-long investigation requiring significant government resources, including interviews of more than a hundred individuals. A sentence that serves as general deterrence of crimes that are complex and difficult to investigate is also warranted here. See, e.g., United States v. Heffernan, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of

(general) deterrence argue for punishing more heavily those offenses that either are lucrative

or are difficult to detect and punish, since both attributes go to increase the expected benefits

of a crime and hence the punishment required to deter it.").

IV.    The Need to Avoid Unwarranted Sentencing Disparities

Under 18 U.S.C. § 3553(a)(7), the Court must also consider "the need to avoid

unwarranted sentence disparities among defendants with similar records who have been

found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  This factor is difficult to apply in

this case as Raniere is not similarly situated to other defendants, but even so, the government

submits that it also weighs in favor of a sentence of life imprisonment.  See, e.g., United

States v. Brown, 12-CR-145 (N.D.N.Y.) (GLS) (sentence of 60 years for production and

possession of child pornography); United States v. Rivera, 09-CR-619 (SJF) (E.D.N.Y.)

(sentence of 40 years for sex trafficking, forced labor, and alien harboring counts); United

States v. McGowan, 09-CR-653 (SJF) (E.D.N.Y.) (sentence of 90 years for three counts of

production of child pornography); United States v. Brockett, 08-CR-289 (E.D.N.Y.) (SJ)

(sentence of 23 years for sex trafficking); United States v. Broxmeyer, 08-CR-21 (TJM)

(N.D.N.Y.) (sentence of 30 years for attempted production and possession of child

pornography in connection with 17-year-old girl).  Notably, Raniere did not just commit one

or two of the crimes.  He led members of a racketeering enterprise in the commission of all

of them, and over an extended period of time.

**Ex. E, p. 58**

<u>CONCLUSION</u>

For the reasons set forth above, the government respectfully submits that the

Court should impose a Guidelines sentence of life imprisonment on the defendant.


Dated:     Brooklyn, New York
           August 27, 2020

                              Respectfully submitted,

                              SETH D. DUCHARME
                              ACTING UNITED STATES ATTORNEY
                              Eastern District of New York
                              271 Cadman Plaza East
                              Brooklyn, New York 11201


                     By:      /s/ Tanya Hajjar
                              Tanya Hajjar
                              Mark J. Lesko
                              Karin Orenstein
                              Assistant United States Attorneys
                              (718) 254-7000

Exhibit F

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Keith Raniere,<br><br>    Plaintiff,<br><br>vs.<br><br>Merrick Garland, US Attorney General, et al.,<br><br>    Defendants. | No. 22-cv-00212-RCC-PSOT<br><br>**DECLARATION OF ANTHONY GALLION** |

I, Anthony Gallion, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records reasonably relied upon by me in the course of my employment, hereby make the following declaration relating to the above-titled matter.

1. I am the Acting Special Investigative Agent for the Federal Bureau of Prisons (Bureau), assigned to the United States Penitentiary in Tucson, Arizona (USP Tucson). In this role, my duties include overseeing the Special Investigative Services (SIS) Department at USP Tucson and investigating inmate misconduct. I address inmate institutional needs on a daily basis.

2. As part of my official duties, I have access to records maintained by the Bureau in the ordinary course of business, including administrative remedy requests of federal inmates, information maintained in the SENTRY[1] database, and inmate central files. All records attached to this declaration are true and accurate copies of Bureau records maintained in the ordinary course of business.

3. The following statements are based on my review of official Bureau files and records, my own personal knowledge, or on information acquired by me through the

---

[1] SENTRY is the Bureau's national database which tracks various data regarding an inmate's confinement, including, but not limited to, an inmate's institutional history, sentencing information, administrative remedies, and discipline history.

performance of my official duties.

4.     I am familiar with inmate Keith Raniere, Federal Register No. 57005-177. He has been incarcerated at USP Tucson since January 21, 2021, and I have known him during his time at USP Tucson.  *See* Att. 1, SENTRY Inmate History at 1 ("TCP" is the facility code for USP Tucson).

## I.     PREVIOUS INSTITUTION

5.     On July 16, 2020, an Intelligence Analysis in the Bureau's Counter Terrorism Unit (CTU) drafted a memorandum seeking to block all contact between Raniere and Suneel Chakravorty due to behavior that compromised the security of the facility in which Plaintiff was then held, the Metropolitan Detention Center in Brooklyn, New York (MDC Brooklyn).  *See* Att. 2, CTU Memorandum.

6.     Specifically, Raniere and Suneel Chakravorty were recording prison-initiated telephone calls to use for podcasts and "interviews [Raniere] is pursuing to use in HBO, Netflix and Showtime."  *Id.* at 1-2.  Additionally, they were endangering the security of the facility and the public by organizing "a group of women to show up regularly and dance provocatively by inmates to view through their cell windows."  *Id.* at 2.  Raniere "directed Suneel [Chakravorty] to contact more women" to "danc[e] erotically" which led to a request for Plaintiff to be moved to another housing unit.  *Id.* at 2-3.  Plaintiff also informed Suneel Chakravorty about "the staff work schedules and indicated his protesters should wait outside for the staff and offer donuts and coffee as they exit the facility" because "we are all in this together."  *Id.* at 3 (internal quotation marks omitted).

7.     The CTU concluded that "Raniere's manipulative behavior continues to manifest from behind the prison through the help of Suneel Chakravorty.  Inmate Raniere's actions would place the safety and security of staff and the public at risk."  *Id.*  The CTU recommended that Suneel Chakravorty be removed as one of Plaintiff's approved contacts. *Id.*

8.     On July 16, 2020, the MDC Brooklyn Warden concurred with the recommendation and approved Suneel Chakravorty's removal from Raniere's approved

**Ex. F, p. 2**

contact list. *See* Att. 3, Warden Approval E-Mail (Redacted) at 1.

## II.  USP TUCSON

### A.  <u>Visitation Privileges</u>

9.      As to inmate friends and associates, "[t]he visiting privilege ordinarily will be extended to friends and associates having an established relationship with the inmate prior to confinement, unless such visits could reasonably create a threat to the security and good order of the institution.  Exceptions to the prior relationship rule may be made, particularly for inmates without other visitors, when it is shown that the proposed visitor is reliable and poses no threat to the security or good order of the institution."  28 C.F.R. § 540.44(c).  "Regardless of the institution's security level, the inmate must have known the proposed visitor(s) prior to incarceration.  The Warden must approve any exception to this requirement."  *See* Program Statement 5267.09, *Visiting Regulations* at 6.[2]

10.      On May 2, 2021, a few months after arriving at USP Tucson, Suneel Chakravorty's visiting privileges were denied as the "prospective visitor/applicant did not have an established relationship with [Raniere] prior to [his] incarceration."  *See* Att. 4, Visitor Denial Notice.

11.      This conclusion is supported by federal court records submitted by Suneel Chakravorty in October 2020 where he admitted that his "first conversation with Keith Raniere was in prison, after his trial.  At this time, he and I were complete strangers." *See* Att. 5, Sentencing Court Documents Excerpt at 1.  Suneel Chakravorty also detailed his involvement with NXIVM.  *Id.* at 2-4 (becoming a coach for Executive Success Programs (ESP) and NXIVM, including his decision to "stay involved even during an international media storm.  To me, ESP did not seem like a sinister organization[.]" and "that is why I chose to continue as a coach up u[n]til the companies closed in May 2018.").

---

[2] Available at https://www.bop.gov/policy/progstat/5267_09.pdf (last visited on May 27, 2022).

### B. **TRULINCS[3] and Telephone Privileges**

12.     "Use of TRULINCS is a privilege; therefore, the Warden may limit or deny the privilege of a particular inmate[.] *See* Program Statement 4500.12, *Trust Fund/Deposit Fund Manual* at 126.[4]

13.     "Inmates may be subject to telephone restrictions imposed by the Warden to protect the safety, security, and good order of the institution, as well as to protect the public." *See* Program Statement 5264.08, *Inmate Telephone Regulations* at 14.[5]

14.     In early May 2022, my staff in the SIS Department were monitoring telephone calls between Raniere and Suneel Chakravorty.  They spoke to each other about being "at war" with the federal government that would be "no holds barred."  Even more concerning than this language or "war" is the fact that Raniere asked about the quality of the recordings and stated that he has many recordings.  As indicated above, Suneel Chakravorty has previously recorded telephone conversations with Raniere.  The CTU recommended that Raniere's current contacts be removed and that all future contact requests go through the SIS Department for approval so as to determine whether any individuals have affiliation with NXIVM, as prohibited by special conditions of supervised release in the Judgment and Commitment Order.  *See* Att. 6, Judgment and Commitment Order at 9 (special condition number eleven).

15.     On May 3, 2022, as a result of the findings of the SIS Department and in consultation with the CTU, the USP Tucson Warden imposed limitations on Raniere's contact list.  *See* Att. 7, Service Limitation Notice.  Specifically, Raniere was limited to a

---

[3] The Trust Fund Limited Inmate Computer System (TRULINCS) provides inmates with a computer system that does not jeopardize the safety, security, orderly operation of the correctional facility, or the protection of the public or staff.  Inmates doe not have access to the Internet through TRULINCS, but may exchange electronic messages with approved contacts.

[4] Available at https://www.bop.gov/policy/progstat/4500.12.pdf (last visited on May 27, 2022).

[5] Available at https://www.bop.gov/policy/progstat/5264_008.pdf (last visited on May 27, 2022).

maximum of ten active contacts. *Id.* All of his current contacts were removed, [6] with the exception of nine verified attorneys and Marianna Fernandez. *See* Att. 8, TRULINCS Active Contact List (Redacted) at 1-3.

16.     Part of this removal was also associated with Raniere's restriction from communicating (e-mail, telephone, mail, etc.) with any members or associates of NXIVM or its affiliated organizations per the Judgment and Commitment Order issued by his sentencing court. If it is dangerous for Raniere to have access to these individuals once released, it is also a security risk to allow access to these individuals while incarcerated.

17.     None of the above actions imposed have any relationship to Raniere's access to his attorneys via legal mail, legal calls, and legal visits. Raniere may still access his attorneys through these confidential lines of communication.

18.     In the future, if Raniere wants to add more contacts to his approved TRULINCS list, the SIS Department will review the individual names as part of the approval process. To date, Raniere has not requested additional individuals be added to his approved TRULINCS contact list.

19.     I am not and was not aware of Raniere's litigation regarding his conviction and sentence imposed in New York. All recommendations and determinations made, as reflected above, were made for the safety, security, and good order of the institution and not in any way to hinder Raniere's legal efforts.

//
//
//
//
//
//

---

[6] Part of this removal was also associated with Raniere's restriction from communicating (e-mail, telephone, mail, etc.) with any members or associates of NXIVM or its affiliated organizations per the Judgment and Commitment Order issued by his sentencing court. If it is dangerous for Raniere to have access to these individuals once released, it is also a security risk to allow access to these individuals while incarcerated.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on this 31st day of May 2022, in Rochester, Minnesota.

Anthony Gallion
Acting Special Investigative Agent
USP Tucson, Arizona
Federal Bureau of Prisons

**Enclosures**

Att. 1, SENTRY Inmate History

Att. 2, CTU Memorandum

Att. 3, Warden Approval E-Mail (Redacted)

Att. 4, Visitor Denial Notice

Att. 5, Sentencing Court Documents Excerpt

Att. 6, Judgment and Commitment Order

Att. 7, Service Limitation Notice

Att. 8, TRULINCS Active Contact List (Redacted)

- 6 -

# Exhibit F
# Attachment 1

Case 1:22-cv-00581-RCCD Document 17-4-5 Filed 02/06/22 Page 283 of 320

```
 REG NO..: 57005-177 NAME....: RANIERE, KEITH
 CATEGORY: ARS        FUNCTION: PRT      FORMAT:


FCL     ASSIGNMENT DESCRIPTION                   START DATE/TIME STOP  DATE/TIME
TCP     A-DES      DESIGNATED, AT ASSIGNED FACIL 01-21-2021 1904 CURRENT
A03     RELEASE    RELEASED FROM IN-TRANSIT FACL 01-21-2021 2104 01-21-2021 2104
A03     A-ADMIT    ADMITTED TO AN IN-TRANSIT FACL 01-21-2021 1020 01-21-2021 2104
OKL     HLD REMOVE HOLDOVER REMOVED              01-21-2021 0920 01-21-2021 0920
OKL     A-HLD      HOLDOVER, TEMPORARILY HOUSED  01-19-2021 1444 01-21-2021 0920
OKL     ADM CHANGE RELEASE FOR ADMISSION CHANGE  01-19-2021 1445 01-19-2021 1445
OKL     A-BOP HLD  HOLDOVER FOR INST TO INST TRF 01-19-2021 1330 01-19-2021 1445
A01     RELEASE    RELEASED FROM IN-TRANSIT FACL 01-19-2021 1430 01-19-2021 1430
A01     A-ADMIT    ADMITTED TO AN IN-TRANSIT FACL 01-19-2021 0730 01-19-2021 1430
LEW     HLD REMOVE HOLDOVER REMOVED              01-19-2021 0730 01-19-2021 0730
LEW     A-HLD      HOLDOVER, TEMPORARILY HOUSED  01-06-2021 0800 01-19-2021 0730
B01     RELEASE    RELEASED FROM IN-TRANSIT FACL 01-06-2021 0800 01-06-2021 0800
B01     A-ADMIT    ADMITTED TO AN IN-TRANSIT FACL 01-06-2021 0248 01-06-2021 0800
BRO     HLD REMOVE HOLDOVER REMOVED              01-06-2021 0248 01-06-2021 0248
BRO     A-HLD      HOLDOVER, TEMPORARILY HOUSED  10-27-2020 1827 01-06-2021 0248
BRO     COURT      COURT APPEARANCE W/SCHED RETRN 10-27-2020 0839 10-27-2020 1827
BRO     A-HLD      HOLDOVER, TEMPORARILY HOUSED  10-31-2019 1720 10-27-2020 0839
BRO     COURT      COURT APPEARANCE W/SCHED RETRN 10-31-2019 0838 10-31-2019 1720
BRO     A-HLD      HOLDOVER, TEMPORARILY HOUSED  07-15-2018 1806 10-31-2019 0838
BRO     LOCAL HOSP ESC TRIP TO LOCAL HOSP W/RETN 07-15-2018 1704 07-15-2018 1806
BRO     A-HLD      HOLDOVER, TEMPORARILY HOUSED  04-10-2018 1858 07-15-2018 1704
A01     RELEASE    RELEASED FROM IN-TRANSIT FACL 04-10-2018 1858 04-10-2018 1858
A01     A-ADMIT    ADMITTED TO AN IN-TRANSIT FACL 04-10-2018 0830 04-10-2018 1858
OKL     HLD REMOVE HOLDOVER REMOVED              04-10-2018 0730 04-10-2018 0730
OKL     A-HLD      HOLDOVER, TEMPORARILY HOUSED  03-29-2018 0905 04-10-2018 0730




 G0000       TRANSACTION SUCCESSFULLY COMPLETED
```

# Exhibit F
# Attachment 2



**U.S. Department of Justice**
Federal Bureau of Prisons

Correctional Programs Division

---

Counter Terrorism Unit

796 N. Foxcroft Ave., Suite 201
Martinsburg, WV 25401

July 16, 2020

MEMORANDUM FOR  H. TELLEZ, WARDEN
MDC BROOKLYN

//s//
THROUGH:        Guy Pagli, Chief
                Counter Terrorism Unit
                //s//

THROUGH:        J.Simmons, Senior Intelligence Analyst

                //s//
FROM:           H. Boussag, Intelligence Analyst

SUBJECT:        Recommendation for Contact Block and Rejection of
                incoming or outgoing correspondence

Re:             I/M Raniere, Keith. Reg. No. 57005-177

This memorandum is submitted to request approval for removing one of inmate
Raniere, Keith, Reg. No. 570055-177, contacts from his TRULINCS account.  Raniere
is currently designated at MDC Brooklyn and is currently awaiting sentencing for Sex
Trafficking, Sex Trafficking Conspiracy and Forced Labor Conspiracy.

Beginning on or about July 15, 2020, CTU staff began conducting a review of
communications between inmate Raniere and one of his contacts. Namely, Suneel
Chakravorty. During this review of phone and emails, CTU Staff found numerous
occasions where this individual, under the direction of inmate Raniere, has violated
BOP policies and procedures.

**Ex. F, p. 10**

A review of multiple telephonic conversations concluded the above mentioned individual has helped inmate Raniere recorded podcasts for interviews he is pursuing to use in HBO, Netflix and Showtime.

For instance, on a call placed by Raniere to Suneel at telephone number [646-939-9625] on Friday, May 8, 2020. Raniere asked the recipient if he is ready for him to record a podcast and then counts him off. At that time, inmate Raniere knowingly began to record a podcast, the narrative of which was "How much legal experience a judge has?"

On another call, placed by Raniere to Suneel on Monday, July 13, 2020. At the same telephone number, inmate Raniere inquired as to how many podcasts they have recorded up to this point. At that moment, Suneel indicated they have recorded over 110 official segments and about 50 podcasts. It shall be noted, during the monitoring of this inmate, nearly most of his phone calls included a segment he dedicated to a podcasts with the help of Suneel, Chakravorty.

Additionally, while reviewing inmate Raniere's communication, neither Raniere nor Suneel Chakravorty, have been reviewed or approved by the Office of Research and Evaluation (ORE) for research privileges within the Bureau of Prisons.

Further review of the communication between Raniere and Suneel have concluded inmate Raniere is also utilizing this individual to set up protests outside of the prison. Specifically, Raniere orchestrated through this individual for a group of women to show up regularly and dance provocatively for inmates to view through their cell windows.

Case in point, on a telephone call placed by Raniere to Suneel to the same number on July 12, 2020, Raniere and Suneel discussed the success of the women dancing in front of the prison. Suneel added the inmates were "banging on their windows and making a beat," Expectedly, Raniere gloated and hoped this movement keeps growing and more women get involved. Additionally, Raniere directed Suneel to contact more women.

CTU staff became aware of these events occurring on Friday, July 03, 2020. During a monitoring of a phone call to the same individual, Raniere thanked Suneel for coming by and for bringing Eduardo and Nicky to see him and inquired about whether they read the messages the inmate was writing on the light fixture for them and vice versa.

Relatedly, On Tuesday, July 06, 2020, Raniere authored an electronic correspondence to email address [marvy@pm.me] belonging to a contact named Marianna Fernandez. In the email, Raniere talked about the realization of his ideas. Specifically, his

acquaintances gathering outside of the prison and the women dancing erotically to the delight of other inmates.

Below is an excerpt from the abovementioned email

> *"My dearest love! I have another idea that seems to be evolving into something good: for the past few nights people like Suneel, Eduardo, Nicki, and Danielle, have been coming to stand outside of my window to "visit". It evolved to the women dancing, and the whole side of the building appreciating it."*

Additionally, in the body of the email, Raniere discussed his future plans for protesters gathered outside in a form of a not-for-profit organization titled "The forgotten ones," Essentially, more women dancing scantily dressed dancing in front of the prison.

Below is an excerpt from the email,

> *"The forgotten ones" to bring in other dancers etc., interface with the local radio stations to bring in other dancers etc., with the local radio stations to bring together, community, inmates and talent. It can quite nicely grown to encompass licensing, finding new artists etc…"*

CTU staff immediately contacted the SIS office at MDC Brooklyn and requested inmate Raniere be moved to another unit.

Moreover, on a telephone call placed by inmate Raniere to the above-mentioned individual on July 11, 2020, Inmate Raniere espoused his disdain for being moved to another unit after he had organized for the women to come out and dance in front of the facility. Additionally, he begins to tell Suneel about the staff work schedules and indicated his protesters should wait outside for the staff and offer donuts and coffee as they exit the facility. Moreover Raniere advised Suneel the protesters should befriend the staff and justified this behavior by stating "we are all in this together." The staff and the inmates. Suneel indicated the protesters had made offerings to the staff and all of their efforts were declined.  Inmate Raniere's manipulative behavior continues to manifest from behind the prison through the help of Suneel Chakravorty. Inmate Raniere's actions would place the safety and security of staff and the public at risk.

BOP may prohibit inmates from communicating with a particular individual/organization in the community, when it is found the communication would jeopardize the safety, security or orderly operation of a facility or would jeopardize the protection of the public or staff.

We hereby request to reject the contact and any pending correspondence or e-mails, currently used by inmates housed at MDC Brooklyn and any future inmates who are housed at MDC Brooklyn, who may request this contact.

# Exhibit F
# Attachment 3

## Hamza Boussag - Re: Contact Block Recommendation I/M Raniere 57005-177

| | |
|---|---|
| **From:** | Heriberto Tellez |
| **To:** | Boussag, Hamza |
| **Date:** | 7/16/2020 5:36 PM |
| **Subject:** | Re: Contact Block Recommendation I/M Raniere 57005-177 |
| **CC:** | ███████████████████████ |

Good evening Mr. Boussag,

I concur with your recommendation and approve for the individual in question (Suneel Chakravorty)be removed from inmate Raniere, Keith, Reg. No. 57005-177, contacts from his TRULINCS account.

Thank you

Heriberto H. Tellez
Warden
MDC Los Angeles
535 N Alameda St.
Los Angeles, CA 90012
(213) 485-0439 ext. ████
████ @bop.gov


>>> Hamza Boussag 7/16/2020 1:23 PM >>>
Good afternoon Warden,

I am requesting one of inmate Raniere, Keith, Reg. No. 57005-177 contacts be removed and blocked from his Trulincs account, please see the attached memo where I have detailed the reasonings behind this recommendation. Let me know if you concur, or if you need more information please let me know.


*H.Boussag / Intelligence Analyst*
*U.S. Department of Justice*
*Federal Bureau of Prisons*
*Counter Terrorism Unit (CTU)*
*Office : 304-262-████*
*Fax: 304-262-8359*
*Correctional Programs Division*
*Central Office*



*UNCLASSIFIED // FOR OFFICIAL USE ONLY / LAW ENFORCEMENT SENSITIVE*

*The information contained in this electronic message as well as any and all accompanying attachments constitutes confidential and/or legally privileged information, which is intended only for use by the individual or entity to which the transmission is addressed. This information is the property of the U.S. Department of Justice. This message and its contents are not to be transmitted over non-secure servers and faxes, reproduced or further distributed without the express consent of the Federal Bureau of Prisons' Counter Terrorism Unit.*

*If you are not the intended recipient of this information, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on this information is strictly prohibited. If you received this message in error, please notify us immediately at the above number to make arrangements for its return. **THIS DOCUMENT, OR ANY SEGMENT/ATTACHMENT THEREOF, MAY NOT BE RELEASED TO ANY MEDIA SOURCES, ANY NON-LAW ENFORCEMENT ENTITY, THE GENERAL PUBLIC OR THOSE WITHOUT A "NEED TO KNOW."***

**Ex. F, p. 16**

# Exhibit F
# Attachment 4



**U.S. Department of Justice**
**Federal Bureau of Prisons**
**Federal Correctional Complex - Tucson**

*USP Unit Team*                                      *Tucson, AZ 85756*

F.O.I. EXEMPT

**May 2, 2021**

MEMORANDUM FOR: HOWARD, C., COMPLEX WARDEN

THROUGH:              Tubb, A., Associate Warden

FROM:                 Stangl, A., Unit Manager

SUBJECT:              **Visitor Denial for RANIERE, KEITH #57005-177**

Visiting privileges have been denied for **Mr. Sunil Kumar Chakraborty** due to the following reason(s):

**_X_  The prospective visitor/applicant did not have an established relationship with you prior to your incarceration.**

____ A criminal background check investigation revealed that the applicant has prior conviction(s).

____ The applicant provided false, inaccurate, and/or incomplete information on his/her Visitor Form.

____ A discrepancy in the background investigation must be resolved before being allowed in the institution.

____ On active probation.                                F.O.I. EXEMPT

____ OTHER:_____          **Ex. F, p. 18**

# Exhibit F
# Attachment 5

Honorable Nicholas G. Garaufis
United States District Judge
Eastern District of New York
225 Cadman Plaza East Brooklyn, NY 11201

Re: <u>United States v. Keith Raniere</u>, 18 Cr. 204 (NGG)

Judge Garaufis:

My name is Suneel Chakravorty. My family is from India and I am a first-generation American. I grew up in South Florida. In my family, education was one of the highest values. I studied hard, became county valedictorian and was admitted to Harvard College, where I majored in mathematics. After college, I worked as a software engineer before starting my own company. I co-founded a software consulting firm in NYC, which grew in just a few years to be the technology innovation partner for a Fortune 100 company, a national healthcare network, a top hedge fund, and several startups.

My first conversation with Keith Raniere was in prison, after his trial. At the time, he and I were complete strangers. Now I count him as one of my friends. I am writing this letter to you, your honor, to provide my perspective on Keith's character, for consideration in your sentencing decision.

I first learned of Executive Success Programs in August 2016, when a fellow Harvard graduate told me about it and invited me to take it. He told me the company and its founder had very bad press but that the program was very effective for entrepreneurs. He explained that the program focused on helping the participant to overcome limiting behaviors and patterns. This sounded interesting so I signed up. Then later I Googled the company. I was initially very disturbed at what I read about Keith and about NXIVM, but most of the articles seemed to be personal blog posts and I have known political friends who were written fallaciously about in the media. In addition, the person who enrolled me seemed smart and kind, so I decided I would see for myself.

In October 2016, I took my first five-day intensive in an office building in midtown Manhattan. There were about 20 participants, from seasoned businesspeople to college graduates and everyone with a unique motivation for being at the training, from figuring out their next career move to achieving better work-life balance to finding inner peace. There were certain practices that I found strange, like referring to Keith as "Vanguard" in the classes. I later came to understand that there were benign, rational explanations for those things. Also, I took Tae Kwon Do growing up and had no issue with calling my instructor "Master." I believe that if there were no bad press, I would not have interpreted those practices as negatively as I initially did.

What I learned about emotions and my own patterns of behavior was invaluable and I left the training energized to build my company and so much less stressed. As the weeks went by, I noticed more and more benefits. With my family, where I used to be controlling and tense, I

EXHIBIT

**15**

U.S. v. Raniere, 18-Cr-204 (NGG)

Ex. F, p. 20

became relaxed and able to enjoy time with them more. Our family trips became even more precious and memorable.  With my company, I began to push harder, get more projects, and grow my team faster than I thought possible.

Over the next few months, I completed my sixteen-day intensive and took an additional training called Mobius. On some occasions, I was asked by some of the coaches if I had anyone I wanted to invite to take a training. Although I did have people in mind, I did not feel comfortable publicly associating myself with NXIVM because of its negative reputation, so I told the coaches that I did not want to invite people and they completely understood. I did not feel any pressure to invite anyone and no one asked me about it thereafter. However, at a certain point, I felt that the classes of ESP had helped me so much, to be a more effective founder, a more compassionate brother, and a more grateful son that my desire to share this with others exceeded my fear of what people would think and I invited a few friends to take the course.

I became a coach in June of 2017 at the "coach summit" where many leaders in ESP decided to leave the organization. To me, this was strange because I never thought of ESP as something one would join or leave. To me, they were just classes you could take or not take. I continued to be a coach in the New York City ESP Center over the next few months as articles began to come out about "sex slaves" and "sex cult." I found the articles seriously alarming, but they did not contain any evidence, seemed to be defamatory in nature, and were the opposite of my experience as a coach in NYC. All we did was have classes in midtown Manhattan, nothing more exciting than that, and I was seeing firsthand how the ESP classes were helping people in my family and in my company.

This contradiction between what I was experiencing and what was being written only grew more extreme. When the NY Times article came out in October 2017 about NXIVM being a "cult" that branded women, I received a flurry of emails from friends who knew I was a coach in the program and were concerned for my well-being and safety. In reality, that day was like any other for me. I had normal business meetings with my clients and my team and in the evening met with my ESP coach about my 3-month fitness goal. My reality was so mundane compared to what the media was writing. I also had the opportunity to get to know the subjects of some of those articles, people like Lauren Salzman and Allison Mack. I found them to be intelligent, strong-willed and caring women who were motivated to help others. Lauren had coached me to become more productive in managing my employees and Allison had taught me how to become more expressive and less reserved. At the same time that they were being described as bad people, I was getting to know them and finding them to be the opposite.

Because my personal experiences had been so positive and I had not been able to find evidence of what was being alleged, I decided to stay involved even during an international media storm. To me, ESP did not seem like a sinister organization with the hidden agenda of serving Keith Raniere. It seemed to me to be a personal growth company filled with good, earnest people who were being intentionally maligned. I was raised to stand up for good people, especially when they are being attacked, and that is why I chose to continue as a coach up util the companies closed in May 2018.

Almost a year later, I chose to attend Keith's trial because I had seen so much untruth and sensationalism in the media coverage about NXIVM and its family of companies that I was hoping that the legal process might be more data-driven and logical. Because I had sold my business by that time, I had the flexibility to attend the trial as often as I wanted, and I decided to go every day. I found that the narrative being presented about NXIVM was the same one that was in the media. The witnesses, some of whom I was familiar with, had changed their perspective completely and were presenting information that I could have contradicted with my experience as well as my experience of them even just a year prior. Although the types of crimes that Keith was convicted of are very serious and I do not in any way condone acts like sex trafficking and forced labor, I believe that Keith is innocent of these crimes and that he was convicted not because of evidence but because of how much hate he was painted with. It was an emotional trial and it would be hard for any person to not feel that Keith is a bad person, based only on what the witnesses said.

After the trial, I felt restless. I felt I had just observed a serious injustice and wanted to help, so I decided to visit Keith in prison and asked him how I could help.

Over the course of the past year, I have had a hundred hours of phone calls and dozens of in-person visitations with Keith as we have been working closely together on several initiatives that not only could help separate the prejudice from the law in his case but could help many others in the future who encounter prejudice in our legal system. Some of these communications have been published in court filings. I believe that if your honor were to hear them in context, you would find them to be upstanding and well-intentioned.

In every interaction that I have had with Keith, he has been kind, understanding and patient. Sometimes he is my fellow math nerd. Other times, he is a mentor to me. Other times yet, he is just my friend. He has never ordered me to do anything or been demanding or punishing. On the contrary, when I have tried to help but have come up short, he has always been understanding and grateful. I also feel that he has treated me like a true friend. Although our prison calls are short and there are many pressing matters with his case to discuss, he would always find some time to tell me a joke, discuss math topics with me, just tell me how he was feeling or ask me if I was doing okay.

For more than a year, I have only seen Keith try to use his situation to the benefit of others. Almost on a daily basis, he would call me with an idea of how to highlight the injustice in his situation to bring attention to the broader issues going on. He rarely, if ever, emphasized saving himself. At times, he expressed that he was not sure if he would ever be free but at least if his situation can help others, then he would feel happy.

Unfortunately, in July 2020, my communications with Keith were blocked by the prison. I have appealed the decision but never gotten any explanation or a response.

Ex. F, p. 22

I have talked at length with Keith about his situation, the case and the NXIVM community and to me he seems very sorry for all that has happened, because is the leader of that community, but at the same time he maintains his innocence of the charges.

I firmly believe that you only know a person's character in the worst moments of their life. I have had the privilege of getting to know Keith during such a time and I believe him to be a good and peaceful person.

I implore you, your honor, to be as lenient as possible and not sentence Keith to life in prison.


Sincerely,

Suneel Chakravorty

# Exhibit F
# Attachment 6

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

Eastern District of New York

| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
|---|---|---|
| v. | ) | |
| | ) | Case Number:   CR 18-0204 (S-2) (NGG) |
| KEITH RANIERE | ) | USM Number:   57005-177 |
| | ) | Marc A. Agnifilo, Esq. |
| | ) | Defendant's Attorney |

## THE DEFENDANT:

**X**   was found guilty by jury   verdict on Counts 1, 2, 6, 7, 8, 9 & 10 of the Superseding Indictment (S-2).

☐ pleaded nolo contendere to count(s)
which was accepted by the court.

☐ was found guilty on count(s)
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| **Title & Section** | **Nature of Offense** | **Offense Ended** | **Count** |
|---|---|---|---|
| SEE PAGE 2 OF JUDGMENT | | | |

The defendant is sentenced as provided in pages 2 through ___11___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

**X**   Any underlying Indictment is dismissed by motion of   the United States.

**X**   Counts 3, 4, 5 & 11 of the Superseding Indictment (S-2) are dismissed by motion of the United States before trial.

☐ Count(s) _____   ☐ is   ☐ are dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

October 27, 2020
Date of Imposition of Judgment

Signature of Judge

Nicholas G. Garaufis, U.S.D.J.
Name and Title of Judge

October 30, 2020
Date

DEFENDANT:     KEITH RANIERE
CASE NUMBER:   CR 18-0204 (S-2)(NGG)

# ADDITIONAL COUNTS OF CONVICTION

**Offense:**

**Count 1:**
RACKETEERING CONSPIRACY
18 U.S.C. §1962(d), 18 U.S.C. §1963(a)
Not more than life imprisonment/$250,000 fine
(Class A Felony)

**Count 2:**
RACKETEERING
18 U.S.C. §1962(c), 18 U.S.C. §1963(a)
Not more than life imprisonment/$250,000 fine
(Class A Felony)

**Count 6:**
FORCED LABOR CONSPIRACY
18 U.S.C. §1594(b)
Not more than 20 years imprisonment/$250,000 fine
(Class C Felony)

**Count 7:**
WIRE FRAUD CONSPIRACY
18 U.S.C. §1349, 18 U.S.C. §1343
Not more than 20 years imprisonment/$250,000 fine
(Class C Felony)

**Count 8:**
SEX TRAFFICKING CONSPIRACY
18 U.S.C. §1594(c), 18 U.S.C. §1591(b)(1)
15 years to life imprisonment/$250,000 fine
(Class A Felony)

**Count 9:**
SEX TRAFFICKING OF JANE DOE 5
18 U.S.C. §1591(a)(1), 18 U.S.C. §1591(b)(1)
15 years to life imprisonment/$250,000 fine
(Class A Felony)

**Count 10:**
ATTEMPTED SEX TRAFFICKING OF JANE DOE 8
18 U.S.C. §1594(a), 18 U.S.C. §1591(b)(1)
15 years to life imprisonment/$250,000 fine
(Class A Felony)

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page ___3___ of ___11___

DEFENDANT: **KEITH RANIERE**
CASE NUMBER: **CR 18-0204 (S-2) (NGG)**

## IMPRISONMENT

      The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of: **SEE PAGE 4 OF JUDGMENT.**

☐ The court makes the following recommendations to the Bureau of Prisons:

X The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at  _____ ☐ a.m. ☐ p.m.  on  _____ .

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on  _____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on  _____  to  _____

at  _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

**Ex. F, p. 27**

AO 245B (Rev. 09/19)  Judgment in a Criminal Case
Sheet 2A — Imprisonment

DEFENDANT:     KEITH RANIERE
CASE NUMBER:   CR 18-0204 (S-2) (NGG)

Judgment—Page    4    of    11

# ADDITIONAL IMPRISONMENT TERMS

FORTY (40) YEARS (480 MONTHS) (CAG) ON COUNT ONE (1) OF THE SUPERSEDING INDICTMENT (S-2) TO BE SERVED CONCURRENTLY WITH THE SENTENCE ON COUNT 2 AND CONSECUTIVELY WITH ALL OTHER SENTENCES IMPOSED;

FORTY (40) YEARS (480 MONTHS) (CAG) ON COUNT TWO (2) OF THE SUPERSEDING INDICTMENT (S-2) TO BE SERVED CONCURRENTLY WITH THE SENTENCE IMPOSED ON COUNT 1 AND CONSECUTIVELY WITH ALL OTHER SENTENCES IMPOSED;

TWENTY (20) YEARS (240 MONTHS) (CAG) ON COUNT SIX (6) OF THE SUPERSEDING INDICTMENT (S-2) TO BE SERVED CONSECUTIVELY WITH ALL OTHER SENTENCES IMPOSED;

TWENTY (20) YEARS (240 MONTHS) (CAG) ON COUNT SEVEN (7) OF THE SUPERSEDING INDICTMENT (S-2) TO BE SERVED CONSECUTIVELY WITH ALL OTHER SENTENCES IMPOSED;

FORTY (40) YEARS (480 MONTHS) (CAG) ON COUNT EIGHT (8) OF THE SUPERSEDING INDICTMENT (S-2) TO BE SERVED CONCURRENTLY WITH THE SENTENCES IMPOSED ON COUNTS 9 AND 10, AND CONSECUTIVELY WITH ALL OTHER SENTENCES IMPOSED;

FORTY (40) YEARS (480) MONTHS (CAG) ON COUNT NINE (9) OF THE SUPERSEDING INDICTMENT (S-2) TO BE SERVED CONCURRENTLY WITH THE SENTENCES ON COUNTS 8 AND 10, AND CONSECUTIVELY WITH ALL OTHER SENTENCES IMPOSED;

FORTY (40) YEARS (480) MONTHS (CAG) ON COUNT TEN (10) OF THE SUPERSEDING INDICTMENT (S-2) TO BE SERVED CONCURRENTLY WITH THE SENTENCES ON COUNTS 8 AND 9, AND CONSECUTIVELY WITH ALL OTHER SENTENCES IMPOSED.

TO SUMMARIZE, THIS IS A CUMULATIVE SENTENCE OF 120 YEARS (CAG).

Case 4:21-cr-00009 Document 607-45 Filed 06/09/22 Page 304 of 320

DEFENDANT:　　　KEITH RANIERE
CASE NUMBER:　　CR 18-0204 (S-2) (NGG)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of: FIVE (5) YEARS ON COUNT ONE (1) OF THE SUPERSEDING INDICTMENT (S-2). FIVE (5) YEARS ON COUNT TWO (2) OF THE SUPERSEDING INDICTMENT (S-2). THREE (3) YEARS ON COUNT SIX (6) OF THE SUPERSEDING INDICTMENT (S-2). THREE (3) YEARS ON COUNT SEVEN (7) OF THE SUPERSEDING INDICTMENT (S-2). A LIFETIME TERM ON COUNT EIGHT (8) OF THE SUPERSEDING INDICTMENT (S-2). A LIFETIME TERM ON COUNT NINE (9) OF THE SUPERSEDING INDICTMENT (S-2). A LIFETIME TERM ON COUNT TEN (10) OF THE SUPERSEDING INDICTMENT (S-2). ALL TERMS OF SUPERVISED RELEASE TO BE SERVED CONCURRENTLY WITH ONE ANOTHER.

# MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   - ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☐ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                    Sheet 3A — Supervised Release

| | |
|---|---|
| DEFENDANT:   KEITH RANIERE | Judgment—Page   6   of   11   |
| CASE NUMBER:   CR 18-0204 (S-2) (NGG) | |

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.


## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.


Defendant's Signature   _____      Date _____

Ex. F, p. 30

DEFENDANT: KEITH RANIERE
CASE NUMBER: CR 18-0204 (S-2)(NGG)

## SPECIAL CONDITIONS OF SUPERVISION

#1. The defendant shall comply with any applicable state and/or federal sex offender registration requirements, as instructed by the probation officer, the Bureau of Prisons, or any state offender registration agency in the state where he resides, works, or is a student;

#2. The defendant shall participate in a mental health treatment program, which may include participation in a treatment program for sexual disorders, as approved by the U.S. Probation Department. The defendant shall contribute to the cost of such services rendered and/or any psychotropic medications prescribed to the degree he is reasonably able, and shall cooperate in securing any applicable third-party payment. The defendant shall disclose all financial information and documents to the Probation Department to assess his ability to pay. As part of the treatment program for sexual disorders, the defendant shall participate in polygraph examinations to obtain information necessary for risk management and correctional treatment;

#3. The defendant shall not associate with or have any contact with convicted sex offenders unless in a therapeutic setting and with the permission of the U.S. Probation Department;

#4. The defendant shall not associate with children under the age of 18, unless a responsible adult is present and he has prior approval from the Probation Department. Prior approval does not apply to contacts which are not known in advance by the defendant where children are accompanied by a parent or guardian or for incidental contacts in a public setting. Any such non-pre-approved contacts with children must be reported to the Probation Department as soon as practicable, but no later than 12 hours. Upon commencing supervision, the defendant shall provide to the Probation Department the identity and contact information regarding any family members or friends with children under the age of 18, whom the defendant expects to have routine contact with, so that the parents or guardians of these children may be contacted and the Probation Department can approve routine family and social interactions such as holidays and other family gatherings where such children are present and supervised by parents or guardians without individual approval of each event;

#5. If the defendant cohabitates with an individual who has residential custody of minor children, the defendant will inform that other party of his prior criminal history concerning his sex offense. Moreover, he will notify the party of his prohibition of associating with any child(ren) under the age of 18, unless a responsible adult is present;

#6. The defendant shall submit his person, property, house, residence, vehicle, papers, computers (as defined in 18 U.S.C. § 1030(e)(1)), other electronic communications or data storage devices or media, or office, to a search conducted by a United States probation officer. Failure to submit to a search may be grounds for revocation of release. The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition. An officer may conduct a search pursuant to this condition only when reasonable suspicion exists that the defendant has violated a condition of his supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner;

Ex. F, p. 31

DEFENDANT: KEITH RANIERE
CASE NUMBER: CR 18-0204 (S-2)(NGG)

Judgment—Page __8__ of __11__

# SPECIAL CONDITIONS OF SUPERVISION

#7. The defendant is not to use a computer, Internet capable device, or similar electronic device to access pornography of any kind. The term "pornography" shall include images or video of adults or minors engaged in "sexually explicit conduct" as that term is defined in Title 18, U.S.C. § 2256(2). The defendant shall also not use a computer, Internet capable device or similar electronic device to view images of naked children. The defendant shall not use his computer to view pornography or images of naked children stored on related computer media, such as CDs or DVDs, and shall not communicate via his computer with any individual or group who promotes the sexual abuse of children. The defendant shall also cooperate with the U.S. Probation Department's Computer and Internet Monitoring program. Cooperation shall include, but not be limited to, identifying computer systems, Internet capable devices, and/or similar electronic devices the defendant has access to, and allowing the installation of monitoring software/hardware on said devices, at the defendant's expense. The defendant shall inform all parties that access a monitored computer, or similar electronic device, that the device is subject to search and monitoring. The defendant may be limited to possessing only one personal Internet capable device, to facilitate the Probation Department's ability to effectively monitor his/her Internet related activities. The defendant shall also permit random examinations of said computer systems, Internet capable devices, similar electronic devices, and related computer media, such as CDs, under his control.

#8. The defendant shall report to the Probation Department any and all electronic communications service accounts (as defined in 18 U.S.C. § 2510(15)) used for user communications, dissemination and/or storage of digital media files (i.e. audio, video, images). This includes, but is not limited to, email accounts, social media accounts, and cloud storage accounts. The defendant shall provide each account identifier and password, and shall report the creation of new accounts, changes in identifiers and/or passwords, transfer, suspension and/or deletion of any account within 5 days of such action. Failure to provide accurate account information may be grounds for revocation of release. The defendant shall permit the Probation Department to access and search any account(s) using the defendant's credentials pursuant to this condition only when reasonable suspicion exists that the defendant has violated a condition of his supervision and that the account(s) to be searched contains evidence of this violation. Failure to submit to such a search may be grounds for revocation of release.

#9. Upon request, the defendant shall provide the U.S. Probation Department with full disclosure of his financial records, including co-mingled income, expenses, assets and liabilities, to include yearly income tax returns. With the exception of the financial accounts reported and noted within the presentence report, the defendant is prohibited from maintaining and/or opening any additional individual and/or joint checking, savings, or other financial accounts, for either personal or business purposes, without the knowledge and approval of the U.S. Probation Department. The defendant shall cooperate with the probation officer in the investigation of his financial dealings and shall provide truthful monthly statements of his income and expenses. The defendant shall cooperate in the signing of any necessary authorization to release information forms permitting the U.S. Probation Department access to his financial information and records;

DEFENDANT: KEITH RANIERE
CASE NUMBER: CR 18-0204 (S-2)(NGG)

## SPECIAL CONDITIONS OF SUPERVISION

#10. The defendant shall not have contact with any of the named victims of his offenses. This means that he shall not attempt to meet in person, communicate by letter, telephone, or through a third party, without the knowledge and permission of the Probation Department;

#11. The defendant shall not associate in person, through mail, electronic mail or telephone with any individual with an affiliation to Executive Success Programs, Nxivm, DOS or any other Nxivm-affiliated organizations; nor shall the defendant frequent any establishment, or other locale where these groups may meet pursuant, but not limited to, a prohibition list provided by the U.S. Probation Department;

#12. The defendant shall comply with the fine payment order;

#13. The defendant shall comply with the attached Order of Forfeiture.

AO 245B (Rev. 09/19) Judgment in a Criminal Case
                 Sheet 5 — Criminal Monetary Penalties

| | |
|---|---|
| DEFENDANT: | KEITH RANIERE |
| CASE NUMBER: | CR 18-0204 (S-2) (NGG) |

Judgment — Page **10** of **11**

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | Forfeiture Money Judgment | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 700.00 | $ TBD | $ 1,750,000.00 | $ N/A | $ 15,000.00 |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| | | | |
|---|---|---|---|
| **TOTALS** | $ _____ | $ _____ | |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

    ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

Ex. F, p. 34

AO 245B (Rev. 09/19)  Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

DEFENDANT: KEITH RANIERE
CASE NUMBER: CR 18-0204 (S-2) (NGG)

Judgment — Page  11  of  11

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☒ **Special Assessment of $** 700.00 **due immediately, balance due**

   ☐ not later than _____ , or
   ☐ in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

**B** ☐ .  ☐  ☐ D, or ☐ F below); or

**C** ☒ **Fine Payment of $1,750,000.00 due immediately.**
   ☐   (  over a period of
   _____ _ *(e.g., months or years)*, **to commence** _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D** ☐ **Payment in equal** _____ *(e.g., weekly, monthly, quarterly)* **installments of $** _____ **over a period of**
   _____ _ *(e.g., months or years)*, **to commence** _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
   **term of supervision; or**

**E** .
   ☒ **JVTA assessment of $15,000.00**

**F** ☒ **Order of Restitution to be determined**

   **An Order of Restitution must be submitted within 90 days from October 27, 2020.**

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

   Case Number
   Defendant and Co-Defendant Names  ·
   *(including defendant number)*  **Total Amount**  **Joint and Several Amount**  **Corresponding Payee, if appropriate**

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

Ex. F, p. 35

BDM:KKO
F. #2017R01840

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA

        - against -

KEITH RANIERE,

              Defendant.

– – – – – – – – – – – – – – – – X

<u>ORDER OF FORFEITURE</u>

18-CR-204 (S-2) (NGG)

WHEREAS, on or about June 19, 2019, Keith Raniere, also known as "Vanguard," "Grandmaster," and "Master" (the "defendant"), was convicted after a jury trial of Counts One, Two, and Six through Ten, of the above-captioned Superseding Indictment, charging violations of 18 U.S.C. §§ 1349, 1591(a)(1), 1594(a), 1594(b), 1594(c), 1962(c), and 1962(d); and

WHEREAS, the Court has determined that pursuant to 18 U.S.C. § 1963(a), the defendant shall forfeit: (a) any interest the defendant acquired or maintained in violation of 18 U.S.C. § 1962; (b) any interest in, security of, claim against or property or contractual right of any kind affording a source of influence over any enterprise which the defendant has established, operated, controlled, conducted or participated in the conduct of, in violation of 18 U.S.C. § 1962; (c) any property constituting, or derived from, any proceeds which the defendant obtained, directly or indirectly, from racketeering activity in violation of 18 U.S.C. § 1962; and/or (d) substitute assets, pursuant to 18 U.S.C. § 1963(m), which shall be reduced to a forfeiture money judgment (the "Forfeiture Money Judgment").

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

1.      The defendant shall forfeit to the United States the Forfeiture Money Judgment, pursuant to 18 U.S.C. §§ 1963(a) and 1963(m).

2.      This Order of Forfeiture ("Order") is entered pursuant to Fed. R. Crim. P. 32.2(b)(2)(c), and will be amended pursuant to Fed. R. Crim. P. 32.2(e)(1) when the amount of the Forfeiture Money Judgment has been calculated.

3.      All payments made towards the Forfeiture Money Judgment shall be made by a money order, or certified and/or official bank check, payable to U.S. Marshals Service with the criminal docket number noted on the face of the check. The defendant shall cause said payment(s) to be sent by overnight mail delivery to Assistant United States Attorney Karin K. Orenstein, United States Attorney's Office, Eastern District of New York, 271-A Cadman Plaza East, Brooklyn, New York 11201, with the criminal docket number noted on the face of the instrument. The Forfeiture Money Judgment shall become due and owing in full thirty (30) days after any amendment of this Order pursuant to Rule 32.2(e)(1) (the "Due Date").

4.      If the defendant fails to pay any portion of the Forfeiture Money Judgment on or before the Due Date, the defendant shall forfeit any other property of his up to the value of the outstanding balance, pursuant to 18 U.S.C. § 1963(m).

5.      Upon entry of this Order, the United States Attorney General or his designee is authorized to conduct any proper discovery in accordance with Fed. R. Crim. P. 32.2(b)(3) and (c). The United States alone shall hold title to the monies paid by the

---

defendant to satisfy the Forfeiture Money Judgment following the Court's entry of the judgment of conviction.

6.     The defendant shall fully assist the government in effectuating the payment of the Forfeiture Money Judgment.

7.     The entry and payment of the Forfeiture Money Judgment is not to be considered a payment of a fine, penalty, restitution loss amount or a payment of any income taxes that may be due, and shall survive bankruptcy.

8.     Pursuant to Fed. R. Crim. P. 32.2(b)(4)(A) and (B), this Order of Forfeiture shall become final as to the defendant at the time of sentencing and shall be made part of the sentence and included in the judgment of conviction. This Order shall become the Final Order of Forfeiture, pursuant to Fed. R. Crim. P. 32.2(c)(2) and (e)(1). At that time, the monies and/or properties paid toward the Forfeiture Money Judgment shall be forfeited to the United States for disposition in accordance with the law.

9.     This Order shall be binding upon the defendant and the successors, administrators, heirs, assigns and transferees of the defendant, and shall survive the bankruptcy of any of them.

10.     This Order shall be final and binding only upon the Court's "so ordering" of the Order.

---

18-CR-204 (S-2) (NGG)

*United States v. Keith Raniere*
Order of Forfeiture

Page 3

11.     The Court shall retain jurisdiction over this action to enforce

compliance with the terms of this Order and to amend it as necessary, pursuant to Fed. R.

Crim. P. 32.2(e).

Dated:   Brooklyn, New York

_____ Oct 26 _____, 2020

SO ORDERED:

_____

HONORABLE NICHOLAS G. GARAUFIS
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF NEW YORK

# Exhibit F
# Attachment 7

# NOTICE OF EMAIL/MAIL/PHONE SERVICE LIMITATION CHANGE

Pursuant to Program Statements 4500.11 Trust Fund/Deposit Fund Manual, 5264.08 Inmate Telephone Regulations, & 5265.14 Correspondence, I have exercised my discretion to limit your Telephone Usage, TRULINCS services, and Correspondence. This form is maintained in your Central File, which you may access through your Unit Team, unless this request had to be maintained in the FOIA Exempt Section due to sensitive content. If this request is in the FOIA Exempt Section, you can request such through the FOIA process. Your Unit Team can provide you the address for the FOIA. If you have concerns about this limitation, you may utilize the Administrative Remedy Process.

P.S. 4500.11: Use of TRULINCS is a privilege; therefore, the Warden may limit or deny the privilege of a particular inmate (see Section 14.9 for restrictions). This authority may not be delegated below the Associate Warden level.

P.S. 5264.08: In addition to the procedures set forth in this subpart, inmate telephone use is subject to those limitations which the Warden determines are necessary to ensure the security or good order, including discipline, of the institution or to protect the public.

P.S. 5265.14: The Warden may place an inmate on restricted general correspondence based on misconduct or as a matter of classification.

TO: _Keith Raniere_
Inmate Name

Register No. _57005 - 177_

Quarters _C1 -108_

FROM: _____
D. Colbert, Warden

Date _5/3/2022_

Reason for change (Check Box): ☒ SIS Investigation  ☐ 100/200 Series Incident Report  ☐ FRP Refused  ☐ Other

Restore (initial)

| | | |
|---|---|---|
| ☐ | Disallow Telephone Fund Transfers (TRUFONE) Manage TRU-Units Restricted (TRULINCS). Manage Funds Restricted (TRULINS). Restrict Commissary shopping list. | |
| ☐ | Limit of one 5 minute phone call per week. | |
| ☒ | Maximum of 10 total active contacts *(All current contacts will be deleted and SIS will need to approve the initial 10 contacts entered).* (TRULINCS) | |
| ☒ | Inmate is placed on Contact Pre-Approval *(SIS will review change requests on a quarterly basis).* (TRULINCS) | |
| ☐ | Recommend to Unit Team that inmate be placed on PSF for the telephone and disallow public messaging. (TRUFONE & TRULINCS) | |
| ☐ | Inmate is placed on Restricted General Correspondence. | |

☐ Restore full privileges.

D. Colbert , Warden _____   _____ Date

CC: Trust Fund Supervisor
Applicable Unit Team

INITIAL REVIEW DATE: _____
*If you are currently housed within the Special Housing, upon your release see a member of the Executive Staff at mainline to be assigned a review date. Bring this form with you.*

# Exhibit F
# Attachment 8

Date:   05/19/2022                                                                                            Facility: TCN
Time:   03:19 PM

Federal Bureau of Prisons

TRULINCS

**Inmate Contacts**

Sensitive But Unclassified

| Inmate Reg#: | 57005177 |
|---|---|
| **Group:** | *<ALL>* |
| **Facility:** | TCN |
| **Institution:** | *<ALL>* |
| **Contact Status:** | Active |
| **Contact:** | <ALL> |

| Inmate:  57005177 RANIERE, KEITH | TCP-C-A |
|---|---|

| Contact Name<br>Legal Name | Address(es) | Email Address(es) | Phone Number(s) | Comment(s) | Video<br>Contact |
|---|---|---|---|---|---|
| **Marc Agnifolo**<br>Marc Agnifolo | ▮▮▮▮▮<br>NEW YORK, NY 10016<br>United States | | | | No |
| Date Created:<br>05/18/2022 | | | | | |
| Relationship: Attorney | Last Changed: 05/19/2022 | | | | |
| **Jennifer Bon Jean**<br>Jennifer Bon Jean | ▮▮▮▮▮<br>BROOKLYN, NY 11238<br>United States | | | | No |
| Date Created:<br>05/18/2022 | | | | | |
| Relationship: Attorney | Last Changed: 05/18/2022 | | | | |
| **Paul Derohanesian**<br>Paul Derohanesian | ▮▮▮▮▮<br>CLIFTON PARK, NY 12065<br>United States | | | | No |
| Date Created:<br>05/18/2022 | | | | | |
| Relationship: Attorney | Last Changed: 05/18/2022 | | | | |

User ID:   TF44221

**Ex. F, p. 43**

Federal Bureau of Prisons

TRULINCS

**Inmate Contacts**

Sensitive But Unclassified

| Contact Name<br>Legal Name | Address(es) | Email Address(es) | Phone Number(s) | Comment(s) | Video<br>Contact |
|---|---|---|---|---|---|
| **Marianna Fernandez** | ▮▮▮▮▮▮<br>CLIFTON PARK, NY 12065<br>United States | | | | No |
| Date Created:<br>05/16/2022<br>Relationship: Other Relation Last Changed: 05/19/2022 | | | | | |
| **Teny Geragos** | ▮▮▮▮▮▮<br>NEW YORK, NY 10016<br>United States | | | | No |
| Date Created:<br>05/19/2022<br>Relationship: Attorney Last Changed: 05/19/2022 | | | | | |
| **Jacob Kaplan** | ▮▮▮▮▮▮<br>NEW YORK, NY 10016<br>United States | | | | No |
| Date Created:<br>05/19/2022<br>Relationship: Attorney Last Changed: 05/19/2022 | | | | | |
| **Howard Leader** | ▮▮▮▮▮▮<br>NEW YORK, NY 10007<br>United States | | | | No |
| Date Created:<br>05/19/2022<br>Relationship: Attorney Last Changed: 05/19/2022 | | | | | |

Date:    05/19/2022                                                                                          Facility: TCN
Time:    03:19 PM

Federal Bureau of Prisons

TRULINCS

**Inmate Contacts**

Sensitive But Unclassified

| Contact Name<br>Legal Name | Address(es) | Email Address(es) | Phone Number(s) | Comment(s) | Video<br>Contact |
|---|---|---|---|---|---|
| **Jeffrey Lichtman** | ███████<br>NEW YORK, NY 10017<br>United States | | | | No |
| Date Created:<br>05/19/2022 | | | | | |
| Relationship: Attorney | Last Changed: 05/19/2022 | | | | |
| **Danielle Smith** | ███████<br>CLIFTON PARK, NY 12065<br>United States | | | | No |
| Date Created:<br>05/19/2022 | | | | | |
| Relationship: Attorney | Last Changed: 05/19/2022 | | | | |
| **Michael Sullivan** | ███████<br>CLIFTON PARK, NY 12065<br>United States | | | | No |
| Date Created:<br>05/19/2022 | | | | | |
| Relationship: Attorney | Last Changed: 05/19/2022 | | | | |