Stacy Scheff
LAW OFFICE OF STACY SCHEFF
P.O. Box 40611, Tucson, AZ 85717-0611
(520) 471-8333 • FAX (520) 300-8033
stacy@ScheffLaw.com
State Bar No. 028364
*Counsel for Plaintiff*

# DISTRICT COURT FOR THE UNITED STATES
## DISTRICT OF ARIZONA

| | |
|---|---|
| Keith Raniere,<br><br>                  Plaintiff,<br><br>v.<br><br>Merrick Garland, US Attorney General; Michael Carvajal, Director Federal Bureau of Prisons; Danon Colbert, Warden USP Tucson, Anthony Gallion (all in their official capacities),<br><br>                  Defendants | Case No.: 4:22-cv-00561-RCC-PSOT<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION.**<br>***(Expedited Consideration Requested)***<br>***(Hearing Requested)*** |

Plaintiff, via counsel, replies to Defendants' Opposition[1] to Plaintiff's Motion for a Preliminary Injunction and Temporary Restraining Order at Doc. 14.  Defendants' opposition is nearly *identical* to the one filed in *Raniere I.* 4:22-cv-212-RCC, Doc. 14.  Defense Counsel, Denise Faulk, apparently did not read Plaintiff's reply in *Raniere I,* because none of Plaintiff's arguments have been addressed.  This arguably violates F.R.Civ.P. Rule 11(b), that the written motion presented to the Court is based on "an inquiry reasonable under the circumstances…"  Here, Ms. Faulk apparently conducted <u>*no inquiry at all*</u> into the arguments and evidence presented in support of Plaintiff's Motion for Preliminary Injunction in *Raniere I,* nor the arguments presented in Plaintiff's Motion

---

[1]No appearance has been entered.

1

here.  Indeed, Ms. Faulk appears to still be fighting *Raniere I*.

**I. Factual Inaccuracies.**

Defendants' Opposition contains numerous inaccurate or misleading statements, and inapplicable arguments.  Defendants still claim to have the authority to decide who is or is not a member of the now-defunct NXIVM or DOS for the purpose of selectively banning (and unbanning and re-banning) Plaintiff's supporters and retaliating against Plaintiff for the acts of his supporters.  Defendants claim that their actions are justified by the safety and security needs of the institution, however they gloss over the details that do not fit with that narrative:

1. "The SIS Department may determine whether any requested individuals are affiliated with NXIVM, ESP, DOS or any other NXIVM-affiliated organizations, as prohibited by the special conditions of supervised release in the Judgment… If it is dangerous for Plaintiff to have access to particular individuals once released, it is also a security risk to allow Plaintiff to have access to these same individuals while incarcerated." Doc. 14, p.6.

    ◦ The "Special Conditions of Supervision" state,

    > As part of your supervised release, you must comply with the following standard conditions of supervision… The defendant shall not associate in person, through mail, electronic mail, or telephone with any individual with an affiliation to Executive Success Programs, Nxivm, DOS or any other Nxivm-affiliated organizations; nor shall the defendant frequent any establishments, or other locale where these groups may meet…"

    Doc. 14-2, p.30.

Defendants claim that they have the authority to interpret this order by an Article 3 judge to apply to Plaintiff currently, even though he has not been released, NXIVM does not exist, the people who have been banned are in no danger from Plaintiff, and they wish to have contact with Plaintiff. Doc. 14-2, p.5. This assertion of authority does not cite to any law granting it. *Id.*

2. "Nicki Clyne is a former associate of NXIVM who has been banned from communicating with Plaintiff." Doc. 14, p.2.

    ○ If this were the entire story, then Nicki Clyne would have been banned from communicating with Plaintiff *immediately* after his sentencing on October 27, 2020. However, she was allowed to visit Plaintiff at both the MDC in New York and the USP in Tucson long after the sentence was handed down. In fact, Ms. Clyne communicated with Plaintiff at USP Tucson from January of 2021 until July 24, 2021, when she was banned. Doc. 1, p.16. Notably, Ms. Clyne was banned *after* Plaintiff was cited for "communicating with Ms. Clyne through another inmate and by using her to communicate with Clare Bronfman…"[2] If Defendants were truly concerned for the "safety and security of the institution" (Doc. 14, p.2), and they truly believed that Ms. Clyne was a threat because of this, they would have prevented Ms. Clyne from *ever* communicating with Plaintiff, not after seven months and a significant media event. This failure to follow even their own stated aims erodes the credibility

---

[2] Plaintiff denies ever trying to speak with Clare Bronfman.

3

of Defendants' claims.  Additionally, the timing of the decision to ban her coming shortly after the publicity around Plaintiff's restitution hearing, and the back-and-forth decisions raise questions about the Defendants' motivations.

2. In their response, Defendants claimed "Plaintiff circumvented mail monitoring by communicating with Ms. Clyne through another inmate [Timothy Brooks] and by using her to communicate with Clare Bronfman, another associate of NXIVM and co-defendant of Plaintiff who currently is serving time in federal prison. (*Id.* pp. 3, 12-17.)" Doc. 14 at 2:10-13

   ◦ Defendants support their claim with evidence from an Inmate Investigative Report (IIR), from SIS, and the DHO Report. However, the evidence does not make sense, and is impossible and self-contradictory.

   ◦ Also, the SIS technician Xavier Calvillo involved in the investigation got critical facts incorrect in his memo to Warden Catricia Howard, recommending that Ms. Clyne be banned from communicating with and visiting Mr. Raniere. For example, Calvillo claimed that Brooks' email "is being utilized to contact Nicki Clyne ***when inmate Keith Raniere is not able to communicate with her.***" *Raniere I,* Doc. 31-2 at 11. However, Ms. Clyne ***was*** able and allowed to communicate with Mr. Raniere at that time. She was an approved contact on his call list and visitation list and they had phone calls regularly, sometimes multiple times a day, and visited every other week, and even visited Mr. Raniere once after he was placed in the SHU.

   ◦ In the IIR, an entry from M. Rhynard on July 22, 2021, states, "During an

4

interview with inmate Keith Raniere … I asked inmate Raniere if Ms. Clyne passes messages between him and Bronfman? *He said yes.* She tells me what's going on with her and how she's doing… *Inmate Raniere said* she pays my legal fees, but I do not talk to her directly." *Raniere I,* Doc. 31-2 at 16.

- However, the DHO report states, "during the investigation you elected to remain silent." *Id.,* Doc. 22-2 at 15. It elaborates, "During your UDC hearing you stated, "This does not violate policy. I didn't pass any messages. I didn't admit anything to SIS." *Id*. Mr. Raniere could not have both remained silent during the investigation *and* made admissions during it.

- In response to Mr. Raniere's request for administrative relief on this issue relating to communication with Ms. Clyne, Regional Director Rios wrote, "Such evidence supports the fact that … staff reviewed an email and discovered you were utilizing another inmate's Trulincs and Trufone account to *receive* messages**.**" (emphasis added) Doc. 22-2 at 17. However, the only (false) allegation was that Mr. Raniere was using another inmate's account to *send* messages.

3. "Danielle Roberts is a former associate of NXIVM who has been removed from Plaintiff's visiting list due to her extensive involvement with NXIVM." Doc. 14, p.2.

- "Dr. Roberts visited Plaintiff regularly from approximately April of 2021 until January of 2022." Doc. 1, p20.  Just like Nicki Clyne, Dr. Roberts' involvement with NXIVM was known by the BOP when Plaintiff was

5

sentenced on October 27, 2020, but she was allowed to visit with Plaintiff until shortly after she spoke out in support of Plaintiff's claim of innocence. Doc. 1, pp.19-20. Again, the circumstances do not support the claim that Dr. Roberts posed or poses any threat to the safety and security of the institution. The circumstances do, however, indicate that Defendants had other reasons for banning Dr. Roberts that do not relate to institutional security.

4. "Suneel Chakravorty is a former associate of NXIVM who has been banned from communicating with Plaintiff at two institutions for misconduct during Plaintiff's incarceration." Doc. 14, pp.2-3.

   - Defendants complain that Plaintiff spoke with Mr. Chakravorty on a call that was recorded by both the BOP and Chakravorty, about their sincerely held belief that corruption was involved in Plaintiff's conviction. Doc. 14, pp. 2-3.

   - Defendants complain that Mr. Chakravorty recorded the conversations for podcasts. There is no law or BOP policy that prohibits this exercise of First Amendment speech.

   - Defendants complain that Chakravorty organized people to dance outside the prison, and characterize it as "erotic", however, the dancers were captured on video, and the Court can make its own determination about whether the dancing posed any threat to the safety and security of the prison or the public, or whether the Defendants are being hyperbolic about potential threats to the institution. Exh. 1, p.1. attached. The dancing included families and friends of other prisoners besides Plaintiff, and, on one occasion, a corrections officer. *Id.*

- Defendants pretend not to understand that using terms such as "at war", and "no holds barred" were martial metaphors that are frequently used in the context of legal cases, and assert that these words alone are reason enough to ban Mr. Chakravorty.  However, the full context of the conversations shows that Plaintiff and Mr. Chakravorty were merely expressing their opinions about what was necessary to expose the corruption that they sincerely believe was involved in Plaintiff's conviction.  Exh. 5, attached.

5. "The Court flatly rejected Plaintiff's argument: "Plaintiff argues that Mr. Chakravorty 'serves 'precisely this role on behalf of the attorneys of Tully & Weiss,' 'played an essential role in interpreting computer data for the attorneys,' and before Tully & Weiss were retained, Mr. Chakravorty and Plaintiff 'spent months discussing, analyzing and theorizing about how this metadata contained in computer files affects Plaintiff's legal case.'" (Ex. I, p. 14.) Plaintiff makes the identical argument here. (Compare Dkt. 7 at 8-9 with Doc. 3 at 7-8.)"  Doc. 14, p.7

    - The Court did not reject Plaintiff's argument, flatly or otherwise.  The Court found,

        > While Mr. Chakravorty may have provided assistance to Plaintiff in his legal case, Plaintiff **has not provided any evidence** that Mr. Chakravorty is a paralegal or agent of any kind employed by Plaintiff's attorney(s). In each of the cases cited by Plaintiff, the professionals assisting attorneys were actually agents of those attorneys. There is no evidence that attorney Tully or any other of Plaintiff's attorneys has provided the Warden of USP-Tucson with a signed statement certifying Mr. Chakravorty's ability, that the attorney has pledged to supervise Mr. Chakravorty's activities, or that the attorney accepts personal and professional responsibility for

> Mr. Chakravorty's activities that may affect the institution, prisoners, and staff, as set forth in 28 C.F.R. § 543.16(b)(1)-(3)

*Raniere I,* Doc. 18, pp.14-15 (emphasis added).

Here, Plaintiff attaches the evidence that Mr. Chakravorty is a paralegal to Plaintiff's attorney Joseph Tully.  Exh. 2, attached.  Defendant Warden approved two legal calls for Mr. Chakravorty as a recognized paralegal, then reversed his decision, and is now claiming that Mr. Chakravorty is banned because he was affiliated with NXIVM.  These reversals add to the accumulation of facts supporting Plaintiff's theory that access to supporters and attorneys are being used as retaliation tools.

6. "Mr. Chakravorty clearly identified himself as holding Plaintiff's power of attorney, not as a paralegal *working for* Plaintiff's attorneys"  Doc. 14, p.5.
   ◦ There is no reason that he cannot be both.  Plaintiff admits that Mr. Chakravorty's role has "evolved into both paralegal for, and manager of the legal team…" Doc. 1, p.11, ¶61.
7. Between the jury's verdict and the court's sentence, Plaintiff continued regularly contacting people affiliated with NXIVM, including Mr. Chakravorty, and the government so informed the judge.  Both parties agree on this statement, and each believes that it supports their contentions.  Defendants have not shown that there was any problem with these communications.
8. "the Court held [in *Raniere I*] that "Plaintiff's Motion, as it relates to his access to the courts, fails because Plaintiff has not presented any evidence supporting that

8

his ability to litigate has been hindered by prison officials, and Plaintiff has not alleged an actual injury such as inability to meet a filing deadline or to present a claim.'"" Doc. 14, p.8.

- Plaintiff's new complaint is significantly expanded from *Raniere I,* both backwards in time to Plaintiff's first days in the USP Tucson, and forward to the end of last year. Plaintiff has presented a clear pattern of retaliation for publicity surrounding Plaintiff's challenge to his criminal case. He has now been injured by having forever forfeited any Rule 33 motions based on newly discovered evidence because the interference with communications by scrubbing Mr. Chakravorty from his call list. He has also been injured by being held in lock-down conditions in the SHU, including being painfully shackled during legal visits and calls with his attorneys. The shackles should not be necessary if Plaintiff is in the SHU for his own safety rather than as punishment or because the BOP believes that he is a threat to his attorneys. These conditions and the credible appearance of retaliatory animus are sufficient to "chill a person of ordinary firmness…"

> In this context, and at the pleading stage, we have *never* required a litigant, *per impossibile,* to demonstrate a *total* chilling of his First Amendment rights to file grievances and to pursue civil rights litigation in order to perfect a retaliation claim. Speech can be chilled even when not completely silenced. In *Mendocino Environmental Center v. Mendocino County,* we pointed out that the proper First Amendment inquiry asks "whether an official's acts would chill *or* silence a person of ordinary firmness from future First Amendment activities." 192 F.3d 1283, 1300 (9th Cir.1999) (emphasis added), (quoting *Crawford-El v. Britton,* 93 F.3d 813, 826

(D.C.Cir.1996), *vacated on other grounds,* 520 U.S. 1273, 117 S.Ct. 2451, 138 L.Ed.2d 210 (1997) (internal quotation marks and citation omitted)). Because "it would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity," Rhodes does not have to demonstrate that his speech was "actually inhibited or suppressed."

*Rhodes v. Robinson*, 408 F. 3D 559, 569 (9th Cir. 2005)

9. "On July 26, 2022, Plaintiff was involved in a physical altercation in Food Service" Doc. 14, p.10.
    ◦ This appears to be an intentional mischaracterization of what we now know occurred. Plaintiff was the victim of an assault. This was known by Defendants within days of the incident, yet Plaintiff is *still* in the SHU long after his assailant was transfered.[3]

10. "Plaintiff has introduced no evidence that he expressed concerns about his current housing status or cellmate during any of the SRO reviews, through cop-outs or through the Administrative Remedy Program."
    ◦ Attached as Exhibit 3 are Plaintiff's administrative grievances about his concerns. Additionally, Plaintiff's previous lawsuit sought to introduce these claims. *See*, *Raniere I,* Docs. 43-1, 44.
    ◦ Attached as Exhibit 6 are Plaintiff's recent affidavits and declarations filed in Toni's Fly's case.

---

[3] The BOP inmate locator shows Maurice Adonis Withers #10300-090 is at USP Terre Haute. https://www.bop.gov/mobile/find_inmate/byname.jsp#inmate_results

10

11. "There are no safety or security concerns with Plaintiff's current housing assignment" Doc. 14, pp. 10-11.
    - This is presented with no evidentiary support other than the word of Jeremy Ulrich, a Defendant in this action.
12. "The docket in Plaintiff's criminal case belies his claim that he is being denied access to the court. Plaintiff's criminal attorneys filed a Rule 33 motion, and Plaintiff filed one as well."
    - *See Rhodes v. Robinson, supra.* It is not only the fact that Plaintiff's opportunity to fully develop all his claims under Rule 33 was interfered with, but also the fact of the *timing* of this interference, as well as other acts of apparent retaliation that, combined, would "chill… a person of ordinary firmness from future First Amendment activities."
13. "The Supreme Court approved a similar regulation in *Pell v. Procunier*, 417 U.S. 817, 827 (1974), because "[i]n the judgment of the state corrections officials, this visitation policy will permit inmates to have personal contact with those persons who will aid in their rehabilitation, while keeping visitations at a manageable level that will not compromise institutional security. Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." Doc. 14, p.12, fn.12.

- *Pell* also says "legitimate policy objectives of the corrections system itself, require that some limitation be placed on such visitations. **So long as reasonable and effective means of communication remain open and no discrimination in terms of content is involved**, we believe that, in drawing such lines, 'prison officials must be accorded latitude.'"
- Here, there is evidence of content-based discrimination because anyone who supports Plaintiff's challenges to his conviction is banned.

14. "Constitutionality of SHU Placement" Doc. 14, pp.16-17.
    - Defendants try to shape Plaintiff's claims for him by discussing his placement in the SHU as a 5th Amendment due-process, liberty interest. However, Plaintiff's claims fall under First Amendment retaliation and Sixth Amendment interference with counsel. Doc. 1. Even if he were pleading a 5th Amendment claim, SHU placement here is significantly different from general population, and is identical to SHU placement for disciplinary reasons, constituting atypical and significant deprivation required.

15. Defendants claim that the Motion is outside the scope of the Complaint. Below are Defendants' characterizations, and Plaintiff's Claims:
    - Plaintiff receive all legal calls and visits with attorneys that are requested by the attorney; Doc. 14, p.21.
        - Count I: Under this Count, Plaintiff seeks reasonable access to communicate with his attorneys and their agents, both in person and using

    contemporaneous telephonic methods, subject only to modest limitations that have a reasonable relationship to legitimate penological interests.

- Defendants recognize Plaintiff's *power-of-attorney*, Suneel Chakravorty, a non-attorney, as a legal professional for the purposes of communicating confidentially with Plaintiff;
  - Count II: On information and belief, Plaintiff's right to communicate with Mr. Chakravorty was denied as retaliation for exercising his First Amendment rights.
- Defendants release Plaintiff from SHU and return him to his original unit or provide him a single cell in the SHU;
  - Count I: As described above, Defendants, in a non-frivolous manner, have a pattern and practice of frustrating and interfering with Plaintiff's First Amendment right to communicate with his attorneys. By doing so, Defendants frustrated and interfered with Plaintiff's First Amendment right of access to the courts.

16. Defendants complain that Plaintiff's requested relief is not "modest" (Doc. 14, p.21).  However,

- Prisoners have the "right[ ] to litigate without active interference," *Silva v. Di Vittorio*, 658 F.3d 1090, 1102 (9th Cir.2011), a guarantee that exists so prisoners have a "viable mechanism to remedy prison injustices." *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir.2005). The heart of the anti-interference right is "the presentation of constitutional, civil rights and habeas corpus claims," *Snyder v. Nolen*, 380 F.3d 279, 291 (7th Cir.2004). But, by virtue of their "broader right to petition the government for a redress of [their] grievances under

> the First Amendment," *Bradley*, 64 F.3d at 1279, prisoners must also have opportunities to pursue certain other types of civil litigation. See, e.g., *Snyder*, 380 F.3d at 291; *Straub v. Monge*, 815 F.2d 1467, 1470 (11th Cir.1987); *Jackson v. Procunier*, 789 F.2d 307, 311 (5th Cir.1986).

*Blaisdell v. Frappiea*, 729 F.3d 1237, 1243 (9th Cir. 2013)

- "The most fundamental of the constitutional protections that prisoners retain are the First Amendment rights to file prison grievances and to pursue civil rights litigation in the courts." Entler v. Gregoire, 872 F.3d 1031, 1039 (9th Cir. 2017) (footnotes omitted). "[B]ecause purely retaliatory actions taken against a prisoner for having exercised those rights necessarily undermine those protections, such actions violate the Constitution quite apart from any underlying misconduct they are designed to shield." *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005). We have said that a First Amendment claim in this context has five elements: (1) adverse action by a state actor against the inmate (2) because of (3) that prisoner's protected conduct, and the action (4) chilled the inmate's exercise of his First Amendment rights and (5) did not reasonably advance a legitimate correctional goal. *Chavez v. Robinson*, 12 F.4th 978, 1001 (9th Cir. 2021)."

*Johnson v. Ryan* (9th Cir. 2022)

17. Defendants claim that Jorge De La Garza has not shown that he is an attorney in good standing. Attached as Exh. 4 is evidence of Mr. De La Garza's credentials, which he submitted to Defendants.

18. Defendants claim that Mr. De la Garza was banned because he had not shown he is an attorney in good standing. However, the reason Defendants provided was that he was a security threat to the institution. Exh. 4, p.8

19. Defendants complain about Plaintiff's reliance on *United States v. Rowe*, 96 F.3d 1294 (9th Cir. 1996), and *Jenkins*, 487 F.3d at 491.

- Even if Chakravorty were not a paralegal, he still is covered under the privilege:

- The attorney-client privilege protects communications made in confidence by a client to his attorney in the attorney's professional capacity for the purpose of obtaining legal advice. See Evans, 113 F.3d at 1461. "[B]ecause the privilege is in derogation of the search for the truth, it is construed narrowly." Id. Thus, ordinarily, statements made by a client to his attorney in the presence of a third person do not fall within the privilege, even when the client wishes the communication to remain confidential, because the presence of the third person is normally unnecessary for the communication between the client and his attorney. Id. at 1462. However, there is an exception to the general rule that the presence of a third party will defeat a claim of privilege when that third party is present to assist the attorney in rendering legal services. 2 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 183 at 312 (2d ed.1994). Ms. Jenkins recognizes this exception, but insists that it is limited to those individuals who would be considered agents of the attorney under the law of master and servant. Nothing in our case law so limits the exception. This exception applies both to agents of the attorney, such as paralegals, investigators, secretaries and members of the office staff responsible for transmitting messages between the attorney and client, and to outside experts engaged "to assist the attorney in providing legal services to the client," such as accountants, interpreters or polygraph examiners. *Id.* at 313. Additionally, this exception reaches retained experts, other than those hired to testify, when the expert assists the attorney by transmitting or interpreting client communications to the attorney or formulating opinions for the lawyer based on the client's communications. *Id.* at 314.
*Jenkins v. Bartlett*, 487 F.3d 482, 490-91 (7th Cir. 2007)

20. "Plaintiff has not shown that the Bureau has deliberately interfered with the confidential relationship between him and his counsel or chilled his right to privately confer with counsel. *See Nordstrom*, 762 F.3d at 910. He cannot do so

because the evidence shows that the Bureau has facilitated his numerous confidential legal calls and frequent legal visits with his counsel." Doc. 14, p.24.

- The BOP is not authorized to decide what counts as *enough* communication with Plaintiff's attorneys. The raw number does not reflect the amount of work that was done, or that needed to be done, on the calls and visits.

21. "Plaintiff has introduced no evidence at all, instead relying upon the allegations in his Complaint, many of which are based "on information and belief."" Doc. 14, p.24.

    - Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Specific facts are not necessary; the statement need only "`give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). At the pleading stage, a judge must accept as true all of the factual allegations contained in the complaint. *Bell Atlantic Corp., supra,* at 555 556, 127 S.Ct. 1955 (citing *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 508, n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

22. "Plaintiff has not shown irreparable harm. A plaintiff "must demonstrate that there exists a significant threat of irreparable injury." *Oakland Tribune, Inc. v. Chron.*

*Publ'g Co.,* 762 F.2d 1374, 1376 (9th Cir. 1985). The irreparable injury must be both likely and immediate. *Winter,* 555 U.S. at 24. Mere "[s]peculative injury does not constitute irreparable injury to warrant granting a preliminary injunction." *Caribbean Marine,* 844 F.2d at 674."

- The harm has already been done in part.  Plaintiff's opportunity to file Rule 33's is over.  The delays between calls and visits means delays in court, and therefore delays in relief.  What Defendants characterize as violations of the prison rules, is actually Plaintiff exercising his 1st Amendment rights to challenge his conviction. Plaintiff's ability and willingness to speak out are significantly chilled when, each time he or his supporters speak out in support of Plaintiff, they are banned from speaking with him, and he is thrown in the SHU.

23. "Plaintiff erroneously stated that an Arizona District Court found that "a prisoner who suffered a First Amendment violation enjoys a presumption of irreparable harm." (Doc. 3 at 11.) Again, the case says the opposite: "Therefore, based on the filings, the oral argument, the evidence presented, and the case law, the Court finds that the Plaintiff has demonstrated the possibility of irreparable harm, if not the probability of harm." *Luckette v. Lewis*, 883 F. Supp. 471, 483 (D. Ariz. 1995)."

    - "In the context of a First Amendment free speech claim, the Supreme Court stated, "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). The loss of an ability to practice a central tenet of one's religion for any extended amount of time is clearly an irreparable injury."

*Luckette v. Lewis*, 883 F.Supp. 471 (D. Ariz. 1995)

## II. CONCLUSION

Cleared of the inaccuracies in Defendants' Opposition, the facts and the law demonstrate that Plaintiff has shown a credible basis for First Amendment retaliation for protected speech in a pattern that indicates that Defendants seek to prevent Plaintiff from challenging his criminal conviction and sentence. *Not interfering* is the bare minimum, and can be no hardship on Defendants.

DATED this 24th day of February, 2023 by

/s/Stacy Scheff
STACY SCHEFF
Attorney for Plaintiff

Delivered via ECF
to all registered parties