EXHIBIT 5

## DECLARATION OF SUNEEL CHAKRAVORTY

1. Since early 2020, I have been collaborating with Mr. Raniere to uncover potential evidence that bad actors in the FBI and DOJ committed malfeasance to secure his conviction.

2. One of the most egregious issues we suspected is the manipulation and falsification of evidence to convict him of the racketeering predicate acts of child pornography and sexual exploitation of a minor.

3. After two years of effort, on April 28, 2022, Mr. Raniere submitted to the appellate court three affidavits from leading forensic experts, including Dr. James Richard Kiper, Ph.D., a former Special Agent and forensic examiner who had worked for the FBI for twenty years until 2019.

4. These affidavits contained the experts' findings of manipulation of child pornography evidence, some of which was shown to have occurred while in the custody of the FBI. US v. Raniere, Eastern District of New York, 18-cr-204, Doc. 1169-1.

5. On that same day, AUSA Kevin Trowel, of the Eastern District of New York, called this evidence of government malfeasance "frivolous." US v. Raniere, United States Court of Appeals for the Second Circuit, 20-3520, Doc. 205.

6. On April 30, 2022, Mr. Raniere called me, and in conversation he used the word "war."

7. In their filings in *Raniere v. Garland*, 22-cv-561, the BOP seems to have misconstrued or possibly conflated Mr. Raniere's use of the word "war" as if it were used in a manner other than as part of the "attack" on his conviction or a "fight" for justice.

8. In their response to Mr. Raniere's motion for preliminary injunction, Doc. 14, the BOP wrote:

   > In early May 2022, the SIS Department at USP Tucson was monitoring telephone calls between Plaintiff and Mr. Chakravorty. (Ex. F, p. 4.) They spoke to each other about being "at war" with the federal government that would be "no holds barred." (Id.)... The CTU recommended that the USP Tucson SIS Department remove all of Plaintiff's current contacts and review all future contact requests. (Doc. 14 at 6:7-14.)

9. They cited the affidavit of SIS Lieutenant Anthony Gallion, dated, May 31, 2022, in Exhibit F. In his affidavit, Lt. Gallion wrote:

1

In early May 2022, my staff in the SIS Department were monitoring telephone calls between Raniere and Suneel Chakravorty. They spoke to each other about being "at war" with the federal government that would be "no holds barred." Even more concerning than this language or "war" is the fact that Raniere asked about the quality of the recordings and stated that he has many recordings. As indicated above, Suneel Chakravorty has previously recorded telephone conversations with Raniere. The CTU recommended that Raniere's current contacts be removed and that all future contact requests go through the SIS Department for approval so as to determine whether any individuals have affiliation with NXIVM, as prohibited by special conditions of supervised release in the Judgment and Commitment Order. See Att. 6, Judgment and Commitment Order at 9 (special condition number eleven). Doc. 14-2 at 279 ¶14.

10.  It is true that I recorded my phone calls with Mr. Raniere, as Lt. Gallion states. Mr. Raniere was aware that I was recording the conversation just as he was aware the BOP was recording the conversation. To my knowledge there is no prohibition against recording conversations with a federal prisoner.

11.  My calls with Mr. Raniere centered around uncovering evidence that bad actors within the Federal Bureau of Investigation and potentially the US Attorney's Office for the Eastern District of New York had violated Mr. Raniere's rights and, in doing so, committed criminal acts, potentially requiring an independent investigation separate and apart from Mr. Raniere's efforts to attack his conviction.

12.  Lt. Gallion's affidavit, in which Mr. Raniere was quoted, stated Mr. Raniere was "at war" and as such it was a "no holds barred" engagement.

13.  On April 30, 2022, Mr. Raniere used the word "war" not once but three times in calls to me. The BOP has the recordings. I offer relevant excerpts, transcribed by the service Rev.com.

14.  The excerpt of the first instance is below (emphasis added):

Mr. Raniere: ***We're in a war here, and we're fighting for justice***….

15.  The excerpt of the second instance is below (emphasis added):

Let's not be light-languaged or anything like that…. ***It's interesting at the end of JFK, the movie, where he looks up and says, in effect, give us get our government back.*** It's up to you…

***But really we want our government back and this is the war.***

16. The third instance is centered around Mr. Raniere discomfiture over a response from an individual who represents the Department of Justice that did not address the numerous findings of alterations and manipulation of evidence in FBI custody, made under oath by three qualified forensic experts in his appellate submission but rather was dismissed with a single word: "frivolous." Mr. Raniere believed this was at least disingenuous if not a wholesale abrogation of the right to another word, the very centerpiece of the name of their institution: "Justice."

17. Credible evidence of potential violations of law and due process by government actors, to Mr. Raniere's mind, and to my mind also, and perhaps to most Americans' minds, would inspire a prosecutor to urgent action, not dismissive rhetoric. Mr. Raniere believed that such a response from Mr. Trowel was not in keeping with a prosecutor's role, which Mr. Raniere believes is not to win convictions but to ensure justice. As such, in his view, this kind of dismissive conduct should result in dismissal or censure.

18. The excerpt containing the third instance is below (emphasis added):

    Mr. Raniere: It's not frivolous. And to think this is frivolous is a horrible sin, is a horrible evil. Has to be taken out of the gov. They have to resign.

    Mr. Chakravorty: Yes.

    Mr. Raniere: Does that make sense?

    Mr. Chakravorty: Yes, it does.

    Mr. Raniere: And we need to ask for it publicly. So I'll speak to you, I'll try not to have too much more. Okay?

    Mr. Chakravorty: Thank you. Okay.

    Mr. Raniere: Yeah. We have 10 seconds last five seconds, so, all right, ***send my best to everyone and I'm so sorry, but we're in the war now.***

    Mr. Chakravorty: Yes we are.

    Mr. Raniere: ***No holds barred.***

19. In those conversations, I understood Mr. Raniere and myself to be talking about a fight for justice and for truth, not only to attack Mr. Raniere's conviction but to weed out

corruption if we find it, even inside our most powerful, or venerable or vaunted institutions.

20. The use of the word "war" had nothing to do with taking up arms against the government or anyone, or anything else other than to fight for the goals of our government as expressed in the Constitution, using the legal system and the public forum to expose violations committed under the color of law by bad actors in sheep's clothing.

21. To ring an alarm bell over the use of a word "war" without providing the context is not entirely dissimilar to the use of the word "frivolous" by another government representative, for both are misleading. Under other circumstances, it might be a humorous way to win by misdirection, but in the case of a prisoner of the USA who has raised the most serious allegations that every American should have cause to be concerned about, it is not comical. People often use the language of war without the slightest possibility that they are speaking literally:

   - Being "in the trenches" does not mean one is in trench warfare, but means being deeply involved in a hands-on, ground-level work on a project.
   - Going "nuclear" does not mean detonating an atomic bomb but rather that a person is acting in a volatile manner or on a full-scale attack but necessarily violent and not with thermal heat.
   - "Pulling the trigger" does not literally mean shooting an actual gun but rather making a decision.
   - Being in a battle or a fight or a war does not mean a literal combat with lives at stake, but rather a quest for victory against an adversary.

22. On May 3, 2022, Mr. Raniere filed the Rule 33. US v. Raniere, 18-cr-204, Doc. 1169. (Attachment 1)

23. On May 5, 2022, in part because of the 'language of war' from the calls on April 30, 2022, which Lt. Gallion inferred to have an alarming meaning, I was scrubbed from Mr. Raniere's list. Mr. Raniere has not been able to call me since that time.

24. One and half months later, on June 17, 2022, USP Tucson recognized me as a paralegal for Mr. Joseph Tully Esq. and the Warden permitted me two legal calls with Mr. Raniere. One was on June 19, 2022, and the other was on June 20, 2022, just one day before Mr. Raniere's Rule 33 final submission deadline of June 21, 2022.

25. Mr. Raniere, with my help, filed an additional Rule 33 motion, by the deadline, on June 21, 2022. US v. Raniere, 18-cr-204, Doc. 1178.

26. Since then, the Warden has not approved any further requests for legal calls between Mr. Raniere and me.

27. I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.


Executed on February 24, 2023

_____

Suneel Chakravorty

Attachment 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA,                Case No. 1:18-cr-00204-NGG-VMS

                    v.                   **EVIDENTIARY HEARING REQUESTED**

                                         **ORAL ARGUMENT REQUESTED**

KEITH RANIERE,
                              Defendant.
-------------------------------------------------------X


## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT KEITH RANIERE'S MOTION FOR RULE 33 RELIEF


Dated:      May 3, 2022,              Joseph M. Tully
            Martinez, CA              CA SBN 201187
                                      Tully & Weiss Attorneys at Law
                                      713 Main Street
                                      Martinez, CA  94553
                                      Phone: (925) 229-9700
                                      Fax: (925) 231-7754

                                      *Attorneys for Defendant Keith Raniere*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................- 2 -

INTRODUCTION ....................................................................................................- 3 -

STATEMENT OF RELEVANT FACTS ......................................................................- 6 -

ARGUMENT ..........................................................................................................- 22 -

I.     MR. RANIERE IS ENTITLED TO RELIEF UNDER RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE AS A RESULT OF THE NEWLY DISCOVERED EVIDENCE, WHICH SHOWS THAT THE FBI TAMPERED WITH MATERIAL DIGITAL EVIDENCE IN THIS CASE, THAT THE FBI GAVE FALSE TESTIMONY WHICH THE GOVERNMENT USED AT TRIAL TO SECURE A CONVICTION, AND THAT THE GOVERNMENT WITHHELD MATERIAL EVIDENCE IN THE EFFORT TO COVER-UP THE GOVERNMENT'S CULPABILITY. ......................................................................- 22 -

    A.   *The Evidence at Issue is Newly Discovered Within the Meaning of Rule 33 of the Federal Rules of Criminal Procedure, Even If Parts of the Evidence Were Known to the Defense During Trial.* ..............................................................................................- 22 -

    B.   *Several Facts Exist From Which the Court Can Infer Due Diligence On the Part of the Defense to Obtain Evidence, Which the Court Can Also Infer Governmental Malfeasance Therefrom.* ..........................................................................................- 25 -

    C.   *The Clandestine Nature of the Government's Tampering and Suppression of Material Evidence That Would Have Uncovered It Indicate That the Defense Could Only Have Been As Diligent As the Available Evidence Could Have Allowed At the Time.* .......- 28 -

    D.   *The Evidence at Issue is Material, Not Merely Cumulative or Impeaching, and the Evidence Would Probably Lead To an Acquittal Under the Circumstances.* ............- 29 -

II.    MR. RANIERE'S CONVICTIONS MUST BE VACATED AS A MATTER OF LAW BECAUSE OF THE GOVERNMENT'S USE OF FALSE TESTIMONY AND EVIDENCE. .- 36 -

III.   IN THE ALTERNATIVE, MR. RANIERE REQUESTS THIS COURT PROVIDE AN INDICATIVE RULING THAT THIS MOTION RAISES A SUBSTANTIAL ISSUE. .....- 39 -

# TABLE OF AUTHORITIES

**Cases**

*Bailey v. Glover*, 88 US 342 (1874)..................................................................- 29 -
*Davis v. Alaska*, 415 US 308 (1974).................................................................- 27 -
*Dimattina v. United States* 949 F. Supp. 2d 387 (E.D.N.Y. 2013).................- 25 -
*Dist. Atty's Off. for Third Jud. Dist. v. Osborne,* 557 US 52 (2009). ...............- 24 -
*Giglio v. United States*, 405 US 150  (1972). ....................................................- 36 -
*Grotto v. Herbert*, 316 F.3d 198 (2d Cir. 2003). ..............................................- 27 -
*Kyles v. Whitley*, 514 US 419 (1995)..................................................................- 30 -
*Napue v. Illinois*, 360 US 264, 269 (1959). .........................................- 6 -, - 36 -
*Pierre v. Doorley*, 19-2638-cv (2d Cir., November 25, 2020). ........................- 24 -
*Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001). ...........................- 6 -, - 25 -
*United States v. Alston*, 899 F.3d 135, 146, (2d Cir. 2018) .............- 6 -, - 22 -, - 29 -
*United States v. Bagley*, 473 US 667 (1985). ....................................................- 30 -
*United States v. Figueroa*, 548 F.3d 222 (2d Cir. 2008). ..................................- 27 -
*United States v. Forbes*, 790 F. 3d 403 (2d Cir. 2015). .......................- 22 -, - 23 -
*United States v. Schwarz*, 259 F.3d 59 (2d Cir. 2001). ......................................- 41 -
*United States v. Spinelli* 97 CR 209 (EDNY, October 30, 2007). ...........- 30 -, - 31 -
*Untied States v. Santos*, 02 CR. 798 (SDNY, January 13, 2004). ......................- 36 -
*Wright v. U. PO, Parole Officer*, 10-CV-5127 (EDNY, July 2, 2021).........- 24 -, - 25 -

**Other Authorities**

American Bar Association Standards for Criminal Justice, standard 3-12 (4th ed. 2017). ......- 27 -
Committee Notes on Federal Rule of Criminal Procedure 37– 2012. ...........- 40 -, - 41 -

**Statutes**

Fed. R. Crim. P. 37. ............................................................................................- 40 -
Fed.R.Crim.P. 33(a). ...........................................................................................- 22 -
Fed.R.Crim.P. 37(a)(3). .......................................................................................- 40 -
Fed.R.Crim.P. Rule 37(c). ...................................................................................- 40 -

**Transcripts**

Pre-Trial Transcript (February 11, 2019)................................................- 25 -, - 28 -
Pre-Trial Transcript (September 27, 2018)...........................- 25 -, - 26 -, - 28 -, - 37 -
Status Conference Transcript (July 25, 2018).........................................................- 7 -
Status Conference Transcript (March 18, 2019)......................................................- 8 -
Trial Transcript. ...........................................................................................passim

*"In my 20 years serving as an FBI agent, I have never observed or claimed that an FBI employee tampered with evidence, digital or otherwise. But in this case, I strongly believe the multiple, intentional alterations to the digital information I have discovered constitute evidence manipulation. And when so many human-generated alterations happen to align with the government's narrative, I believe any reasonable person would conclude that evidence tampering had taken place[1]."*

– Dr. J. Richard Kiper, Ph.D.

## INTRODUCTION

In its prosecution of Keith Raniere, the government manufactured child pornography and planted it on a computer hard drive to tie it to him. Additionally, the government falsified, fabricated, and manipulated all the key evidence it used to convict Mr. Raniere of the most heinous crimes he was charged with, that is, possession of child pornography and sexual exploitation of a child – for purportedly taking twenty-two contraband photographs in 2005. Such extensive government tampering renders the critical pieces of evidence used to convict him of these charges incompetent, unreliable, and invalid. The government's conduct here not only shatters rights inherent in the concept of ordered liberty, but it also shocks the conscience.

The plain evidence of tampering, in this case, is established by the findings of Dr. J. Richard Kiper, Ph.D., a retired FBI Special Agent of 20 years who served as a case agent, a supervisor, a computer forensic examiner, a Unit Chief of the FBI Academy in Quantico, a whistleblower who was lauded by the United States Senate, and who was the "raison d'etre" of the FBI Whistleblower Protection Enhancement Act of 2016. Dr. Kiper concludes, "My analysis demonstrates that some of these alterations definitely took place while the devices were in the custody of the FBI. Therefore, in the absence of any other plausible explanation it is my expert opinion that the FBI must have been involved in this evidence tampering." Ex. D at Bates 002 –

---

[1] Dr. J. Richard Kiper, Ph.D., served as an FBI Special Agent for 20 years, from 1999 to 2019, with more than half of that career in cybersecurity and digital forensics. His expert report is attached hereto as Exhibit D. His curriculum vitae is attached hereto as Exhibit D1.

Expert Report of Dr. J. Richard Kiper, Ph.D., hereafter "Ex. D.," Review of Evidence. Further, Dr. Kiper is not alone in his conclusions. Steven M. Abrams, JD, MS,[2] and Wayne B. Norris,[3] accomplished forensic analysts in their own right, concur with Dr. Kiper's findings. All three experts agree that the electronic evidence in Mr. Raniere's trial was extensively manipulated while in FBI custody and that it was falsified to fit the government's narrative of criminal conduct. This newly discovered evidence of illegal tampering by the government is conclusive, indisputable, and shocking.

The experts' key findings are:

1. During the execution of the search warrant at 8 Hale Drive, Halfmoon, New York, on March 27, 2018, FBI agents initially ignored several areas with evidentiary items in the downstairs of the residence, went upstairs, ignored several more areas, and then went straight to the study area, where the very first two evidentiary items they collected just happened to be the Canon digital camera with its compact flash card, hereafter "CF card" and a Western Digital hard disc drive, hereafter "WD HDD." Trial Tr. at 4290:4-4307:5. These two evidentiary items also just happened to be the only two pieces of digital evidence used to prove the alleged contraband, which just happened to be discovered over ten (10) months later. Dkt. 618 at 3 ¶ 1.

2. The backup folder on the WD HDD where the contraband photographs were placed has all the hallmarks of fraud. The names of subfolders within this backup folder were

[2] Steven M. Abrams, J.D., M.S is a licensed attorney, a retired State Constable in South Carolina, and an expert in digital forensics, which he has taught to police and military organizations around the world. He has used the forensic tool programs at issue in this case for nearly 20 years. His expert report is attached hereto as Exhibit E and curriculum vitae is attached hereto as Exhibit E1.

[3] Wayne B. Norris has served as an expert witness in more than 100 technology-related cases in federal, state, and municipal courts. He currently specializes in digital forensics. His expert report is attached hereto as Exhibit F and curriculum vitae is attached hereto as Exhibit F1.

manually altered to look autogenerated in a manner that comported with the government's narrative that the photos were taken in 2005. The government used this 2005 date to establish some of the photos as contraband. Further, the photographs' metadata within these subfolders were also manually altered to comport with the government's 2005 narrative. Additionally, the backup itself was not done in a manner consistent with a user backup and is only plausibly explained by someone planting the alleged contraband photographs on the WD HDD inside a backup folder that they mistakenly backdated to 2003, rather than the photographs being there due to a legitimate automated backup. Ex. D at Bates 010-11, Finding 7.

3.      Despite being the first items seized, the camera and CF card were not checked into the forensics lab until 332 days – ten months and 26 days later. Trial Tr. at 4906:10 - 4907:5. During that time, two FBI Special Agents, hereafter "SA," Maegan Rees, and Michael Lever, broke protocol and checked the camera and CF card out of Evidence Control twice for a total of **24 days** (Def.'s. Trial Ex 945), even though FBI policy strictly prohibits the agents from examining either of the devices before such devices are examined by a forensics examiner in a forensic lab.[4]

4.      At least once, while the CF card was in SA Lever's custody, it was accessed improperly, without authorization, and was altered. Ex. D at Bates 006, Finding 3. It was undoubtedly tampered with, as the thumbnails of a brunette impossibly became thumbnails of a blonde. Ex. D at Bates 003-04, Finding 1.

5.      All three experts, who have over 100 years of technical experience combined,

---

[4] Pursuant to Section 3.3.4.5 of the FBI's Digital Evidence Policy Guide, content review of digital evidence, hereafter "DE" is authorized only after DE is processed by authorized personnel… Content review of original DE is prohibited by those not trained and authorized by the Operational Technology Division, hereafter "OTD." Ex. C. at 21 – FBI's Digital Evidence Policy Guide (January 3, 2014, revised January 3, 2017) unclassified.

conclude that the only reasonable explanation for the plethora of anomalies on the WD HDD and the CF card – which all support the government's narrative – is that the government, acting with malfeasance, tampered with the evidence – destroying, constructing, and altering it. *See generally* Ex. D-F1.

This newly discovered evidence of tampering and purposeful fabrication constitutes a due process violation necessitating, a new trial because the government obtained a tainted conviction of Mr. Raniere by using evidence that the government knew or should have known was false. See *United States v. Alston*, 899 F.3d 135, 146, (2d Cir. 2018) (citing *Napue v. Illinois*, 360 US 264, 269 (1959).)

"Due process requires that criminal trials 'proceed consistently with 'that fundamental fairness,' which is essential to the very concept of justice." *Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001). The government's use of false evidence calls into doubt the validity of Mr. Raniere's convictions, specifically those tied to sexual exploitation of a child and possession of child pornography. Accordingly, pursuant to Rule 33 of the Federal Rules of Criminal Procedure, Mr. Raniere respectfully requests that this Court vacate the judgment of his conviction and grant him a new trial and all other relief that the Court deems just under the circumstances. A grant of anything less than the maximum remedy sought under the existing circumstances would condone historic government criminal activity, constitute an egregious disregard of Mr. Raniere's constitutionally guaranteed due process right to a fair trial, and create an unacceptable precedent that denigrates our system of justice.

## STATEMENT OF RELEVANT FACTS

The District Court's familiarity with the pre-trial proceedings, trial, and post-trial motion practice obviates the need to recite the case's procedural or substantive history, culminating in

Mr. Raniere's conviction after trial and a sentence of 120 years' imprisonment. Therefore, Mr. Raniere respectfully limits the factual discussion herein to matters pertaining to the newly discovered evidence.

On March 27, 2018, FBI agents seized 21 electronic devices from 8 Hale Drive Halfmoon, New York, pursuant to a search warrant. Ex. G & G1. Three of the items seized form the centerpiece of this motion: the WD HDD containing tens of thousands of files, including the alleged contraband photographs, the camera purportedly used to take the photographs, and the CF card inside the camera, from which the photographs were downloaded onto an unknown computer and backed up to the WD HDD. *See generally* Ex. D.

On October 5, 2018, the government turned over an assumedly complete copy of the WD HDD as part of a routine discovery disclosure. Dkt. 580 at 3 ¶ 1. Due to the Court granting the government's motions to continue, the trial date moved from October 2018 to January 2019, to March 2019, and finally to April 2019, over Mr. Raniere's speedy trial objections. Status Conference Tr. at 9:2 - 8; 15:17 - 18:18 (July 25, 2018); Dkt. 127 at 5; Dkt. 280.

On February 21, 2019, the government suddenly sounded an alarm by alleging that two digital photographs of an underage nude female, "Camila," had been found on the government's copy of the WD HDD. Dkt. 618 at 3 ¶ 1. On that same day, the government then asked Mr. Raniere's trial counsel to return its copy of the WD HDD so as not to remain in possession of child pornography, and Mr. Raniere's trial counsel complied that day. *Id*.

The contraband nature of these digital photographs is not prima facie and is date-dependent; if Camila was under eighteen, they are contraband, however, if she was eighteen or over, they were legal.

On March 13, 2019, with just a little over three weeks before the start of jury selection,

the government brought a second superseding indictment alleging for the first time four new and highly explosive racketeering acts, including possession of child pornography and two acts of sexual exploitation of a child. Dkt. 423 & 430.

On the same day as the second superseding indictment was filed, March 13, 2019, co-defendant Nancy Salzman pled guilty. Dkt. 474.

On March 15, 2019, Mr. Raniere's trial counsel was allowed to inspect the WD HDD at the location of the FBI's Computer Analysis Response Team, hereafter "CART." Status Conference Tr. at 8:24 - 9:2 (March 18, 2019).

On March 18, 2019, Mr. Raniere's trial counsel moved to sever and dismiss the newly added counts, noting that they would need to retain a computer forensic expert to analyze the electronic evidence and that, "This may not be done in twenty-six days." Dkt. 436 at 2 ¶ 1.

Also, on March 18, 2019, co-defendant Bronfman moved to sever based on the newly added counts in the second superseding indictment. Bronfman's then-attorney, Mark Geragos, wrote in a letter in support of her motion to sever, noting that, "Mr. Raniere is now charged with child exploitation and child pornography. These new charges are even more inflammatory and prejudicial to Ms. Bronfman than the DOS charges, which already warranted a severance… As we have already shown, courts sever RICO cases to avoid unfair prejudice, and it is difficult to imagine a more compelling case than one in which a co-defendant is charged with sex crimes against a child." Dkt. 437 at 1 ¶ 1.

On March 22, 2022, co-defendants, Salzman, Mack, and Russell filed motions to sever their respective trials from Mr. Raniere, arguing that the new and explosive charges would make it impossible for them to have a fair trial. Dkt. 455; 460; and 463.

In their motion to sever, Ms. Salzman's attorneys wrote, "Child pornography is a vile,

heinous crime. Mention the term to your average American, and he responds with immediate disgust and a sense of unease," "At a trial with Raniere, uneasy jurors will simultaneously be asked to decide the guilt or innocence of Lauren, who is not alleged to have known about or participated in any such conduct," "Indeed, prosecuting Lauren at a trial involving evidence that Raniere sexually exploited a child poses a serious risk that the jury will fail to reliably judge Lauren's guilt or innocence," and "The newly-added child sex crimes against Raniere are reason alone to sever Raniere from Lauren when this case goes to trial." Dkt. 455.

Ms. Mack's attorneys, William McGovern, Matthew I. Menchel, Sean S. Buckley, and Gabriela M. Ruiz, wrote in their motion to sever that the government had "added disturbing allegations against Raniere, including two counts of sexual exploitation of a child and one count of possession of child pornography," that "The Child Exploitation Acts are unrelated to any of the allegations against Ms. Mack, including the alleged RICO enterprise," and that, "The Court must sever Ms. Mack from the trial of Raniere." Dkt. 461.

In her motion to sever, Ms. Russell's attorney, Justine A. Harris, wrote, "The risk of unfair prejudice is heightened by the new inflammatory charges against Mr. Raniere. Indeed, it is difficult to imagine allegations more prejudicial to a defendant than those charged here – sex crimes against a child and child pornography." Dkt. 463.

On March 25, 2019, Lauren Salzman pled guilty and agreed to cooperate with the government. Dkt. 473.

On April 8, 2019, co-defendant Allison Mack pled guilty. Dkt. 1084.

On April 19, 2019, co-defendants Clare Bronfman and Kathy Russell plead guilty. Dkt. 994 & 1151.

On April 22, 2019, Mr. Raniere's trial counsel submitted a declaration regarding the

government's failure, despite repeated requests, to provide the Defense with the FBI reports concerning the search of the WD HDD, from which the child pornography was allegedly recovered. Dkt. 577 at ¶ 4. Thus, Mr. Raniere's expert had limited time to complete a last-minute review of the WD HDD before the trial would commence days later, on May 7, 2019.

On April 24, 2019, Defense counsel received an FTK report of the CF card and an FTK report of the metadata of the contraband ranges on the WD HDD. Ex. I. However, this FTK report of the CF card would be radically limited when compared with the June 11, 2019, FTK report that would eventually be disclosed. Ex. D at Bates 029. Notably, the government failed or refused to ever provide access to the camera's CF card at any time before, during, or after trial.

At trial, two witnesses – Lauren Salzman and Daniela – testified that Mr. Raniere had taken nude photographs of them, purportedly in 2005. Trial Tr. at 1534:24-1537:3; 2422:7-2424:6. Both witnesses described the camera he had allegedly used. Yet, neither witness was shown or asked to identify the camera in question, or those photographs, which the government would later use in closing argument to approximately corroborate the dates that the alleged contraband photographs were taken *Id*. at 5371:16-24. Further, neither witness was asked to identify any of the alleged contraband photographs, although both purportedly knew the subject well and Daniela was Camila's sister. *Id*. at 1596:1-7, 2281:11. SA Michael Weniger was the only witness to testify regarding the subject in the alleged contraband photographs. *Id*. at 5163:19 - 5167:11.

On June 10, 2019, to substantiate the existence of the alleged contraband images, the government called SA Mills to discuss the seizure and custody of the Canon digital camera, along with its CF card, and the WD HDD. *Id*. at 4290:4 - 4307:5. SA Mills described how, on March 27, 2018, agents executing the search moved past the kitchen, living room, bathroom, and

open areas of the first floor. They then took a spiral staircase to the second floor, where they moved through several more areas, including a bathroom and a seating room area, before finally arriving at the "office space." Trial Tr. at 4291:12 - 4302:17. Although the office was the last of many areas discovered in the residence, it became the first area to be searched. *Id.* at 4294:22 - 4295:19; 4304:16 - 4307:5. Government agents immediately crawled underneath a desk to retrieve the Canon digital camera containing the CF card at issue as the first seized item. *Id.* Next, agents beelined to the top of a bookshelf to retrieve the WD HDD, the second seized item. *Id.* at 4308:1 - 4308:23. This conduct is particularly notable because SA Mills' trial testimony indicated that the typical process for executing a search warrant starts at the very beginning of the entry to the residence, where agents move through each space in the residence, documenting each room and identifying pieces of evidence in the room. *Id.* at 4295:20 - 4296:12.

It is also important to note that the camera, its CF card (Item #1), and the WD HDD (Item #2), comprised the entirety of the digital evidence for the child pornography and child exploitation charges against Mr. Raniere – evidence which supposedly was not "discovered" by the FBI until February 21, 2019, ten months and 26 days (332 days total) after the items were taken into FBI custody. Dkt. 618 at 3 ¶ 1. The government never addressed, let alone explained, how these three central items (the camera, the CF card, and WD HDD) were uncannily also the first three items seized in the search. Ex. G1.

On June 12 and 13, 2019, the government called Senior Forensic Examiner, hereafter "SFE," Booth, to testify regarding the alleged contraband photographs. SFE Booth testified that he was a member of CART and that he had examined the WD HDD. Trial Tr. at 4778:25 - 4779:5; 4786:2-4795:23.

SFE Booth asserted that, as part of the examination process, a forensic image of the WD

- 11 -

HDD is created by using a write blocker that allows reading of the data on the WD HDD using a computer without writing onto it. Trial Tr. at 4782:9 - 4783:12. He explained, "It's really important that we don't alter that evidence at all. We want to make it as pristine as possible and put it back into the evidence vault the same way that we got it. We don't touch it after that. The file that we create from it is the only thing we use after that." *Id.* at 4783:13 - 16.

SFE Booth also testified about his familiarity with forensic imaging, and EXIF data, which is metadata that establishes the time and date a photograph is taken, which is stored on the CF card. *Id.* at 4781:3 - 4782:3; 4817:18 - 4820:20.

SFE Booth testified that nearly all the reports he created dealt with a folder identified as a "studies folder." *Id.* 4796:15 - 4798:8. The government claimed that the photographs' metadata was of "significant importance" because it was purported evidence of when the photographs at issue were created. *Id.* at 4800:24 - 4801:9. The government further claimed that the photographs in the "studies folder" were taken in 2005. *Id.* at 4800:6 - 8; *see also* 4821:12 - 18.

Over Defense objection, the Court admitted into evidence Gov. Ex. 505A, an FTK report from the "Studies folder" containing over 150 images of nude women unrelated to the charged offenses. *Id.* at 4798:9 - 4802:11.

The government's contention that the photographs were purportedly taken in 2005 is significant because that would put Camila at fifteen years of age. *Id.* at 3450:2 - 12. Thus, any digital photographs of her nude taken in 2005 could qualify as contraband. On that point, SFE Booth testified that he created an FTK report with images found in the "V110205" subfolder of the "Studies folder." *Id.* at 4871:13 - 4873:2. The alleged contraband photographs were found within two additional subfolders in "V110205" that were labeled "2005-11-02-422-20" and "2005-11-24-0814-46." *Id.* at 4873:19 - 4874:10. SFE Booth testified that the EXIF data from

- 12 -

the alleged contraband photographs that showed the date and time of the photographs roughly matched the name of the subfolders in which they resided. Trial Tr. at 4878:9 - 4881:11.

Regarding the CF card, SFE Booth testified that it was submitted to him in an unsealed cellophane bag. *Id*. at 4889:16 - 22. **Incredibly, SFE Booth also testified that he does not always receive evidence in sealed boxes or bags, that a record is not always made when an agent unseals evidence, and that a record does not necessarily have to be made when evidence is opened or unsealed.** *Id*. at 4887:16 - 4888:4. As a Senior Examiner, SFE Booth knew that his representations regarding the evidentiary chain of custody were false. Generally, the evidentiary chain of custody is paramount in all law enforcement, including the FBI. Ex. D at Bates 033, Finding 1 ("As I will discuss later, FBI policy requires the securing and sealing of evidence, and employees may be disciplined if they fail to do so. In my experience with the FBI, I never received unsealed evidence other than in exigent (emergency) situations."); *See also* Ex. E at Bates 013-14 ¶ 19 ("I always placed the evidence into an evidence bag and affixed a tamper evident seal before passing the evidence on in the chain of custody… I was taught that any evidence that arrived from further down the chain of custody in an unsealed state should be considered to be outside a proper chain of custody and not usable in a criminal matter."). The prosecution either knew or should have known of the falsity of SFE Booth's testimony for the same reasons as noted above.

Camila did not testify. Nothing other than the testimony of SA Weniger, SA Mills, and SFE Booth explained to the jury how they should understand and evaluate the digital evidence on these very serious charges. Daniela, who is Camila's older sister, testified about an appendectomy Camila underwent in 2007 and that the lack of an appendectomy scar in the photographs would indicate Camila as being underage. Trial Tr. at 2485:10 - 2489:3. However, if

the photographs were taken while Camila was an adult *and they still showed no scar*, that would have refuted Daniela's testimony.

The government bolstered its contention that the contraband photographs were purportedly taken in 2005 by eliciting false testimony from SFE Booth, specifically that EXIF data, once embedded in a picture, is very hard to remove no matter how many times it is moved between devices, that commercial software will not touch EXIF software, and that EXIF data was purposefully designed to make it more difficult to alter; especially the time and date unless one obtains software that is specifically developed to modify EXIF data. Trial Tr. at 4819:21-4820:20.

Damningly, every anomaly found on the WD HDD, and the CF card supports the government's 2005 narrative, a result which the expert reports and affidavits of Dr. J. Richard Kiper, Steven Abrams, and Wayne Norris, resoundingly prove is impossible outside of government manipulation and fraud. *See generally* Ex. D-F.

While any one of these expert reports cast grave doubt on the government's actions in this case, when taken together, they establish beyond a reasonable doubt that the government engaged in perjury and criminal tampering against Mr. Raniere. *Id*. All three experts reports prove SFE Booth's testimony about the chain of custody and EXIF data were knowingly false.[5] Ex. D at Bates 036, Finding 5; Ex. E at Bates 012 ¶ 18; See also Ex. F at Bates 006, Kiper Finding 5. All three expert reports prove that the file dates and folder names for the contraband photographs on WD HDD were manipulated to comport with the government's narrative of the photographs being taken in 2005. *See generally* Ex. D-F. Lastly, all three expert reports prove

---

[5] To get away with the tampering of the digital evidence to frame Mr. Raniere for these heinous crimes, the government needed to establish 1.) that a broken chain of custody for evidence items is normal and that 2.) EXIF data is very difficult to alter. Conveniently, Booth established both of these points in his testimony.

that the CF card was manipulated and retrofitted to buttress the falsified evidence on the WD HDD. *See generally* Ex. D-F

While the timing for the tampering on the WD HDD cannot be established with the discovery currently provided to the Defense, it is unequivocally established that tampering to the CF card *occurred while it was in FBI custody*. Ex. D at Bates 011; Ex. E at Bates 002-03 ¶ 6; Ex. F at Bates 009-10. The experts reviewed trial testimony, a forensic image of the WD HDD, and the FBI CART-generated FTK reports. *See generally* Ex. D-F. The experts concur: the FBI tampered with the digital evidence to support the government's theory of the case. *Id*. Seven critical technical findings support this conclusion:

1.      The digital photo files for images 93, 94, 96, and 97 on the CF card had counterparts (alleged backups) on the WD HDD. Both sets of images had the same filenames and date/time stamps, as one would expect with backups. However, the thumbnail images for 93, 94, 96, and 97 on the WD HDD depict a brunette, whereas the images 93, 94, 96, and 97 on the CF card depict a blonde. Moreover, these same thumbnail images for 93, 94, 96, and 97 on the CF card are identical to other images on the CF card – 180, 181, 182, and 183. Ex. D at Bates 003-004, Finding 1; Ex. E at Bates 003-04 ¶¶ 7-8, Finding # 1; Ex. F at Bates 004-05, Kiper Finding 1. No plausible explanation exists for the anomalies in the government's exhibits other than intentional tampering on the part of the government. Ex. F at Bates 008.

2.      Files were added to the CF Card, apparently between 4/11/19 and 6/11/19, in an attempt to create a stronger relationship between the CF Card and the WD HDD. Ex. D at Bates 005-06, Finding 2; Ex. E. at Bates 004-06 ¶ 9, Finding # 2; Ex. F. at Bates 005, Kiper Finding 2.

3.      An unknown person accessed the CF card on 9/19/18, without a write blocker, thereby altering and destroying file system dates while it was in SA Lever's custody. Ex. D at

Bates 006 Finding 3; *See also* Ex. E. at Bates 006 ¶ 10, Finding # 3; Ex. F. at Bates 006, Kiper Finding 3.

4.      Dates of a range of photographs on the WD HDD were altered through manual intervention. Ex. D at Bates 007 Finding 4; Ex. E at Bates 007 ¶ 11, Finding # 4; Ex. F. at Bates 006, Kiper Finding 4.

5.      The metadata of a photo on the WD HDD, whose numbered filename appears between the alleged contraband ranges, that was modified was manually altered to create the appearance that it had not been modified. Ex. D at Bates 007 Finding 5; Ex. E at Bates 008 ¶ 12, Finding # 5; Ex. F. at Bates 006, Kiper Finding 5.

6.      The folders on the WD HDD that contained the alleged contraband and others that supported the dating of the photographs to 2005, were made to appear to be named after exact dates and times in 2005 via computer automation. However, at least some, if not all, of these timestamped folder names were created manually. Ex. D at Bates 008-09 Finding 6; Ex. E. at Bates 009 -11 ¶ 13-15, Finding # 6; Ex. F. at Bates 007, Kiper Finding 6.

7.      Relatedly, the same photographs in #6. above, which include the alleged contraband photographs, were made to appear to be on the WD HDD from an automated computer backup in 2009. But in fact, they were placed there manually. Ex. D at Bates 010-11 Finding 7; Ex. E. at Bates 011 -12 ¶ 16, Finding # 7; Ex. F. at Bates 008, Kiper Finding 7.

As noted in the introduction, Digital Forensic Expert Dr. Kiper concludes that, "[W]hen so many human-generated alterations happen to align with the government's narrative, any reasonable person would conclude that evidence tampering had taken place. Ex. D at Bates 002.

Digital Forensic Expert Stephen Abrams, who has handled over 1200 cases, Ex. E1 at Bates 005, concludes that the only logical conclusion to be drawn by any reasonable person from

the set of forensic artifacts present here is that a manual alteration of the digital photographic and

file system evidence, and an unsuccessful attempt to cover that manual alteration, occurred while

the evidence was in the custody of the FBI. Ex. E at Bates 002-03 at ¶ 6.

Digital Forensic Expert Wayne Norris concludes that no plausible explanation exists for

the anomalies in the government's exhibits other than intentional tampering by the government.

Mr. Norris further notes that he has been a witness in more than 100 cases in 35 years, that he

has never personally witnessed tampering of digital evidence by any law enforcement agency,

and that he was personally disturbed by what he learned in this case. Ex. F at Bates 008.

In addition to the technical findings, Dr. Kiper, who served as a case agent, a supervisor,

a unit chief, a forensic examiner, a trainer of forensic examiners, and a trainer of other trainers of

forensic examiners, notes there "were several irregularities and violations of FBI protocol which

"raise serious concerns about the integrity of the evidence." Ex. D at Bates 033 ¶ 2

Further, such irregularities and violations of FBI protocol show that the prosecution knew

or should have known about the below breaches in protocol or, at a minimum, was concerned

enough about them to actively seek to obfuscate them from the jury. These irregularities include

the following:

1.      **Broken Chain of Custody**: Neither the camera nor the CF card was sealed when

delivered to SFE Booth at CART on 06/10/2019, two days before SFE Booth took the stand. Ex.

D at Bates 033, Finding 1; See also Trial Tr. at 4886:15-19; 4889:14-18. According to Dr. Kiper,

in his experience, the FBI's policy requires the securing and sealing of evidence, and employees

may be disciplined if they fail to do so. Further in his experience as an FBI agent, he ***never***

received unsealed evidence other than in exigent situations. Ex. D at Bates 33, Finding 1

(emphasis added). According to Digital Forensic Expert Steve Abrams, who handled over 1200

computer forensic investigations Ex. E1 at Bates 005, and was a sworn law enforcement officer for over 11 years, worked digital forensics cases for over two decades with Municipal, State, and Federal law enforcement agencies, including the FBI, US Secret Service, and military units of the United States and friendly foreign countries, ***evidence was always placed into a sealed evidence bag, and a chain of custody was started by the agent/officer who initially collected the evidence.*** Ex. E at Bates 013 ¶ 19 (emphasis added). Mr. Abrams further noted that, according to his training, any evidence that arrived from further down the chain of custody in an unsealed state should be considered outside a proper chain of custody and not usable in a criminal matter. *Id*.

2. <u>**Unusual Evidence Handling Procedures**</u>: The digital evidence seized on 03/27/2018 seemed to be in and out of the physical control of the case agents rather than primarily managed through the Evidence Control Unit, hereafter "ECU." Although the digital evidence was first turned into the ECU by the FBI's ten-day deadline, it was subsequently checked out by individuals who were **not authorized** to review it. The chain of custody for the Camera and CF Card, for example, indicates that SA Maegan Rees checked out the evidence on 07/10/2018 for 17 days and SA Michael Lever on 09/19/2018 for seven days – before it was first examined by a CART examiner on 02/22/2019. Both SA Rees and SA Lever indicated "Review" as the reason they were checking the evidence out of the ECU, but **neither of these individuals were authorized to review the contents of unexamined digital evidence** Ex. D at Bates 034, Finding 2; Ex. A at 15 – FBI's Evidence Management and Operations Policy implementation Guide (October 27, 2009) unclassified (emphasis added).

3. <u>**The CF card was accessed and modified twice by an unauthorized person while in FBI custody**</u>: On September 19, 2018, while SA Lever had possession of the CF card

(evidence item 1B15a), someone accessed the files on it in a manner where file system data was overwritten. Ex. D at Bates 035 Finding 3. This occurred six months *after* the FBI seized the CF card, but five months *before* it was delivered to an authorized CART examiner.[6] Ex. D at Bates 034-35. Note also that September 19, 2018, is the same day that FSE Donnelly conducted her *authorized* forensic analysis of the WD HDD. Ex. D at Bates 034, Finding 2. This shows coordination between the *authorized* forensic examination of the WD HDD and an *unauthorized* access of the CF card, the two pieces of evidence the government needed to have in sync to establish its contraband narrative.

Further, thirty-seven new files were apparently added to the CF card between April 11, 2019, and June 11, 2019. Ex. D at Bates 028-32. These files did not show up on FE Flatley's FTK report from April 11, 2019, but they did show up on SFE Booth's FTK report from June 11, 2019, *even though Flatley and Booth used the same version of the same software to run their respective reports*. Ex. D at Bates 035-36, Finding 4. Also, the thirty-seven new files on Booth's June 11, 2019, FTK report were the only files not viewable on that report, as opposed to the files in common from Flatley's April 11, 2019, FTK report, which were viewable in both reports. Lastly, as discussed above, the thumbnail images for 93, 94, 96, and 97 on the CF card, *which at first blush appear to have exact counterparts on the WD HDD*, depict a blonde, whereas the thumbnail images for 93, 94, 96, and 97 on the WD HDD depict a brunette.

Clearly, the files on the CF card were modified while in the custody of the FBI.

4. **FBI Expert Witness Knowingly Gave False Testimony**:

---

[6] Under Section 3.3.4.5 of the FBI's Digital Evidence Policy Guide, content review of digital evidence, hereafter "DE," *is authorized only after DE is processed by authorized personnel*… **Content review of original DE is prohibited by those not trained and authorized by the Operational Technology Division, hereafter "OTD**. Ex. C at 21 – FBI's Digital Evidence Policy Guide (January 3, 2014, revised January 3, 2017) unclassified (emphasis added).

a.    ***SFE Booth testified that receiving unsealed evidence is not
extraordinary***, ***and that maintaining a chain of custody of evidence is not necessarily.*** Trial Tr. at 4887:16 - 4888:1(emphasis added). However, FBI policy requires the securing and sealing of evidence, and employees may be disciplined if they fail to do so. Ex. D at Bates 033, Finding 1. Further, under Section 2.2.1 of the FBI's Digital Evidence Policy Guide, "all FBI personnel who ***handle, content review, or process digital evidence, hereafter 'DE,' are responsible for maintaining the chain of custody of all DE.***" Ex. C at 8 (emphasis added).

b.    SFE Booth repeatedly testified to the reliability of EXIF data, stating that it is "very hard to remove" and "it's not easily modifiable." Trial Tr. at 4819:21-23; 4830:3-8. In fact, there are several readily available tools that can modify EXIF data. This is a fact that would be well-known to any forensic examiner, let alone a senior forensic examiner such as Booth. Ex. D at Bates 36, Finding 5. As noted by Mr. Abrams, "[A] cursory search of the Internet would inform Mr. Booth and the Prosecution that there are many readily available inexpensive (or free) software products that facilitate changing EXIF data of the kind that Booth insisted was not easy to change" Ex. E at Bates 012 -13 ¶¶ 17 -18

5.    **Aberrant Search Procedure by FBI Agents**: SA Mills testified that during the service of the search warrant, the FBI entered the house and then moved past the kitchen, living room, bathroom, and open areas of the first floor. They then took a spiral staircase to the second floor, where they moved through several more areas, including a bathroom and a seating room area, before finally arriving at the upstairs "office space." Trial Tr. at 4294:9 - 4295:19. Although the office was the last of many areas discovered in the residence, it became the first area to be searched. *Id*. at 4304:16 - 4307:5. Once there, FBI agents immediately crawled underneath a desk to retrieve the Canon digital camera containing the CF card at issue as the first

seized item. *Id*. Next, FBI agents beelined to the top of a bookshelf to retrieve the WD HDD, the second seized item. *Id*. at 4308:1 - 4308:23. Then, twelve items later, the FBI curiously went back underneath the desk to collect more items. *Id*. at 4310:6-8.

This conduct is particularly notable because SA Mills' trial testimony indicated that the typical process for executing a search warrant starts at the very beginning of the entry to the residence, where agents move through each space in the residence, documenting each room and identifying pieces of evidence in the room. Trial Tr. at 4295:20 - 4296:12. ***However, here, these first two pieces of evidence collected at the residence happened to be the <u>only</u> two pieces of digital evidence used to convict Raniere of child exploitation and possession of child pornography.*** Ex. D at Bates 50, Introduction (emphasis added). This aberrant search procedure is consistent with FBI agents knowing ahead of time that the two most important pieces of evidence in the trial would eventually be "found" on those devices.

In light of this compelling and credible new scientific proof that the evidence, in this case, was manipulated and fabricated, the Court must vacate Mr. Raniere's conviction in the interests of justice pursuant to Rule 33.

///

///

///

///

///

///

**ARGUMENT**

I. <u>MR. RANIERE IS ENTITLED TO RELIEF UNDER RULE 33 OF THE
FEDERAL RULES OF CRIMINAL PROCEDURE AS A RESULT OF THE
NEWLY DISCOVERED EVIDENCE, WHICH SHOWS THAT THE FBI
TAMPERED WITH MATERIAL DIGITAL EVIDENCE IN THIS CASE, THAT
THE FBI GAVE FALSE TESTIMONY WHICH THE GOVERNMENT USED AT
TRIAL TO SECURE A CONVICTION, AND THAT THE GOVERNMENT
WITHHELD MATERIAL EVIDENCE IN THE EFFORT TO COVER-UP THE
GOVERNMENT'S CULPABILITY.</u>

Rule 33 of the Federal Rules of Criminal Procedure provides that, "Upon defendant's

motion, the court may vacate any judgment and grant a new trial if the interest of justice so

requires." Fed.R.Crim.P. 33(a). "In evaluating a Rule 33 motion, the court must ***"examine the***

***entire case, take into account all facts and circumstances, and make an objective evaluation,"***

***keeping in mind that the 'ultimate test' for such a motion is 'whether letting a guilty verdict***

***stand would be a manifest injustice.'"*** *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018)

(emphasis added).

Relief under Rule 33 is based on whether: (1) the evidence [was] newly discovered after

trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant

to obtain evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or

impeaching; and (5) the evidence would likely result in an acquittal. *United States v. Forbes*, 790

F. 3d 403, 406-407 (2d Cir. 2015).

> **A.** ***The Evidence at Issue is Newly Discovered Within the Meaning of Rule 33 of***
> ***the Federal Rules of Criminal Procedure, Even If Parts of the Evidence Were***
> ***Known to the Defense During Trial.***

When a defendant is aware of evidence unavailable to a defendant at trial as a matter of

circumstance rather than as a matter of law, such as the invocation of a fundamental right by the

holder of the evidence, if the defendant is later able to locate the evidence, provided the other

requirements of Rule 33 are satisfied, his evidence is newly discovered within the meaning of

Rule 33 thus entitling him or her to the relief sought. *See United States v. Forbes,* 790 F.3d 403, 409 (2d Cir. 2015).

Here, the newly discovered evidence satisfies all the requirements of Rule 33. First, the evidence was newly discovered after trial in that the expert reports of Digital Forensic Experts Dr. Richard Kiper, Steven Abrams, and Wayne Norris, evidencing the intentional alteration of evidence by the FBI in this case, were not available before trial. Even though these reports are based on information that was partially produced to the Defense near the end of trial, because the depth of analysis required to uncover the malfeasance at issue was so extensive, ***it would have been impossible to have generated them before or during trial.*** Notably, in his "Expert Opinion Regarding Time to Review Digital Evidence," Dr. Kiper notes, "The government placed the Raniere Defense team at a significant and unjust disadvantage by intentionally withholding key evidence they intended to use at trial." Specifically, the Defense "was given only twenty-six days to conduct a technical review of some of the digital evidence (a non-forensic and partial copy of the hard drive contents), and at worst, it was given *no opportunity* to review the second FTK forensic report related to the CF card." Ex D at Bates 59, Conclusion. Thus, the necessary analysis could not have been performed within that timeframe. *Id.*

The necessary analysis here has taken considerable time. Dr. Kiper's initial review and assessment alone required three months to complete. An additional period of almost a year was required for independent examination and further analysis. This was due to the complexity of the necessary analysis, the unavailability of original trial evidence, and the lack of a forensic copy of the CF card, which was never discovered though it easily could have been as it was never alleged to contain any contraband. Also, extra care was needed to thoroughly verify such vile criminal activity on the part of the FBI, before bringing it forth. Finally, it was very difficult for reputable

experts to accept such tampering and cover-up involving the government, including the FBI and possibly other actors. As Mr. Abrams notes in his report, "it saddens me to concur that manual alteration of evidence and an attempt to cover it up occurred while the evidence was in FBI custody." Mr. Norris notes in his report, "[T]his is difficult for me to discuss since my own family proudly includes multiple law enforcement officers dating back approximately a century." Ex. E at Bates 003; Ex. F at Bates 004.

Second, critical discovery is still needed, including *Brady* material such as the clone of the CF card, which the government is in possession of but has refused to disclose, despite the Defense's request even as recent as March 18, 2022. Ex H; H1-H3 – Defense Informal Discovery Request, and responses from the government, respectively.

Although both the United States Supreme Court and the United States Court of Appeals for the Second Circuit have held that unlike criminal defendants at or before trial, post-conviction defendants lack a specific *Brady* right to the disclosure of material, favorable evidence, this Court has held that what a post-conviction movant is entitled to is premised on a fair trial calculus. *See Wright v. U. PO, Parole Officer*, 10-CV-5127, at *36 (EDNY, July 2, 2021). As noted by the Second Circuit, in evaluating the constitutionality of post-conviction procedures, courts must ask whether the procedure "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental, or transgresses any recognized principle of fundamental fairness in operation." *Pierre v. Doorley*, 19-2638-cv, at *3 (2d Cir., November 25, 2020) (*citing Dist. Atty's Off. for Third Jud. Dist. v. Osborne,* 557 US 52, 69 (2009).

Due process requires that criminal trials "proceed consistently with 'that fundamental fairness,' which is essential to the very concept of justice." *Raheem v. Kelly*, 257 F.3d 122, 133

(2d Cir. 2001). If ordered to be disclosed to the Defense during a hearing, the still-outstanding

discovery here will allow the Defense to further expand on the breadth and scope of the

government's tampering perpetrated in this case. Denying Mr. Raniere such an opportunity

would be offensive to the due process principles of fundamental fairness essential to the concept

of justice.

Moreover, as noted by this Court, "***the fact that prosecutors' Brady disclosure obligation ends at judgment does not insulate prosecutors from accountability for earlier, prejudgment Brady violations. A post-conviction movant or habeas petitioner may obtain post-judgment relief for these prejudgment Brady violations.***" *Wright v. U. PO, Parole Officer,* 10-CV-5127, at \*36 n.32 (EDNY, July 2, 2021) (emphasis added, internal citations omitted).

### B. *Several Facts Exist From Which the Court Can Infer Due Diligence On the Part of the Defense to Obtain Evidence, Which the Court Can Also Infer Governmental Malfeasance Therefrom.*

Due diligence under Rule 33 requires the movant to show facts from which the court can

infer that the defendant or his counsel would not have been able **"*without unusual effort*,"** to

acquire the new evidence prior to or during trial. *See Dimattina v. United States* 949 F. Supp. 2d

387, 397 (E.D.N.Y. 2013) (emphasis added).

Here, Mr. Raniere's trial counsel repeatedly addressed the non-disclosure of material

evidence specifically: (1) in pre-trial conferences where prosecutors misrepresented to the court

that complete evidentiary disclosures were made. Pre-Trial Tr. at 35:5-9 (September 27, 2018);

*See also* Pre-Trial Tr. at 34:12-25 (February 11, 2019); (2) in an affidavit filed with the court on

April 22, 2019. Dkt. 577; and on June 13, 2019, during SFE Booth's testimony. Trial Tr. at

4890:17-4891:2; 4892:1-4893:20; 4894:11-4897:6; 4898:4-4899:23.

Further, the false representations by the prosecutors to the court, the late disclosure of the CF card FTK reports, the non-disclosure of the CF card itself, and the false testimony of the government's witness deserve deeper exploration as they are evidence of intentional governmental malfeasance and establish that the Defense would have had to resort to unusual efforts to obtain the evidence. As noted herein, the length of time that it has taken three top experts in the field of digital forensics to uncover the tampering detailed above further establishes the arduous nature and intensive amount of time required.

From the onset of the case, March 27, 2018, the government clearly had knowledge of the CF card, Gov. Ex. 524, as it was the first item collected during the execution of the search warrant. Trial Tr. at 4304:16 - 4305:24.

On September 27, 2018, during a pre-trial hearing, AUSA Hajjar stated on the record that "***Not everything has to be uploaded to our vendor***. There are other items, for example, where we have just produced the results of the search. I think one of those was like an 8 Hale camera, for example. ***We just pulled out the pictures out and gave them everything. That search is done***." Pre-Trial Tr. at 35:5-9 (September 27, 2018) (emphasis added). This statement is significant because it shows that Ms. Hajjar had knowledge that someone in the government retrieved the photographs from the CF card in an unauthorized manner. Ex. D at Bates 006, Finding 3.

On January 9, 2019, AUSA Penza told the Court that the government "continues to expect a superseding indictment in this case… [T]here are a number of factors that are weighing into the timing considerations for a superseding indictment." Incredibly, she stated this six weeks before FBI agents allegedly stumbled upon photos that SA Lever would identify as being contraband. Pre-trial Tr. at 4:14-25 (January 9, 2019). On February 11, 2019, in an oral argument before Judge Scanlon regarding discovery issues, AUSA Penza assured the Court that the

Defendants "**have everything from 8 Hale**." Pre-Trial Tr. at 34:12 - 25 (February 11, 2019) (emphasis added). Such a representation was patently false as the CF card not been produced to the Defense though FBI agents had checked it out for review twice. Def.'s. Trial Ex 945.

These two instances of the government misleading the Court and the Defense into believing that evidence had been disclosed when it indeed had not obstructed due process by hindering the Defense's preparation for trial by falsely establishing that no further action is required regarding acquiring that piece of evidence.[7] Such falsehoods about discovery disclosure created a blind spot in the Defense's preparation regarding the key pieces of evidence in this case and thus obstructed constitutionally guaranteed due process.

As the Second Circuit has noted, it is "**well established as a fundamental matter of due process that the defendant in a criminal case has the right to present a defense, that is, to present to the jury admissible evidence that might influence the determination of guilt**." *Grotto v. Herbert*, 316 F.3d 198, 205-06 (2d Cir. 2003). A defendant also has the right to confront the witnesses against him, including **through cross-examination of the government's witnesses at trial so as to test "the believability of a witness and the truth of his testimony."** *Davis v. Alaska*, 415 US 308, 316 (1974); *See also United States v. Figueroa*, 548 F.3d 222, 227 (2d Cir. 2008) ("The Confrontation Clause guarantees a criminal defendant the right to cross-examine government witnesses at trial.").

Here, the CF card was the purported source of the alleged contraband and other photographs in the alleged "studies folder" on the WD HDD. The government clearly had knowledge of this device, analyzed it on several occasions, believed it was relevant, and

---

[7] Prosecutors have a primary duty to seek justice within the bounds of the law, not merely to convict, and should respect the constitutional and legal rights of all persons, including the accused. *See* American Bar Association Standards for Criminal Justice, standard 3-12 (4th ed. 2017).

material, yet was late in disclosing the operative FTK report until June 11, 2019 – at the tail end of trial. Further, at no point in time – *including to date* – has the government ever turned over a forensic clone of the CF card so the Defense could conduct its own forensic examination of the device. Unlike the WD HDD, giving a clone of the CF card would not have been problematic as FBI agents never claimed to have found even a trace of the purported contraband on the device.

The government conduct here is profoundly egregious, conspiratorial, and conniving in that it: (1) calculably and deliberately was untimely in disclosing critical relevant and material reports regarding the CF card, which they claim supported their theory of Mr. Raniere's guilt; (2) denied (and continues to deny) all access to the CF card because they knew their fraud on the CF card may be more easily detected than their fraud on the WD HDD; (3) made false representations to the Court and Defense counsel about CF card discovery disclosures then waited to nonchalantly introduce the FTK report of the second examination of the CF card through the FBI's SFE Booth, their second-to-last witness, who testified falsely in order to corroborate the timing of the planted photographs on the WD HDD to falsely establish the contraband nature of the photographs. Pre-Trial Tr. at 35:5 - 9 (September 27, 2018.); Pre-Trial Tr. at 34:12 - 25 (February 11, 2019); Trial Tr. at 4778:25 - 4779:5; 4786:2 - 4795:23; 4781:3 - 4782:3; 4817:18 - 4820:20; 4800:24 - 4801:9; 4800:6 - 8; *see also* 4821:12 - 18; 4871:13 - 4873:2; 4889:16 - 22; 4887:16; 4818:24 - 4819:20; 4819:21- 4820:20; *See also* 3450:2 – 12; compare to Ex. D-F.

C. ___The Clandestine Nature of the Government's Tampering and Suppression of Material Evidence That Would Have Uncovered It Indicate That the Defense Could Only Have Been As Diligent As the Available Evidence Could Have Allowed At the Time.___

In combination, or even individually, the expert reports prove that the government committed significant evidence tampering to frame Mr. Raniere for heinous crimes. Because the

effort was composed of criminal conduct and required more than one person, the tampering was a criminal conspiracy. *See* Ex. F at Bates 009-14. Further, the obvious should not be overlooked: *the government supplied no discovery related to the criminal conspiracy or its tampering with the evidence*. The government did not disclose any witness statements, confessions, videos, photographs, 'before and after' reports of the tampered digital items, or any forensic analysis regarding the actions undertaken to execute the tampering. While it would be unreasonable to expect that the bad actors who carried this out would also have disclosed details of their activities, ***the prejudice to the Defense due to this non-disclosure nonetheless remains***.

Further, because the FBI's tampering here was fraudulent, clandestine by its very nature and purpose, carried out with the intent to have it be undetectable, it could only have been discovered after trial. *See generally* Ex. D-F. Our Nation's High Court has long recognized the principle that when the unawareness of fraud has been produced by the affirmative acts of a guilty party in concealing the facts from the other party, the law should not bar relief for the harmed party who timely acts upon discovery of the fraud. *Bailey v. Glover*, 88 US 342, 347 (1874). Accordingly, based on the egregious conduct of the FBI and the government as indicated above, it is clear that the Defense was as diligent as possible under the circumstances by timely acting upon the discovery of the government's significant evidence tampering. Thus, Mr. Raniere respectfully asks that this Court vacate the entire judgment against him and grant him a new trial in the interest of justice as letting a conviction stand under the current circumstances would be a manifest injustice. *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018).

**D. <u>*The Evidence at Issue is Material, Not Merely Cumulative or Impeaching, and the Evidence Would Probably Lead To an Acquittal Under the Circumstances.*</u>**

Generally, Rule 33 relief is warranted only if the defendant demonstrates that "the evidence is so material and non-cumulative that its admission 'would probably lead to an

acquittal.'" *US v. Spinelli* 97 CR 209, *7 (EDNY, October 30, 2007). However, as this Court has recognized, "[T]he standard differs when the government has failed to disclose evidence favorable to the defense." *Id*. Constitutional error occurs "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id*. citing *Kyles v. Whitley*, 514 US 419, 433-34 (1995) (quoting *United States v. Bagley*, 473 US 667, 682 (1985)). In such a circumstance, our Nation's High Court has opined that "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, ***but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."*** *US v. Spinelli* 97 CR 209 *7, citing *Kyles v. Whitley*, 514 US 419 at 434 (quoting *Bagley*, 473 US at 678).

Here, the newly discovered evidence of electronic tampering is not only material, but given its absence in Mr. Raniere's trial, it is incontestable that Mr. Raniere did not receive a fair trial because the new evidence proves that the FBI and other actor(s) committed criminal acts such as tampering with the WD HDD and CF card and perjury to frame Mr. Raniere for child exploitation and possession of child pornography. Suppression of such evidence without a doubt clearly undermines the confidence in the outcome of the trial in this case because the resulting conviction of Mr. Raniere was based on evidence that was fabricated by the government with the intent to mislead the jury into convicting Mr. Raniere. Under no such circumstance would this amount to a fair trial. Consequently, Mr. Raniere is entitled to Rule 33 relief. Denial of such relief under these circumstances constitutes constitutional error, for if the government had

disclosed the evidence of tampering, this would have undoubtedly resulted in a different result at trial in favor of Mr. Raniere. *US v. Spinelli* 97 CR 209, *7 (EDNY, October 30, 2007).

Moreover, AUSA Hajjar represented to the court that the metadata of the photographic images in the eleven folders within the WD HDD, including the folder that purportedly contained child pornography, was critical evidence for the child exploitation charges. Trial Tr. at 4799:20-23. She also noted that the metadata bears that the photographs were taken in 2005, that the type of photographs that are depicted ***in the folders are the same kind the defendant later receives as part of DOS, and as such establishes the entire course of conduct and basis for the means and methods that the government charged.*** *Id*. at 4800:6-13. Further, AUSA Hajjar informed the court that the photographs' metadata was of "***significant importance in the case***" as such metadata "***goes to the timing and receipt of the photographs and when they were created.***" *Id*. at 4800:24-4801:9 (emphasis added). Consequently, new evidence that shows that the FBI added images to the CF card and engaged in rampant tampering with the WD HDD, would certainly undermine the confidence of the verdict in this case, and, given the absence of such evidence, conclusively proves that Mr. Raniere did not receive a fair trial.

Additionally, evidence showing that the FBI and members of the prosecution team intentionally altered the metadata of the files purportedly found in the WD HDD Drive, and the CF card, goes against the government's narrative of Mr. Raniere's guilt. According to the prosecutors in this case, the forensic metadata evidence was the only evidence that allegedly connected Mr. Raniere to the digital photographs and *was the primary evidence that established these photographs as contraband*. See Trial Tr. at 4800:24 - 4801:9 (emphasis added) Consequently, the government's intentional nondisclosure of a forensic copy of the CF card for the Defense to perform its own analysis demonstrates that the government suppressed evidence

that would uncover its illegal conduct regarding what it called the evidence "of significant importance in this case." Trial Tr. at 4801:4-9. Such suppression certainly undermines confidence in the outcome of Mr. Raniere's trial and necessitates that this Court grant Mr. Raniere a new trial pursuant to Rule 33.

Further, the newly discovered evidence is not merely cumulative or impeaching. Although the three reports of Dr. Kiper, Mr. Abrams, and Mr. Norris come to the same conclusion regarding evidentiary tampering and perjury by the FBI and members of the prosecution team, each report is built on the experts' individual thoughts and conclusions, as well as the individual professional experience of each expert, notwithstanding their ultimate corroboration that there was evidence tampering and perjury by the prosecution team in this case. Compare Ex. D – F; *See also* Ex. D1 - F1.

As to the possibility of the new evidence leading to Mr. Raniere's acquittal, presenting evidence of tampering would have established overwhelming reasonable doubt regarding the digital evidence, including the source of the alleged contraband images, the dates the photographs were taken, the authenticity of the photographs, and the competency of the government's forensic expert witness. Most importantly, it would have demonstrated to a "scientific certainty" that the government substantively violated Mr. Raniere's due process rights with their criminal activity. *See generally* Ex. D – F.

The conclusion of tampering is unavoidable. As Dr. Kiper notes, "[T]he forensic evidence shows that folder names and dates (key facts upon which the prosecution's argument relied) were manually altered, and the entire backup folder to which the alleged contraband belonged was manipulated. While it is impossible to determine exactly when the information on the Western Digital hard drive was altered, it is a scientific certainty that files on the CF card

were added and/or modified while the device was in FBI custody." Ex. D at Bates 011, Conclusion.

Dr. Kiper's detailed discussion of the bases for each of his findings is highly persuasive. His report makes it clear that fraud committed by the FBI and the prosecution team occurred in this case. *See generally* Ex. D. For instance, although the files on the CF card are purported to be identical with their counterparts on the WD HDD, with "identical file names, identical Modified dates, and (presumably) identical EXIF data, including the date taken, camera model, and serial number." However, they cannot be identical photo files because their MD5 hashes ("digital fingerprints") do not match. *Id*. at Bates 003-04, Finding 1, bullet point 2. "Moreover, a content review of the files reveals the subjects of the photographs found on the two devices are actually two different people." *Id*. at Bates 004, bullet point 2. In short, "*This would mean the same camera, with the same serial number, took two different photographs of two different subjects at precisely the same time and assigned them the same file name.* This is impossible, of course, so the presence of these files indicates the manipulation of the content and metadata for these photos." *Id* (emphasis in original). Dr. Kiper concludes that there is only one explanation for such discrepancies: intentional conduct of an "unknown actor." *Id*

This newly discovered evidence is shocking as it demonstrates malfeasance on the part of the prosecution team, goes to the heart of the case against Mr. Raniere and, most importantly, shows that the government intentionally and substantially violated Mr. Raniere's due process rights. Had the jury been presented with such evidence, it is highly unlikely they would have convicted Mr. Raniere. Thus, under the totality of these facts and circumstances, letting Mr. Raniere's guilty verdict stand would be a manifest injustice. Consequently, this Court must grant Mr. Raniere relief pursuant to Rule 33.

At the very least, the newly discovered evidence would have resulted in an acquittal on the child exploitation and possession of child pornography charges. First, neither the electronic devices nor the files that formed the evidentiary basis for these charges are competent evidence. *See generally* Ex. D-F Nonetheless, moving past that, the government's evidence as to those charges was scant. Camila did not testify, and therefore, the government had no direct evidence that Mr. Raniere took lascivious photographs of her in 2005 when she was 15 years old. The only evidence to support this charge was weak: images of Camila found in a backup folder on a hard drive that was used to allegedly back up files from at least three different computers in a location to which countless people had access.

The government's entire theory as to these counts hinged on the jury believing that the images were taken on a specific camera, a camera that Lauren Salzman and Daniela suggested Mr. Raniere used in 2005, and within a particular timeframe, a camera similar to the one that the government had in its custody, later presented as evidence in the trial, asked the witnesses to describe, yet did not ask either witness to identify. Trial Tr. at 4800:6-13. The government needed the jury to credit its argument that the forensic evidence was consistent with the purported dates on which Mr. Raniere photographed other women, Lauren Salzman and Daniela, to create a timeline from which the jury could infer that Mr. Raniere also took the alleged contraband photographs during the time that the subject would have been underage.

Had the jury learned that the FBI agents, other government personnel, or someone working alongside them had manually added photographs onto the WD HDD and the CF card to make both devices corroborate the government's narrative regarding the contraband photographs and that the dates of photographs and folder names that the government relied upon as proof had been manipulated, it would have viewed the forensic evidence in an entirely different light. *See*

*generally* Ex. D-F. **The jury would have questioned whether the prosecution's contention that the photographs were taken in 2005 was accurate because the government would not have had to tamper with the evidence <u>if the alleged contraband photographs were genuine.</u>** If the digital photographs were truly taken in 2005, there would be no reason to forge folder names to make them seem like they were autogenerated in 2005. Likewise, there would be no reason to forge file names within those folders to make them seem like they were autogenerated in 2005. Such reasonable doubt would have resulted in the acquittal of Mr. Raniere of the most heinous charges of child exploitation and possession of child pornography.

Moreover, the jury might have acquitted Mr. Raniere of all counts if it had learned that the government manipulated the evidence to frame Mr. Raniere for the most severe and explosive charges alleged in the second indictment, given the participation of multiple actors who together are estimated to have spent well over 100 hours to perpetrate this fraud. Ex. F at Bates 009 - 14. Lastly, the impact that the horrific charges of sexual exploitation of a child and possession of child pornography had on the case was paramount. Proof of this is that all co-defendants pled immediately or shortly after the introduction of these charges. The heinousness of those charges pervaded every aspect of this case.

Accordingly, at the very least, Mr. Raniere's convictions for child exploitation and possession of child pornography cannot stand and at most, his conviction in its entirety should be vacated, pursuant to Rule 33, in the interest of justice as a result of the FBI and the prosecution team's intentional illegal conduct as indicated herein.

///

///

///

- 35 -

## II. MR. RANIERE'S CONVICTIONS MUST BE VACATED AS A MATTER OF LAW BECAUSE OF THE GOVERNMENT'S USE OF FALSE TESTIMONY AND EVIDENCE.

Under Rule 33, if the new evidence reveals that false testimony was "used by the State in securing the petitioner's conviction" and that false testimony has "an effect on the outcome of the trial," post-conviction relief must be granted. *US v. Santos*, 02 CR. 798, *3-4 (SDNY, January 13, 2004) (internal citations omitted). The United States Supreme Court has long opined that a prosecutor's knowing use of perjured testimony violates the due process clause of the Fourteenth Amendment. *Giglio v. United States*, 405 US 150, 153 (1972); *Napue v. Illinois*, 360 US 264, 269 (1959). ***Due process requires not only that the prosecutor avoid soliciting false testimony but that he not sit idly by and allow it to go uncorrected when it is given.*** *Giglio, supra,* 405 US at 153; *Napue, supra*, 360 US at 269 (emphasis added). "The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness." *Id.* at 269. As indicated by the High Court in *Napue*, "A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the prosecutor has the responsibility and duty to correct what he knows to be false and elicit the truth as the impact of their silence prevents a fair trial." *Id.* at 269-70.

Here, the photographic evidence and its metadata was critical evidence in the government's case, as the government itself noted that such evidence established the entire course of conduct for the charges the government brought forth and was deemed to be evidence of significant importance in the case in that the metadata purportedly established the timing and receipt of the photographs as well as when they were created. Trial Tr. at 4799:20 - 23; 4800:6 - 13; 4800:24 - 4801:9.

On June 12 and 13, 2019, the government called SFE Booth to testify regarding the alleged contraband photographs. Booth testified that he was a member of CART and that he had examined the WD HDD. Trial Tr. at 4778:25 - 4779:5; 4786:2 - 4795:23. SFE Booth asserted that, as part of the examination process, a forensic image of the WD HDD was created by using a write blocker that allows reading of the data on the WD HDD using a computer without writing onto it. Trial Tr. at 4782:9 - 4783:12. He explained, "It's really important that we don't alter that evidence at all. We want to make it as pristine as possible and put it back into the evidence vault the same way that we got it. We don't touch it after that. The file that we create from it is the only thing we use after that." Trial Tr. at 4783:13 - 16.

However, we now know that this testimony was false in that the new evidence reveals that the FBI did not use a write blocker to preserve the evidence because file system dates on the CF card were altered on at least one occasion, September 19, 2018, six months after the FBI collected it on March 27, 2018, and while it was in the custody of SA Lever. Ex. D at Bates 006, Finding 3. As noted above, this false testimony was known to the prosecutors as Ms. Hajjar represented to the court that the government had extracted the digital pictures from the camera's CF card. Pre Trial-Tr. at 35:5 - 9 (September 27, 2018).

The government's contention that the photographs were purportedly taken in 2005 is significant because that would put Camila at fifteen years of age. Trial Tr. at 3450:2 - 12. Thus, any digital photographs of her nude could be contraband. On that point, SFE Booth testified that he created an FTK report with images found in the "V110205" subfolder of the "Studies folder." *Id*. at 4871:13 - 4873:2. The alleged contraband photographs were found within two additional subfolders in "V110205" that were labeled "2005-11-02-422-20" and "2005-11-24-0814-46." *Id*. at 4873:19 - 4874:10. SFE Booth testified that the EXIF data from the alleged contraband

photographs that showed the date and time of the photographs roughly matched the name of the subfolders in which they resided. Trial Tr. at 4878:9 - 4881:11. The new evidence proves that Booth's testimony on this point was false in that the new evidence shows that folders containing the alleged contraband and others that supported the dating of the photos to 2005 appear automatically named after exact dates and times in 2005 but that at least some of these timestamped folder names were given those exact dates and times in 2005 through manually alteration made to look as if they had been created by computer automation. Ex. D at Bates 008, Finding 6.

Regarding the CF card, SFE Booth testified that it was submitted to him in an unsealed cellophane bag. Trial Tr. at 4889:16-22. SFE Booth also testified that he sometimes receives evidence in unsealed boxes and bags, that a record is not always made when an agent unseals evidence, and that a record should not always be made when evidence is opened or unsealed. *Id*. at 4887:16 - 4888:4. As a Senior Examiner, SFE Booth knew that his representations regarding the evidentiary chain of custody were false. Generally, the evidentiary chain of custody is paramount in the FBI and law enforcement. Ex. D at Bates 033, Finding 1 ("As I will discuss later, FBI policy requires the securing and sealing of evidence, and employees may be disciplined if they fail to do so. In my experience with the FBI, I never received unsealed evidence other than in exigent (emergency) situations."); *See also* Ex. E at Bates 013-14 ¶ 19 ("I always placed the evidence into an evidence bag and affixed a tamper evident seal before passing the evidence on in the chain of custody…I was taught that any evidence that arrived from further down the chain of custody in an unsealed state should be considered to be outside a proper chain of custody and not usable in a criminal matter."). Further, under Section 2.2.1 of the FBI's Digital Evidence Policy Guide ***"all FBI personnel who handle, content review, or process***

*digital evidence, hereafter "DE," are responsible for maintaining the chain of custody of all DE."* Ex. C at 8 (emphasis added).

Consequently, the prosecution also knew or should have known of the falsity of SFE Booth's testimony for the same reasons as noted above.

The prosecutor's knowledge or presumed knowledge of the falsity of SFE Booth's testimony as to the digital evidence is also supported by the fact that the government, despite its representation that the digital evidence was of significant importance, rather than establish an unbroken chain of custody for the evidence at trial, it elicited a summary of what SA Mills believes generally happens with digital evidence. Trial Tr. at 4307:6-18.

The prosecutor's knowledge or presumed knowledge of the falsity of SFE Booth's testimony is further buttressed by the fact that in closing arguments, the government emphasized that Booth testified that the most reliable metadata that the FBI could obtain from the images on the Western digital hard drive established that the digital photographs were taken exactly when the folders stated they were taken, i.e., on November 2, 2005. Trial Tr. at 5371:16-24. We now know that contention is false based on the new evidence. *See generally* Ex. D - E.

Consequently, it is clear that the government knowingly used false evidence, including false testimony, to obtain a tainted conviction of Mr. Raniere. As such, Mr. Raniere must be granted relief under Rule 33 as a matter of law.

## III.  IN THE ALTERNATIVE, MR. RANIERE REQUESTS THIS COURT PROVIDE AN INDICATIVE RULING THAT THIS MOTION RAISES A SUBSTANTIAL ISSUE.

In relevant part, Rule 37 of the Federal Rules of Criminal Procedure provides that if a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending, the court may state either that it would grant the motion if the

court of appeals remands for that purpose or that the motion raises a substantial issue.
Fed.R.Crim.P. 37(a)(3). In the event of such a ruling from this Court, Mr. Raniere would
promptly notify the Court of Appeals pursuant to Rule 37(b), which instructs that "movant[s]
must promptly notify the circuit clerk pursuant to Federal Rule of Appellate Procedure 12.1 if the
district court states that it would grant the motion or that the motion raises a substantial issue."

      Such a sequence would permit this Court to decide this motion. See Fed.R.Crim.P. Rule
37(c).

      Rule 37 was indeed enacted to address the exact circumstances present herein. As noted
in the April 23, 2012, Committee Notes on Rules to Rule 37, "Rule 37 will be used primarily if
not exclusively for newly discovered evidence motions under Criminal Rule 33(b)(1)." Fed. R.
Crim. P. 37, Committee Notes on Rule 37 – 2012. The committee further notes that Rule 37 does
not attempt to define the circumstances in which an appeal limits or defeats the district court's
authority to act in the face of a pending appeal… but indicates that Rule 37 applies when rules
that govern the relationship between trial courts and appellate courts deprive the district court of
authority to grant relief without appellate permission. *Id*. If the district court concludes that it has
authority to grant relief without appellate permission, it can act without falling back on the
indicative ruling procedure. *Id*. To ensure proper coordination of proceedings in the district court
and in the appellate court, the movant must notify the circuit clerk under Federal Rule of
Appellate Procedure 12.1 if the district court states that it would grant the motion or that the
motion raises a substantial issue. *Id*. Although remand is in the court of appeals' discretion under
Federal Rule of Appellate Procedure 12.1, the committee notes that it will often be wise for the
district court to determine whether it would grant the motion if the court of appeals remands for
that purpose. *Id*. Moreover, the Second Circuit has recognized that in the interest of Judicial

economy, the District Court should consider an appellant's new trial claims brought under Rule 33 as doing so enhances the appellate court's ability to assess the appellant's claims and helps avoid piecemeal litigation. *U.S. v. Schwarz*, 259 F.3d 59, 65 (2d Cir. 2001).

Accordingly, Mr. Raniere respectfully requests that the Court evaluate the newly discovered evidence in this case as borne out in the reports of the Defense experts attached hereto and at the very least determine that the newly discovered evidence presents a substantial issue that should be resolved before his direct appeal is decided.

## CONCLUSION

For the foregoing reasons, Mr. Raniere moves this Court to grant him all available relief under Rule 33 of the Federal Rules of Criminal Procedure and any other relief that the Court deems just and proper under the circumstances.

Dated: May 3, 2022,                    Respectfully submitted,

                                       TULLY & WEISS ATTORNEYS AT LAW
                                       /s/ Joseph M. Tully
                                       JOSEPH M. TULLY

Attachment 2

# As CMU Looms; Raniere Talking to Chakravorty About 'War' Becomes Relevant

**F̲R̲** frankreport.com/2023/02/15/as-cmu-looms-raniere-talking-to-chakravorty-about-war-becomes-relevant/

February 16, 2023



After a six-week trial, a jury of 12 convicted Keith Alan Raniere of racketeering, conspiracy, sex trafficking, forced labor and other felony counts on June 19, 2019, after about 30 minutes of deliberations.

Suneel Chakravorty attended every day of the trial. He was a NXIVM coach who had met Raniere briefly a few times.

One of the most significant charges was the predicate acts of racketeering of possession of child porn and sexual exploitation of a minor.

The primary evidence was metadata, which established a 2005 date – when Camila was 15.

The prosecution relied on FBI expert testimony on the metadata from files on a seized hard drive that dated the photos to 2005, when Camila was 15.

Camila did not testify at trial.

After the conviction, Chakravorty began to meet Raniere at the Brooklyn Metropolitan Detention Center. They collaborated to find evidence of potential tampering by FBI agents who worked on Raniere's case.

In the days leading up to the sentencing, Chakravorty with others appeared in the media and wrote a letter to the judge alleging the FBI tampered with the photos.



*Eduardo Asunsolo and Suneel Chakravorty appear at a press conference to accuse the FBI of tampering.*

On October 27, 2020, at his sentencing, Camila appeared.

She was not sworn and did not identify the photos, but said she had engaged in sexual contact with Raniere beginning at age 15, and that he took photographs of her starting at age 15.

Judge Nicholas G. Garaufis sentenced Raniere to 120 years of prison.

In January, 2021, the BOP transferred Raniere to USP Tucson. Around the same time, Raniere appointed Chakravorty his power of attorney.

On April 30, 2022, after two years of collaboration, which included retaining experts, Raniere, through his attorney Joseph Tully, submitted to the US Court of Appeals for the 2nd Circuit, three affidavits from forensic experts detailing their evidence and opinions that the FBI tampered with a camera card and hard drive to fabricate evidence of the child porn and sexual exploitation predicate acts.

The foremost expert was Dr. James Richard Kiper, a former FBI special agent, forensic examiner and trainer of trainers of FBI forensic examiners. He worked for the FBI for 20 years, until 2019.



Suneel Chakravorty retained Dr. J. Richard Kiper to investigate FBI tampering.



A photo of a Lexar camera card similar to the one seized at the executive library of Keith Raniere.

On the day Raniere filed the expert reports, Assistant US Attorney Kevin Trowel, in the Eastern District of New York, called the notion of government malfeasance "frivolous."

He did not address metadata and forensic issues raised in the reports. AUSA Trowell wrote that at Raniere's sentencing, Camila said Raniere engaged in sexual contact and took her photographs from age 15 onward.

Two days later, Raniere called Chakravorty from USP Tucson three times in the evening on the monitored prison phone line.

In these conversations, Raniere used the word "war."

This was used in part to justify the BOP "scrubbing" of Raniere's permitted contacts, including Chakravorty.

Raniere filed for a preliminary injunction to restore contact with Chakravorty and others in *Raniere v. Garland*, 22-cv-561,

In response, the BOP wrote:

> In early May 2022, the SIS Department at USP Tucson was monitoring telephone calls between [Raniere] and Mr. Chakravorty….They spoke to each other about being "at war" with the federal government that would be "no holds barred." The CTU recommended that the USP Tucson SIS Department remove all of Plaintiff's current contacts and review all future contact requests.



Raniere's calls to Chakravorty appear to have centered around his filing that day, and Trowell's response.

The scrubbing of Raniere's contacts, including Chakravorty, occurred nine months ago.

However, it may be important today, as sources suggest the BOP is considering moving Raniere out of the SHU at USP Tucson to a prison in the Midwest where there is a Communications Management Unit, a prison facility designed to limit contact between inmates and the outside world, which are reserved primarily for Muslim terrorists.

According to the FBI inventory list, evidence item #2 was a black Western Digital hard drive. But the FBI photograph of evidence item #2 is a silver LaCie hard drive. Eleven months later, 22 photos of Camila were found on a black Western Digital hard drive. At the trial, an FBI agent testified that evidence item #2, where the child porn evidence found, was a silver hard drive. Later, a black hard drive was shown to the jury.



FR review of the context Raniere's mention of war is from calls he made to Chakravorty on April 30, 2022 – at 8:40pm, 9:20pm, and 9:58pm.

Raniere used the word "war" three times.

Here are the relevant excerpts.

## Three References to War by Raniere on April 30, 2022

## First Conversation

Raniere: We're in a war here, and we're fighting for justice. One of the things that I said in the tape **[Chakravorty was taping the calls with Raniere]**, which I don't know if you heard, but **[I said]** 'Lady Justice has had her blindfold ripped off by a thug who's holding a knife to her throat.'

Chakravorty: Mm-hmm.

Raniere: We have to stop it. And they have to understand also the logic. Considering that 97% alleged **[DOJ]** conviction rate or 90-some odd percent or whatever, that means that all that everyone sees on TV, people going to trial, the adversarial system or whatever that is a little fringe ornament that happens in a small percentage of cases.

So what does happen?

The grand jury, which is non-adversarial, not constitutional as a final arbiter, is what is the arbiter. Say, if it's a 97% conviction rate, and the prosecution brags about this, it's a percentage of shame.

What it means is that only 3% prevails **[at]** trial, and most of the – them, don't even go to trial. So how are they convicted?

And how do we have such a high conviction rate compared to any other civilized country, any other country?

We have more people incarcerated **[than any nation]**. There's that thing on the internet from [Jeff Daniels'] Newsroom, where he's answering the question of "why is America the best?" It isn't. It isn't. And he talks about, and this is before I was ever incarcerated, that we have, I think. I don't know how much more **[people in prison]** than the sum of all the other countries, or something like that.

Same thing with our defense budget. But we have this shameful system that. And **[Raniere's attorney]** Daugherty had looked up some statistics. Since the '70s, there's like a 70% conviction rate. Over the past 50 years, it's risen to this horrible thing **[97 percent conviction rate]**.

And it's not just going to turn around and get a little better. It's because of the culture, and it's because people are allowed to call things like this **[affidavits of tampering evidence]** 'frivolous' in the government, and they can never be frivolous. Due process violation, it can never be frivolous. We **[our government]** have to be as close to perfect, if we want to live up to the other countries that we claim to be like, and as civilized as, like, we have to live up to that standard.

## Raniere 2nd Reference to 'War'

Raniere: This **[FBI tampering]** is a historical wrong, which we can translate into a historical opportunity, which we can translate into historically good change. So let's do this. Let's not let them **[the FBI, DOJ}** get away **[with it]**. Let's not be light-languaged or anything like that. Is there anything else? No.

Chakravorty: No.

Raniere: Okay. I hope the recording is good. There's a lot of noise around here.

Chakravorty: It's very good. Coming in really clear.

Raniere: Okay. And **[I hope]** the last one came in clear because I think the last one expressed some good things.

Chakravorty: Yes, very clear.

Raniere: It's interesting at the end of JFK, the movie, where he looks up and says, in effect, 'give us,' 'get our government back. It's up to you,' that sort of a thing.

\*\*\*

Raniere: And I can see, I was trying to think what sort of an argument could they say. These **[tampering allegations]** certainly aren't 'frivolous' changes **[as AUSA Trowell said].**  These are monstrous changes **[to the camera card and hard drive]** that take a whole lot of time **[for FBI agents]** that just happen to line up with the government **[narrative]**. So if the government didn't do it, gosh, they're the fortunate recipient **[of tampering]**.

Chakravorty: So true.

Raniere: But the janitor saying that "Oh, we didn't do these," or, "Oh, we don't know how this happened" or whatever, that's like saying 'the dog ate my homework.' The janitor did it **[tampering with metadata on the hard drive and camera card, while in FBI custody.]** Like in the middle of the night, unbeknownst to the FBI, some janitor came in **[to FBI offices]** with computer expertise and the equipment. Understand, to do some of these changes, there is no other motivation but to frame someone.

Why in the world would you change a camera card like that? Why in the world would you even cut out. If Photoshop was used, [**Raniere's experts say a photo was altered with Photoshop**] why would you change the **[modified]** date so that it looks like it wasn't used unless you're trying to perpetrate some sort of a fraud? Why would you do all these things? And if you try to argue, 'well, there doesn't have to be changes, it [**the photos when they're taken]** goes into Photoshop.' Well then all the pictures **[in taken from the camera]** should have had Photoshop on them.

But really we want our government back, and this is the **war.**

We're facing the beast. And right now, the voice of the beast was the person that wrote that response [**Trowell**]. Also, **[AUSA]** Tanya Hajjar, who, when we asked for discovery, insisted she gave it all. You know she didn't, right? **[The government never gave the camera card clone to the defense despite the legal requirement to do so.]**

Chakravorty: Of course.

## Third Reference to War

The excerpt of the third instance was the last of three calls Raniere made to Chakravorty on April 30, 2022.

Raniere: Say, I wonder how Dr. Kiper feels about his experience of 20 years in the FBI and being a unit chief. And he says he's never seen anything like this. That's being called 'frivolous.' Maybe ask him.

Chakravorty: Yes.

Raniere: It's not frivolous. And to think this is frivolous is a horrible sin, is a horrible evil. Has to be taken out of the gov. They have to resign.

Chakravorty: Yes.

Raniere: Does that make sense?

Chakravorty: Yes, it does.

Raniere: And we need to ask for it publicly. So I'll speak to you, I'll try not to have too much more. Okay?

Mr. Chakravorty: Thank you. Okay.

Mr. Raniere: Yeah. We have 10 seconds, last five seconds, so, all right, send my best to everyone. And I'm so sorry, but we're in the war now.

Mr. Chakravorty: Yes, we are.

Mr. Raniere: No holds barred.

***

Subsequent conversations do not seem to contain the word "war."

From FR's perspective, Raniere does not appear to be urging Chakravorty to take up arms, commit sedition, treason or revolution. Or if he was, we have not seen any evidence of it in the nine months since Raniere spoke of war.

On May 3, 2022, Raniere filed a Rule 33 motion alleging the FBI tampered and included the experts' reports.

On May 5, 2022, the BOP scrubbed Chakravorty and others from Raniere's contact list, and Raniere was not permitted to speak with him.

There may be reasons to send Raniere to a CMU, but it certainly is not because he said "war" three times on the phone on April 30, 2022. A review of later transcripts and tapes shows Raniere did not mention the word "war" again during the remaining five days the prison let him speak to Chakravorty.

It seems evident that Raniere said 'war' in a context of fighting injustice. He either believed, or pretended to believe, [he knew the calls were monitored] that the government perpetrated an "historical" injustice on him, and, according to him, on the American people.  He was, by the way, misquoted by the BOP.

He did not say he was "at war" with the USA. He said he was "in a war" and "no holds barred."

And so far, Raniere has lost every battle. It remains to be seen if he is sent to the CMU, just when his Rule 33 motion, whether frivolous or not, is due to be heard, dismissed or granted soon.



Frank Parlato