SKC

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Keith Raniere,<br><br>                    Plaintiff,<br><br>v.<br><br>Merrick Garland, et al.,<br><br>                    Defendants. | No.   CV 22-00561-TUC-RCC<br><br>**ORDER** |

Plaintiff Keith Raniere, who is currently confined in the United States Penitentiary (USP)-Tucson, has filed through counsel a civil rights Complaint pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).  Before the Court is Plaintiff's Motion for Preliminary Injunction (Doc. 3).

The Court will deny the Motion.

## I.   Background

On May 5, 2022, Plaintiff filed *Raniere v. Garland*, 22-CV-00561-RCC ("*Raniere I*"), alleging violations of his First and Sixth Amendment rights based on Defendants' alleged interference with his access to the courts/right to counsel.  (*Raniere I*, Doc. 1.)  On December 5, 2022, the Court dismissed Plaintiff's First Amended Complaint in that action without prejudice for insufficient service of process.  (*Id.*, Doc. 52.)  On December 16, 2022, Plaintiff filed this action based on the same core allegations as *Raniere I*.

In his three-count Complaint, Plaintiff sues United States Attorney General Merrick Garland, Bureau of Prisons (BOP) Director Collette Peters, USP-Tucson Warden

Gutierrez, and Acting Special Investigative Agent (SIA) Ulrich in their official capacities.[1] Count One asserts a violation of Plaintiff's First Amendment right of access to the courts based on Defendants' alleged interference with Plaintiff's ability to communicate with his attorneys and their agents.  Count Two asserts a First Amendment retaliation claim based on Defendants' alleged interference with Plaintiff's right to communicate with friends, a business partner, and criminal defense attorneys and their agents about his finances, legal affairs, conditions of confinement, and preparation for a new criminal trial.  Count Three asserts a violation of Plaintiff's Sixth Amendment right to counsel based on Defendants' alleged interference with the confidential relationship between Plaintiff and his criminal defense attorney.  Plaintiff seeks a declaratory judgment, prospective injunctive relief, and attorney's fees and costs.

On screening Plaintiff's Complaint under 28 U.S.C. § 1915A(a), the Court required Plaintiff to serve Defendants and Defendants to answer. (Doc. 6.)

## II.    Legal Standards

### A.    Injunctive Relief

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted) ("[a] preliminary injunction is an extraordinary remedy never awarded as of right").  Nonetheless, "federal courts must not shrink from their obligation to enforce the constitutional rights of all persons, including prisoners" and must not "allow constitutional violations to continue simply because a remedy would involve

---

[1] Plaintiff named "Unknown Current Warden," not Warden Gutierrez, in his official capacity, but Defendants identified Warden Gutierrez as the current USP-Tucson Warden in their Response.  Plaintiff also named Lt. Gallion, not SIA Ulrich, in his official capacity, but Defendants have substituted SIA Ulrich for Lt. Gallion in his official capacity pursuant to Rule 25 of the Federal Rules of Civil Procedure.  (Doc. 17 at 1 n.1.)  The Court will direct the Clerk of Court to make these changes in the docket.

1  intrusion into the realm of prison administration."  *Porretti v. Dzurenda*, 11 F.4th 1037,

2  1047 (9th Cir. 2021) (citation omitted).

3       A plaintiff seeking a preliminary injunction must show that (1) he is likely to

4  succeed on the merits, (2) he is likely to suffer irreparable harm without an injunction, (3)

5  the balance of equities tips in his favor, and (4) an injunction is in the public interest.

6  *Winter*, 555 U.S. at 20.  "But if a plaintiff can only show that there are 'serious questions

7  going to the merits'—a lesser showing than likelihood of success on the merits—then a

8  preliminary injunction may still issue if the 'balance of hardships tips sharply in the

9  plaintiff's favor,' and the other two *Winter* factors are satisfied."  *Shell Offshore, Inc. v.*

10  *Greenpeace, Inc*., 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild*

11  *Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).  Under this serious questions

12  variant of the *Winter* test, "[t]he elements . . . must be balanced, so that a stronger showing

13  of one element may offset a weaker showing of another."  *Lopez*, 680 F.3d at 1072. When

14  the government opposes a preliminary injunction," [t]he third and fourth factors of the

15  preliminary-injunction test—balance of equities and public interest—merge into one

16  inquiry."  *Porretti*, 11 F.4th at 1047.  The "balance of equities" concerns the burdens or

17  hardships to a prisoner complainant compared with the burden on the government

18  defendants if an injunction is ordered.  *Id.*  The public interest mostly concerns the

19  injunction's impact on nonparties rather than parties.  *Id.* (citation omitted).  Regardless,

20  "[i]t is always in the public interest to prevent the violation of a party's constitutional

21  rights."  *Id.* (citation omitted).

22       Regardless of which standard applies, the movant "has the burden of proof on each

23  element of the test."  *See Envtl. Council of Sacramento v. Slater,* 184 F. Supp. 2d 1016,

24  1027 (E.D. Cal. 2000).

25       The Prison Litigation Reform Act imposes additional requirements on prisoner

26  litigants who seek preliminary injunctive relief against prison officials and requires that

27  any injunctive relief be narrowly drawn and the least intrusive means necessary to correct

28  the harm.  18 U.S.C. § 3626(a)(2); *see Gilmore v. People of the State of Cal*., 220 F.3d 987,

999 (9th Cir. 2000).

"The urgency of obtaining a preliminary injunction necessitates a prompt determination" and makes it difficult for a party to procure supporting evidence in a form that would be admissible at trial. *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984). As a result, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). In its determination on a motion for a preliminary injunction, "a court may properly consider evidence that would otherwise be inadmissible at trial." *Cherokee Inc. v. Wilson Sporting Goods Co.*, No. CV 15-04023 BRO (Ex), 2015 WL 3930041, at *3 (C.D. Cal. June 25, 2015); *see Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) (district court did not abuse its discretion by considering "unverified client complaints" and the plaintiff's counsel's interested declaration when it granted a preliminary injunction); *Flynt Distrib. Co.*, 734 F.2d at 1394 (the district court has discretion to rely on hearsay statements when deciding whether to issue a preliminary injunction). A court may also consider evidence or developments that postdate the pleadings. *Farmer v. Brennan*, 511 U.S. 825, 846 (1994).

When evaluating the merits of a preliminary injunction motion, a court's factual findings and legal conclusions are not binding at trial on the merits. *Univ. of Tex.*, 451 U.S. at 395.

### B.   First Amendment (Access to the Courts)

There are two types of access-to-court claims: those concerning a prisoner's right to affirmative assistance in challenging their sentences or conditions of their confinement and those, like the instant action, concerning a prisoner's right to litigate without active interference. *Silva v. Di Vittorio*, 658 F.3d 1090, 1102 (9th Cir. 2011), *overruled on other grounds by Richey v. Dahne*, 807 F.3d 1202, 1209 n.2 (9th Cir. 2015).

In this second line of cases, the right of meaningful access to the courts prohibits officials from actively interfering with prisoners' attempts to prepare or file legal documents in all types of civil proceedings so long as those proceedings have a reasonable

basis in law or fact.  *See Blaisdell v. Frappiea*, 729 F.3d 1237, 1243 (9th Cir. 2013) ("by virtue of their broader right to petition the government for a redress of [their] grievances under the First Amendment, prisoners must also have opportunities to pursue certain other types of civil litigation") (internal quotations and citations omitted).

Regardless of which type of claim is alleged, to prevail on an access-to-court claim, a plaintiff must show: "(1) the loss of a 'nonfrivolous' or 'arguable' underlying claim; (2) the official acts frustrating the litigation; and (3) a remedy that may be awarded as recompense but that is not otherwise available in a future suit."  *Phillips v. Hust*, 477 F.3d 1070, 1076 (9th Cir. 2007) (citing *Christopher*, 536 at 416), *vacated on other grounds* 555 U.S. 1150 (2009).

The Ninth Circuit has held that "[t]he opportunity to communicate privately with an attorney is an important part" of meaningful access to the courts; thus, "a prisoner's right of access to the courts includes contact visitation with his counsel."  *Ching v. Lewis*, 895 F.2d 608, 609–10 (9th Cir. 1990).  The Ninth Circuit has also held that a prisoner may be deprived of access to the court if he is denied telephone access to his attorney absent a legitimate penological reason.  *Barnett v. Centoni*, 31 F.3d 813, 816 (9th Cir. 1994).  And it is well established that prisoners have a constitutional right to send legal mail, and prison officials cannot take any actions that delay the mailing of legal mail.  *See Houston v. Lack*, 487 U.S. 266, 270–76 (1988) (prison officials cannot take actions that delay mailing of prisoner's legal papers when such a delay effectively denies access to the courts).

### C.     Sixth Amendment (Right to Counsel)

The Sixth Amendment guarantees a criminal defendant the right to counsel, and this right extends to the first appeal of right.  U.S. Const. amend. VI; *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987).  Courts have long recognized that the right to counsel embodies a right to confidential communication between a defendant and his attorney.  *See Hunt v. Blackburn*, 128 U.S. 464, 470 (1888) ("[legal] assistance can only be safely and readily availed of when free from the consequences or apprehension of disclosure"); *Coplon v. United States*, 191 F.2d 749, 757 (D.C. Cir. 1951) ("[i]t is well established that an accused

does not enjoy the effective aid of counsel if he is denied the right of private consultation with him"); *see also Nordstrom v. Ryan*, 762 F.3d 903, 910 (9th Cir. 2014) ("the right to privately confer with counsel is nearly sacrosanct").

In *Nordstrom*, the Ninth Circuit distinguished between Sixth Amendment claims asserted as grounds for reversing a conviction and Sixth Amendment civil claims brought under § 1983.   Where a defendant challenges his conviction following government intrusion into the attorney-client relationship, a court examines "whether the Sixth Amendment violation caused prejudice requiring reversal of the conviction." *Nordstrom*, 762 F.3d at 911; *see United States v. Fernandez*, 388 F.3d 1199, 1240 (9th Cir. 2004) (where defendants appealed their conviction, to show that government intrusion with the attorney-client relationship violated their Sixth Amendment rights, they had to show "that the intrusion was purposeful, that there was communication of defense strategy to the prosecution, or that the intrusion resulted in tainted evidence").   But where, like here, a plaintiff in a civil rights action alleges that government intrusion into the attorney-client relationship constituted a Sixth Amendment violation, the harm "is not that tainted evidence was used against him but that his right to privately confer with counsel has been chilled." *Nordstrom*, 762 F.3d at 911.

**III.   Discussion**

**A.   Motion for Injunctive Relief**

In his Motion for Preliminary Injunction, Plaintiff seeks "an ***urgent*** injunction allowing reasonable attorney visits and calls, and to prevent retaliatory transfer." (Doc. 3 at 1 (emphasis in original).)  He argues that, during the two years he has been incarcerated at USP-Tucson, anyone who advocated for his innocence who was not a United States licensed attorney, including Suneel Chakravorty, Nicole Clyne, Dr. Danielle Roberts, and Mexican attorney Jorge de la Garza, was banned from communicating with Plaintiff on false claims of such communications posing a threat to the safety and security of the institution. (*Id.* at 2.)  He also claims that two local attorneys, Stoltz and counsel in this action, have been banned from in-person visits, and that his one-hour legal phone call with

counsel in this action on December 14, 2022 was insufficient to meet his legal needs.  (*Id.* at 3.)  Plaintiff lastly claims that he is being held in the special housing unit (SHU) long after being exonerated of the incident that placed him there and is currently sharing a cell with a mentally unstable prisoner who has threatened to kill any child sex offender, is not receiving his medications, and is acting out violently.  (*Id.* at 3.)

Plaintiff seeks five remedies: (1) that he "receive all legal calls and visits with attorneys that are requested by the attorney," (2) that his "power-of-attorney, Suneel Chakravorty[,] be recognized as a legal professional for purposes of communicating confidentially with Plaintiff," (3) that Plaintiff "be released from the SHU and returned to his original unit," or (4) if he must stay in the SHU, he "get a single cell for safety," and (5) that he "not be transferred to another prison."  (*Id.* at 12−13.)

Plaintiff argues he is likely to succeed on the merits of each of his claims, the balance of the equities is in his favor because he is suffering constitutional violations and there is no hardship in requiring Defendants to follow the Constitution, and it is in the public interest to grant relief.  (*Id.* at 5−12.)

Defendants argue that Plaintiff's Motion should be denied as outside the scope of this action because Plaintiff's requests are either unrelated to or greatly exceed the relief sought in the Complaint.  (Doc. 17 at 21.)  Defendants further argue that Plaintiff has not satisfied any of the *Winter* factors, including likelihood of success on the merits or irreparable harm.  (*Id.* at 21−28.)

**B.    Facts**[2]

**1.    Plaintiff's Criminal Proceedings**

On June 19, 2019, Plaintiff was convicted by a jury in *United States v. Raniere*, Case No. 1:18-cr-00204-NGG-VMS (E.D.N.Y. May 9, 2022), on charges of Racketeering, Racketeering Conspiracy, Forced Labor Conspiracy, Wire Fraud Conspiracy, Sex

---

[2] Because Plaintiff's Motion mirrors other Motions for Preliminary Injunction he filed in *Raniere I*, the Court incorporates relevant facts and evidence already set forth in *Raniere I*, along with any additional relevant facts and evidence set forth by the parties in their briefing on this Motion.

Trafficking, Attempted Sex Trafficking, and Sex Trafficking Conspiracy.  (*Raniere I*, Doc. 18 at 6.)  After the trial, but prior to Plaintiff's sentencing, the government informed the judge that Plaintiff continued to contact people affiliated with NXIVM, the organization that featured in Plaintiff's criminal trial,[3] including Suneel Chakravorty.  (*Id.*)  The government further informed the court that, in July 2020, the Bureau of Prisons (BOP) suspended calls between Plaintiff and Mr. Chakravorty, and Plaintiff thereafter entered an individual by the name of "Issac Edwards" to his contact list; the address Plaintiff provided for Issac Edwards was fabricated, the phone number belonged to a burner phone, and Issac Edwards turned out to be Mr. Chakravorty.  (*Id.* at 6.)

At Plaintiff's sentencing on October 27, 2020, the judge ordered as part of Plaintiff's special conditions of supervision upon release that Plaintiff "shall not associate in person, through mail, electronic mail or telephone with any individual with an affiliation to Executive Success Programs, Nxivm, DOS or any other Nxivm-affiliated organizations." (*Id.* at 6−7.)  Plaintiff appealed his conviction, and on April 29, 2022, the Second Circuit Court of Appeals denied Plaintiff's motion to stay his criminal appeal pending a Rule 33 motion.  (*Id.*)  Plaintiff filed a Rule 33 petition for post-conviction relief on May 3, 2022,

---

[3] According to a June 19, 2019 Department of Justice (DOJ) news release, it was proven at trial that

> in 2003, Raniere founded Nxivm, a purported self-help organization headquartered in Albany, New York, with centers operating elsewhere in the United States, Mexico and Canada.  Raniere established Executive Success Programs ("ESP"), a series of purported self-help workshops in which participants paid thousands of dollars to attend classes based on Raniere's teachings.  In 2015, Raniere added a secret society within Nxivm called DOS or "The Vow," with levels of women "slaves" headed by "masters."  The goal of the criminal enterprise was to promote Raniere, for example, by exalting his teachings and ideology, and to recruit new members, including as sexual partners for Raniere.

https://www.justice.gov/usao-edny/pr/jury-finds-nxivm-leader-keith-raniere-guilty-all-counts (last visited April 12, 2023).  Much of this information is also contained in the government's sentencing memorandum.  (Doc. 17-3, Ex. E.)

1    and on May 9, 2022, the New York District Court deferred consideration of Plaintiff's Rule

2    33 Motion due to the appeal.  (*Id.* at 6; Doc. 3 at 8.)

3                    **2.    BOP Visitation Policies**

4            Under BOP regulations, prisoner visitation privileges are extended to friends and

5    associates "having an established relationship with the inmate prior to confinement, unless

6    such visits could reasonably create a threat to the security and good order of the institution."

7    28 C.F.R. § 540.44(c).  An exception is made for prisoners without other visitors if it "is

8    shown that the proposed visitor is reliable and poses no threat to the security or good order

9    of the institution."  (*Id.*)  The Warden may limit or deny the use of email via TRULINCS

10   to a prisoner, and prisoners may be subject to telephone restrictions imposed by the Warden

11   "to protect the safety, security and good order of the institution, as well as to protect the

12   public."  BOP Program Statement (P.S.) 4500.12 and P.S. 5264.08.

13           The BOP "recognizes the use of assistants by attorneys to perform legal tasks and,

14   with proper controls and exceptions enumerated . . . accords such assistants the same status

15   as attorneys with respect to visiting and correspondence."  28 C.F.R. § 543.16(a). "The

16   special visiting/correspondence status accorded to paralegals, clerks, and legal assistants

17   depends on an ongoing, supervisory relationship with an attorney on an approved

18   visiting/correspondence list.  Absent any current supervisor relationship, such persons may

19   only receive social visiting or general correspondence privileges." P.S. 1315.07.  When an

20   attorney employs an assistant whom the attorney wants to visit or correspond with a

21   prisoner, the attorney must provide the Warden with a signed statement certifying the

22   assistant's ability, that the attorney pledges to supervise the assistant's activities, and the

23   attorney accepts personal and professional responsibility for the assistant's activities that

24   may affect the institution, prisoners, and staff.  28 C.F.R. § 543.16(b)(1)-(3).  The Warden

25   may require the assistant to fill out and sign a personal history statement and pledge to

26   abide by BOP regulations and institution guidelines, and the Warden may prohibit a legal

27   assistant from visiting or corresponding with a prisoner if necessary to maintain security

28   and good order in the institution.  *Id.*  The Warden may also require each paralegal, clerk,

1   or legal assistant to complete a BP-S243.013 application and the BP-S242.013 Paralegal

2   or Legal Assistant Agreement form.  P.S. 1315.07.

3                    **3.      Plaintiff's Banned Contacts**

4            Mr. Chakravorty took courses from and served as a coach for NXIVM and its

5   affiliate company, Executive Success Programs (ESP), but he was not identified at

6   Plaintiff's trial as a member of NXIVM, and he did not meet Plaintiff until after the trial

7   when his role "evolved into paralegal and manager of the legal team" working to overturn

8   Plaintiff's conviction.  (*Raniere I*, Doc. 18 at 5.)   According to the allegations in the

9   Complaint, Mr. Chakravorty is a paralegal to Plaintiff's criminal defense/post-conviction

10  relief counsel who serves a "a central role" in communications between Plaintiff and his

11  legal team.  (Doc. 3 at 2, 7; *Raniere I*, Doc. 18 at 4, 8.)

12           A BOP Counter Terrorism Unit (CTU) Memorandum shows that CTU staff began

13  reviewing Plaintiff's phone communications with Mr. Chakravorty on or about July 15,

14  2020, and determined they compromised the security of the Metropolitan Detention Center

15  in Brooklyn, New York ("MDC Brooklyn"), where Plaintiff was then being held.  (Doc. 17

16  at 4; Doc. 17-2, Ex. E at 57, Ex. F, Gallion Decl. ¶ 5.)   Plaintiff and Mr. Chakravorty

17  discussed recording prison-initiated phone calls for use in podcasts and other media outlets.

18  (Doc. 17 at 4; Gallion Decl. ¶ 6.)   They also discussed organizing "a group of women to

19  show up regularly and dance provocatively for inmates to view through their cell

20  windows," and Plaintiff informed Mr. Chakravorty about "the staff work schedules and

21  indicated his protesters should wait outside for the staff and offer donuts and coffee as they

22  exit the facility" because "we are all in this together."  (*Id.*)   The report concluded that

23  "Raniere's manipulative behavior continues to manifest from behind the prison through the

24  help of Suneel Chakravorty.  Inmate Raniere's actions would place the safety and security

25  of staff and the public at risk," and recommended removing Mr. Chakravorty from

26  Plaintiff's approved contacts.  (Gallion Decl. ¶ 7, *Raniere I* at Doc. 14-5 at 13.)  The MDC

27  Brooklyn Warden concurred, and Mr. Chakravorty was removed.  (Doc. 17 at 5.)

28

On May 2, 2021, Mr. Chakravorty was denied visiting privileges with Plaintiff at USP-Tucson because he had previously represented to the New York District Court that he did not have a relationship with Plaintiff prior to Plaintiff's incarceration, his first conversation with Plaintiff was while Plaintiff was in prison after Plaintiff's criminal trial, and Mr. Chakravorty had continued his involvement in NXIVM and ESP until the companies closed in May 2018.  (*Id.* at 6.)

In October 2021, Mr. Chakravorty wrote a letter to the district court judge in *Edmonson v. Raniere*, Case 1:20-cv-00485-EK-CLP (E.D. N.Y.), a New York civil action brought by some of Plaintiff's victims, identifying himself as "not a party to this case, nor am I an attorney.  I am defendant Keith Raniere's power of attorney."  (Doc. 17 at 5.)  He further indicated that "as Mr. Raniere's power of attorney, [he had] referred cyber forensics experts to [Plaintiff's] criminal counsel."  (*Id.*)  In November 2021, Mr. Chakravorty wrote two additional letters to the judge, identifying himself as Plaintiff's power of attorney, not as an attorney or paralegal working for Plaintiff's attorneys.  (*Id.*)  These letters were not on attorney letterhead.  (*Id.*)

According to an August 2021 BOP Special Investigative Services (SIS) Investigation, Nicki Clyne is an unindicted co-conspirator and former associate of NXIVM whom the BOP banned from communicating with Plaintiff.  (Doc. 17 at 2; *Raniere I*, Doc. 31-2, Ex. A, Mitchell Decl. ¶ 6, Attach. 2, SIS Rpt.)  Plaintiff circumvented USP-Tucson mail monitoring by communicating with Ms. Clyne through another prisoner and using Ms. Clyne to communicate with Clare Bronfman, another former associate of NXIVM and co-conspirator who is serving time in federal prison.  (Mitchell Decl. ¶ 6.)

Danielle Roberts is a former associate of NXIVM who has been removed from Plaintiff's visitation list "for safety and security of the institution" due to her extensive involvement in NXIVM.  (*Id.* ¶ 7.)

In January 2022, Plaintiff's counsel wrote to the BOP, claiming that the denial of social visitation privileges for Mr. Chakravorty, Ms. Clyne, and Ms. Roberts was improper,

1    and the BOP informed Plaintiff's counsel that Plaintiff could file a request through the

2    Administrative Remedy Process regarding their removal.  (*Id.* ¶ 8.)

3         In early May 2022, the USP-Tucson SIS Department was monitoring phone calls

4    between Plaintiff and Mr. Chakravorty in which the two spoke about being "at war" with

5    the federal government, and Plaintiff asked about the quality of their phone recordings and

6    said he had many recordings.  (*Id.* ¶ 17.)  Based on these calls, and in consultation with the

7    CTU, the USP-Tucson Warden limited Plaintiff's approved contact list to ten active

8    contacts, not including counsel, and removed his current contacts except for Marianna

9    Fernandez and Plaintiff's nine verified attorneys.  (Doc. 17 at 6.)

10        Plaintiff may request that contacts be added, and the SIS Department will review

11   the requested individuals as part of the approval process.  (*Id.*)  Plaintiff may still access

12   his approved attorneys through confidential lines of communication, and he has had

13   numerous legal calls and visits, with many legal calls lasting an hour or two hours.  (*Id.* at

14   7, 9–10.)

15                  **4.       Plaintiff's Legal Calls**

16        When an attorney requests a legal call with a prisoner, the prisoner's correctional

17   counselor ensures the attorney is licensed and in good standing.  (*Raniere I*, Doc. 14-2, Ex.

18   A, Flores Decl. ¶ 9.)  Legal calls in a housing unit take place in the counselor's office and

19   the counselor facilitates the call.  (*Id.*)  The legal calls are not recorded or monitored, and

20   the staff member only remains in the office until the connection is made with the prisoner's

21   attorney or appropriate staff; the counselor leaves the room once the connection is made

22   and visually monitors the prisoner from outside the room but cannot hear the content of the

23   legal call.  (*Id.*)

24        Plaintiff's legal calls are coordinated within these normal procedures, and he has not

25   been targeted for any restrictions on his ability to have legal phone calls.  (*Id.* ¶ 10.)

26   Plaintiff's counsel keeps a log of his legal calls, and as of May 31, 2022, the log shows

27   32 legal calls facilitated by Plaintiff's counselor since October 4, 2021, with most calls

28   lasting an hour.  (*Id.* ¶ 11.)  The log shows a call on May 4, 2022, between Plaintiff and

Joseph Tully, which lasted an hour.  (*Id.*)  That call was disconnected.  (*Id.*)  If a call is disconnected, the counselor attempts to reestablish the call.  (*Id.* ¶ 12.)  In addition, another counselor, Ashworth, placed 16 legal calls to Plaintiff's attorneys between January 5, 2022 and May 27, 2022, with most calls lasting an hour; one call lasted two hours and, another call lasted 35-minutes.  (*Id.* ¶ 13, *Raniere I*, Doc. 14-2, Ex. A, Attach 4.)  On May 6, 2022, Case Manager Watson facilitated a call between Plaintiff and Mr. Daugherty.  (*Raniere I*, Doc. 14-9, Ex. H, Watson Decl. ¶ 5.)  The connection was lost during the call, and Watson called Mr. Daugherty back, and the legal call resumed without further incident.  (*Id.*)

## 5.    Plaintiff's Placement in the SHU

On July 26, 2022, Plaintiff was involved in a physical altercation with another prisoner in Food Service, and per policy, was issued an incident report and placed on administrative detention status pending an investigation.  (Doc. 17 at 10.)  Plaintiff remains in the SHU while the SIS is investigating security issues for Plaintiff at USP-Tucson.  (*Id.*)  If Plaintiff has concerns about his security in the SHU, including cell assignments and cellmates, he may express these concerns through the prison's Administrative Remedy Program.  (*Id.*)

### C.    Analysis

#### 1.    Access to Courts/Counsel Claims

##### a.    Likelihood of Success on the Merits

Plaintiff argues he is likely to prevail on his First Amendment access-to-courts claim in Count One based on Defendants' visitation restrictions on Mr. Chakravorty.  (Doc. 3 at 5−7.)[4]  As he did when seeking a preliminary injunction in *Raniere I*, Plaintiff cites several cases in which the Ninth Circuit has held that a prisoner's right to communicate with an attorney extends to the attorney's paralegal and even non-attorney professionals retained by the attorney to render legal advice.  (Doc. 3 at 6; *see Raniere I*, Doc. 7 at 7 (citing

---

[4] Plaintiff also claims that a Mexican attorney and two local attorneys, including Plaintiff's counsel in this action, have been banned from in-person visits, but his assertions about these incidents (Doc. 3 at 2) do not feature in Plaintiff's arguments, and as stated in the background section of Plaintiff's Motion, the facts around these limitations are too vague and conclusory to serve as a basis for Plaintiff's access-to-courts claim.

cases).)  He then claims, without evidence, that "Mr. Chakravorty serves <u>precisely</u> this role on behalf of the attorneys of Tully & Weiss."  (*Id.* at 7.)

The Court already rejected this argument in *Raniere I*, finding

> There is no evidence that attorney Tully or any other of Plaintiff's attorneys has provided the Warden of USP-Tucson with a signed statement certifying Mr. Chakravorty's ability, that the attorney has pledged to supervise Mr. Chakravorty's activities, or that the attorney accepts personal and professional responsibility for Mr. Chakravorty's activities that may affect the institution, prisoners, and staff, as set forth in 28 C.F.R. § 543.16(b)(1)-(3).

(*Raniere I*, Doc. 18 at 13−14.)  *See Fidelity Nat. Title Ins. Co. v. Castle*, C 11-0896 SI, 2011 WL 5882878, at *3 (N.D. Cal. 2011) (A motion for preliminary injunction must be supported by "[e]vidence that goes beyond the unverified allegations of the pleadings") (internal citation omitted).[5]

Even if Plaintiff can show that Mr. Chakravorty is assisting Plaintiff's criminal defense counsel and is operating under attorney supervision, Plaintiff is unlikely to succeed on the merits of his access-to-courts claim based on Defendants' denial of confidential legal visits to Mr. Chakravorty.  It is undisputed that Mr. Chakravorty was involved in NXIVM and ESP, and as a condition of Plaintiff's release, the New York District Court ordered that Plaintiff "shall not associate in person, through mail, electronic mail or telephone with any individual with an affiliation to Executive Success Programs, Nxivm, DOS or any other Nxivm-affiliated organizations."  (Doc. 17 at 6−7; Doc. 17-2, Ex. 4 at 33.)  According to SIA Gallion, whose duties include overseeing the SIS Department at USP-Tucson and investigating prisoner misconduct, "[i]f it is dangerous for Raniere to have access to these individuals once released, it is also a security risk to allow access to these individuals while incarcerated."  (Doc. 17-2, Ex. F, Gallion Decl. ¶ 16.)

---

[5] Plaintiff attempts to support this claim for the first time in his Reply, but the Court struck Plaintiffs' attachments to that Reply, except for Mr. Chakravorty's affidavit (Doc. 32), and Plaintiff does not cite to Mr. Chakrovorty's affidavit.

Plaintiff argues that "Defendants do not have the authority to decide who was or was not a member of the now-defunct NXIVM or DOS, nor to ban them on that basis." (Doc. 30 at 2.)   He also argues that the above order only applies post-release, and Defendants "do not have the authority to re-interpret the terms of the sentencing order by an Article III judge." (*Id.* at 2−3.)  Plaintiff is correct that these judge-imposed restrictions only apply to Plaintiff's conditions of release, but that does not prevent prison administrators from imposing similar restrictions during custody where, as here, prison officials have relied on their own investigations at two different facilities to determine that a particular individual poses a security risk.  The Supreme Court has long recognized that, in matters of prison security, courts must defer "to the informed discretion of prison administrators . . . to make the difficult judgments concerning institutional operations." *Jones v. N. Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 128 (1977).  Although Plaintiff disagrees with some of the factual assertions and conclusions in the CTU report (*see* Doc. 30 at 3), his factual disagreements and differences of opinion with BOP/CTU investigators about what constitutes a threat to the safety, security, and orderly operation of the institution do not show he is likely to prevail on the merits of his access-to-courts claim.

Plaintiff's arguments that he is likely to succeed on the merits of his Sixth Amendment right to counsel claim in Count Three are also unavailing because Plaintiff does not materially dispute that he has <u>nine</u> attorneys on his approved contact list or that he has regular, confidential access to counsel, including his criminal defense attorneys. Instead, Plaintiff once again relies solely on Defendants' restrictions on his communications with Mr. Chakravorty to establish this claim when, as noted, he has not shown that Mr. Chakrovorty, who is not a licensed attorney or paralegal, was acting on behalf of and under the supervision of a licensed attorney when Defendants denied him visitation.  Absent such evidence, Plaintiff is unlikely to prevail on the merits of his right to counsel claim.[6]

---

[6] Because Plaintiff has not shown that Mr. Chakravorty was either a licensed

### b.     Irreparable Harm

Even if Plaintiff can show he is likely to prevail on—or has raised serious questions going to the merits of—his access-to-courts/right to counsel claims, Plaintiff's requests for injunctive relief with respect to Mr. Chakravorty must be denied for failure to show irreparable harm.  As he did in *Raniere I*, Plaintiff claims in conclusory fashion that he "is likely to suffer irreparable harm because, absent injunctive relief, he will be deprived of the most basic constitutional protections under the First and Sixth Amendments."  (Doc. 3 at 11 (emphasis in original).)  In *Raniere I*, the Court noted that this argument was circular and did not show that Plaintiff was "at risk of losing a 'nonfrivolous' or 'arguable' underlying claim as needed to support a First Amendment [access-to-courts] claim or that his 'right to privately confer with counsel has been chilled' as needed to support a Sixth Amendment [right to counsel] claim."  (*Raniere I*, Doc. 18 at 15.)

Plaintiff vaguely argues in his Reply that he has "shown injury by having forever forfeited any Rule 33 motions based on newly discovered evidence because of the interference with communications by scrubbing Mr. Chakravorty from his call list."  (Doc. 30 at 5.)  Plaintiff claimed in his Motion that "[d]uring the months that Plaintiff's attorneys spent gathering evidence and preparing the Rule 33 petition for a new trial, Mr. Chakravorty played an essential role in interpreting computer data for the attorneys."  (Doc. 3 at 7 (emphasis in original).)  But Plaintiff does not explain why Mr. Chakravorty required personal contact with Plaintiff to perform this function or how being "scrubbed" from Plaintiff's call list "forever forfeited any Rule 33 motions."  Plaintiff also reiterates that, because the First and Sixth Amendments protect fundamental rights, "any interference **presumptively constitutes irreparable harm**."  (Doc. 30 at 11 (emphasis in original).)  Plaintiff, though, must still show that Defendants' restrictions on Mr. Chakravorty's visitation interfere with those fundamental rights, and that requires showing Plaintiff either risks losing a nonfrivolous legal claim or that his right to confer privately with counsel has

attorney or a legal professional working under the supervision of a licensed attorney when Defendants denied him visitation, the Court need not discuss the extent to which the Sixth Amendment right to counsel applies to those retained by and working under the supervision of an attorney.

been chilled.  *Phillips*, 477 F.3d at 1076, *Nordstrom*, 762 F.3d at 911.  Plaintiff's arguments, which rely simply on equating a constitutional violation with irreparable harm, fail to show a likelihood of either of these irreparable harms due to the loss of personal contact with Mr. Chakrovarty.

### 2.    Retaliation Claim

Plaintiff fails to show he is likely to succeed on the merits of his First Amendment retaliation claim in Count Two.  As to the "adverse action" element of this claim, Plaintiff argues that Defendants are "restrict[ing] Plaintiff's contacts with his attorney and power-of-attorney; banning Plaintiff's friends and supporters; and keeping Plaintiff in the SHU with a mentally unstable cellmate."  (Doc. 3 at 8.)[7]  Plaintiff argues that these actions are "because of [Plaintiff's] protected conduct of speaking out and challenging his criminal convictions."  (*Id.*)  Defendants argue, however, that the evidence shows Plaintiff continues to have robust access to his attorneys, and the restrictions on his "friends and supporters" and his movement to the SHU were for "legitimate penological interests."  (Doc. 17 at 25.)

As already discussed, Plaintiff has not shown that Mr. Chakravorty is an attorney or was working for/under the supervision of an attorney when Defendants denied him confidential legal visits with Plaintiff.  Plaintiff therefore cannot meet the fourth prong on this portion of his retaliation claim—that Defendants lacked a legitimate penological

---

[7] Plaintiff's related requests for preliminary injunctive relief are that Mr. Chakravorty be recognized as a legal professional and that Plaintiff be released from the SHU or placed in a single cell for safety.  (Doc. 3 at 13.)  Because Plaintiff does not seek relief based on Defendants' bans on his friends and supporters, the Court need not discuss whether he is likely to succeed on that portion of his claim.

Plaintiff also seeks that he "not be transferred to another prison" (*id.*), but it is not clear how this relief relates to any of his claims or is needed to prevent any alleged harms.  The Court lacks jurisdiction over claims for injunctive relief that are not related to the claims pleaded in the operative complaint.  *See Pac. Radiation Oncology, LLC v. Queen's Med. Center*, 810 F.3d 631, 636 (9th Cir. 2015) ("[w]hen a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have the authority to issue an injunction"); *see also Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) (per curiam) (a party seeking injunctive relief must establish a relationship between the claimed injury and the conduct asserted in the complaint)

interest for restricting Mr. Chakravorty's access to Plaintiff.  Even if Plaintiff can show Defendants were motivated to some degree by animus against Plaintiff or Mr. Chakravorty when they imposed these restrictions, this showing would not support a retaliation claim where the evidence shows their decision conformed to BOP policy and federal regulations for approving legal visits.  "[A]ction colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway." *Hartman v. Moore*, 547 U.S. 250, 260 (2006).  To support a retaliation claim, the adverse action must be one that would not have happened "but for" retaliatory animus.  (*Id.*)

This finding also applies to Plaintiff's placement in the SHU, which Defendants have shown was done, per policy, due to Plaintiff's involvement in an altercation with another prisoner.  Although Plaintiff argues Defendants kept him in the SHU even after he was exonerated of that incident, he again fails to show they lacked a legitimate penological reason for doing so.  Defendants present evidence that they kept Plaintiff in segregation to allow SIS staff to investigate security issues impacting Plaintiff at USP-Tucson.  Defendants have also shown that, upon placement in the SHU, Plaintiff received an initial 3-day review followed by successive reviews each month; the Segregation Review Official (SRO) holds a formal review and hearing every 30 days, which Plaintiff can attend to express concerns about his SHU placement, cell assignments, cellmates, and any other issues; and there are no current safety or security concerns with Plaintiff's housing assignment; including his cellmate.  (Doc. 17 at 10; Doc. 17-3, Ex. L, Ulrich Decl. ¶¶ 10, 18−20.)[8]  Based on these facts, Plaintiff is unlikely to succeed in showing that his placement in the SHU or his cell/cellmate assignment were "because of" his protected First Amendment conduct or that his continued SHU placement lacks a legitimate penological interest.

---

[8] Defendants argue that, due to Plaintiff's cellmate's privacy rights, they cannot address Plaintiff's specific allegations about him but will provide such evidence in camera if the Court requires it.  (Doc. 17 at 10−11, ns. 8, 9.)  Absent additional facts and evidence from Plaintiff that he faces a threat of irreparable harm, the Court does not currently require this information.

Plaintiff has also not shown irreparable harm to his legal interests in the SHU, where he continues to have confidential access to counsel, or that he requires a single cell "for safety."  Although Plaintiff's allegations about his cellmate are concerning, the evidence shows Plaintiff has many ways to raise personal safety concerns while in the SHU, including through daily staff visits, the Administrative Remedy process, SRO evaluations, and status hearings.  (Doc. 17-3, Ex. L, Ulrich Decl. ¶¶ 11−14.)  Plaintiff has presented no evidence he ever raised concerns about his cellmate through any of these available means and his concerns were ignored.  Absent any evidence that he sought relief from prison officials regarding threats to his personal safety and such relief was refused, Plaintiff's allegations of irreparable harm are too speculative to merit the "extraordinary remedy" of Court intervention.  *See Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988) (speculative injury is not irreparable injury sufficient for a preliminary injunction.)

Because Plaintiff fails to produce evidence to show a likelihood of success on the merits of his claims or that he faces a likelihood of irreparable harm absent preliminary injunctive relief, the Court will deny the Motion for Preliminary Injunction and will not address the remaining *Winter* factors.  *See Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1174 (9th Cir. 2011) (because the plaintiffs failed to show they are likely to suffer irreparable harm in the absence of preliminary relief, the court need not address the remaining elements of the preliminary injunction standard).

**IT IS ORDERED**:

(1)     Plaintiff's Motion for Preliminary Injunction (Doc. 3) is **denied**.

(2)     Defendant Ulrich is **substituted** for Defendant Gallion in his official capacity pursuant to Rule 25 of the Federal Rules of Civil Procedure.

. . . .

. . . .

. . . .

(3)    The Clerk of Court must **update** the docket to substitute Lt. Gallion for Defendant Ulrich and to identify "Unknown Party" as Warden Gutierrez.

Dated this 18th day of April, 2023.

Honorable Raner C. Collins
Senior United States District Judge